NO. 21-2151

# United States Court of Appeals

*for the*

# Fourth Circuit

———————————————

SHAWN CURRAN,

*Plaintiff-Appellant,*

– v. –

AXON ENTERPRISE, INC.; RICHARD NELSON,

*Defendants-Appellees.*

———————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA AT NORFOLK IN CASE NO.
2:19-CV-00617-RGD-LRL, HONORABLE ROBERT G. DOUMAR,
SENIOR U.S. DISTRICT COURT JUDGE

## BRIEF FOR PLAINTIFF-APPELLANT

M. SCOTT BUCCI
ELLIOTT M. BUCKNER
JEFFREY N. STEDMAN
BREIT CANTOR GRANA BUCKNER
7130 Glen Forest Drive, Suite 400
Richmond, Virginia 23226
(804) 644-1400

*Attorneys for Plaintiff-Appellant*

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................. iii

JURISDICTIONAL STATEMENT ....................................................... 1

ISSUES FOR REVIEW ........................................................................ 2

STATEMENT OF THE CASE ............................................................... 3

    I.     Procedural Background ............................................................. 3

    II.    Statement of Material Facts ..................................................... 8

SUMMARY OF THE ARGUMENT ..................................................... 20

ARGUMENT ........................................................................................ 22

    STANDARD OF REVIEW ............................................................ 22

    ANALYSIS ..................................................................................... 23

    I.     The District Court erred in ruling that Plaintiff Shawn Curran
           did not have a general negligence claim against Defendant
           Richard Nelson based on the allegedly negligent manner in
           which Nelson set up, conducted, ran, and oversaw the
           CEW/TASER training, or for the allegedly negligent use of
           property under his control .................................................... 24

           A.    The Law Applicable to Plaintiff's
                 General Negligence Claim ......................................... 24

           B.    The Application of General Negligence Principles to
                 this Case ..................................................................... 28

                1.    The facts presented by Plaintiff on summary
                       judgment were more than sufficient to establish
                       that Nelson had a duty to Curran under
                       Virginia's general negligence principles .......... 28

i

2.    Because Virginia imposes joint-and-several liability on multiple, joint tortfeasors, any alleged negligence by the trainee who fired the CEW would be irrelevant ...............................................31

3.    The doctrine of "special relationship" is irrelevant to Plaintiff's general negligence claim against Nelson...............................................................32

a.    The "special relationship" doctrine imposes liability for failure to warn or protect against <u>criminal</u> acts by third parties .............................................................33

b.    "Special relationship" and "duty to protect against third-party acts" are not applicable where the defendant created the hazard through his own active conduct............................35

4.    The District Court failed in its attempt to distinguish <u>RGR</u>, <u>Quisenberry</u>, and <u>Shoemaker</u>.............38

II.    The District Court erred in ruling that there was no special relationship between Defendant Nelson and Plaintiff Curran, and thus that Nelson had no legal duty to protect Curran from the actions of a third-party actor .......................................40

CONCLUSION .......................................................................45

## TABLE OF AUTHORITIES

Page(s)

**Cases:**

Burdette v. Marks,
  244 Va. 309, 421 S.E.2d 419, 9 Va. Law Rep. 273 (1992) ........................... 34, 40

Burns v. Gagnon,
  283 Va. 657, 727 S.E.2d 634 (2012) ...................................................... 32, 34, 35

Didato v. Strehler,
  262 Va. 617, 554 S.E.2d 42 (2001) .............................................................. 34, 35

Doe v. Virginia Wesleyan College,
  90 Va. Cir. 345 (Norfolk 2015) ...........................................................................34

Dorman v. State Indus.,
  292 Va. 111 (2016) ..............................................................................................31

Dudley v. Offender Aid & Restoration of Richmond, Inc.,
  241 Va. 270 (1991) ........................................................................................ 26, 27

Dur v. W. Branch Diesel,
  240 Fed. Appx. 568 (4th Cir. 2007).....................................................................22

Holles v. Sunrise Terrace,
  257 Va. 131 (1999) ..............................................................................................22

In re Council of Unit Owners of the 100 Harborview Drive Condo.,
  584 B.R. 639 (Bankr. D. Md. 2018) ....................................................................43

In re Vulcan Materials Co.,
  674 F. Supp. 2d 756 (E.D. Va. 2009) ..................................................................31

Kellermann v. McDonough,
  278 Va. 478 (2009) ........................................................................................ 34, 35

Overstreet v. Security Storage & Safe Deposit Co.,
  148 Va. 306 (1927) ........................................................................................ 25, 26

Palsgraf v. Long Island R.R. Co.,
  162 N.E. 99 (N.Y. 1928)......................................................................................26

Quisenberry v. Huntington Ingalls, Inc.,
  296 Va. 233 (2018) ..................................................................................... *passim*

RGR, LLC v. Settle,
   288 Va. 260 (2014) ........................................................................ *passim*

Shoemaker v. Funkhouser,
   299 Va. 471 (2021) ....................................................................... *passim*

Sullivan v. Robertson Drug Co., Inc.,
   273 Va. 84 (2007) .................................................................................31

Terry v. Irish Fleet, Inc.,
   296 Va. 129 (2018) ..............................................................................34

Thompson v. Skate Am., Inc.,
   261 Va. 121 (2001) ..............................................................................34

United States ex. rel. Michaels v. Agape Senior Cmty., Inc.,
   848 F.3d 330 (4th Cir. 2017) ..............................................................22

Watts v. Arlington Ret. Hous. Corp.,
   No. CL 20-235(00), 2021 Va. Cir. LEXIS 53 (Arlington Mar. 26, 2021) .... 28, 37

Yost v. Travelers Ins. Co.,
   No. 98-1790, 1999 U.S. App. LEXIS 13665 (4th Cir. June 21, 1999) ...............22


**Statutes & Other Authorities:**

28 U.S.C. § 1291 ..........................................................................................1

28 U.S.C. § 1332 ..........................................................................................1

2 Dan B. Dobbs, The Law of Torts § 251 (2d ed. 2011) ..........................25

Black's Law Dictionary (8th ed. 2004) ....................................................43

Charles E. Friend, Personal Injury Law in Virginia, 3d ed. § 1.1.1 ................. 25, 27

Dan B. Dobbs, *et al.*, The Law of Torts § 259 (2d ed. 2016) ..................................32

Fed. R. Civ. P. 12(b)(6) ........................................................................ 4, 5, 6

Fed. R. Civ. P. 30(b)(6) ..............................................................................11

Kent Sinclair & Charles E. Friend, Personal Injury Law in Virginia,
   4th ed. § 2.1(D) ...................................................................................27

Kent Sinclair & Charles E. Friend, Personal Injury Law in Virginia,
   4th ed. § 2.2 ........................................................................................27

Kent Sinclair & Charles E. Friend, *Personal Injury Law in Virginia*,
  4th ed. § 5.10.................................................................................31

Restatement (Second) of Torts § 281 .......................................................26

Restatement (Second) of Torts § 314 .......................................................36

Restatement (Second) of Torts § 314, cmt. e...........................................37

Restatement (Second) of Torts § 315 (1965)............................. 35, 36, 37

Restatement (Second) of Torts § 315, cmt. a...........................................36

Restatement (Second) of Torts § 318 ............................................. *passim*

## **JURISDICTIONAL STATEMENT**

This appeal is taken from judgment entered on a motion for summary judgment.  Jurisdiction in the District Court existed under 28 U.S.C. § 1332, given the parties' diversity of citizenship and amount in controversy.  On October 12, 2021, Appellant noted a timely appeal from the District Court's entry of final judgment, which disposed of all of Appellant's claims.  This Court accordingly has jurisdiction under 28 U.S.C. § 1291.

## ISSUES FOR REVIEW

1. Did the District Court err in ruling that Plaintiff Shawn Curran did not have a general negligence claim against Defendant Richard Nelson based on the allegedly negligent manner in which Nelson set up, conducted, ran, and oversaw the CEW/TASER training, or for the allegedly negligent use of property under his control?

2. Did the District Court err in ruling that there was no special relationship between Defendant Nelson and Plaintiff Curran, and thus that Nelson had no legal duty to protect Curran from the actions of a third-party actor?

## STATEMENT OF THE CASE

### I.     Procedural Background

Appellant Shawn Curran ("Plaintiff" or "Curran") appeals the granting of summary judgment to Defendants/Appellees Axon Enterprises, Inc. ("Axon") and Richard Nelson ("Nelson") by the United States District Court for the Eastern District of Virginia ("the District Court"). (Case 2:19-cv-00617-RGD-LRL; ECFs 71, 76, 77, Appendix[1] pp. 1543-58, 1561-69, 1570).  This personal-injury action arose from an incident on December 14, 2017.  At the time of his injury, Curran – a Virginia Beach Police officer – was a trainee in a Conducted Energy Weapons ("CEW") course to become a TASER Certified Instructor.  Defendant Axon, the manufacturer of TASER CEWs, hired Defendant Nelson to implement the two-day training course.[2]  Curran was permanently injured when a fellow trainee left the training area that Nelson had set up, and discharged a dart from his CEW during a scenario-based training exercise, which struck Curran in his eye.

---

[1] Throughout this brief, "Appendix" refers to the parties' Joint Appendix, which Plaintiff is filing contemporaneously with this brief.  In citing the Joint Appendix, Plaintiff omits the "JA" designation in the Appendix's page numbers – for example, referring to pages JA-1543 through JA-1558 simply as "Appendix pp. 1543-58."

[2] Although "TASER" is a brand name associated with Axon, CEWs are commonly referred to as "tasers."

3

Alleging that "Defendant Nelson set-up, oversaw, implemented, ran, and supervised the scenario-based training" (Complaint, ECF 1-1, ¶ 6, Appendix p. 17), Curran brought a direct-negligence claim against Nelson and a vicarious-liability claim against Axon as Nelson's employer (ECF 1-1, Count I, ¶¶ 14-22, Appendix pp. 19-20). Curran brought an additional vicarious-liability claim against Axon, alleging that even if Nelson was an independent contractor, Axon would still be vicariously liable for Nelson's negligence since the training scenario was "likely to create a peculiar unreasonable risk of physical harm to others unless special precautions were taken." (ECF 1-1, Count II, ¶¶ 23-27, Appendix p. 21). Finally, Curran brought a direct-negligence claim against Axon, (ECF 1-1, Count III, ¶¶ 28-30, Appendix pp. 21-22).

After both defendants filed Rule 12(b)(6) Motions to Dismiss on all Counts, and following oral argument by counsel, the District Court continued the Motions to Dismiss and ordered limited fact discovery on two questions: (1) whether Defendant Nelson was an employee, agent, or independent contractor of Defendant Axon; and (2) whether a special relationship existed between Defendant Nelson and Plaintiff Curran such that the Court could impose liability for the conduct of a third party." (ECF 48, p. 2, Appendix p. 25). The District Court further ordered "that any arguments concerning the above-mentioned questions after discovery must be presented as a motion for summary judgment," (ECF 48, p. 2, Appendix p.

4

25), thus essentially converting Defendants' Rule 12(b)(6) Motions to Dismiss into Motions for Summary Judgment.[3]

As explained in Plaintiff's briefs in response to both Nelson's Motion to Dismiss and his Motion for Summary Judgment (ECF 36, pp. 4-5, 9-12; ECF 53, pp. 1-2, 10-11, 18-19), Plaintiff always intended his "special relationship" allegation to be secondary and supplementary to his primary claim against Nelson, which was based on Virginia's general negligence principles.  In other words, Curran did not need a special-relationship allegation in order to maintain a valid cause of action against Nelson, since even without such a relationship, Nelson would still be liable for his own active negligence in setting up, coordinating and executing the training session in which Curran was injured.

Nevertheless, the District Court dismissed Curran's claims against Nelson based on its finding that there was no special relationship between Curran and Nelson, virtually ignoring the facts, evidence, and Virginia case law supporting

---

[3] In his Reply in Opposition to Nelson's Rule 12(b)(6) Motion (ECF 36, p. 17), Curran requested leave to file an amended complaint "[t]o the extent the [District] Court for some reason finds Plaintiff's allegations insufficient to support any of the claims put forth in the Complaint."  Having essentially converted the Rule 12(b)(6) Motion to a Motion for Summary Judgment and having ordered discovery, briefing, and argument on the latter Motion, the District Court never acted on Curran's request to file an amended complaint.  Nevertheless, Curran contends that the allegations in the Complaint were sufficient to survive Nelson's Rule 12(b)(6) Motion, and the facts presented in Curran's Reply in Opposition to Defendant Nelson's Motion for Summary Judgment (ECF 53) and reiterated in this brief were more than sufficient to survive summary judgment.

Curran's general-negligence claim. (ECF 71, pp. 7-14 Appendix pp. 1549-56).[4]

Having ruled that Nelson violated no duty to Curran, the District Court never

reached the question of whether Nelson was an employee or independent

contractor, and granted Axon's Motion for Summary Judgment on Curran's

vicarious-liability claims against Axon. (ECF 71, pp. 15-16, Appendix pp. 1557-

58).

    In a subsequent Order, the District Court granted Axon's Motion to Dismiss

Curran's remaining direct-negligence claim against Axon. (ECF 76, pp. 1, 9,

Appendix pp. 1561, 1569).[5]  Curran has not appealed the District Court's dismissal

_____

[4] Approximately two months after Plaintiff filed his Response in Opposition to
Defendant Nelson's Motion for Summary Judgment (ECF 53), the Supreme Court
of Virginia issued its decision in Shoemaker v. Funkhouser, 299 Va. 471 (2021),
which reiterated Virginia's general-negligence principles and further strengthened
Plaintiff's position against Nelson.  After Curran brought the Shoemaker decision
to the attention of the District Court (ECFs 62, 63, 63-2) and a full month after that
decision's publication, the District Court (without citing or mentioning the
Shoemaker decision in its Certification Order, though it cited a number of other
cases in the Order) certified the following question of law to the Supreme Court of
Virginia: "Does an instructor owe a duty in tort under Virginia law to protect a
trainee from injury by another trainee?" (ECF 69, p. 2, Appendix p. 1535).
Approximately one month later, the Virginia Supreme Court "decline[d] to accept
the certified question of law." (ECF 70, Appendix p. 1542).

[5] In its September 13, 2021 Order (ECF 76, Appendix pp. 1561-69), the District
Court granted Axon's Rule 12(b)(6) Motion to Dismiss, but gave Curran 21 days
to file an amended complaint. (Appendix p. 1569).  Curran never filed an amended
complaint, making the Court's dismissal of Axon from the case final on October 4,
2021.  The District Court issued a subsequent Order to that effect on October 12,
2021 (noted as "*nunc pro tunc* September 13, 2021") (ECF 77, Appendix p. 1570).

of its Count III against Axon, and that ruling is not at issue on this appeal.  Curran
instead contends that the District Court erred in focusing almost exclusively on the
issues of "special relationship" and a "duty to protect" and in ruling that Nelson
essentially had no duty to conduct the CEW training session and use the property
under his control in a reasonably safe manner.  Despite the ultimate immateriality
of the "special relationship" and "duty to protect" allegations, Curran also contends
that the particular facts in this case do in fact support the existence of a special
relationship, thus providing an additional basis for Nelson's duty to Curran.

Because the District Court's granting of partial summary judgment to Axon
was based on its ruling that Nelson had no duty to Curran and thus was not
negligent, Curran contends that the District Court also erred in granting partial
summary judgment to Axon on Curran's vicarious-liability claim.  Curran does
not, however, contest or appeal the Court's granting of partial summary judgment
on his direct-negligence claim against Axon.  Finally, Curran notes that the District
Court never reached the question of whether Nelson was an agent or employee of
Axon or an independent contractor, or the question of whether the training session
required special precautions such that Axon would have been vicariously liable
even for the actions of an independent contractor.

7

## II.    Statement of Material Facts

1.  On December 14, 2017, Plaintiff Shawn Curran was injured during a TASER CEW Instructor Course taught by Defendant Richard Nelson at the Virginia Beach Law Enforcement Training Academy ("LETA"). Nelson was running a scenario-based training exercise known as a "box drill" (Nelson Dep. 72:10-13, Ex. 1, Appendix p. 230). Nelson directed Curran and other trainees to set up four blue accordion-style wrestling mats to form a square with openings between the mats (Curran Dep. 210:20 – 211:7, Ex. 2, Appendix pp. 655-56; and Photographs,[6] Ex. 3, Appendix pp. 793-98). During the drill, a role player/aggressor would hide outside the "box," a trainee/student would enter the box, the role player/aggressor would then enter the box, and the trainee/student would have to quickly assess if the role player/aggressor was a threat (Curran Dep. 217:1 – 218:4, Ex. 2, Appendix pp. 662-63). If the role-player/aggressor was a threat, the trainee/student was to deploy the TASER CEW at the role-

---

[6] The parties agreed to use a single set of numbered deposition exhibits which were referred to by the various parties and witnesses. For example, the Photographs were Deposition Exhibit No. 22 (see Deposition Exhibit Sticker). To avoid confusion, Plaintiff will not refer to the Deposition Exhibit Numbers.

player/aggressor (Id., Ex. 2, Appendix pp. 662-63. See also Full Video File, Ex. 4, to be transferred to the Court digitally after filing, Appendix p. 1574).[7]

2.  CEWs are weapons and must be handled safely (Faubion Dep 24:5-8, Ex. 5, Appendix p. 826; Sanders Dep. 19:19-22, Ex. 6, Appendix p. 933).

3.  All of the trainee witnesses who have been deposed in this matter, all of whom are experienced police officers certified as firearms and CEW instructors, have confirmed that CEW training has a substantial risk of injury unless special precautions are taken (Elliott[8] Dep 79:9-15, Ex. 7, Appendix p. 1118 ("Q.  Is CEW training . . . where you're discharging a CEW, scenario-based training such as this, is this the type of activity where injury – there's a substantial likelihood that injury will result unless special precautions are taken?  A.  Yes."); Craun[9] Dep. 83:1-7,

_____

[7] In the District Court, Plaintiff delivered a thumb drive to the court containing seven video clips, which collectively were designated as "Exhibit 4." (Appendix pp. 799-801, including index and brief descriptions of contents of each clip).  For purposes of this appeal, Plaintiff will download the same seven video clips as part of its Digital Media File, pursuant to the Fourth Circuit's instructions found at https://www.ca4.uscourts.gov/appellateprocedureguide/Briefing/briefapxreq_ca4.html (last visited Dec. 17, 2021) (Appendix p. 1574).

[8] Owen David Elliott is a Sergeant with the Hampton Police Department in charge of training and he instructs officers in firearms and CEW use.  He is also a firearms instructor for the Commonwealth of Virginia (Elliott Dep. 10:21 – 12:12, 14:17-18, Ex. 7, Appendix pp. 1049-51, 1053-57).

[9] Grayson Craun is an officer with the Suffolk Police Department, where he is a CEW and Defensive Tactics instructor as well as a member of the SWAT team (Craun Dep. 10:16-21, 13:6 – 16:4, Ex. 8, Appendix pp. 1165, 1168-71).

Ex. 8, Appendix p. 1236 ("Q. Would you agree with the statement that CEW's can be dangerous? A. Yes. Q. And that there can be a risk of serious injury during training unless special precautions are taken? A. That's correct."); Sanders[10] Dep. 92:1-5, Ex. 6, Appendix p. 1006 ("Q. And it sounds like they wanted people to be advised that there was a risk of physical harm unless special precautions were taken during the course of the training, is that right? A. Yes, sir."), Faubion[11] Dep. 24:5-8, Ex. 5, Appendix p. 826 ("Q. Was it also your understanding at that time that CEW's are weapons that must be handled safely? A. Yes.") and 48:22 – 50:13, Appendix pp. 850-52 (agreeing that TASERS are weapons that can cause serious injury and death, and that special precautions must be used)).

4. Nelson admitted that he was in charge of setting up, overseeing, implementing, and running the scenario based training (Nelson Dep. 230:12-16, Ex. 1, Appendix p. 388), and it was his responsibility to "manage the entire class in general" (Id. 246:11-12, Ex. 1, Appendix p. 404).

5. Nelson told Curran and the other trainees that the exercise was only supposed to take place inside the square formed by the mats. Curran testified:

---

[10] Jerry Sanders is a First Sergeant for Prince William Regional Adult Detention Center and trains other officers. He is a certified instructor for TASER, firearms and use of force (Sanders Dep. 9:13-22, 11:18-21 and 17:9-12, Ex. 6, Appendix pp. 923, 925, 929).

[11] Matthew Faubion is a Sergeant with the Suffolk Police Department, and a certified TASER and firearms instructor.

> Mr. Nelson informed us that we were going to set it up this way using the folding mats that you lay on the ground that fold up to make, like, a square with an opening on each end. And then he informed us that the scenarios that he wanted done were going to take place inside of that box.

(Curran Dep. 211:1-7, Ex. 2, Appendix p. 656.  See also id. 215:2-19, Ex. 2, Appendix p. 660 ("Q:  Did Mr. Nelson actually say that the scenarios should not go outside the box?  A:  Yes.  He said they're supposed to stay inside this area [the inside of the box]")).  Other participants confirmed that the drill was supposed to take place inside the box (Craun Dep. 75:2-12, 76:8-13, Ex. 8, Appendix pp. 1230-31; Elliott Dep. 40:4 – 13, Ex. 7, Appendix p. 1079). That was consistent with the purpose of the walls, which was to contain the action and approximate officers encountering aggressors in a confined space like a "bedroom or living room." (Elliott Dep. 62:14 – 63:8, Ex. 7, Appendix p. 1101-02).

6.  To protect themselves from the CEW darts, the role players/aggressors wore full body protective suits ("sim suits") and helmets (Curran Dep. 294:5-14, Ex. 2, Appendix p. 739 and Photographs, Ex. 3, Appendix pp. 793-98).  The sim suit is made of heavy material, it does not breath well, and accordingly it can get hot for the aggressor/role player (Cousins[12] Dep. 185:22 – 186:10, Ex. 9, Appendix p. 1452-53.  See also Nelson Dep. 161:1-7, Ex. 1, Appendix p. 319 ("the jacket part . . . is the hottest and heaviest part") and Curran Dep. 295:17, Ex. 2, Appendix

---

[12] Lamar Cousins was Axon's Rule 30(b)(6) deposition witness.

p. 740 ("the suits are extremely hot")).  Nelson designated a safety area with a

bench for the role players/aggressors when it was not their turn (Curran Dep.

215:12 – 216:15, Ex. 2, Appendix pp. 660-61.  See also Photographs, Ex. 3,

Appendix pp. 793-98).

    7.    Nelson told Curran that if he got hot, Curran could take his helmet off to

get a breather when he was in the safety area:

> A.    The bench area was – that one bench was our designated area to
> rest and recoup due to the fatigue from doing the scenarios and the heat
> from the helmet and protective area because it's kind of heavy
> . . .
>
> A.    We were – we were instructed that this is exactly where the
> safety area is for us to relax, take our equipment off, get a breather if
> need be before the next scenario –
> …
>
> Q.    And so did, then Instructor Nelson tell you that you could take
> your helmet off during those breaks in the safety area?
>
> A.    Yes, he said we could take the equipment off to get a breather
> but it had to be in this area.

(Curran Dep. 219:22 – 221:11, Ex. 2, Appendix p. 664.  See also Nelson Dep.

160:10-12, Ex. 1, Appendix p. 318 ("it's kind of for them to be out of sight – yeah,

for them to get a breather in between [scenarios]"), Curran Dep. 296:18-20, Ex. 2,

Appendix p. 741 ("Q.  So you recall Mr. Nelson telling you that you could take

your helmet off?  A.  Yes"), and Elliott Dep. 55:3-6, Ex. 7, Appendix p. 1094 ("Q.

Had you seen other role players removing their helmets while on deck in the other

scenarios?  A. Yes, sir.")).

8.  Nelson was in charge of safety for the box drill (Curran Dep. 218:9-11,

Ex. 2, Appendix p. 663.  See also Faubion Dep. 12:22 – 13:5, Appendix pp. 814-15

(". . . in any training that involves dynamic movement, there is an inherent risk

involved in that and . . . as an instructor you have to take steps to minimize that

risk as much as possible.") and 68:1 – 69:4, Ex. 5, Appendix pp. 870-71; Elliott

Dep. 77:4-8, Ex. 7, Appendix p. 1116 ("What has been impressed upon me ever

since my first instructor course is the instructor is the overall responsible party for

ensuring everything is safe.")).

9.  Nelson agrees that as the instructor in charge of the training, he has to

conduct it in a way to keep it as safe as possible (Nelson Dep. 186:6-12, Ex. 1,

Appendix p. 344).

10.  Axon admitted that "the master instructor [Nelson] is ultimately

responsible [for safety], but there are other students who also have the ability to

stop a scenario if someone is being unsafe . . . So everyone is responsible, but the

ultimate responsibility is on the master instructor" (Cousins Dep. 141:6-18, Ex. 9,

Appendix p. 1408).

11.  Nelson told all of the trainees they were also safety officers (Nelson

Dep. 186:14-19, Ex. 1, Appendix p. 344), but he never instructed the trainees on

what safety issues to actually be on the lookout for, despite it being his
responsibility to do so (Nelson Dep. 191:10-13, Ex. 1, Appendix p. 349 (Q.  Would
you also agree that it's your responsibility to convey those safety protocols to all of
the students?  A.  Yes); Faubion Dep. 69:8-15, Ex. 5, Appendix p. 871 ("Q.  At any
time during your training over that two-day period, did Mr. Nelson ever provide
training to you or, to your knowledge, anyone else, regarding specific safety
violations to be on the lookout for when you were the designated safety officer for
a simulation?  A. I do not recall any specific thing that we were supposed to look
for, no."); Elliott Dep. 68:9 – 69:11, Ex. 7, Appendix pp. 1107-08 ("Q.  Do you
recall anything more than hey, if you see something unsafe, yell stop action or – or
yell stop or something like that?  A. I don't – I don't recall anything beyond that,
sir."); Craun Dep. 82:2-22, Ex. 8, Appendix p. 1237 (". . . I don't recall any
specific examples of what to call stop action for.")).

12.  Nelson was present in the gym during all of the scenarios leading up to
the one that Curran was injured during (Faubion Dep. 62:21 – 63:1, Ex. 5,
Appendix pp. 864-65).

13.  There were approximately 40 to 44 different scenarios that occurred
prior to the incident (Curran Dep. 302:19 – 303:1, Ex. 2, Appendix pp. 747-48).
The surveillance video captured these sessions, and the incident.  The video shows
at least five separate occasions prior to the subject incident where the role

14

player/aggressor pursued the trainee/student far outside the "box" and discharged his TASER CEW, often with the non-active role player without his helmet, or where observers were downrange from the weapon discharge (Video Clips 1 – 6, Ex. 4, Appendix p. 1574).  See also Video Stills, Ex. 10, Appendix pp. 1519-28). Nelson admitted at his deposition that he would have called "stop action!" if he had seen a situation where the participants were "back too far out" from the "box" (Nelson Dep. 166:16 – 167:2, Ex. 1, Appendix pp. 324-25).  However, he never called "stop action" at any point (Id. 168:17-21, Ex. 1, Appendix p. 326).  Other participant witnesses confirmed "stop action" should have been called during various scenarios prior to the one that injured Curran (Craun Dep. 59:5-13, Ex. 8, Appendix p. 1214 (the aggressor did not leave the confines of the "box," so "stop action" didn't need to be called, but ". . . obviously [when] that role player exits that area, then the taser deployment can take place anywhere, then that would be in my opinion a stop action immediately."), 61:16-22, Appendix p. 1216 ("Q. In this particular scenario, we see both the student and the aggressor outside the mat.  So is it, would you consider that to be not worthy of a stop action at that point?  A. I would have considered – I would have considered that along the lines of a stop action potentially needed."); 77:13 – 78:22, Appendix pp. 1232-33 (two additional scenarios where stop action should have been considered and a fourth scenario where stop action should have been called); Sanders Dep. 76:19 – 78:11, Ex. 6,

Appendix pp. 990-92 (scenario at 34:08 on video should have had stop action called); Elliott Dep. 74:11 – 78:20, Ex. 7, Appendix pp. 1113-17 (scenario where the participant discharged his CEW at an aggressor, with observers behind the aggressor, should have prompted a "stop action.")).

14. In addition to the scenarios that should have prompted a "stop action" due to the distance the trainee and role player were outside the box, numerous active scenarios occurred while the non-involved role player had his helmet off; there was nothing that would have prevented Nelson from observing this, and in some instances the role player was standing near Nelson with his helmet off, and no one called stop action or gave any corrective safety direction to the role player (Video Clips 1-7, Ex. 4, Appendix p. 1574; Sanders Dep. 57:5-58:12, 66:18 – 67:8, 71:21 – 72:19, 73:12 – 74:15, Ex. 6, Appendix pp. 971-72, 980-81, 985-88; Faubion Dep. 63:21 – 64:8; 78:4-12, Ex. 5, Appendix pp. 865-66, 880).

15. While the active scenarios themselves tended to happen quickly, there was downtime between each scenario where Nelson could have instructed the students on any safety issues that arose during the prior scenario, including those scenarios that went far outside of the "box" where "stop action" should have been called (Craun Dep 93:13 – 94:5, Ex. 8, Appendix pp. 1248-49; Faubion Dep 94:12 – 95:6, Ex. 5, Appendix pp. 896-97).

16.   The incident occurred when Curran was in the designated safety area, as he was not the "active" aggressor/role player.  He had removed his helmet to get some air and cool down, as he had done several times previously.  The second aggressor/role player and a trainee were conducting an active scenario at the time. The trainee backed out of the "box" approximately 15 to 20 feet, and the aggressor/role player followed.  Based on the position of the trainee and the aggressor/role player, Curran was downrange from the trainee.  No stop action was called.  The trainee discharged his CEW, and it struck Curran's right eye, causing catastrophic injuries (Video Clip 7, Ex. 4, Appendix p. 1574).

17.   Prior to lunch on Day 2 of the training, Nelson told Curran that he (Curran) was going to act as one of two role-players, and accordingly after lunch, Curran went to the gym to get out some gear needed for the training, including TASER suits (aka "Sim Suits") and fake weapons (such as a rubber axe) belonging to Curran's department (Curran Dep. 207:2-21; 210:8-19, Ex. 2, Appendix pp. 652, 655 ("He [Nelson] said he needed me to be a role player, so I said okay.")).

18.   Curran's understanding (based on direction he received from Nelson) was that the purpose of the mats was to contain the training scenario in that area. (Curran Dep. 215:2-7, Ex. 2, Appendix p. 660.  See also id. at 228:6-22, Ex. 2, Appendix p. 673 (testifying that: "We were informed that . . . this is where the

17

scenario is taking place, inside of that area [i.e., inside the vertical "accordion style mats"])

19.  Curran testified that the bench "was our designated safety area for role players" and that "only you and the other role player could go into the designated safety area" (Curran Dep. 220:5-9, Ex. 2, Appendix p. 665).

20.  Curran testified that Nelson designated the specific area with the bench on which Curran was sitting as "the safety area" (Curran Dep. 215:20-216:15, Ex. 2), Appendix pp. 660-61).

21.  Curran's "understanding was that . . .  if you're outside the designated safety area [i.e., the bench where Curran was seated when the TASER probe struck his eye], you're going to be wearing [safety] glasses." Curran Dep. 219:10-13, Ex. 2, Appendix p. 664).

22.  Nelson testified that, at the training session, although there were some "dummies that you shoot at that are provided by [the] Virginia Beach [Police]" Nelson, as the TASER representative, supplied the trainees with "all the TASERs [CEWs]" used in the session, along with "the batteries and holsters for each student to use" and that the trainees did not "get to keep them" and instead at the end of the session the trainees had to return all of the CEWs, batteries, and holsters. (Nelson Dep. 140:7 – 141:17, Ex. 1, Appendix pp. 298-99).

23. Nelson testified that, on the second day of training (the active session), he posted a "person at the door checking for weapons . . . to ensure that no one has an actual live firearm, a knife, pepper spray, baton, anything that's going to . . . cause significant . . . injuries, damages, death, things like that" and that the trainees did not receive cartridges for their CEWs until they entered the room where the active training took place. (Nelson Dep. 210:6 – 211:5, Ex. 1, Appendix pp. 368-69).

24. Cousins testified that, other than Nelson, there were no Axon employees or representatives at the training session, and that once the host in Virginia Beach contacted Nelson requesting a training session, Nelson emailed Axon employee Jennifer Biven, who arranged to have the CEWs, cartridges, batteries, holsters, protective eyewear, and Sim Suits sent to the training location in Virginia Beach. (Cousins Dep. 30:18 – 33:16, 98:14 – 99:1; 166:4-7, Ex. 9, Appendix pp. 1297-1300, 1365-66, 1433).

## SUMMARY OF THE ARGUMENT

Plaintiff's claim against Defendant Nelson is simple and straightforward: Nelson conducted the CEW/TASER training session in a dangerous and haphazard manner, which resulted in a severe injury to Curran.  Because Virginia law imposes pure joint-and-several liability, the fact that a third party actually fired the CEW (even if done negligently) cannot exonerate Nelson for his role in creating, running, and overseeing the hazardous scenario leading to Plaintiff's injury.

From the beginning, the core of Plaintiff's case against Nelson has been a claim of direct negligence based on Nelson's active role in personally managing, supervising, implementing, and conducting the training exercise.  This negligence claim relies on well-established general negligence principles under Virginia law, which the Supreme Court of Virginia has very recently reiterated in Shoemaker v. Funkhouser (2021), Quisenberry v. Huntington Ingalls, Inc. (2018), and RGR, LLC v. Settle (2014).  In a spirit of belt-and-suspenders, Plaintiff's Complaint also alleged a secondary theory of liability against Nelson – that there was a special relationship between Nelson and Plaintiff, imposing on Nelson a duty to protect Plaintiff (and the other trainees) from even an intentional, criminal act by a third party.  Because discovery revealed no evidence that the firing of the CEW was in any way criminal, the special-relationship theory in this case turned out to be a superfluous claim, ultimately unnecessary to Plaintiff's core negligence claim

20

against Nelson, and thus immaterial for purposes of Nelson's Motion for Summary Judgment.

For his part, in both his Motion to Dismiss and his Motion for Summary Judgment, Nelson did his best to divert the District Court's attention away from the familiar general negligence principles reflected in <u>Shoemaker</u>, <u>Quisenberry</u>, and <u>RGR</u>, and to focus instead on the secondary, and ultimately immaterial, question of whether a special relationship existed between Nelson and Plaintiff.  Nelson was successful in this endeavor, with the District Court virtually ignoring the <u>RGR</u> line of cases and instead granting Nelson's Motion upon a finding of no special relationship between Nelson and Plaintiff, and correspondingly, no duty to "protect" Plaintiff from "an act by a third party."

The District Court's reliance on the doctrine of "special relationship" and a "duty to protect" was a clear misreading and misapplication of Virginia law. These doctrines apply where there has been a criminal act by a third party, or where the defendant himself played no active role in creating the hazardous condition or scenario at issue.  Because this case did not involve any criminal act, and Nelson himself created and actively managed the dangerous training session that caused Plaintiff's injuries, the cases dealing with "special relationship" and a "duty to protect" are simply inapposite and inapplicable to the core of Plaintiff's claim against Nelson – i.e., the general negligence claim based on Nelson's active role in implementing and conducting the training session.

## **ARGUMENT**

## **STANDARD OF REVIEW**

The District Court's granting of summary judgment to Defendant Nelson based on its determination that Nelson owed no duty to Plaintiff is reviewed *de novo* on appeal. See Dur v. W. Branch Diesel, 240 Fed, Appx. 568, 571 (4th Cir. 2007) (noting that, under Virginia substantive law, "whether a duty of care exists in a negligence action is a pure question of law" and reviewing the district court's ruling on summary judgment *de novo*); Yost v. Travelers Ins. Co., No. 98-1790, 1999 U.S. App. LEXIS 13665, at *6 (4th Cir. June 21, 1999) ("Because the propriety of a summary judgment presents a pure question of law, our review is de novo."). See also United States ex. rel. Michaels v. Agape Senior Cmty., Inc., 848 F.3d 330, 336 (4th Cir. 2017) (explaining that a district court's ruling on a "pure question of law" is reviewed *de novo*); Shoemaker v. Funkhouser, 299 Va. 471, 478 (2021) ("Whether a legal duty in tort exists is a pure question of law to be reviewed de novo") (internal punctuation omitted); Holles v. Sunrise Terrace, 257 Va. 131, 136 (1999) (explaining that whether there is a special relationship imposing a duty of care to control the criminal conduct of third persons is a question of law).

## ANALYSIS

From the beginning, the primary thrust of Plaintiff's case against Nelson has been a direct, general negligence claim against Nelson, based on his own active negligence in the implementation and execution of the CEW training session.[13]

---

[13] Plaintiff's Complaint alleged the following: "Defendant Nelson set-up, oversaw, implemented, ran, and supervised the scenario based training." (ECF 1-1, ¶ 6, Appendix p. 17); "In the scenario based training, several accordion style wrestling mats were placed on end, and were arranged as walls to form a large square by, or at the direction of, Defendant Nelson." (ECF 1-1, ¶ 7, Appendix p. 17); "There were two participants, one of which was Plaintiff Curran, who were designated as aggressors by Defendant Nelson." (ECF 1-1, ¶ 8, Appendix p. 17); "Defendant Nelson placed a designated recovery area in the 'safe zone' for aggressors to recover after their turn." (ECF 1-1, ¶ 11, Appendix pp. 17-18); "Defendant Nelson was present, actively managing and conducting the training, and was fully aware that on several occasions participants discharged their Taser from or in the 'safe zone.'" (ECF 1-1, ¶ 12, Appendix p. 18); "Defendant Nelson began a training episode and the other aggressors 'charged' the participant. As Defendant Nelson supervised, monitored and ran the training episode, the participant backed out of the 'hot zone' and the aggressor followed." (ECF 1-1, ¶ 13, Appendix pp. 18-19). Paragraph 14 of the Complaint incorporated all of these allegations into Count I against Nelson, and ¶ 16 of the Complaint then listed numerous omissions by Nelson, which collectively constitute negligent implementation and conducting of the training exercise – i.e., the general negligence claim against Nelson. Having established the general negligence claim against Nelson, only then (in ¶¶ 17-19) did the Complaint allege a special relationship between Nelson and Plaintiff and a corresponding duty to protect against harm from third parties. (Appendix pp. 19-20). Although the District Court's Order granting summary judgment to Nelson noted ¶¶ 17-19 (ECF 71, p. 13 (citing pp. 5-6 of the Complaint), Appendix p. 1555), the Order nevertheless ignored all of the earlier allegations supporting Plaintiff's general negligence claim against Nelson. Instead, the District Court endorsed Nelson's contention that Curran's "[C]omplaint grounds liability exclusively in a special relationship" and concluded that "[t]he evidence fails to establish that Defendant Nelson and Plaintiff were in a special relationship and Plaintiff has not pled any other valid theory of recovery." (ECF 71, pp. 7, 14, Appendix pp. 1549, 1556).

The District Court, however, ruled that Curran could have no claim against Nelson absent a "special relationship" between the two. (ECF 71, p. 14, Appendix p. 1556).  As explained below, Curran's general-negligence claim requires no such special relationship, and the District Court's analysis was therefore fundamentally flawed.  Moreover, even assuming for the sake of argument that Curran's negligence claim did somehow require a special relationship between Curran and Nelson, the evidence in this case does support a finding of just such a relationship.

**I.     The District Court erred in ruling that Plaintiff Shawn Curran did not have a general negligence claim against Defendant Richard Nelson based on the allegedly negligent manner in which Nelson set up, conducted, ran, and oversaw the CEW/TASER training, or for the allegedly negligent use of property under his control.**

### A.     The Law Applicable to Plaintiff's General Negligence Claim

The Supreme Court of Virginia recently reiterated Virginia's long-established principles of duty in common-law tort claims. See Quisenberry v. Huntington Ingalls, Inc., 296 Va. 233, 242 (2018) ("The principles of duty in general negligence claims under such circumstances in Virginia are familiar and established.  They were set forth in *RGR, LLC v. Settle*, 288 Va. 260, 275 (2014), and we reaffirm them today.").  "While *RGR* concerne[d] a defendant landowner and a plaintiff who [was] injured adjacent to the land, it [was] neither a premises liability case nor unique to real property, but **based firmly in general negligence principles**." Id. at 242 n.3 (emphasis added).  "*RGR* invoked precedent from

negligence cases addressing real property, personal property, **and conduct** and is **one of this Court's benchmarks in the area of general negligence**." Id. (emphasis added).

"General negligence principles require a person to exercise due care to avoid injuring others." RGR, 288 Va. at 275 (citing Overstreet v. Security Storage & Safe Deposit Co., 148 Va. 306, 317 (1927)).  In RGR, the Virginia Supreme Court noted its previous recognition of "a duty owed to mankind generally not to **do any act** which a person of ordinary prudence could reasonably apprehend, as a natural and probable consequence thereof, would subject another person to peril." Id. (quoting Overstreet, 148 Va. at 317 (internal punctuation omitted; emphasis added)). See also id. at 275-76 ("There is a general duty not to injure others that arises whenever a defendant's **conduct creates a risk of harm to others**.") (quoting Charles E. Friend, Personal Injury Law in Virginia, 3d ed. § 1.1.1) (internal punctuation omitted; emphasis added); id. at 276 ("Recognition that a duty of care is ordinarily owed **to avoid conduct that creates risks of harm to others** is the majority view of both courts and commentators" and "where the defendant **by some action on his part creates, maintains, or continues a risk of physical harm**, the general standard or duty is the duty of reasonable care, that is, the duty to avoid negligent conduct.") (quoting 2 Dan B. Dobbs, The Law of Torts § 251, at 2-3 (2d ed. 2011)) (internal punctuation altered; emphasis added).

25

The Supreme Court has further explained that "[t]his general duty is owed to those **within reach of a defendant's conduct**." Id. (emphasis added). "This is because **the risk reasonably to be perceived defines the duty to be obeyed**, and risk imports relation; it is risk to another or to others **within the range of apprehension**." Quisenberry, 296 Va. at 243 (internal punctuation omitted; emphasis added) (quoting Palsgraf v. Long Island R.R. Co., 162 N.E. 99, 100 (N.Y. 1928)).  "Whenever the circumstances are such that an ordinary prudent person could reasonably apprehend that, as a natural and probable consequence of his act, another person rightfully there will be in danger of receiving an injury, a duty to exercise ordinary care to prevent such injury arises." RGR, 288 Va. at 279 (internal punctuation omitted) (quoting Overstreet, 148 Va. at 318).

"In order for the actor to be negligent with respect to the other, his conduct must create a recognizable risk of harm to the other individually, or **to a class of persons** – as, for example, all persons within a given area of danger – to which the other is a member." Id. (underlining in original; bold added) (quoting Dudley v. Offender Aid & Restoration of Richmond, Inc., 241 Va. 270, 278 (1991) and Restatement (Second) of Torts § 281 cmt.).  "This duty is not abstract: a specific course of conduct gives rise to a specific duty extending to specific persons." Quisenberry, 296 Va. at 242 (citing Dudley, 241 Va. at 278.  "The **scope of the duty will vary with the circumstances of each case**, but it is always a duty owed

to a discernable individual, **or to a class of individuals**." Id. (quoting Dudley, 241

Va. at 278) (emphasis added).  "**The only 'relationship' which must exist is a**

**sufficient juxtaposition of the parties in time and space to place the plaintiff in**

**danger of the defendant's acts**." RGR, 288 Va. at 280 (quoting Friend, Personal

Injury Law in Virginia, 3d ed. § 1.1.1, at 2) (internal punctuation omitted;

emphasis added).  "Thus, in the vast majority of negligence actions, the parties

were strangers at the time of the incident, and the action is based upon a **broad**

**duty** not to injure others by **acts of omission** or commission." Quisenberry, 296

Va. at 243 (internal punctuation omitted; emphasis added).

As Friend and Sinclair have recently observed, "[t]he premise of

*Quisenberry* . . . is clearly that the default or normal situation is a generalized duty

of care." Kent Sinclair & Charles E. Friend, Personal Injury Law in Virginia, 4th

ed. § 2.2.  "In that light, the case doctrine avoiding any recognition of a duty to

protect others from harm from third persons is a specially identified exception to

the general duty to protect anyone who could be in the zone of danger." Id. See

also Quisenberry, 296 at 247 (noting that "the common law has recognized some

exceptions to duty arising from foreseeable harm"); Sinclair & Friend, 4th. ed. §

2.1(D) ("The landscape painted by the majority opinion in *Quisenberry* is that the

fundamental, or preset, condition is a general duty to mankind, subject to only a

few exceptions that the law has specifically carved out.").[14]  Specifically, under

Virginia law, there is "no general duty to rescue" where the defendant did not

contribute to the hazard facing the plaintiff "or place him in harm's way and then

fail to provide any assistance." Watts v. Arlington Ret. Hous. Corp., No. CL 20-

235(00), 2021 Va. Cir. LEXIS 53, at *3 (Arlington Mar. 26, 2021) (citing RGR,

288 Va. 260).

### B.    The Application of General Negligence Principles to this Case

#### 1.    The facts presented by Plaintiff on summary judgment were more than sufficient to establish that Nelson had a duty to Curran under Virginia's general negligence principles.

The material facts listed above ("Statement of Material Facts, supra, pp.  8-

19) establish not only that Defendant Nelson had a duty to Curran to conduct the

training session in a reasonably safe manner, but also that Nelson in fact breached

that duty.  However, because the District Court's analysis stopped at a finding of

no duty, and never reached the question of breach, the following facts are

---

[14] Noting a need "to avoid the extension of liability for every conceivably foreseeable accident, without regard to common sense or good policy," the Quisenberry Court noted exceptions to the general-duty principle in the areas of products liability and dram-shop liability. 296 Va. at 247; id. at 247 n.6.  More recently, reiterating the RGR rule that "[g]eneral negligence principles require a person to exercise due care to avoid injuring others," the Court stated that "in determining whether a duty exists, the likelihood of injury, the magnitude of the burden of guarding against it, and the consequences of placing that burden on the defendant must be taken into account" and in that sense, "[i]mposition of a duty does not depend upon foreseeability alone." Shoemaker v. Funkhouser, 299 Va. 471, 478 (2021) (internal punctuation omitted).

especially pertinent to the duty issue, and are sufficient by themselves to establish

that the District Court erred in ruling that Nelson had no duty to Curran:

- Nelson was running a scenario-based training exercise known as a "box drill." Nelson directed Curran and other trainees to set up four blue accordion style wrestling mats to form a square with openings between the mats. (Material Fact 1).[15]

- Nelson admitted that he was in charge of setting up, overseeing, implementing, and running the scenario based training and it was his responsibility "to manage the entire class in general." (Material Fact 4).

- Nelson told Curran that if he got hot, Curran could take his helmet off to get a breather when he was in the safety area. Nelson told Curran and the other trainees that could take the equipment off to get a breather, but it had to be in this designated area. (Material Fact 7).

- Participants in the training session (including Curran) testified that "Nelson was in charge of safety for the box drill," that "as an instructor you have to take steps to minimize that risk as much as possible," and that "the instructor is the overall responsible party for ensuring that everything is safe." (Material Fact 8).

---

[15] To avoid repetition, Plaintiff here refers to the numerical listing of material facts contained in the Statement of Material Facts, <u>supra</u>, pp. 8-19).

- Nelson agreed that as the instructor in charge of the training, he had to conduct it in a way to keep it as safe as possible. (Material Fact 9).

- Axon testified that "the master instructor [Nelson] is ultimately responsible [for safety]. (Material Fact 10).

- Nelson testified that it was his responsibility to convey safety protocols to all of the students in the training session. (Material Fact 11).

- Nelson was present in the gym during all of the scenarios leading up to the one in which Curran was injured. (Material Fact 12).

- The video of the training session showed at least five separate occasions prior to Curran's injury where participants were "outside the box," and Nelson admitted at deposition that he would have called "stop action!" if he had seen such a situation, but Nelson never called "stop action" at any point. (Material Fact 13).

- Curran testified that Nelson designated the specific area with the bench on which Curran was sitting when he was injured as "the safety area." (Material Fact 20).

Given Nelson's active role in conducting the training session and creating the dangerous scenario in which Curran was injured, there is no question that, under the general negligence principles articulated above, Nelson had a duty to Curran and the other trainees to conduct the session in a reasonably safe manner.

30

2. **Because Virginia imposes joint-and-several liability on multiple, joint tortfeasors, any alleged negligence by the trainee who fired the CEW would be irrelevant.**

In its Order granting Nelson's Motion for Summary Judgment, the District Court remarked that "Plaintiff elected not to name the fellow trainee who struck him in the eye as a defendant. Rather, Plaintiff elected to sue Defendant Nelson and Defendant Axon" (ECF 71, p. 4, Appendix p. 1546), suggesting that perhaps Plaintiff chose the wrong defendant(s) to sue in this case.

However, any alleged negligence on the part of the trainee who fired the CEW/TASER would be irrelevant, since Virginia law imposes joint-and-several liability. See Dorman v. State Indus., 292 Va. 111, 122 (2016) ("Without question, the law is that a litigant can not be exonerated by urging and showing the negligence of other parties and non-parties.") (internal punctuation omitted); In re Vulcan Materials Co., 674 F. Supp. 2d 756, 771 (E.D. Va. 2009) ("Virginia adheres to the principle of joint and several liability. 'If separate and independent acts of negligence of two parties directly cause a single indivisible injury to a third person, either or both wrongdoers are responsible for the whole injury.'") (quoting Sullivan v. Robertson Drug Co., Inc., 273 Va. 84, 92 (2007)); Kent Sinclair & Charles E. Friend, Personal Injury Law in Virginia, 4th ed., § 5.10 (summarizing Virginia's rule of joint-and-several liability and citing cases). Accordingly, even assuming for the sake of argument that the trainee who fired the CEW was

31

negligent in doing so (which Plaintiff does not contend), such negligence would be irrelevant to the question of whether Nelson was negligent in his implementation and conducting of the training session.

### 3. The doctrine of "special relationship" is irrelevant to Plaintiff's general negligence claim against Nelson.

In its Order granting summary judgment to Nelson, the District Court briefly acknowledged that, under Virginia law, "[t]he general duty of care defendants owe to strangers is the duty to use reasonable care in the defendant's active conduct." (ECF 71, p. 7, Appendix p. 1549 (quoting Dobbs, Dan B., et al., the Law of Torts, § 259 (2d ed. 2016)). However, the District Court then immediately pivoted to a lengthy discussion of "special relationship," stating that "the Virginia Supreme Court 'has consistently held that generally a person does not have a duty to protect another from the conduct of third persons'" and that "in certain circumstances a 'special relationship' arises between a defendant and plaintiff that imposes a duty on the defendant to protect the plaintiff from acts of third parties." (ECF 71, pp. 7-8, Appendix pp. 1549-50 (quoting Burns v. Gagnon, 283 Va. 657, 668, 727 S.E.2d 634, 641-42 (2012)) (internal punctuation omitted); see also ECF 71, pp. 7-13, Appendix pp. 1549-55 (analyzing case in terms of special relationship and the duty to protect from actions by third parties)).

However, this analysis of special relationship and the duty to protect against actions by third parties is relevant only where (1) the case involves a criminal act

by a third party; or (2) the case does not involve any active negligence by the defendant, or the defendant played no role in creating the danger at issue. Because there was nothing criminal in the fellow trainee's firing of his CEW and it was Nelson himself who created and actively oversaw the hazardous training scenario in which Curran was injured, the doctrine of special relationship and the related duty to protect against third-party actions are irrelevant to Curran's general negligence claim against Nelson.

> ### a. The "special relationship" doctrine imposes liability for failure to warn or protect against <u>criminal</u> acts by third parties.

The Supreme Court of Virginia recently reiterated the role of the special-relationship doctrine under Virginia law, explaining that it arises where a plaintiff seeks to hold a defendant liable for failure to protect the plaintiff against harm from a **criminal** act by a third party:

> As a general rule, there is no duty to warn or protect against **acts of criminal assault** by third parties. This is so because under ordinary circumstances, acts of **assaultive criminal behavior** by third persons cannot reasonably be foreseen. Indeed, in only rare circumstances has this Court determined that the duty to protect against harm from third party **criminal acts** exists.

> We have previously held that before any duty can arise with regard to the conduct of third persons, there must be a special relationship between the defendant and either the plaintiff or the third person. Examples of such a relationship between a defendant and a plaintiff include common-carrier-passenger, business proprietor-invitee, and innkeeper-guest. Another example of a special relationship is that of employer-employee with regard to the employer's potential duty of

33

protecting or warning an employee.  We have stated that the finding of a
special relationship is a threshold requirement.

Terry v. Irish Fleet, Inc., 296 Va. 129, 135-136 (2018) (internal punctuation and

citations omitted; emphasis added). See also Doe v. Virginia Wesleyan College, 90

Va. Cir. 345, 352 (Norfolk 2015) ("In Virginia, a person generally does not have a

duty to warn another or protect another from the **criminal** acts of a third party.")

(citing Thompson v. Skate Am., Inc., 261 Va. 121, 128 (2001)) (emphasis added).

Indeed, the one case that the District Court cited in support of its application

of "special relationship" analysis itself involved a criminal act by a third party. See

Burns, 283 Va. at 664 (describing criminal assault and battery by third party).

Here is the entire quote from the Burns opinion, from which the District Court

selected only the first sentence:

> "We have consistently held that 'generally a person does not have a duty
> to protect another from the conduct of third persons.'" *Kellerman*, 278
> Va. at 492, 684 S.E.2d at 793 (quoting *Didato v. Strehler*, 262 Va. 617,
> 628-29, 554 S.E.2d 42, 49 (2001).  "This is particularly so when the
> third person commits acts of **assaultive criminal behavior because
> such acts cannot reasonably be foreseen**." *Burdette v. Marks*, 244 Va.
> 309, 311-12, 421 S.E.2d 419, 420, 9 Va. Law Rep. 273 (1992).  There is
> an exception to the general rule, however, where "a special relation
> exists (1) between the defendant and the third person which imposes a
> duty upon the defendant to control the third person's conduct, or (2)
> between the defendant and the plaintiff which gives a right to protection
> to the plaintiff." *Id.* at 312, 421 S.E.2d at 420.

Burns, 283 Va. at 668-69 (emphasis added).  Because this case did not involve any

criminal actions, the Burns decision simply offers no support for the application of

a "special relationship" analysis in the present case.[16]

> **b.    "Special relationship" and "duty to protect against third-party acts" are not applicable where the defendant created the hazard through his own active conduct.**

In Shoemaker v. Funkhouser, 299 Va. 471, 479 (2021), the Supreme Court

of Virginia cited both Burns and the Restatement (Second) of Torts § 315 (1965),

noting that the Court had "consistently held that generally a person does not have a

duty to protect another from the conduct of third persons." (internal punctuation

omitted).  The Court further noted that § 315 "recognizes the general principle that

'there is no duty so to control the conduct of a third person as to prevent him from

causing physical harm to another unless . . . a special relation exists between the

---

[16] In support of his Motion for Summary Judgment (ECF 52, p. 10), Nelson cited Kellermann v. McDonough, 278 Va. 478, 492 (2009), for the proposition that "generally a person does not have a duty to protect another from the conduct of third persons."  However, like Burns, the Kellermann case involved a criminal act by a third party, id. at 495, and all of the cases cited in Kellermann – except for Didato – also involved third-party criminal acts. See id. at 492 (citing cases). Furthermore, in Didato, the Virginia Supreme Court canvassed its line of cases "within the ambit of [its] jurisprudence governing special relationships" and concluded that, "because those relationships give rise to a duty of protection from **criminal acts** committed by third parties, the legal principles articulated and applied in these cases **have no application here**" where there are **no allegations of criminal conduct**. Didato, 262 Va. at 630 (emphasis added).

actor and the third person, or . . . between the actor and the other.'" <u>Shoemaker</u>,

299 Va. at 479 (quoting Restatement (Second) of Torts § 315).

Taken out of context, the <u>Shoemaker</u> Court's invocation of § 315 of the

Restatement could be misinterpreted as supporting the District Court's "special

relationship" analysis, since neither the <u>Shoemaker</u> opinion nor § 315 of the

Restatement explicitly mentions criminal acts. However, in <u>Shoemaker</u> – which

involved a third party firing a gun from the defendant's property, striking and

killing a neighbor – the Supreme Court emphasized that, "as a general proposition,

the occupier of land must use reasonable care for the safety of those outside the

land to prevent direct harm resulting from his **affirmative activities** on the land."

299 Va. at 478 (emphasis added; internal punctuation omitted); <u>see also</u> <u>id.</u> at 479

("A possessor of land is subject to liability for physical harm to others outside of

the land caused **by an activity carried on by him** thereon which he realizes or

should realize will involve an unreasonable risk of physical harm to them under the

same conditions as though the activity were carried on at a neutral place.")

(emphasis added; internal punctuation omitted).

Similarly, the official Restatement commentary and illustrations make clear

that the special-relationship analysis does not apply where the defendant created

the dangerous condition. Comment (a) for § 315 states that "[t]he rule in this

Section is a special application of the general rule stated in § 314," and § 314 in

turn provides a series of comments and illustrations demonstrating that the "no duty to protect" principle applies primarily in rescue-type situations, where the defendant played no role in creating the hazard or danger faced by the plaintiff. For example, Comment "e" to § 314 notes that, "[s]ince the actor is under no duty to aid or protect another who has fallen into peril **through no conduct of the actor**, it is immaterial that his failure to do so is due to a desire that the other shall be harmed" and provides the following illustration: "A, a strong swimmer, sees B, against whom he entertains an unreasonable hatred, floundering in deep water and obviously unable to swim.  Knowing B's identity, he turns away.  A is not liable to B." Restatement (Second) of Torts § 314, cmt. e, illus. 4 (emphasis added). <u>See also</u> <u>Watts</u>, 2021 Va. Cir. LEXIS 53 at *3 ("At common law, there was no general duty to rescue.  Here, the employee did not cause Watts to become stuck or place him in harm's way and then fail to provide any assistance.").

Here, however, Defendant Nelson did play an active role in creating the hazardous scenario in which Curran was injured. Accordingly, the <u>Shoemaker</u> Court's invocation of Restatement § 315 does not support, and instead positively undermines, the District Court's "special relationship" analysis. <u>See also</u> <u>Quisenberry</u>, 296 Va. at 242 ("There is a general duty not to injure others that arises whenever a **defendant's conduct creates a risk of harm to others**." (emphasis added; internal punctuation omitted); <u>id.</u> at 244 ("We have recognized

the duty of a negligent actor can arise **through his conduct** to the class of persons exposed to **the recognizable risk he creates**.") (emphasis added); id. at 249 ("Nobody is permitted by the law **to create with impunity a stumbling block, a trap, a snare or a pitfall** for the feet of those rightfully proceeding on their way.") (emphasis added; internal punctuation omitted).

In short, because the fellow trainee's firing of the CEW during the training session was not a criminal act, and because Defendant Nelson was more than just a bystander in a position to protect Curran or come to his aid, and Nelson instead actively set up, implemented, and executed the training session at the time of the incident, the principles of "special relationship" and "duty to protect" simply have no application to Curran's general negligence claim against Nelson.

### 4. The District Court failed in its attempt to distinguish <u>RGR</u>, <u>Quisenberry</u>, and <u>Shoemaker</u>.

In granting summary judgment to Nelson, the District Court virtually ignored the <u>RGR</u> line of cases, instead employing a "special relationship" analysis. Indeed, the District Court relegated <u>RGR</u>, <u>Quisenberry</u>, and <u>Shoemaker</u> to a footnote at the end of its analysis, where it stated the following:

> In all of these cases, the defendants were utilizing <u>their own</u> property, either real or personal. Here, Defendant Nelson did not have any ownership rights in the CEWs used for training nor the facilities used to conduct the training. It is highly unlikely the Virginia Supreme Court would choose to apply this line of precedent to Plaintiff's claims.

(ECF 71, p. 14 n.1, Appendix p. 1556 n.1 (emphasis in original)).  However, in

Quisenberry, the Supreme Court emphasized that RGR was "based firmly in

general negligence principles" and "invoked precedent from negligence cases

addressing real property, personal property **and conduct**, and is one of this Court's

benchmarks in the area of general negligence," making clear that these duties do

not depend on ownership rights. Quisenberry, 296 Va. at 242 n.3 (emphasis

added).

There is nothing in any of the RGR line of cases cases to suggest that the

principles of general negligence are somehow dependent upon the defendant

having ownership rights in the place where the incident took place, or the tools,

devices, or implements used during the incident in question.  Indeed, in

Shoemaker, the Supreme Court emphasized that, to the extent that such general

negligence principles involve the use of one's personal or real property, it is

**possession** and not formal **ownership** that is relevant: "Although we employ the

term 'landowner' in this opinion, the duty we discuss springs from *possession* of

the land, and it is not necessarily placed on the person in whom the land is *titled*."

299 Va. at 478 n.1 (italics provided by Court); see also id. at 481 ("If the actor

permits a third person to use land **or chattels in his possession** otherwise than as a

servant, he is, **if present**, under a duty to exercise reasonable care so to control the

conduct of the third person as to prevent him from . . . conducting himself as to

create an unreasonable risk of bodily harm to them. . . .") (quoting Restatement (Second) of Torts § 318) (emphasis added).

It is undisputed in this case that Defendant Nelson was in charge of the training scenario and actively controlled and provided the various implements and devices used by the trainees.  Whether Nelson held title or formal ownership in the items used in the training exercise is simply irrelevant to his duty to use these items and conduct the exercise in a reasonably safe manner.

## II.    The District Court erred in ruling that there was no special relationship between Defendant Nelson and Plaintiff Curran, and thus that Nelson had no legal duty to protect Curran from the actions of a third-party actor.

Even assuming for the sake of argument that the District Court was correct to analyze this case in terms of "special relationship" and a "duty to protect," Nelson still had a duty to Curran because there was a special relationship between the two.  Without adding to the recognized list of traditional "special relationships" (such as innkeeper/guest and common carrier/passenger), the Supreme Court of Virginia has recognized that the particular circumstances of a case can give rise to a special relationship and corresponding duty to protect. See, e.g., Burdette v. Marks, 244 Va. 309, 312-13 (1992) (police officer witnessing a person being beaten had a duty in tort to intervene and protect the victim, based on special relationship arising from particular circumstances).

In its Order granting summary judgment, the District Court concluded that

Nelson exercised insufficient control over the trainees to support a special

relationship. (ECF 71, pp. 9-11, Appendix pp. 1551-53).  However, the Supreme

Court's recent <u>Shoemaker</u> decision demonstrates that the control requirement is not

nearly as stringent as the District Court supposed.

> The Second Restatement of Torts recognizes exceptions to these general
> principles for relationships made "special" by virtue of the degree of
> control the actor/defendant is able to exercise over the third party.
> Notably, § 318 of the Second Restatement of Torts recognizes that a
> duty may arise between the landowner and those allowed on the land
> because of the possessor's power of control over those allowed to enter.
> If such a duty were to arise, the landowner would have to exercise
> reasonable care for the protection of others, including the power of
> control **or expulsion** which his occupation of the premises gives him
> over the conduct of a third person who may be present, to prevent injury
> to the visitor at his hands.

<u>Shoemaker</u>, 299 Va. at 480 (citations omitted).  In <u>Shoemaker</u>, the fact that the

landowners had invited the shooter onto their property and retained the power to

expel him from their property was sufficient to support a duty to protect third

parties outside the premises from the shooter's actions.  In our case, it is similarly

undisputed that Nelson was in charge of the training scenario and at all times

retained the discretion to call a stop to the action, and that he retained the power

and authority to take back the CEWs, batteries, and holsters that he had provided to

the trainees. (Material Facts 13, 22-24).

Moreover, even the dissent in <u>Shoemaker</u> agrees that, if the landowners were present when the third party fired the gun toward the neighbor's house, there would clearly be a duty to intervene to protect the potential victim from injury.

> I would leave the common law as we have found it. Absent a special relationship between the parties, no duty to control a licensee exists under the common law **unless the landowner is present with the licensee when he commits the tort** on the landowner's property. Being in the licensee's presence triggers the landowner's duties to personally observe the licensee's conduct, determine the level of risk associated with it, and intervene if and when that risk becomes unreasonable. In this case, if the grandparents had been in Nicely's presence when he aimed his rifle on a horizontal plane at a target unprotected by a natural or man-made backstop, they would have had a duty to intervene.

<u>Id.</u> at 500 (Kelsey, J. dissenting) (emphasis added). There is no question that Nelson was present and actively conducting, monitoring, and overseeing the training exercise when Curran was injured, and thus even on the dissent's analysis, Nelson clearly had a duty to intervene and stop the exercise.

The Virginia Supreme Court also made clear that the duty to intervene and protect is not limited to defendants who own or possess the land; and instead the principle expressed in Restatement § 318 also extends to defendants in possession of personal property or chattels:

> If the actor permits a third person to use land **or chattels in his possession** otherwise than as a servant, he is, **if present**, under a duty to exercise reasonable care so as to **control the conduct of the third person** as to prevent him from intentionally harming others or from so

42

conducting himself as to create an unreasonable risk of bodily harm to them, if the actor

(a) knows or has reason to know that he has the ability to control the third person, and
(b) knows or should know of the necessity and opportunity for exercising such control.

Id. at 481 (quoting Restatement (Second) of Torts § 318) (emphasis added). See also id. at 478 n.1 ("Although we employ the term 'landowner' in this opinion, the duty we discuss springs from *possession* of the land, and it is not necessarily placed on the person in whom the land is *titled*.") (emphasis in original).

"A 'chattel' is defined as 'movable or transferable property; personal property; esp., a physical object capable of manual delivery and not the subject matter of real property.'" In re Council of Unit Owners of the 100 Harborview Drive Condo., 584 B.R. 639, 657 (Bankr. D. Md. 2018) (quoting Black's Law Dictionary 251 (8th ed. 2004)) (internal punctuation omitted).  It is undisputed that all of the trainees arrived at the training session essentially empty handed, and that Nelson provided them with CEWs/TASERs, batteries, and holsters, and that the trainees had to return these items to Nelson after the training session was completed. (Material Facts 22-24).  Thus, while these chattels may have been owned by Axon, it is undisputed that Nelson was the only Axon representative on

site for the training session, and that he had the right of control and possession of these items for the duration of the training session.

The Defendant Nelson permitted a third person to use potentially dangerous chattels in his possession, while he was present and actively monitoring and directing the training session. Pursuant to the <u>Shoemaker</u> decision and Restatement (Second) of Torts § 318, Nelson had a duty to intervene and stop the training session once he knew or should have known that the session was unfolding in a manner that was clearly hazardous to Curran. Although <u>Shoemaker</u> involved the use of land, there is simply no logical reason to assume that the Supreme Court of Virginia, having already embraced and applied Restatement § 318, would arbitrarily refuse to extend § 318 to the possession of chattels, especially when the plain language of § 318 explicitly extends its application to the possession of chattels.

In short, even assuming for the sake of argument that this case requires a special relationship between Nelson and Curran, such a relationship clearly exists pursuant to Restatement (Second) of Torts § 318 and the Virginia Supreme Court's <u>Shoemaker</u> decision.

## **CONCLUSION**

In granting summary judgment to Defendant Nelson, the District Court –
with its focus on "special relationship" and a duty to "protect against harm by a
third-party actor" – employed an analysis inappropriate to the case at hand.  Nelson
was not some innocent bystander who simply failed to intervene in a hazardous
scenario not of his making.  Rather, it was Nelson himself who created the danger,
by designing, implementing, and actively directing the training session.  Under
Virginia's familiar principles of general negligence, Nelson had a duty in tort to
conduct the training session in a reasonable safe and non-negligent manner,
regardless of whether there was a special relationship between Curran and Nelson.

Moreover, even if "special relationship" were somehow the correct analysis,
Nelson would still have a duty to Curran under Virginia law, since the elements of
§ 318 of the Second Restatement of Torts (embraced by the Virginia Supreme
Court) are satisfied here.  Being immediately present throughout the training
session, and having permitted the other trainee to use chattels in his possession,
Nelson had a duty to intervene to prevent foreseeable injury to Curran pursuant to
§ 318 and the Supreme Court's Shoemaker decision.  In short, the District Court
erred (1) in ruling that Nelson had no duty to Curran absent a special relationship

45

between the two and (2) in ruling that there was no special relationship between Nelson and Curran supporting a duty to protect against harm by a third party.

WHEREFORE, Plaintiff Shawn Curran respectfully requests that this Court reverse the District Court's granting of summary judgment to Defendant Richard Nelson and partial summary judgment to Defendant Axon Enterprises, Inc. and remand the case to the District Court for further proceedings.

SHAWN CURRAN
By Counsel

s/ Jeffrey N. Stedman_____
Elliott M. Buckner, Esq. (V.S.B. #45227)
M. Scott Bucci, Esq. (V.S.B. #42636)
Jeffrey N. Stedman, Esq. (V.S.B. #84496)
Attorneys for Shawn Curran
Breit Cantor Grana Buckner, PLLC
7130 Glen Forest Drive, Suite 400
Richmond, Virginia  23226
Telephone:  (804) 644-1400
Facsimile:  (804) 644-9205
ebuckner@breitcantor.com
sbucci@breitcantor.com
jstedman@breitcantor.com

## **REQUEST FOR ORAL ARGUMENT**

Appellant hereby requests oral argument pursuant to Rule 34 of the Federal Rules of Appellate Procedure and Local Rule 34(a).


SHAWN CURRAN
By Counsel

s/ Jeffrey N. Stedman
Elliott M. Buckner, Esq. (V.S.B. #45227)
M. Scott Bucci, Esq. (V.S.B. #42636)
Jeffrey N. Stedman, Esq. (V.S.B. #84496)
Attorneys for Shawn Curran
Breit Cantor Grana Buckner, PLLC
7130 Glen Forest Drive, Suite 400
Richmond, Virginia  23226
Telephone:  (804) 644-1400
Facsimile:  (804) 644-9205
ebuckner@breitcantor.com
sbucci@breitcantor.com
jstedman@breitcantor.com

## <u>CERTIFICATION OF COMPLIANCE</u>

1.     I certify that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7) because it contains 11,202 words of text, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f), as verified by the word-count function of Microsoft Word.

2.     I certify that this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface, Times New Roman in 14-point size font for Microsoft Word.

SHAWN CURRAN
By Counsel

s/ Jeffrey N. Stedman
Elliott M. Buckner, Esq. (V.S.B. #45227)
M. Scott Bucci, Esq. (V.S.B. #42636)
Jeffrey N. Stedman, Esq. (V.S.B. #84496)
Attorneys for Shawn Curran
Breit Cantor Grana Buckner, PLLC
7130 Glen Forest Drive, Suite 400
Richmond, Virginia   23226
Telephone:  (804) 644-1400
Facsimile:  (804) 644-9205
ebuckner@breitcantor.com
sbucci@breitcantor.com
jstedman@breitcantor.com

## **CERTIFICATE OF SERVICE**

I hereby certify that on December 21, 2021, I served Appellant's Opening Brief upon the Appellees by electronic filing:


SHAWN CURRAN
By Counsel

s/ Jeffrey N. Stedman_____
Elliott M. Buckner, Esq. (V.S.B. #45227)
M. Scott Bucci, Esq. (V.S.B. #42636)
Jeffrey N. Stedman, Esq. (V.S.B. #84496)
Attorneys for Shawn Curran
Breit Cantor Grana Buckner, PLLC
7130 Glen Forest Drive, Suite 400
Richmond, Virginia  23226
Telephone:  (804) 644-1400
Facsimile:  (804) 644-9205
ebuckner@breitcantor.com
sbucci@breitcantor.com
jstedman@breitcantor.com