**NO. 21-2151**

# United States Court of Appeals

*for the*

# Fourth Circuit

SHAWN CURRAN,

*Plaintiff-Appellant,*

– v. –

AXON ENTERPRISE, INC.; RICHARD NELSON,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF VIRGINIA AT NORFOLK IN CASE NO. 2:19-CV-00617-RGD-LRL, HONORABLE ROBERT G. DOUMAR, SENIOR U.S. DISTRICT COURT JUDGE

## JOINT APPENDIX
## Volume 2 of 3 (Pages JA-445 to JA-1038)

BRIAN N. CASEY
TAYLORWALKER P.C.
1206 Laskin Road, Suite 100
Virginia Beach, Virginia 23451
(757) 625-7300

*Attorneys for Defendant-Appellee Richard Nelson*

M. SCOTT BUCCI
ELLIOTT M. BUCKNER
JEFFREY N. STEDMAN
BREIT CANTOR GRANA BUCKNER
7130 Glen Forest Drive, Suite 400
Richmond, Virginia 23226
(804) 644-1400

*Attorneys for Plaintiff-Appellant*

JAMES A. CALES III
FURNISS, DAVIS, RASHKIND
AND SAUNDERS, P.C.
6160 Kempsville Circle, Suite 341B
P.O. Box 1252
Norfolk, Virginia 23541
(757) 461-7100

– and –

PAMELA B. PETERSEN
AXON ENTERPRISE, INC.
17800 North 85th Street
Scottsdale, Arizona 85255
(623) 326-6016

*Attorneys for Defendant-Appellee Axon Enterprise, Inc.*

## JOINT APPENDIX TABLE OF CONTENTS

Page

**Volume I**

Civil Court Docket Entries........................................ JA-1

Notice of Removal, filed November 13, 2019 .......... JA-11

Exhibit 1 to Notice -
Complaint JA-14 Order, filed October 29, 2020.... JA-24

Defendant Axon's Brief in Support of Motion for
Summary Judgment, filed December 28, 2020
[Omitted Herein]

Exhibit 1 -
Declaration of Peter Brown, filed
December 28, 2020 ............................................... JA-27

Exhibit 2 -
Declaration of Lamar Cousins, filed
December 28, 2020 ............................................... JA-30

Exhibit 4 -
Curran Training History ....................................... JA-42

Exhibit 6 -
Independent Contractor Agreement ...................... JA-68

Exhibit 7 -
Defendant Nelson's RFA Responses...................... JA-72

Exhibit 8 -
Invoice ................................................................. JA-78

Exhibit 10 -
Curran Surveillance Video Images ........................ JA-82

Exhibit 11 -
Photographs ........................................................ JA-87

Exhibit 12 -
Mike Henry Handwritten Statement ...................... JA-93

Exhibit 13 -
Shawn Pickard Handwritten Statement. ................ JA-95

Exhibit 14 -
V20 Instructor Course Slides................................ JA-98

Exhibit 15 -
Incident Memo from Brent Brunette
to Peter M. Slovensky........................................... JA-111

Exhibit 16 -
Curran Online Training Report ............................. JA-114

Exhibit 17 -
Instructor Certification Online Modules ............... JA-132

Exhibit 18 -
CEW Product Warnings, dated March 1, 2013...... JA-144

Exhibit 19 -
Instructor and User Warnings, Risks
and Release Agreement......................................... JA-153

Exhibit 20 -
Instructor Certification Form ................................ JA-156

Plaintiff's Response in Opposition to Defendant
Nelson's Motion for Summary Judgment, filed
January 11, 2021 [Omitted Herein]

Exhibit 1 to Plaintiff's Response -
Deposition Testimony of Richard William
Nelson, dated June 22, 2020 ................................. JA-158

**Volume II**


Exhibit 2 to Plaintiff's Response - Deposition Testimony of Shawn Michael Curran, dated June 22, 2020 .................................. JA-445

Exhibit 3 to Plaintiff's Response - Photographs .......................................................... JA-793

Exhibit 4 to Plaintiff's Response - Surveillance Video and Clips, with Description List [See Digital Media Volume] .................................. JA-799

Exhibit 5 to Plaintiff's Response - Deposition Testimony of Matthew Faubion, dated July 10, 2020.......................................................... JA-802

Exhibit 6 to Plaintiff's Response - Deposition Testimony of Jerry Sanders, dated July 10, 2020.......................................................... JA-914


**Volume III**


Exhibit 7 to Plaintiff's Response - Deposition Testimony of David Elliott, Jr., dated July 10, 2020.......................................................... JA-1039

Exhibit 8 to Plaintiff's Response - Deposition Testimony of Grayson Craun, dated June 29, 2020 ........................................................ JA-1155

Exhibit 9 to Plaintiff's Response - Deposition Testimony of Lamar Cousins, dated July 3, 2020........................................................... JA-1267

Exhibit 10 to Plaintiff's Response - Video Screenshots.................................................. JA-1519

Order, filed March 18, 2021...................................... JA-1529

Plaintiff's Motion for Leave to File a Supplemental Brief, filed March 29, 2021 ............ JA-1531

Court Hearing Notes, filed March 30, 2021 .............. JA-1533

Certification Order, filed April 29, 2021 .................... JA-1534

Virginia Supreme Court's Denial of Certified Question of Law, filed May 25, 2021..................... JA-1542

Order, filed July 13, 2021 .......................................... JA-1543

Order, filed July 19, 2021 .......................................... JA-1559

Order, filed September 13, 2021................................ JA-1561

Judgment, filed October 12, 2021.............................. JA-1570

Notice of Appeal, filed October 12, 2021.................. JA-1571

# Exhibit 2

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

(NORFOLK DIVISION)

--------------------------------X

SHAWN CURRAN, )

)

Plaintiff, ) Case No.

)

v. ) 2:19-cv-617

)

AXON ENTERPRISE, INC. et al., )

)

Defendants. )

--------------------------------X

REMOTE VIDEOTAPED DEPOSITION OF

SHAWN MICHAEL CURRAN

Monday, June 22, 2020; 10:13 a.m. EST

Job No.: 593253

Pgs. 1 - 310

Reported by: Cindy L. Sebo, RMR, CRR, RPR, CSR, CCR, CLR, RSA, Remote Counsel Reporter, LiveDeposition Authorized Reporter

MAGNA LEGAL SERVICES

(866) 624-6221

www.MagnaLS.com

Remote Videotaped Deposition of SHAWN MICHAEL CURRAN taken by Counsel for Defendant Axon Enterprise Inc., before Cindy L. Sebo, Registered Merit Court Reporter, Certified Real-Time Reporter, Registered Professional Reporter, Certified Shorthand Reporter, Certified Court Reporter, Certified LiveNote Reporter, Real-Time Systems Administrator, Remote Counsel Reporter, LiveDeposition Authorized Reporter and Notary Public, beginning at approximately 10:13 a.m. EST, when were present on behalf of the respective parties:

A P P E A R A N C E S:

(All via Zoom Video Communications)

Attorney for Plaintiff:

BREIT CANTOR GRANA BUCKNER
M. SCOTT BUCCI, ESQUIRE
ELLIOTT M. BUCKNER, ESQUIRE
7130 Glen Forest Drive, Suite 400
Richmond, Virginia 23226
804.888.9501
sbucci@breitcantor.com
ebuckner@breitcantor.com

Attorney for Defendant Axon Enterprise, Inc.:

AXON ENTERPRISE, INC.
AMY L. NGUYEN, ESQUIRE
PETER BROWN, ESQUIRE
17800 N. 85th Street
Scottsdale, Arizona 85255
623.326.6016
amynguyen@axon.com
peterbrown@axon.com

A P P E A R A N C E S (Continued):

Attorney for Defendant Richard Nelson:

TAYLORWALKER PC
BRIAN N. CASEY, ESQUIRE
1206 Laskin Road, Suite 100
Virginia Beach, Virginia 23451
757.625.7300
bcasey@taylorwalkerlaw.com

ALSO PRESENT:

KENDRA DOBSON, Videographer

INDEX OF EXAMINATION

SHAWN MICHAEL CURRAN


| EXAMINATION BY | PAGE |
|---|---|
| Ms. Nguyen | 18 |
| Mr. Casey | 280 |
| Mr. Bucci | 301 |


\- - -

INDEX TO EXHIBITS

\- - -

(Exhibits Attached to the Original Transcript.)


| DEPOSITION EXHIBIT NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Training History, Shawn M. Curran, Bates stamped AXON_CURRAN000527 through AXON_CURRAN000551 | 46 |

- - -

INDEX TO EXHIBITS (Continued)

- - -


| DEPOSITION EXHIBIT NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| 2 | TASER International Training Material License Agreement, User Course, Slides 1, 2, 32, 74 and 75, Bates stamped AXON_CURRAN000711 through AXON_CURRAN000712, AXON_CURRAN000746, AXON_CURRAN000789 through AXON_CURRAN000790 | 66 |
| 3 | Product Warnings — Law Enforcement, Bates stamped AXON_CURRAN001952 through AXON_CURRAN001955 | 71 |

- - -

INDEX TO EXHIBITS (Continued)

- - -


| DEPOSITION EXHIBIT NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| 4 | TASER International Training Material License Agreement, Slides 1, 10, 11, 123 and 124, Bates stamped AXONCURRAN_000939, AXONCURRAN_000948 through AXONCURRAN_000949, AXONCURRAN_001065 through AXONCURRAN_001066 | 82 |
| 5 | Number 5, Product Warnings: Law Enforcement | 89 |
| 6 | TASER X26 User Certification Test, Bates stamped AXON_CURRAN0000481 through AXON_CURRAN0000487 | 97 |

- - -

INDEX TO EXHIBITS (Continued)

- - -


| DEPOSITION EXHIBIT NUMBER | DESCRIPTION | PAGE |
| --- | --- | --- |
| 7 | TASER International Training Material License Agreement, Slides 1, 6, 7, 99 through 101, Bates stamped AXON_CURRAN001189, AXON_CURRAN001194 through AXON_CURRAN001194, AXON_CURRAN001291 through AXON_CURRAN001293 | 93 |
| 8 | TASER Important ECD Product Safety and Health Information, Bates stamped AXON_CURRAN001960 through AXON_CURRAN001965 | 99 |

- - -

INDEX TO EXHIBITS (Continued)

- - -

| DEPOSITION EXHIBIT NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| 9 | TASER User Certification Course, User Course, Slides 1, 7, 8, 120, Bates stamped AXON_CURRAN001372, AXON_CURRAN001378 through AXON_CURRAN001379, AXON_CURRAN0001491 | 106 |
| 10 | ECD Warnings, Instructions, and Information: Law Enforcement, Important ECD Product Safety and Health Information, Bates stamped AXON_CURRAN001966 through AXON_CURRAN001973 | 109 |

- - -

INDEX TO EXHIBITS (Continued)

- - -


| DEPOSITION EXHIBIT NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| 11 | User Certification Course, User Course, Slides 1, 7, 8, 107, 108, 117, Bates stamped AXON_CURRAN001566, AXON_CURRAN001572 through AXON_CURRAN001573, AXON_CURRAN001672 through AXON_CURRAN001673, AXON_CURRAN001682 | 112 |
| 12 | Handheld ECD Warnings, Instructions, and Information: Law Enforcement, Important ECD Product Safety and Health Information Bates stamped AXON_CURRAN0001972 through AXON_CURRAN0001979 | 115 |

- - -

INDEX TO EXHIBITS (Continued)

- - -


| DEPOSITION EXHIBIT NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| 13 | User Certification Course, User Course, Slides 1, 7 through 8, 121 through 122 and 131, Bates stamped AXON_CURRAN001753, AXON_CURRAN001759, AXON_CURRAN001760, AXON_CURRAN001873 through AXON_CURRAN001874, AXON_CURRAN001883 | 118 |
| 14 | Certification Test, AXON_CURRAN000514 through AXON_CURRAN000517 | 121 |

\- - -

INDEX TO EXHIBITS (Continued)

\- - -


| DEPOSITION EXHIBIT NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| 15 | Annual CEW User Update, Slides 1, 2, 23, Bates stamped AXON_CURRAN000675 through AXON_CURRAN000676, AXON_CURRAN000698 | 125 |
| 16 | Warnings, Instructions, and Information: Law Enforcement, Important Safety and Health Information, Bates stamped AXON_CURRAN000078 through AXON_CURRAN000085 | 131 |

- - -

INDEX TO EXHIBITS (Continued)

- - -


| DEPOSITION EXHIBIT NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| 17 | Annual Conducted Electrical Weapon (CEW) User Update, Bates stamped AXON_CURRAN000040, AXON_CURRAN000042 through AXON_CURRAN000044, AXON_CURRAN000047, AXON_CURRAN000061, AXON_CURRAN000071 | 142 |
| 18 | Online Modules, Bates stamped AXON_CURRAN000119 through AXON_CURRAN000135 | 160 |
| 19 | Version 20, New Instructor Certification Online Modules, Bates stamped AXON_CURRAN000108 through AXON_CURRAN000118 | 161 |

- - -

INDEX TO EXHIBITS (Continued)

- - -



| DEPOSITION EXHIBIT NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| 20 | Instructor and User, Warnings, Risks and Release Agreement, Bates stamped AXON_CURRAN00037 through AXON_CURRAN00038 | 170 |
| 21 | In-House Instructor Course, Instructor Certification Course, Slides 1, 6, 13, 239 and 240, Bates stamped AXON_CURRAN000039 | 192 |
| 22 | Photos of Training, Bates stamped AXON_CURRAN000104, AXON_CURRAN000154 through AXON_CURRAN000157 | 211 |

- - -

INDEX TO EXHIBITS (Continued)

- - -


| DEPOSITION EXHIBIT NUMBER | DESCRIPTION | PAGE |
| --- | --- | --- |
| 23 | Inter-Office Memorandum, Bates stamped AXON_CURRAN000147 through AXON_CURRAN000153 | 225 |
| 24 | Employer's Accident Report, Bates stamped AXON_CURRAN000100 through AXON_CURRAN000101 | 242 |
| 26 | Damages Summary, Bates stamped AXON_CURRAN000136 through AXON_CURRAN000137 | 266 |
| 27 | Inter-Office Memorandum, Bates stamped AXON_CURRAN000462 | 266 |


*** Deposition Exhibit 25 was not marked.

S T I P U L A T I O N S

IT IS HEREBY STIPULATED AND AGREED by and between counsel no party to the litigation will object to the remote deposition on the grounds that the certified stenographer may not have the legal authority to swear in the witness.

FURTHER STIPULATED AND AGREED that in lieu of the oath administered in person, the witness declares the testimony in this matter under the penalty of perjury.

FURTHER STIPULATED AND AGREED that the certified stenographer is not physically present in the deposition room and will be reporting this deposition remotely.

FURTHER STIPULATED AND AGREED all parties and their counsel consent to this arrangement and waive any objections to this manner of reporting.

P R O C E E D I N G S

Remote Deposition
Monday, June 22, 2020; 10:13 a.m. EST

THE VIDEOGRAPHER: We are now on the record.

This begins Media Number 1 in the deposition of Shawn Curran in the matter of Shawn Curran versus Axon Enterprise, Inc., in the United States District Court for the Eastern District of Virginia.

Today is Monday, June 22nd, 2020, and the time is 10:13 a.m. This deposition is being taken completely by remote at the request of Axon Enterprises Corporation, Inc.

The videographer is Kendra Dobson, and the court reporter is Cindy Sebo, both of Magna Legal Services.

Counsel will be noted on the stenographic record.

Will the court reporter please swear in the witness?

\- - -

SHAWN MICHAEL CURRAN,

after having been first duly sworn, was examined and testified as follows:

\- - -

CERTIFIED STENOGRAPHER: The witness is sworn.

MS. NGUYEN: Thank you.

\- - -

EXAMINATION BY COUNSEL FOR DEFENDANT AXON ENTERPRISE, INC.

\- - -

BY MS. NGUYEN:

Q. Good morning, Mr. Curran.

A. Good morning.

Q. So this will be a rather unique deposition given that we are doing it via Zoom. So we'll go over some standard deposition rules, but, certainly, if we have any problems with communication at any point, let me know if or if

I am interrupting you at any point, please let me know, because there is a little bit of a delay.

So if we try to just give each other a pause before we answer, I think we'll be okay going forward.

Okay?

A. Okay.

Q. Can you please state your full name?

A. Shawn Michael Curran.

Q. And, Mr. Curran, have you gone by any other names or nicknames?

A. No, ma'am.

Q. What about at the Virginia Beach Police Department? Did your colleagues there use any nicknames for you?

A. One guy called me Hollywood, but that wasn't all the time; it was only when I saw him.

Q. Okay. Have you ever sat for a deposition before?

A. No, not --

Q. As -- excuse me?

A. -- not that I can recall, no.

Q. Okay. As an officer, I'm sure that you had been -- sat for many interviews; is that right?

A. Yes, ma'am.

Q. Okay. So a deposition is somewhat similar to that but more formal. Obviously, we have a court reporter present, and this is also being videotaped so we can use it later on at trial.

There are also some rules that I'll go over briefly. Number one is just to make sure that you answer verbally even though I can see you. If you're shaking your head, we still need to get, you know, an affirmative answer for you so that way the court reporter can get -- get down everything that you're saying.

Okay?

A. Okay.

Q. The next one is to -- there's going to be objections made from time to time, hopefully not too many. But unless your attorney tells you, instructs you not to answer a

question, please go ahead and allow for the objection and then go ahead and give your answer.

Okay?

A. Okay.

Q. And if there's anything that you don't understand at any point that I may ask -- and sometimes I don't ask the most concise or clear questions, but let me know and I'll try to rephrase.

If you do answer a question, I'm going to go ahead and assume that you understood that question.

Fair enough?

A. Yes, ma'am.

Q. And, also, we are going to be taking breaks. So if at any point you need a break when the attorneys haven't already called for a break, please let me know. We can take one.

My only request is that if there's a question pending, go ahead and answer that question, and then we can take a break after that.

Okay?

A. Um-hum. Yes, ma'am.

Q. Mr. Curran, are you currently on any medications that would impair your ability to tell the truth today?

A. No.

Q. Are you currently on any medications that would impair your ability to recall events from back in December of 2017, when this incident occurred?

A. No.

Q. Now, let me just introduce myself briefly. My name is Amy Nguyen, and I am counsel for Axon; I'm in-house counsel for the company. And this is the only opportunity that I get to ask you questions and speak with you prior to your trial in this case.

Do you understand that?

A. Yes, ma'am.

Q. Okay. And I'm going to be obviously asking you questions about your claims, but, also, the questions that I ask may become

personal in nature --
A. Um-hum.
Q. -- and it's not my intention to embarrass you or to, you know, do a deep dive into your personal life but only to the extent that it relates to -- to your claims.
Do you understand that?
A. Yes, ma'am.
Q. Okay. What did you do to prepare for your deposition today?
A. Well -- okay. Spoke with my counsel --
Q. Okay.
A. -- reviewed some of my notes, ironed my shirt and -- how -- how -- pretty much that's basically about it.
Q. Okay. And when you say you spoke with your attorney, without getting into the content of those conversations because those are privileged, can you tell me if you met with your attorney, either in person or a phone conference?
A. I did talk to him on the phone, yes.

Q. And how many times did you speak with him on the phone to prepare for your deposition?

MR. BUCCI: I'll object to that. We're not getting into that. That's attorney-client privilege.

I instruct the witness not to answer.

CERTIFIED STENOGRAPHER: Excuse me, Counsel, you are very, very faint.

MR. BUCCI: I object to that. That's -- getting into the number of times I talk with my client is attorney-client privilege.

And I instructed the witness not to answer.

MS. NGUYEN: Okay. So you're saying that even though I'm not asking for the content but simply the number of times you've spoken with him is privileged, not the communication itself?

MR. BUCCI: Yes.

BY MS. NGUYEN:

Q. Mr. Curran, without telling me the number of times or the content, can you tell me how long that you spoke with your counsel, approximately, in preparation for the deposition?

MR. BUCCI: Same objection.

Do not answer.

BY MS. NGUYEN:

Mr. Curran, you have been instructed by your attorney not to answer those prior two questions about both the number of times you've spoken with him as well as the duration.

Are you going to follow your attorney's advice?

A. Yes.

Q. You said that you reviewed some notes, Mr. Curran.

What notes did you review?

A. Interoffice memo from the department; the video of the incident; right now just training record. And that was all I did.

Q. Okay. The interoffice memo -- is

that the one that was drafted by Captain Jones?
A. No; the one that I drafted.
Q. And when did you draft that memo?
A. I'll have to check the date.
It says March 7th, 2018.
Q. And we're going to be referring to what's called "Bates numbers" in the -- typically, they're printed in the lower right corner of documents that have been disclosed in this case.
Can you tell me if that has a Bates number on it?
A. I -- excuse me. I have to find it.
THE WITNESS: This is my own stuff.
MR. BUCCI: Yeah. Just answer the question.
THE WITNESS: Okay.
On mine, no, it does not.
MS. NGUYEN: Scott, has that been disclosed in the case?
MR. BUCCI: Yes. I e-mailed it to

you and Brian along with some medical records.

MS. NGUYEN: Do you happen to have a Bates number?

MR. BUCCI: It was not Bates numbered; it's just something that I have.

Give me one second.

MS. NGUYEN: While you're looking for that, Scott, I'll continue on.

BY MS. NGUYEN:

Q. Mr. Curran, you mentioned that you also reviewed a video.

Is that the surveillance video of the training that occurred in December of 2017?

A. Yes, ma'am.

Q. And then you also mentioned a training record.

Can you provide more detail on what training record that is?

A. Just the printed-out record of my training history in the -- with the department.

Q. When you say "the department," are you referring to the Virginia Beach Police Department?

A. Yes, ma'am.

Q. Any other documents that you reviewed?

A. No, ma'am.

Q. Mr. Curran, where are you currently living?

A. At

.

Q. And how long have you lived at that residence?

A. I believe since 2012.

Q. And prior to that, did you live in any other cities, or was it also Virginia Beach before 2012?

A. Before 2012 was Virginia Beach also.

Q. Did you -- most -- can you say most of your adult life, have you lived in Virginia Beach, or have you --

A. Oh. No, ma'am. Prior to the 2300

address, I lived in a different house in Virginia Beach; prior to that, I lived in an apartment in Virginia Beach; prior to that, I lived up towards my parents' house, which was Langhorne, Pennsylvania.

I spent most of my adult life until about 25 years old up in that area, just north of Philadelphia.

Q. Okay. And you said your parents still live in that area?

A. Yes, ma'am.

Q. And what is your current age, Mr. Curran?

A. Forty-five.

Q. I want to go into your education a little bit.

First, what is the highest grade that you have completed?

A. I have my associate's from Saint Louis University.

Q. And when was that obtained?

A. I believe 2014 or 2015. I'm not

quite sure.

Q. Any other prior -- excuse me -- college education?

A. No, ma'am.

Q. And then what about high school? What high school did you graduate from?

A. I went to Pennsbury in Fairless Hills, Pennsylvania.

Q. Do you have any other specialized training or education, certifications other than those that you received at Virginia Beach?

A. No, ma'am.

Q. Mr. Curran, are you currently employed?

A. No, ma'am.

Q. And you were last employed at Virginia Beach Police Department?

A. Yes, ma'am.

Q. And what was the date of your last employment there?

A. December 1st, 2018.

Q. And in reviewing the records, it

looks like you started there in 1999; is that correct?

A. Yes, ma'am.

Q. What was the position that you had when you started?

A. Well, first, it was police recruit, and then, once I graduated, it was police officer.

Q. So no other law enforcement experience prior to joining Virginia Beach?

A. I went through the Montgomery County Police Academy in, I'd say, '98, maybe, but that doesn't count because I put myself through it. No department hired me at that time, kind of like a college -- trade school thing.

Q. I'm sorry. What year did you say that was?

A. Maybe 2000 -- 2000 -- I'm sorry -- maybe 2007 -- I'm sorry -- 1997, '98 -- I'm not positive on that.

Q. Okay. And so when you were hired on by Virginia Beach Police Department, even though

you had already gone through a police academy, they did not recognize that and they wanted you to go through the academy again; is that correct?

A. Yes, ma'am. Different states, so . . .

Q. What academy did you go through for Virginia Beach?

A. The Virginia Beach Police Academy.

Q. Were you actually hired on prior to joining the academy?

A. Yes, ma'am.

Q. You said that you started as police recruit. Once you graduated, you were officer.

Can you just briefly walk me through the positions that you held while at the Virginia Beach Police Department?

A. Sure. In the first, I was on uniform patrol, and then I went to the oceanfront for a couple of years during the summer, still basically uniform patrol. And then, from there, I went to community policing in the First Precinct.

And then, from there, I went to the special weapons and tactics team for approximately -- I was there for about 12 years, I believe -- I'm sorry, not 12 years -- probably about 11.

Right about 10 years into the SWAT team, I took the job as a defensive tactics coordinator but still did double duty as a SWAT team member at the time until -- I believe it was 2006 or '7. And then I stopped responding to SWAT call-outs and just did the defensive tactics coordinator position.

Q. And that's the position you held until the employment ended on December 1, 2018?

A. Yes, ma'am.

Q. Uniform patrol -- how long were you in uniform patrol before you went to the community policing position?

A. I think -- I believe about three years, maybe four.

Q. Okay. And can you tell me what the community policing position entails?

A. Policing the communities, the -- certain neighborhoods that had a majority or spike in crime or activity.

Q. So how is that different than a regular patrol officer out in the community?

A. Regular patrol officer primarily responds to calls for service and traffic summonses. Community policing doesn't primarily respond to calls for service unless needed. Community policing focuses on problem neighborhoods or gets tasked with adjunct assignments, like possible residential burglaries, where you would just patrol that immediate area where they've had a numerous amount of burglaries or things like that.

Q. And how long did you hold that position?

A. I believe I was only there for about a year, maybe a little bit more.

Q. And that's when you went into special weapons and tactics?

A. Yes, ma'am.

Q. You said that you were in that position for approximately -- I think you said 11 to 12 years?

A. I believe so, around there, yes, ma'am.

Q. Of those positions that you've listed, which ones would include you serving in a supervisory role where you would supervise other officers?

A. Well, during those positions, I was -- are you talking about supervising on the street, or can you explain "supervising"?

Q. Either way. Anytime you're either supervising or managing other officers within the department.

A. Well, at that time, when I was in community policing, I was also a defensive tactics instructor and a general instructor. So I would say from the community policing part all the way including SWAT and defense tactics coordinator, I would manage other officers.

Q. And that would be the officers that

would obviously come into your training courses, correct?

A. Not only that but also if there was -- also on the SWAT team during tactical situations.

Q. So during those tactical situations, would you then be considered a lead officer on the scene, and so they would have to, you know, listen to you -- look to you for commands and instructions?

A. Yes, ma'am.

I was for -- I believe about six out of the 11 years, I was assistant team leader on the SWAT team. And then when we had a break of sergeants, I was tasked with taking the role of being in charge.

Obviously, there was no bump up in title; it was just a duty assigned.

Q. So you never had the title of sergeant; is that correct?

A. No, ma'am.

Q. "No" meaning that is -- you did not

have the --

A. I did not have the title of sergeant.

Q. Okay. Thank you.

Can you tell me what the defensive tactics/less lethal coordinator entails?

A. Okay. The jobs they had -- I had on that was setting up all defensive tactics academy training; setting up all detectives department training; developing the training for the Academy and the department; responding to use-of-force boards as a subject matter expert in defensive tactics; trying out new gear in the rooms and going to different schools to develop advanced training in officer self-defense and deescalation.

Q. And would you categorize, at the Virginia Beach Police Department, the TASER Conducted Energy Weapon, which I will refer to for short as "CEW" -- is that something that's familiar to you?

A. Yes, ma'am.

Q. Okay. So when I say "CEW," you'll

know that I'm referring to the TASER Conducted Energy Weapon?

A. Yes, ma'am.

Q. Would you include that in the defensive tactics/less lethal coordinator umbrella?

A. No, ma'am. That's a separate position.

Q. Okay. And was the TASER CEW considered to be a less -- less lethal use-of-force device at the Virginia Beach Police Department?

A. I believe so.

Q. So before joining Virginia Beach in 1999, you mentioned that you attended an academy in Montgomery County.

Is there any prior employment before joining Virginia Beach?

A. Yes. I was the loss prevention manager at Kohl's department stores.

Q. Okay. And how long did you do that?

A. Two or three years. That's a

guesstimate.

Q. Okay. Any other prior employment?

A. Prior to that, I worked as loss prevention at a department store called Boscov's in Philadelphia and in Bensalem. And prior to that, I believe I was a security officer at the Lynnhaven Mall. And prior to that, I worked at a clothing store for sports inside the Lynnhaven Mall.

As far as any employment before that, I can't recall. It could have been a gas station for a little bit.

Q. Okay. As a security officer, did you carry any use-of-force tools?

A. No, ma'am.

Q. That would include the TASER CEW, correct? You did not carry that?

A. In 1993, no, ma'am.

Q. Mr. Curran, are you currently single or married?

A. I am single, and I have a girlfriend.

Q. And what is your girlfriend's name?

A. Stephanie Felps.

Q. What's the last name?

A. Felps, F-E-L-P-S.

Q. And how long have you been dating?

A. Over two years.

Q. Are you currently residing together or separately?

A. Together.

Q. And how long have you been residing together?

A. About a year and nine months -- about that, maybe.

Q. And so were you dating her at the time of this incident in December of 2017?

A. Yes. We just started dating about three months prior, I believe.

Q. Mr. Curran, do you have any children?

A. Yes, ma'am. One.

Q. How old?

A. He [sic] is 7.

Q. And does he reside with you?

A. She -- her mother and I have joint

custody.
Q. She? I'm sorry. I thought you said "he."
A. No; she. I have a little girl.
Q. And I'm sorry. You -- you were going to tell me about the living arrangements.
A. Yes. Her mother and I have joint custody; we split time equally.
Q. And do you have any siblings?
A. Yes, I have one sister.
Q. And where does she live?
A. She lives in Wilmington, Delaware.
Q. And do you speak with her often?
A. Yes, ma'am.
Q. And you mentioned that your parents still live in Pennsylvania?
A. Yes, ma'am.
Q. Okay. I'm going to go into your training in a little bit more detail with the Virginia Police Department.
So can you tell me when you started and ended the academy there?

A. I believe I started in August '99, and my first day on the street was December 31st, 1999, Y2K.

Q. And did Virginia Beach require any additional training other than the Academy to go out into the street?

A. Not that I'm aware of, no, ma'am.

Q. And were you in field training at the time? Did they have a field training program back in 2000?

A. Yes, ma'am.

Q. And how long was that?

A. I believe it was about three months, maybe three and a half, I believe.

Q. And were you able to graduate from that on time, or was that extended for any reason?

A. On time. On time.

Q. Now, the -- at the academy, is it fair to say that that would be the first time that you received some use-of-force training?

A. Yes, ma'am.

Q. And then subsequent to that, in reviewing your training matrix, which we will go over, it looks like you received periodic training in various use of force and tactics?
A. Yes, ma'am.
Q. And that includes all this stuff -- some of them here -- defensive tactics?
A. Yes, ma'am.
Q. Close quarter combat?
A. Yes, ma'am.
Q. OC spray?
A. Yep.
Q. Batons?
A. Yes.
Q. Firearms?
A. Yes.
Q. Sniper training?
A. Yes.
Q. SWAT?
A. Yes.
Q. And on SWAT training, is that where you would have -- I -- I noticed reference to

40-millimeter single shot launcher, 40-millimeter multishot launcher.

Is that the training in which you would use those devices, the SWAT training?

A. What, the 40-millimeter?

Q. Correct.

A. Yes.

Q. And so would it be fair to say that all of that training would also include practical training?

A. Can you define "practical"? What do you mean by "practical"?

Q. So I -- I kind of divide them up. You know, we'll get into the TASER CEW training, but they kind of have a classroom portion of that training where you're reviewing material, obtaining information, then a practical portion where you're actually learning how to use the device, handling the device, learning how to deploy them --

A. Yes.

Q. -- so that's how I separate it in my

mind.

Does that make sense to you?

A. Yes, ma'am.

Q. Okay. And so practical training on those items that I just listed -- would you have received practical training on how to use those devices?

A. Yes, ma'am.

Q. And so you would have handled all of those devices -- for example, the baton, the OC spray, all the firearms -- you would have handled those yourself, correct?

A. Yes, ma'am.

Q. And in doing those in the practical training portions, you also would have received safety instructions, correct?

A. Yes, ma'am.

Q. And did you also receive safety equipment, if needed, during that practical training?

A. Safety equipment? Can you --

Q. Yeah. For -- for example, if there's

eyeglasses, for example -- when deploying some of the firearms, did you wear protective eye gear?

A. Okay. Yes, either supplied or you had it on your person yourself.

Q. Do you agree that when conducting practical training, that it is important to call -- to follow safety protocols?

A. Yes.

Q. Do you agree that when conducting practical training, it's also important to wear safety equipment, if recommended?

A. Yes.

Q. Okay. We're going to go into what I have marked as Exhibit 1. And this is your training matrix.

\- - -

(Deposition Exhibit Number 1, Training History, Shawn M. Curran, Bates stamped AXON_CURRAN000527 through AXON_CURRAN000551, marked for identification, as of this

date.)

\- - -

MS. NGUYEN: Scott, the Bates range on this is AXON_CURRAN527 through -551.

THE WITNESS: It's right here? Okay.

Oh, I see it. Okay.

MR. BUCCI: I'm getting a stapler so we can start -- so, Amy, just FYI -- so if you're going subsequently through the exhibits, it should be easier, but they're all just in one big stack right here. But the first part of it he's -- he's got in front of him.

MS. NGUYEN: And did you receive the index yet? I believe it was e-mailed to you.

MR. BUCCI: I -- hold on. Let me check.

THE VIDEOGRAPHER: Are we waiting on the record?

MS. NGUYEN: No. We can move forward. I just want to make sure that he has the exhibit in front of him.

BY MS. NGUYEN:

Q. Mr. Curran, do you have Exhibit 1 in front of you?

MR. BUCCI: He's got the exhibit in front of me. So it's -- hold on one second. So it's -- what number is it through?

MS. NGUYEN: AXON_CURRAN527 through -551.

THE WITNESS: Okay.

MR. BUCCI: He's got it.

MS. NGUYEN: Thank you.

BY MS. NGUYEN:

Q. And, Mr. Curran, I don't believe we've made this clear on the record that although the rest of the attorneys are appearing remotely, you are actually present in person with your attorney, Mr. Bucci; is that correct?

A. Yes.

MR. BUCCI: Six feet away.
BY MS. NGUYEN:
Q. Okay. So I'm going to direct you to -- if you look at Exhibit 1, down at the lower right-hand corner is the Bates numbers, where it says AXON_CURRAN.
Do you see that?
A. Yes, ma'am.
Q. Okay. And I'm going to refer to those pretty often throughout the deposition just to make sure that we are literally all on the same page.
So right now, I'm going to direct you to Page 546 of those Bates numbers.
And just let me know when you're there.
A. I'm there.
Q. Okay. So on this page, it has a list of -- it looks like the title is F41s.
Can you tell me what that means?
A. I have no idea, ma'am.
Q. Okay. It -- it looks to be starting

in April of 2005 down at the bottom -- that's the oldest one in mobile tactics -- and then all the way up to the most recent, which was October of 2017. But it appears that most of them are instructor training.

Would you agree with that?

A. It would say that they're instructor research, yes, ma'am.

Q. Well, down at the bottom, it doesn't say research; it actually says -- indicates new instructor training, correct?

A. At -- if you look at 2005, 5 -- 5/3, General Instructor School --

Q. Correct.

A. -- and the same thing right above that, Defensive Tactics Instructor School, yes, that is brand-new-instructor-status class.

Q. Okay. And so it appears to me that this -- this out year -- the instructor or -- either initial instructor or recertification for your instructor positions; is that correct?

A. It would appear so, yes.

Q. Okay. And going to the -- to the first one, which would have been the first one you received, where it indicates you were an instructor was back in -- on May 3rd, 2005 as a general -- you went to general instructor school.

Do you see that?

A. Yes, ma'am.

Q. And what does general instructor school entail?

A. That allows you to teach classes, like if you would need to give a CPR class after you become CPR certified, or you could teach a report-writing class, things of that nature.

Q. So CPR, report writing.

Anything else that you would be able to instruct with that general instructor certification?

A. Yes, there's a ton of things. I couldn't possibly name them all, but, like, ethics, if you were tasked with that -- I'm trying to think of what else is in the training -- accident diagrams, if you were tasked

with that -- bay -- the basic police stuff.

Q. Okay. So did that get into use of force at all?

A. No, ma'am.

Q. And did you maintain that general instructor certification throughout your employment with Virginia Beach?

A. Yes, ma'am.

Q. The next one it looks like you received was on May 31st of 2005, and it says, Defensive Tactics Instructor School?

A. Yes, ma'am.

Q. What did that training entail?

A. That allows you to teach the Academy -- or the department the -- the maneuvers or pressure points, joint manipulations, the curriculum of the Virginia Beach Police Department in the areas of defensive tactics.

Q. So does defensive tactics at Virginia Beach -- would that only include hands-on use of force, or does it also include use-of-force tools?

A. It would include the only use-of-force tools it -- actually, the defensive tactic instructor, you could only teach just hands-on until you received certifications.

Q. Okay. So no use-of-force tools?

A. No.

Q. And then you let me know what that allows you to teach.

What about the actual training, though, to become an instructor?

Do you recall how long it was?

A. I -- possibly about 40 hours or 50 hours. I'm not positive.

Q. And would that have involved both classroom work as well as the --

CERTIFIED STENOGRAPHER: Excuse me, Counsel. You lost connection there.

MS. NGUYEN: Oh, okay.

Can you hear me?

THE WITNESS: Yes, I can now.

CERTIFIED STENOGRAPHER: I can now, too.

MS. NGUYEN: Okay.
BY MS. NGUYEN:
Q. My question --
MS. NGUYEN: Thank you.
BY MS. NGUYEN:
Q. My question was, Did that training include both a classroom as well as a practical portion?
A. Yes, ma'am.
Q. Was it divided up evenly, or was there more of one than the other?
A. There's more practical than classroom.
Q. And did you actually teach -- starting from your instructor certification in May of 2005, did you actually teach defensive tactics pretty consistently throughout your employment at Virginia Beach?
A. Yes, I would say so.
Q. Okay. Referring back to Exhibit 1, there's another one for firearms instructor school.

Do you see that?
A. Yes, ma'am.
Q. Is that another certification that you received?
A. Yes, ma'am.
Q. And that -- that training -- do you recall how long and what that training entailed?
A. That training -- I -- 40 to 60 hours -- I'm not positive exactly the amount of hours. It incorporated classroom portion and shooting portions.
Q. And that -- what kind of courses does that allow you to teach? Only firearms, or does it allow you to go into other training?
A. Just your basic firearms.
Q. Basic firearms.
What about your -- the specialized firearms that you would -- that you referred to earlier in SWAT?
A. No. The -- that -- the basic fire -- firearms instructor would be just your basic weapons that the department might have, your

handgun -- at the time, it was just your handgun or a shotgun.

Q. Okay. And did you teach those courses on a regular basis during your employment?

A. Not to the department, no. At that time, I was just transferred to the SWAT team, so I was -- did most of my training on the -- most of my teaching on the SWAT team -- to the SWAT team.

Q. And did you ever become certified as an instructor to teach more of the specialized firearms?

A. Yes. I was instructor in teaching carbine and sniper rifles.

Q. And do you recall -- do you see that anywhere on Exhibit 1 on Page 546?

A. No, ma'am.

Q. Do you recall when you would have received that certification?

A. The exact dates, no. I would have to look through my training record, if I could even

find it.

Q. What's an approximate time frame?

A. Well, I think I went through sniper school in 2007. And you don't teach right out the gate, so maybe about a -- maybe about two years later, I was teaching the sniper rifle.

And then the carbine or other specialized weapons just comes with training, the more you train on it. There's no -- I'm not quite sure there's a certification letter for it.

Q. Okay. Mr. Curran, do you agree that defensive tactics and firearms training involves -- involves risk of injury?

A. Yes.

Q. In fact, would you agree that all use-of-force practical training involves risk of injury?

A. Yes.

Q. And that you need to implement safety protocols to reduce that risk of injury?

A. Yes, ma'am.

Q. And as an instructor for Virginia Beach in these areas, would you agree that participants in these practical use-of-force trainings are expected to follow those training protocols and use safety equipment?
A. Yes, when specified, they are.
Q. And that that would be a reasonable expectation of an instructor is that the participants do follow those protocols?
A. Yes.
Q. Would you also agree that as a use-of-force instructor, that you can't be expected to watch every participant at all times?
A. No.
Q. You disagree with that?
A. Yes.
Q. And so you believe that instructors should watch every participant at all times?
A. Depending on the size of the class.
Q. Okay. So let me know what -- at what point do you think that an instructor is no longer expected to watch every participant at all

times?

A. When you're dealing with a large amount of people, it's impossible to watch everyone; but when you're dealing with a small group of individuals, you are, as the instructor, expected to watch everyone.

Q. Okay. And what do you consider to be a small group of people? Where is that cutoff for you?

A. About one to three.

Q. Okay. So one to three people -- you would say that the instructor needs to watch all participants at all times --

A. Yes.

Q. -- at least that's the expectation?

A. That would be the expectation, but it also depends on the type of training you're doing.

Q. Okay. And then over three people -- so four or more -- you would say that, there, the instructor is not expected to watch all participants at all times?

A. That one instructor, no. They would have to facilitate other instructors' help.

Q. You will agree, Mr. Curran, that regardless of how many safety -- safety protocols or how much safety equipment is used, that injuries can still occur during practical training on use of force?

A. Yes.

Q. But sometimes it's just not something that can be avoided?

A. I wouldn't say every single time, no.

Q. No. And I didn't -- my question was, Sometimes it's something that cannot be avoided, correct?

A. Possibly.

Q. I'm going to discuss more specifically now your TASER CEW certifications.

Going to Exhibit 1 -- and this exhibit -- just keep it handy because we're going -- this is your training matrix, so I'm going to go and reference it quite often throughout your deposition.

Okay?

I'm going to refer you to Page 541.

And before we actually go through this specifically, can -- is it fair to say that you would not have handled a TASER -- TASER CEW before joining the Virginia Police Department?

A. Correct.

Q. Okay. And according to this exhibit, at least as far as I could tell, the earliest TASER CEW certification that I can see occurred on October 31, 2007. And that's on Page 541.

Do you see that?

A. Yes, ma'am.

Q. But here, it says, TASER recertification. But I wasn't able to find a certification prior to that date.

Do you recall when you were first certified on the TASER CEW?

And feel free to look at the prior dates. This -- this training matrix here goes back to when you joined the department.

A. It would have to be sometime, I

believe --

Q. It looks like it goes back to Page 541.

A. -- I would have to say it would probably be somewhere around 2005 or 2006, while on the SWAT team.

Q. Okay. And if you can then just take a look at those years. So it looks like they appear on Pages 542, 543 and 544.

Do you see anything on there that would indicate a TASER CEW certification?

Most -- the ones that I located -- I'll just tell you they actually say, you know, TASER certification or recertification.

But I'm wondering whether it could have been lumped into any other training that you received during that time frame and perhaps not culled out specifically.

A. I couldn't tell you, to be honest. The --

Q. Okay.

A. -- person who did the training was

required at the time in the SWAT team to fill out the paper. So they could have lumped it together with other training at the time or that day.

Q. Okay. But as you sit here today, you have an independent recollection of first being certified on the TASER CEW either in 2005 or 2006; is that correct?

A. I believe so, yes. I'm not positive.

Q. And am I correct in assuming that you would not have handled a TASER CEW until you actually received that certification?

A. Correct.

Q. So going back to Page 541, that TASER certification that I referenced of October 31, 2007 -- do you see that?

A. Okay.

Q. Now, here, it says it's a recertification. And if you go over to the fourth column, that reflects the number of hours that was in that training.

A. Yes, ma'am.

Q. And it says, Four hours.

Does that sound consistent with your recollection of the TASER recertification?

A. I believe -- in 2007, I don't have a recollection, but according to what it would be, I would assume that would be correct.

Q. And would that have been on the model -- the X26?

A. I can't tell you exactly which model it was. I'm not positive on which one it was.

Q. Okay. So you don't know -- you aren't familiar with what model you were first certified in at Virginia Beach?

A. The actual number -- it was the smaller one. So whatever the department had at the time, that's the one we trained on.

Q. Okay. And that would have been a single-shot device, correct?

A. Yes, ma'am.

Q. Now, at the time, was there -- how -- do you recall how many TASER CEW instructors you had at the department?

A. Oh, I had -- I have no idea.

Q. Okay. Do you recall if your instructor was with Virginia Beach or from some other agency?

A. It was with Virginia Beach.

Q. Do you recall any of the instructor names for the TASER CEW instruction you received?

A. I can only speculate who it was on the -- on -- on the training due to the people on the SWAT team. I don't recall exactly who trained me. It may have been --

Q. Who do you think it may have been?

A. Johnny Mitchell, and possibly Steve Ferrara, but that's a guess.

Q. And are they both still -- with the department still, to your knowledge?

A. I believe Steve is. I'm not quite sure in what capacity Johnny would be.

MS. NGUYEN: Now we're going to go to Exhibit 2, AXON_CURRAN711 through -790.

\- - -

(Deposition Exhibit Number 2, TASER International Training Material License Agreement, User Course, Slides 1, 2, 32, 74 and 75, Bates stamped AXON_CURRAN000711 through AXON_CURRAN000712, AXON_CURRAN000746, AXON_CURRAN000789 through AXON_CURRAN000790, marked for identification, as of this date.)

\- - -

BY MS. NGUYEN:

Q. Do you have that in front of you, Mr. Curran?

A. Yes, ma'am.

Q. Now, if we can just go to Page 2 of that document, which is Bates 712. And this one says, TASER X26, Electronic Control Device User Course, Version 13.0, Released May 1, 2006.

And I will tell you, Mr. Curran, that this was the -- you're aware that TASER,

now Axon, would update their training materials periodically, correct?

A. I was never a TASER instructor, so I'm not quite sure what TASER sends out or does.

Q. I understand that, but you went through multiple TASER certifications and recertifications, correct?

A. Yes, ma'am.

Q. And during that time, did you learn that TASER releases recommended training materials?

A. I'm sure -- I'm sure they probably -- I was told that, yes, ma'am.

Q. Okay. And during that time, would you also have learned that they update those training materials periodically?

A. If it was different than the previous training, I would just assume that they updated. I don't believe ever recalling someone said they updated something.

Q. Okay. And so I'll tell you that Exhibit 2 reflects training released May 1st,

2006, which still would have been, in fact, during this training in October 31, 2007.

Okay?

A. Okay.

Q. Okay. So with that understanding, do you recall that during the CEW training that you went through, that you would review training materials in the form of a PowerPoint deck?

A. Yes, ma'am.

Q. And the instructor would go through that PowerPoint with you?

A. Yes, ma'am.

Q. And so that would -- would that be -- be --

MR. BUCCI: Did we lose her?

CERTIFIED STENOGRAPHER: We lost -- yes, we lost her connection.

BY MS. NGUYEN:

Q. -- be, to your understanding, the classroom portion of the training?

(Connectivity issues.)

CERTIFIED STENOGRAPHER: Counsel,

you -- you cut out in the middle of your question --

MS. NGUYEN: I'm going to try it again.

CERTIFIED STENOGRAPHER: -- we might have to start your whole question. Sorry.

MS. NGUYEN: That's okay. Thanks for letting me know. It seems like it cuts out periodically.

BY MS. NGUYEN:

Q. Can you hear me okay now, Mr. Curran?

A. Yes, ma'am.

Q. And when you reviewed the PowerPoint materials in your training, would you consider that to be the classroom portion?

A. Yes, ma'am.

Q. And then there was also the practical portion, where you actually handled the devices, correct?

A. Yes, ma'am.

Q. And during the classroom portion of

this particular training -- I'm going to take you to Page 746.

And on Page 746, this slide is included, which says, Are TASER Devices Risk-Free? And the answer is No.

Would you agree with that statement based upon your training, Mr. Curran?

A. Yes.

Q. There's also a warning where you're told that TASER devices can cause injury, correct?

A. Yes.

Q. And it also states, At this time, review all TASER warnings contained in the instructor manual.

Do you see that?

A. Yes.

Q. And in the notes, it says, Instructors shall copy all the TASER warnings and hand them out to all user course students for their review prior to proceeding with the course.

Do you see that?

A. I do see that, yes.

MS. NGUYEN: And Exhibit 3 is Warnings, AXON_CURRAN1952 through -1955.

\- - -

(Deposition Exhibit Number 3, Product Warnings — Law Enforcement, Bates stamped AXON_CURRAN001952 through AXON_CURRAN001955, marked for identification, as of this date.)

\- - -

THE WITNESS: Do you have a page number on that? Because mine just jumps.

MR. BUCCI: Here, I'll -- I'll assist him.

Here.

Is it the one, Amy, that starts 1952?

THE WITNESS: Which one -- does it start at --

MS. NGUYEN: Yeah, 1952 through 1955.

THE WITNESS: Okay.

MR. BUCCI: Yeah, if you would, Amy, just tell us what -- what the Bates numbers are -- you know, what to what, and then we can staple them, and it will probably be a little easier to go through.

THE WITNESS: Got it.

BY MS. NGUYEN:

Q. Okay. So these warnings -- you see the date at the bottom, March 1st, 2007?

A. Yes.

Q. These would have been in effect during that October 2007 training.

And I want to go to Page 2 of those warnings.

A. Okay.

Q. Mr. Curran, do you recall reviewing warnings during your TASER CEW courses?

A. The 2007 -- I can't say I recall something from 13 years ago.

Q. Well -- and I know. That's why my

question was a little bit more general. I'm -- I'm sure you aren't going to remember specific warnings at a specific training date --

A. Yes, ma'am.

Q. -- but I'm saying, generally speaking, when you went to your TASER certification, where you reviewed warnings --

A. Yes, I'm sure.

Q. -- at that time.

A. I believe so, yes.

THE WITNESS: I think we lost her.
Oh, there she is.

BY MS. NGUYEN:

Q. Okay. And this warning on Page 2 -- can -- can you repeat that?

A. I'm sorry. You cut out.
Which warning?

Q. So it's Exhibit 3. This is the 2007 warnings.

A. Okay.

Q. Okay. And on Page 2 of those warnings.

A. Okay.
Q. And it says, Deployment Warnings.
Do you see that, the big heading?
A. Yes, ma'am.
Q. And then going down to the third subheading, it says, Avoid Sensitive Areas?
A. Yes, ma'am.
Q. And it says, Significant injury can occur from TASER device deployment into sensitive areas of the body, such as the eyes, throat or genitals — avoid intentionally targeting these areas without justification.
Do you see that?
A. Yes, ma'am.
Q. And that's something that was included in the warnings provided during training, correct?
A. I can't say definitely, like I said earlier, that that was provided on that training; but according to your paperwork, it should have been in there. But I can't -- it's 13 years ago.
Q. Right. And as you sit here today, do

you have any reason to believe that the instructor would have ignored that slide and not provided you with the warnings?

A. No, ma'am.

Q. Going to Page 3 of those warnings, which is Bates Number 1954.

About halfway down on that page, it states, Permanent Vision Loss.

Do you see that heading?

A. Yes, ma'am.

Q. It states, If a TASER probe becomes embedded in an eye, it could result in permanent loss of vision.

Do you see that?

A. Yes, ma'am.

Q. Okay. And we're going to go back to Exhibit 2, which is the PowerPoint slide.

So we went over this slide with the -- where it mentions the warnings, and so we'll turn to the next page, which is Bates 789.

Just let me know when you're there.

MR. BUCCI: One sec here. Let

me -- Amy, I'm going to help him out real quick here.

THE WITNESS: Is it in there?

MR. BUCCI: Okay.

THE WITNESS: Okay. Got it.

BY MS. NGUYEN:

Q. Okay. Are you on Page 789?

A. Yes, ma'am.

Q. Okay. So this was another slide that was included in that classroom portion of the training. And this slide shows a photo of a probe impacting an eye.

Do you see that?

A. Yes, ma'am.

Q. And this photo -- I'll tell you now -- was included in many of the PowerPoint presentations.

Do you recall seeing this photo, Mr. Curran?

A. I recall seeing a photo of a TASER in an eye. I don't recall this exact photo. It could be one -- or it could have been the one,

but the exact photo -- I -- I can't recall if this was the exact photo, but I do remember seeing something depicting what is shown right here.

Q. Okay. And so you recall, prior to your training incident in December of 2017, being shown a photo of an individual having a probe -- a TASER probe in his eye, correct?

A. Yes.

Q. Okay. We can set aside Exhibit 2.

And then there is the prac- -- we went over the PowerPoint, a few of those slides, and then there -- you went into the practical portion of -- of training, correct?

A. You said "practical portion" -- you broke up, but if that's what you said, yes, we would go from classroom to practical, normally.

Q. Okay. And in those -- the practical portion of the training, that's where you would actually hand her -- handle a TASER CEW, correct?

A. I missed the first --

Q. Are you having trouble hearing me

again?

CERTIFIED STENOGRAPHER: Do you want to go off the record? We can solve this.

MR. BUCCI: Sure. Let's solve it.

THE VIDEOGRAPHER: Okay. We are off the record at 11:19 a.m.

\- - -

(Whereupon, a recess was taken from 11:19 a.m. EST to 11:33 a.m. EST.)

\- - -

THE VIDEOGRAPHER: We're back on the record at 11:33 a.m.

BY MS. NGUYEN:

Q. Mr. Curran, where we left off, we were discussing the practical portion of your 2007 TASER CEW training.

In that practical portion, you would actually handle the CEW devices, correct?

A. Yes.

Q. And you would learn how the device worked, turn it on, turn it off, load the

cartridge, unload the cartridges, correct?
A. Yes, ma'am.
Q. And you would also actually deploy the CEWs at that time; is that also true?
A. Yes, we would deploy them at a static target.
Q. Okay. And when you deployed them at a static target, the cartridges that we're using also would deploy the probes, correct?
A. Yes.
Q. And did you have an opportunity at that time to see the probes?
A. Yes.
Q. And did you actually remove them from the target?
A. No. We would shoot the static target, and you would leave them.
Q. Okay. And during that training, were you -- were you also able to observe that the probe has a sharp end?
A. Yes.
Q. And did you understand that it's

designed that way to penetrate skin of the subject so it can actually make contact and deliver the current to the subject?

A. Yes, skin or the clothing, yes.

Q. And you also learned that the probes, because they are sharp, can cause injury, correct?

A. Yes.

Q. And that includes if it's shot to the eye?

A. Yes.

Q. Going back to Exhibit 1 of your training matrix. And I'm going to refer you to Page 538.

Just let me know when you're there because I can't see you when you have the exhibit in front of you.

A. I was just taking a break for a second.

Q. No. You're fine. Let me know when you're ready.

A. I'm ready. Go ahead.

Q. Okay. It's Bates 538. And about the seventh entry down, it says, TASER Users Group — TASER Recertification on May 13th, 2009.
Do you see that?
A. Yes.
Q. And that would have been the recertification on the same model that you had, correct?
A. I believe so. I can't -- I -- I can't tell you exactly what model it was, but -- I would just assume, but I'm not positive.
Q. Well -- and I understand that you didn't know the number of the model, but what I'm asking is, if you do a recertification, it has to be on the same model, right, versus if you were to get trained in a new model? You would have to do a whole initial certification again, not the recertification.
Does that make sense?
A. It does make sense, yes.
Q. And is that your understanding?
A. Is that -- yes. I would just assume

that I did a recert on that same model.

Q. Okay.

MS. NGUYEN: And we're going to go to, now, Exhibit Number 4, which is AXONCURRAN_939 --

THE WITNESS: There you go.

MS. NGUYEN: -- and the last page of that one is 1066. It's just a three-page exhibit.

\- - -

(Deposition Exhibit Number 4, TASER International Training Material License Agreement, Slides 1, 10, 11, 123 and 124, Bates stamped AXONCURRAN_000939, AXONCURRAN_000948 through AXONCURRAN_000949, AXONCURRAN_001065 through AXONCURRAN_001066, marked for identification, as of this date.)

\- - -

MR. BUCCI: That's Number 4?

MS. NGUYEN: Correct.
MR. BUCCI: All right.
THE WITNESS: Got it.
BY MS. NGUYEN:
Q. Okay. And going to the second page, which is AXON_CURRAN948?
A. Okay.
Q. And here in the bottom right corner, you see it says, Version 14.2. Then it has August of 2008 --
A. Okay.
Q. -- do you see that?
And I will let you know that this would be the one in effect at the time of your training in May of -- of 2009. So we'll start with that assumption.
Fair enough?
A. Okay.
Q. And this slide goes into safety rules.
Do you recall learning in your recertification about a -- TASER CEW safety?

A. I'm sure there was one. Offhand, I can't say that I did, but I'm sure there was one, because there normally is one with any type of TASER training; there's always safety.

Q. Okay. And this particular slide states, No live firearms will be brought into the training area.

Do you see that?

A. Yes.

Q. And in that -- was that, in fact, something that you were instructed and recall being instructed during your TASER CEW training?

A. I can only assume it was. You're -- again, you're asking me to recall it from 2009, so I can't tell you exactly that that's the verbiage he used, but I would assume that was given, and it was still not --

Q. My -- my question was just more general.

Is that something that you learned during your TASER CEW training is that they do not allow firearms in the training area?

A. Yes, ma'am.
Okay.
Q. Okay. The next bullet point is, All activity will stop when any student or instructor calls "Stop action."
Do you see that?
A. Yes, ma'am.
Q. And then the next bullet point states, Every participant is a safety officer. All unsafe conditions will be immediately brought to the attention of the instructor. If an unsafe condition occurs or is noticed during an exercise, the student or instructor observing the unsafe condition shall call "Stop action."
Do you see that?
A. Yes, ma'am.
Q. And is that something you generally recall learning during your TASER CEW training, that if anyone saw anything unsafe, that they were to call stop action?
A. It probably was, but I'm not -- like I said, I'm not 100 percent definite, but I would

assume it would.

Q. Okay. And you don't have any reason to believe that this particular slide was not included in your training in 2009, correct?

A. I don't have any reason to believe that it isn't -- it wasn't.

Q. Okay. Going to the next page, which is Bates Number 949 of Exhibit 4.

This is the same slide that we reviewed previously in the 2007 materials, and here, it again talks about the risk of TASER devices causing injury.

Do you see that?

A. Yes.

Q. And then, again, it says, At this time, review all TASER warnings contained in the instructor manual.

And the notes indicate the instructors shall copy all the most current TASER warnings and hand them out to the course students.

Do you see that?

A. Yes.

Q. And then the next page, Bates 1065, talks about effective target zones.

Do you recall learning about target zones in your TASER CEW training?

A. Yes, ma'am.

Q. All right. And here, this slide states, Do not aim at head/throat unless the situation dictates a higher level of injury risk is justified.

And then down in the notes, it says, in capital letters, DO NOT AIM AT THE HEAD/THROAT UNLESS SITUATION DICTATES A HIGHER LEVEL OF INJURY RISK IS JUSTIFIED. Hits in these areas are effective, but probes in the eyes and throat can cause serious injuries.

Do you see that?

A. Yes, ma'am.

Q. And then on the next page, Bates 1066 of Exhibit 4, it has that same slide that we saw previously in the 2007 materials with an individual -- a photo of an individual with a

probe in his eye, correct?

A. Yes.

MS. NGUYEN: And then, next, we are going to go to the warnings for the 2009 training, and that is Exhibit 5.

MR. BUCCI: What -- what is -- what documents are contained within Exhibit 5? I think --

MS. NGUYEN: It's the 2000 -- there's a date at the bottom, 2008 warnings --

MR. BUCCI: April 28th --

MS. NGUYEN: -- and --

MR. BUCCI: -- 2008?

MS. NGUYEN: April 28th, 2008, correct.

-- and it should just be two pages, front and back, or four pages total.

MR. BUCCI: Four pages total.

Hold on one second.

\- - -

(Deposition Exhibit Number 5, Product Warnings: Law Enforcement, marked for identification, as of this date.)

\- - -

THE WITNESS: Okay.

BY MS. NGUYEN:

Q. Okay. So, Mr. Curran, you have Exhibit 5 in front of you, correct?

A. Yes.

Q. Okay. So I'm going to refer you to the third page of that exhibit.

And about halfway down, we again see that same statement about permanent vision loss.

Do you see that?

A. Yes, ma'am.

Q. And it states, If a TASER probe strikes or becomes embedded in, or in close proximity to, an eye, it could result in serious injury, including permanent loss of vision.

Do you see that?

A. Yes.

Q. And then two paragraphs below that, it says, Penetration Injury.

Do you see that?

A. Yes.

Q. And there, it says, TASER probes have small dart points which may cause penetration injury to blood vessels, arteries, internal organs (including lung [pneumothorax]), bone and nerves. The probe and/or the dart point (which may detach), could puncture or become embedded in a bone or organ, which may require immediate medical attention, surgical removal and/or may result in scarring, infection and/or other serious injury.

Do you see that?

A. Yes, ma'am.

Q. And then, Mr. Curran, for that 2009 CEW training, you also would have gone through the same practical portion that we discussed with regard to the 2007 training, correct?

A. The static training? Is that what

you're talking about? Shooting at a paper target?

Q. Correct. So deploying cartridges to the target.

A. Normally, that's standard for the recerts that I've been through, so I can just assume that we did that also.

Q. Okay. You don't have any reason to believe you wouldn't have done it for the 2009 certification, correct?

A. No, ma'am.

Q. And, in fact, did your agency require you to complete the TASER CEW recertification to continue to handle a -- a CEW?

A. Yes.

Q. Okay. And do you know whether or not that included the -- Axon's recommendation -- or TASER at the time -- recommendation that you deploy at least two cartridges during every recertification?

A. I do remember every recert that we did that; we did -- we did deploy two cartridges.

Q. And that would be a minimum, correct --

A. Correct.

Q. -- so it's possible you could have deployed more?

A. I believe it was -- we could've, but I believe the standard was two per person. It was a shoot, reload, shoot, so, yeah.

Q. Okay.

Okay. Going back to Exhibit 1. This is your training matrix.

And I'll refer you to -- this time, it's a 2010 training, and it is located on Bates 536.

A. Okay.

Q. Let me know when you're there.

A. I'm here.

Q. Okay. So this one is about three-fourths of the way down on the page. It says, TASER User Recertification, and the date of it is 3/16/2010.

Do you see that?

A. Yes, ma'am.

Q. And so, again, since this one's a recertification, we can assume it would have been on the same model that you had previously, right?

A. Yes, ma'am.

Q. Okay. And then for the classroom portion, I'm going to show you Exhibit 7, with your counsel's assistance. It is Bates Number AXON_CURRAN1189, and it ends with 1293.

- - -

(Deposition Exhibit Number 7, TASER International Training Material License Agreement, Slides 1, 6, 7, 99 through 101, Bates stamped AXON_CURRAN001189, AXON_CURRAN001194 through AXON_CURRAN001194, AXON_CURRAN001291, through AXON_CURRAN001293, marked for identification, as of this date.)

- - -

MR. BUCCI: One second.

1189 to 12 what?

MS. NGUYEN: 1293.

MR. BUCCI: All right.

That's Number what?

MS. NGUYEN: Seven.

THE WITNESS: Okay. I have it.

BY MS. NGUYEN:

Q. Now, this one -- in the lower right-hand corner on that first page, you can see this is Version 16, and the effective date is November 2009.

Do you see that?

A. Yes, ma'am.

Q. So I will again tell you this would have been in effect during your training on March 16th, 2010.

Can we proceed with that assumption?

A. One would assume, yes, ma'am.

Q. Okay. And on the second page, Mr. Curran, Bates Number 1194, we see the same slide with the safety rules.

A. Yes.

Q. Again, it talks about no live firearms will be brought into the training area and the fact that any -- anybody present during the training can call stop action.
Do you see that?
A. Yes, ma'am.
Q. Any reason to believe that that would not have been included in your 2010 training?
A. No, ma'am.
Q. Okay. And then the next page is Bates 1195, which, again, is the warning, which talks about TASER devices can cause injury, as well as the warnings being passed out to the participants.
Do you see that?
A. Yes, ma'am.
Q. And then on the next page, Bates 1291, we see the same slide we reviewed previously, talking about effective target zones and, in particular, do not aim at sensitive areas, and the probes in the eyes and throat can cause serious injury.

Do you see that?

A. Yes, ma'am.

Q. And then the next page, which is 1292, has a warning. It says, Do not aim at head/throat unless situation dictates a higher level of injury risk is justified. Probes deployed into the eyes or throat can cause serious injuries.

Do you see that?

A. Yes, ma'am.

Q. And any reason to believe that that was not shown to you during your 2010 training?

A. No, ma'am.

Q. And then the last page, Bates 1293 -- it shows that photo we've seen a couple times now of an individual with a probe to the eye.

Do you see that?

A. Yes, ma'am.

Q. Okay.

MS. NGUYEN: Exhibit 6 is going to be a test and checklist, and it is Bates AXON_CURRAN481 through -487.

\- - -

(Deposition Exhibit Number 6, TASER X26 User Certification Test, Bates stamped AXON_CURRAN0000481 through AXON_CURRAN0000487, marked for identification, as of this date.)

\- - -

MR. BUCCI: Give me a second to find it here.

MS. NGUYEN: Sure.

MR. BUCCI: One second, Amy. Give me a second.

MS. NGUYEN: No problem.

MR. BUCCI: Hey, Amy, it looks to me -- yeah, what you guys sent us -- I'm looking at -- so the -- the document is labeled correctly, so, in other words, what you sent me says -- the label is Exhibit 6, X26 Test and Checklist, but what the document is is not that -- not that; it is the same -- it's just another one of the product warning and law

enforcement important health and safety information.

So I don't know that I have that.

Brian, did -- did you get something different than I did, by any chance?

MR. CASEY: No. I've got what you have. I agree with you.

MR. BUCCI: Yeah. It's the -- the title of the document is what you're looking for, but the actual substance of the document is -- is something else. It's just another one of these, you know, things that let us know that TASERs are dangerous.

MS. NGUYEN: Okay. So --

MR. BUCCI: If you can --

MS. NGUYEN: -- so I will, number one, move to strike comments that were just made about the TASERs being dangerous in your summation of the exhibits that we've gone over.

But number two, Scott, I'll just move on. And I've just sent an e-mail over to Kelly, and we'll come back to that exhibit. So hopefully we'll get it soon.

MR. BUCCI: Okay.

MS. NGUYEN: Okay. So let's move on to the next exhibit, which is Exhibit 8. And this is going to be the warnings for 2009. The date of them is September 30th, 2009, and the Bates is AXON_CURRAN1960 through 1965.

\- - -

(Deposition Exhibit Number 8, TASER Important ECD Product Safety and Health Information, Bates stamped AXON_CURRAN001960 through AXON_CURRAN001965, marked for identification, as of this date.)

\- - -

MR. BUCCI: We have the same issue. It's another -- and, Brian,

correct me if -- if what I'm looking at is different, but the title of this one is TASER Important ECD Product Safety and Health Information, and it's not Bates labeled.

Is that what you got, Brian?

MS. NGUYEN: Yeah, it -- so is this one the one that you have that is the -- the first headline? The date on the bottom should be September 30th, 2009.

MR. BUCCI: Okay, yes. I'm sorry. That's it.

MS. NGUYEN: Okay.

MR. BUCCI: Is that right?

MS. NGUYEN: Yep, the -- that's those. And if there -- a total of six pages.

MR. BUCCI: Okay. And this is going to be Exhibit Number 8?

MS. NGUYEN: Correct.

THE WITNESS: Got it.

BY MS. NGUYEN:
Q. Okay. And on Exhibit Number 8, these warnings were in effect September 30th, 2009, and so would have applied to your March 2010 training.
And if I can have you turn to Page 4 of 6 --
A. Okay.
Q. -- and at the top of Page 4, it says, Warning: Probe or Electrode Injury or Infection Hazard.
Do you see that?
A. Yes.
Q. Okay. It said ECD -- now back then, ECD -- it was referred to as "electronic control device," which is now CEW.
Is that your understanding, Mr. Curran?
A. Yes, ma'am.
Q. Okay. So we're talking about the same devices, right?
A. Yes, ma'am.

Q. It says, ECD use may cause a mark, burn, scar, penetration, other skin or tissue damage or infection. Provide first aid and medical care as needed.

Do you see that?

A. I'm sorry. Can you repeat that? Something popped up and blocked the whole screen. I just had to close it.

Can you --

Q. Sure, no problem.

The first portion where it says, Warning: Probe or Electrode Injury or Infection Hazard --

A. Yes, I see that part.

Q. -- hazard -- it states, Use may cause a mark, burn, scar, penetration, other skin or tissue damage or infection. Provide first aid and medical care as needed --

A. Yes --

Q. -- correct?

A. -- yes.

Q. And then, under Penetration Injury,

it has the same warning that we've reviewed in previous warnings, where the probe has a small dart point which may cause a penetration injury.

You see that there?

A. Yes.

Q. Okay. And then the next paragraph talks about penetration injury care, where it states, Injury due to penetration of the probe or dart point into a blood vessel, organ, nerve or bone may require medical attention.

Do you see that?

A. Yes.

Q. Okay. And then down below, you see the box -- the paragraph just above the box. It talks about Untethered Discharge Probe.

Do you see that?

A. Yes.

Q. And it states, In probe deployment, it is possible that a discharged probe that does not impact a subject or target may become untethered from the wire and travel a significant distance. A loose, untethered probe can cause

serious injury.

Do you see that?

A. Yes.

Q. And, Mr. Curran, this incident that occurred in December of 2017 where a probe struck you in the eye, which we will talk about more later -- but do you believe that it was an untethered discharged probe situation?

A. I have -- I have no idea.

Q. Okay. So you don't know whether the probe actually was untethered from -- broke off from the wire or not?

A. I have no idea.

Q. Okay. In the box below, where it says, Warning, in orange -- you see that?

A. Yes.

Q. And it states, Eye Injury Hazard. If a TASER probe, electrode or electrical discharge contacts or comes into close proximity to an eye, it could result in serious injury, including permanent vision loss.

Do you see that?

A. Yes.

Q. Any reason to believe that these warnings were not included in your March 2010 training?

A. No.

Q. And, again, in that 2010 training, you also would have done the practical portion of that certification, correct?

A. Should have, yes.

Q. I know at some point that scenarios were introduced into the practical training.

Do you recall about when that was?

A. I have no idea.

Q. Okay. Going back to Exhibit 1, we're going to review your next training, which is on Page 5 -- Bates 534.

A. I got it.

Okay.

Q. And this one is also about three-fourths of the page down, where it says, TASER User Recertification, April 12th, 2011.

Do you see that?

A. Yep.

Q. And, again, we can assume that it -- because it states Recertification, it would have been on that same model that you had, correct?

A. Yes.

MS. NGUYEN: And for the classroom portion, we're going to look at Exhibit 9, which is Bates 1379 through 1491. And it's four pages.

\- - -

(Deposition Exhibit Number 9, TASER User Certification Course, User Course, Slides 1, 7, 8, 120, Bates stamped AXON_CURRAN001372, AXON_CURRAN001378 through AXON_CURRAN001379, AXON_CURRAN0001491, marked for identification, as of this date.)

\- - -

MR. BUCCI: One second.

THE WITNESS: Got it.

BY MS. NGUYEN:
Q. Okay. And this one -- both in the middle and at the bottom left, it states, Version 17, Released May 2010.
Do you see that?
A. Yes.
Q. And so I will tell you that this would have been in effect during your training in April of 2011.
Can we proceed on that agreement?
A. Yes.
Q. And on Page Bates 1378, we see the same slide with regard to the safety rules.
Do you see that?
A. Yep.
Q. No live firearms as well as anybody can call stop action, correct?
A. Correct.
Q. And I'm just going to go quickly through these since they appear to be duplicates from prior training.
Would you agree with that?

A. Yes.
Q. So the next one has the warning about the possibility of CEWs causing injury and also to review the warnings, correct?
A. Yep.
Q. And then the last page there, Bates 1491, that shows the same photo talking about eye injury hazards of an individual with a probe in the eye, correct?
A. Correct.
Q. So at this point, is it fair to say that that photo was shown frequently during your training?
A. Yes.
MS. NGUYEN: And we're going to go to the warnings that were in effect during that training, which is Exhibit 10.
And this one, Scott, is dated May 1st, 2010.
Thank you.

\- - -

(Deposition Exhibit Number 10, ECD Warnings, Instructions, and Information: Law Enforcement, Important ECD Product Safety and Health Information, Bates stamped AXON_CURRAN001966 through AXON_CURRAN001973, marked for identification, as of this date.)

\- - -

BY MS. NGUYEN:

Q. And on this one, I'll direct you to Page 3.

A. Okay.

Q. Okay. And on Page 3, about three-fourths of the way down in that orange -- after the orange warning box, it says, Eye Injury Hazard.

Do you see that?

A. Yes.

Q. And here, we have the same warning as we saw previously, which states, If a TASER

probe, electrode or electrical discharge contacts or comes into close proximity to an eye, it could result in serious injury, including permanent vision loss, correct?

A. Yes.

Q. And then on Page 506, we see the same warnings, the first one about probe or electrode injury or infection hazard.

Do you see that?

A. Yes.

Q. And then also the same warnings with regard to penetration injury and penetration injury care.

You see that?

A. Yes.

Q. And those would have been warnings that you would have received during your April 2011 training, correct?

A. They should be, yes.

Q. Okay. So we can put Exhibit 10 away.

Now we're going to go back to Exhibit 1, your training matrix.

And on Page 532 is going to be your next CEW training. And there's two that appear on this page. I'll go over the first one, which was in June 19 of 2012.

Do you see that?

A. Okay. Yes.

Q. Almost -- almost halfway down the page, it says, TASER User Recertification --

A. Um-hum.

Q. -- and then there's also X2 TASER Training, August 1, 2012.

Do you see that?

A. Yes.

Q. Okay. So we'll start with the first one, the user recertification.

Since that was before the X2, we know that it was -- would have been on your previous model, correct?

A. Yes, ma'am.

MS. NGUYEN: Okay. And Exhibit 11 is the classroom portion. That's going to be Bates 1566 through 15 -- excuse

me -- 1682.

MR. BUCCI: You said that was 11, Amy?

MS. NGUYEN: Yeah, July 2011 is the date.

MR. BUCCI: I'm sorry. Was it Exhibit 11 or 12? I can't remember.

MS. NGUYEN: Oh. Exhibit 11.

\- - -

(Deposition Exhibit Number 11, User Certification Course, User Course, Slides 1, 7, 8, 107, 108, 117, Bates stamped AXON_CURRAN001566, AXON_CURRAN001572 through AXON_CURRAN001573, AXON_CURRAN001672 through AXON_CURRAN001673, AXON_CURRAN001682, marked for identification, as of this date.)

\- - -

THE WITNESS: Got it.

BY MS. NGUYEN:

Q. Okay. And this one says, User Certification Course, TASER X26, Version 18, Released July 2011.

You see that?

A. Yes.

Q. So this one would have been in effect during your June 2012 training.

And we're going to go to Bates AXON_CURRAN1572, and we see the slide with the safety rules discussing no live firearms as well as any student's ability to call stop action if they see something unsafe.

Do you agree with that?

A. Yes.

Q. Okay. And on Bates 1573, we have the same warning indicating CEWs can cause injury.

Do you see that?

A. Yes.

Q. And also that at this time, students are to review the warnings, and the instructor is to pass those out, correct?

A. Yes.

Q. Okay. And then on the next page, it's Bates 1672. Here is a photo of -- of probes actually penetrating the fingers of an individual.

Do you see that?

A. Yes.

Q. Do you recall seeing this photo in any of your TASER CEW training courses?

A. I -- yes, I'm sure there's an injury photo in there. This exact one, I'm not positive, but I'm sure there was an injury photo somewhere.

Q. Okay. But it was certainly known to you at the time that probes can cause penetration injuries such as these depicted in the photo, correct?

A. Yes.

Q. Okay. And then Bates 1673 shows an X-ray photo of the probes in the hand.

Do you see that?

A. Yes.

Q. And then the last one, Bates 1682, shows the same photo we've seen now several times with an individual with the probe in the eye.

Do you see that?

A. Yes.

Q. And that was also something known to you at the time, that if a probe penetrates the eye, that it can cause serious or permanent injury, correct?

A. Yes.

MS. NGUYEN: Okay. We can put Exhibit 11 away, and we'll go to the next, which is Exhibit 12.

And these are warnings dated November 30th, 2011. And these should be eight pages.

\- - -

(Deposition Exhibit Number 12, Handheld ECD Warnings, Instructions, and Information: Law Enforcement, Important ECD Product Safety and Health Information Bates

stamped AXON_CURRAN0001972 through AXON_CURRAN0001979, marked for identification, as of this date.)

\- - -

MR. BUCCI: Got it.

THE WITNESS: Thank you.

MS. NGUYEN: Thank you.

BY MS. NGUYEN:

Q. Okay. So these warnings were in effect during your June 2012 training. And I'm going to direct you to -- it's Page 5.

At the bottom of Page 5, there is an orange warning symbol which states, Eye Injury Hazard.

Do you see that?

A. Yes, ma'am.

Q. And you would agree that that's the same warning letting you know that a probe can penetrate the eye and, if it does, it could result in serious injury, including permanent vision loss, correct?

A. Yes.

Q. And then on the next page, we have Page 6 of 8. And we have the same warnings there with regard to penetration injury and penetration injury care.
Do you agree with that?
A. Yes.
Q. Okay. And so we previously discussed that in August -- on August 1st, 2012, your training records indicate that you had X2 training on that date.
Would you agree with that?
A. That's what it says, yes.
Q. And the X2, Mr. Curran -- is it your understanding that that is -- was a newer model of a TASER CEW at the time?
A. Yes, ma'am.
Q. And the main difference between that and your previous model was the fact that the X2 has a -- is a two-shot device, whereas your previous device is a single-shot device, correct?
A. Correct.
Q. And so that August 1st, 2012 training

would have been your initial full training on the X2 model; is that right?

A. It should have been, yes.

Q. Okay. And is that consistent with your recollection about when you received the newer two-shot device?

A. I believe so, yes.

MS. NGUYEN: Okay. If we can go to Exhibit 13. And this is going to be Bates 1753, and the last Bates is 1883. And it's titled Version 18, July 2011.

\- - -

(Deposition Exhibit Number 13, User Certification Course, User Course, Slides 1, 7 through 8, 121 through 122 and 131, Bates stamped AXON_CURRAN001753, AXON_CURRAN001759, AXON_CURRAN001760, AXON_CURRAN001873 through AXON_CURRAN001874, AXON_CURRAN001883, marked for

identification, as of this date.)

- - -

MR. BUCCI: So that was 13? Which number is it --

MS. NGUYEN: Yes.

MR. BUCCI: -- 13?

THE WITNESS: Thirteen. You were on 12 last.

MR. BUCCI: Okay. All right.

THE WITNESS: Thanks.

Got it.

BY MS. NGUYEN:

Q. Okay. Mr. Curran, the first page of Exhibit 13 -- it says, This is the User Certification Course for TASER X2, Electronic Control Device, Version 18, Released July 2011.

Do you see that?

A. Yes, ma'am.

Q. And so the -- the initial certification for your X2 would have followed the same format in that you would have had a classroom portion as well as a practical portion,

correct?
A. Correct.
Q. And if we can go to the second page of that exhibit.
We see the same slide that we've discussed previously with regard to safety rules; is that correct?
A. Yes.
Q. And so even though you're dealing with a new model, you're still -- you still have the same safety rules in place, as outlined in this slide, correct?
A. Yes, ma'am.
Q. Okay. And then on the next page of the exhibit, it goes over the warning that CEWs can cause injury and to review the TASER warnings, correct?
A. Yes.
Q. And then on the next two pages, we see the -- the same slide depicting the penetration injuries from the probe to the hand, correct?

A. Yes.

Q. And then the last page of Exhibit 13 shows the photo with the individual that has the probe in the eye, correct?

A. Yes, ma'am.

Q. So is it fair to say that even though you were switching over to a new model, that it still had the probes and it still created the same risk with regard to probe injuries? Is that your understanding?

A. Yes, ma'am.

Q. Okay.

MS. NGUYEN: And Exhibit 14 is the next exhibit. And the Bates numbers on this is AXON_CURRAN514 through 517.

\- - -

(Deposition Exhibit Number 14, Certification Test, AXON_CURRAN000514 through AXON_CURRAN000517, marked for identification, as of this date.)

\- - -

THE WITNESS: Okay.

BY MS. NGUYEN:

Q. Mr. Curran, do you recall that for each TASER CEW certification you completed, that you not only had to attend the classroom and practical portion, but you also had to take and pass a test?

A. Yes. I believe on -- when you switch to a new model, you have to taken a written test.

Q. Okay. And so this one is Version 18, TASER X2 Certification Test.

Do you see that?

A. Yes, ma'am.

Q. And you agree that it has your name printed there, Shawn Curran?

A. Yes, ma'am.

Q. And is that your handwriting, Mr. Curran?

A. Unfortunately, yes.

Q. Okay. And the date of this is August 1st, 2012, correct?

A. Yes, ma'am.

Q. And here, it shows that you were asked -- let's see -- 10, like, multiple choice questions, and then in the last page of that exhibit, you also had to identify the various parts of the CEW, correct?

A. Yes, ma'am.

Q. And you received 100 percent on that test, correct?

A. Yes, ma'am.

Q. And with regard to the practical portion, were you aware also when you completed that, that the instructor had to certify that you successfully completed all requirements of the practical portion, including the two-cartridge deployment?

A. Yes, ma'am.

Q. And do you agree, on the X2 training, if you deployed more than two cartridges -- or was it still the -- the minimum-of-two-cartridge requirement?

A. I don't recall the exact number of cartridges, but I know it's a minimum of two. So

I'm sure I had to deploy at least two.

Q. Okay. And that's for both certifications as well as recertifications, correct?

A. I believe so.

Q. Okay. So going back to your training matrix on Page 30, we'll go to your next training -- or excuse me -- Page 530.

And about three-fourths of the way down, it states, X2 TASER User Recertification, with the date of July 24th, 2013.

Do you see that?

A. Yes, ma'am.

Q. And let me ask you, Do you know, when you're certified on a device, how often you have to do the recertification?

A. I believe -- it depends on the device or what the -- each company suggests. I believe it's normally a standard of two years, though. But that all depends on the device.

Q. Okay. So, to your knowledge, it's two years but depending upon the device?

A. I'm not quite sure, but -- I know the TASER was two years. I know, like, in ASP is two years and the same thing with OC, it's --

Q. Oh, I see what you're saying --

A. Yeah.

Q. -- my question was more specific just to TASER CEWs --

A. Uh-huh.

Q. -- so with regard to those devices, what was your agency policy as to how often you needed to be recertified?

A. I believe it was two years.

Q. Okay.

MS. NGUYEN: So this training that took place on July 24th of 2013, for the classroom portion, we are going to look at Exhibit 15. And the title of that is Annual CEW User Update.

\- - -

(Deposition Exhibit Number 15, Annual CEW User Update, Slides 1, 2, 23, Bates stamped

AXON_CURRAN000675 through
AXON_CURRAN000676,
AXON_CURRAN000698, marked for
identification, as of this date.)

\- - -

MS. NGUYEN: And it's three pages --

MR. BUCCI: Got it.

MS. NGUYEN: -- Bates 675 is the starting number.

MR. BUCCI: Okay.

THE WITNESS: Got it.

BY MS. NGUYEN:

Q. Okay. On this document, it shows Annual CEW User Update, Version 19, April 2013.

Now, do you recall there being -- once you're certified on a device, only having to do an annual update, as opposed to a full recertification?

A. I -- I -- to be honest, I don't recall.

Q. Okay. Who -- who was it at your

agency, if you know of anybody specific, who would have said, Hey, Officer Curran, you're due for your recertification on your TASER CEW?
A. That would have been the individual in charge of training -- not in charge of training but in charge of book -- bookkeeping of the training --
Q. Okay.
A. -- and I think, back then, it would have been Charlotte Wolf. She did firearms, but I'm not positive she did the other training also.
Q. Okay. And so is this something that they would have tracked for you and let you know when you're due for recertification, or is it something that you had to track on your own and let them know, I'm due for recertification?
A. No. There's a program that they do that I believe that person, like Charlotte, would -- has it tracked for you --
Q. Okay.
A. -- and then they let you know when they schedule your in-service. You don't -- you

don't pick a date of your in-service or your recert; they just coordinate with the person doing the recert, and that's the instructor, and then you just -- you get assigned a date.

Q. So you just were provided a date, and then it's up to you to attend and complete the training --

A. Yes, ma'am.

Q. -- is that right?

Okay.

A. Yes.

Q. On Page 2 of Exhibit 15, this slide talks about annual certification requirements. And it says that This recertification is recommended annually.

Do you recall anything about that, Mr. Curran, the fact that the -- at the time, TASER recommended that there be annual recertification?

A. I don't recall any of that. I wasn't involved with the teaching of the TASERs.

Q. Okay. It states -- the first bullet

point -- Each agency must determine the content of each continuing and update training, and TASER's minimum requirements for annual user certificate -- recertification include: Review of this entire presentation, including notes, Review of current law enforcement warnings and Firing two cartridges.

Was that your understanding, Mr. Curran, of your recertification requirements in 2013?

A. I can't be honest to tell you that I recall this as my understanding of the requirements.

I don't recall that --

Q. Okay.

A. -- I'm a --

Q. Do you know, though, that you needed to attend the classroom portion where the presentation was shown? Correct?

A. Yes.

Q. And you also needed to review the law enforcement warnings, correct?

A. That's something they would do at the class.

Q. Correct. That was always part of the class -- the classroom portion?

A. That would have been, yes, ma'am.

Q. Okay. And then you -- also during the practical portion, you always deployed at least two cartridges?

A. Normally, yes, we would --

Q. Okay.

A. -- as far as I recall.

Q. Was there any particular occasion where you recalled not deploying a minimum of two cartridges?

A. I don't. I -- off the top of my head, no, I cannot.

Q. Okay. So going to the next page, which is Bates 698, if you would go there.

This slide talks about targeting, and it states, Avoid intentionally targeting the CEW on sensitive areas of the body, such as head, throat, breast, chest or area of the

heart, genitals or known preexisting injury areas without justification.

And then if you go down to the notes, it says essentially the same thing there.

Do you see that?

A. Yes.

Q. And on that page, it says, Refer to Sensitive Body Part Hazard warnings.

Do you see that?

A. Yes.

MS. NGUYEN: And if we can go to Exhibit 16, which are those warnings. And the date on these is March 1st, 2013. And these are going to be eight pages.

\- - -

(Deposition Exhibit Number 16, Warnings, Instructions, and Information: Law Enforcement, Important Safety and Health Information, Bates stamped AXON_CURRAN000078 through AXON_CURRAN000085, marked for

identification, as of this date.)

\- - -

THE WITNESS: Okay. I got it.

BY MS. NGUYEN:

Q. And we'll go to Page 4 of Exhibit 16.

A. Okay.

Q. And in the box there in the middle of the page, it has the orange warning sign, which states, Eye Injury Hazard.

Do you see that?

A. Yes.

Q. And you agree that that's the same warning that we've seen previously, stating that a probe can result in serious injury, including permanent vision loss?

Do you see that?

A. Yes, ma'am.

Q. And then, also, we see in that box, Probe or Electrode Injury, Puncture, Scarring or Infection Hazard, Warning, as well as the percentage injury warning.

Correct?

A. Yes.

Q. And then down at Number 1, it says, Provide medical care as needed.

Do you see that?

A. Yes.

Q. The second sentence there states, A probe, dart point or barb embedded in a sensitive area, such as the eye, genitals, breast, neck, throat or vascular structure may cause serious injury and require medical care.

Do you see that?

A. Yes.

Q. And is that something that you knew at the time of your training on July 24th, 2013?

A. Yes.

Q. And on Page 6 of 8, again, in the box with the orange warning, we see a warning relating to probe recoil or ricochet.

Do you see that?

A. Um-hum.

Q. And if we go to that -- the next paragraph, it states, Always be sure your target

is within range. Wear protective eyewear when deploying any CEW in training or for practice. Be sure practice targets have a firm backing that will allow the probes to stick and not bounce off and strike an unintended person, animal or object, or continue through the backing and strike objects behind the target.

Do you see that warning?

A. Yes.

Q. And in this instance, Mr. Curran, with regard to the incident that took place in December of 2017, do you know if the probe ricocheted either off the individual Sim Suit or off the mat before it struck you?

A. I don't know if it ricocheted. I was told it didn't, and I was told it did, but I do not know.

Q. Okay. So is it fair to say that you did not see the probe before it actually struck you in the eye?

A. No. I -- my eyes don't move that fast.

Q. I don't think any -- most people's don't --

A. I don't think anybody's eyes can move that fast.

Q. Okay. We're going to move on from Exhibit 16.

MR. BUCCI: Amy, I don't want to interrupt you, but I believe I've got the corrected Exhibit 6, the X23 User Certification Test.

Do you want -- want to cover that first or -- I'll just let you know that I have it -- I have it now.

MS. NGUYEN: Great. Let me pull that up.

MR. BUCCI: Got it? It's the -- (indicating).

MS. NGUYEN: Yep.

BY MS. NGUYEN:

Q. So we will go back to Exhibit 6. And this is Version 14.2, X26 User Certification Test. And the Bates number I have is

AXON_CURRAN481.
A. Got it.
Q. Okay. And, Mr. Curran, is that your handwriting on there?
A. Yes, it is.
Q. Okay. And, again, this exhibit shows another test that you took relating to the X26.
Does that refresh your recollection as to what model you were certified on prior to the X2?
A. Yes, ma'am.
Q. Okay. So we are in agreement that it was the X26 model?
A. Yes, ma'am.
Q. Okay. And there are -- if you go through those pages, it looks like there are -- let's see -- 25 multiple choice questions.
And then, after that, you identify the parts of the X26 CEW, correct?
A. Yes.
Q. Okay. And then the last part is what we had discussed where they verify all the

requirements for the practical portion --
A. Okay.
Q. -- training, and that's on Bates 486.
Do you see that?
A. Yes.
Q. And so I just want to briefly go over these practical portions and those requirements. The first one is Demonstration of proper firing -- excuse me -- finger positions for aiming and firing.
Correct?
A. Yes, ma'am.
Q. Reload TASER device five times in 15 seconds. (Watch finger position, disqualify for fingers in front of blast doors).
Do you see that?
A. Yes, ma'am.
Q. And the blast doors is -- to make sure we have the same understanding, that's where the probes actually come out, correct?
A. Yes, ma'am.
Q. All right. Next requirement:

Officer can control unit adequately when commanded "Arm — Spark — Safe" at random.
Correct?
A. Yes, ma'am.
Q. The next one: Officer can remove and reinstall battery correctly.
Correct?
A. Yep.
Q. And then the last one: Draw TASER device (select the unit most likely to be used in the field) hit target at 8 feet, reload, hit second target at 12 feet with laser site. And there's a time limit of 10 seconds.
Is that correct?
A. Yes, ma'am.
Q. And this document indicates that you completed both the exam portion as well as the practical portion successfully, right?
A. Yes, ma'am.
Q. And, in fact, received 100 percent on both, correct?
A. Yes, ma'am.

Q. And here, the certifying officer is Johnny Mitchell.
That's the individual that you mentioned before, right?
A. Yes, ma'am.
Q. So he was actually employed by Virginia Beach Police Department and would have been your instructor for that particular training, right?
A. Yes, ma'am.
Q. And this is referring to the training that took place on May 13th of 2009?
A. Yes.
Q. And then the last page of that exhibit shows the practical portion and, again, the instructor indicating that you performed each of the requirements at an acceptable level, correct?
A. Yes.
Q. And then the -- the last two requirements there that weren't mentioned on the previous page is Scenario Number 1 and

Scenario Number 2, the first one dealing with the unknown disorder, asking what type of force is needed, and the second one dealing with a suspicious person.

Do you see that?

A. Yes, ma'am.

Q. So based upon this document, is it fair to say that you would have not only deployed cartridges but also had gone through these two scenarios that the instructor put together?

A. Yes, we deployed them at a target and then went through the two -- and then, after that, different -- break and then go through the scenarios, yes.

Q. Okay.

Okay. So we're going to go to your next training, which is back to Exhibit 1 of your training matrix. And I actually want to go to the first page because I didn't realize we didn't go over the general information about Exhibit 1. But I want to make sure that you're in agreement that this pertains to your

training.
The first page has your full name on there?
A. Yes.
Q. And it says, ACE ID: 1418.
Do you know what that is?
A. No idea.
Q. What about the badge number, 1615, about the middle of the page? Was that your badge number, Mr. Curran?
A. No; that's actually my employee number --
Q. Oh, okay.
A. -- my badge number was 593.
Q. Okay. So you would agree that this -- this is, in fact, your training matrix from the Virginia Beach Police Department?
A. Yes.
Q. Okay. So we're going to go to Page 547.
A. Okay.
Q. This one indicates TASER X2,

certification date of March 21st, 2017.
Do you see that?
A. Yes.
Q. And that would have been the last training that you received as a user, right, on CEWs?
A. Yes, the next class was the instructor course.
Q. Okay.
MS. NGUYEN: And so the next exhibit is Exhibit 17. And the title of this is the Version 20, Training Materials, effective March 1, 2017. The first Bates number is AXON_CURRAN40.

- - -

(Deposition Exhibit Number 17, Annual Conducted Electrical Weapon (CEW) User Update Bates stamped AXON_CURRAN000040, AXON_CURRAN000042 through AXON_CURRAN000044, AXON_CURRAN000047,

AXON_CURRAN000061,
AXON_CURRAN000071, marked for
identification, as of this date.)

\- - -

MR. BUCCI: It goes to 71?
MS. NGUYEN: Excuse me?
MR. BUCCI: It goes to 71 --
CURRAN40 to 70 --
MS. NGUYEN: Yes.
THE WITNESS: Got it.
BY MS. NGUYEN:
Q. Mr. Curran, looking at the date -- effective date of March 1, 2017, would you agree that this would have been in effect during your training of March 21st, 2017?
A. I would assume it would be, yes.
Q. Okay. On Page 42 of that document, it talks about the annual CEW user update contents, those being the recertification requirements, the warnings, the targeting and tactical considerations, the use guidelines and the medical overview.

Do you see that?
A. Yes.
Q. On the next page, Page 43, it talks about the requirements, Review this PowerPoint, Receive and review the law enforcement warnings as well as the CEW study aid, pass the functional test, and deploy two live CEW cartridges into the preferred target zone.
Is that consistent with your recollection of the requirements?
A. Yes.
Q. On the next page, which is Bates 44, we see the same slide with the warnings saying that TASER CEWs have risk and can cause serious injury.
Do you see that?
A. Yes.
Q. Then it says, Stop. At this time, distribute, review and understand the current TASER product warnings.
Correct?
A. Yes.

Q. On the next page, Bates 47, it talks about targeting and specifically to avoid sensitive areas of the body, including the head.
Do you agree with that?
A. Yes.
Q. On the next page, Bates 61, it talks about CEW use guidelines.
Do you see that?
A. Yep.
Q. And it's kind of small on this page, but in the middle, it talks about probe targeting and to avoid targeting sensitive areas.
Do you see that?
A. I don't -- I can't read that, but . . .
Q. You would agree that you were taught in your TASER CEW training to avoid sensitive areas, which would include the eyes, correct?
A. Yes.
Q. And you were taught to do so because if -- if you have a probe in the eye, it can cause serious or permanent injury?

A. Yes.

Q. Okay. We can set that exhibit aside. Then we're going to go back to -- to -- to Exhibit 16, because these same warnings were still in effect in March of 2017.

And do you have any reason to believe that you would not have received and reviewed these warnings at the time of that March 2017 training?

A. I have no reason not to believe that.

Q. Okay. So, Mr. Curran, we've gone through, painstakingly, all of the training that you received with regard to TASER CEWs prior to the instructor training that you attended in December of 2017, correct?

A. Yes.

Q. And by my count, that was nine different training courses that were outlined in your training matrix.

And so if you're deploying at least two cartridges, you would have deployed at least 18 cartridges in total during the training,

correct?
A. Yes.
Q. And that does not include any scenario-based training wherein you would have deployed any cartridges.
Is that also true?
A. Yes, that is correct.
Q. So if you deployed any cartridges in scenario training, that would be above and beyond the two-cartridge requirement?
A. Yeah. I don't recall deploying any cartridges in a scenario training on the department.
Q. Okay. And that does not include the instructor training that you attended in December 2017, correct?
A. It does not include that, yes.
Q. And is there also the possibility that you could have deployed more than the two cartridges at the targets?
A. There could have been, yes, at static targets, correct, yes.

Q. While at the Virginia Beach Police Department, did you ever deploy a TASER CEW in the field?

A. No, not that I can -- not that I can recall -- oh, wait. I take that back. I did a drive stun in the field but not an actual probe deployment, as far as I can recall.

Q. And that drive stun was to an individual that was -- you were attempting to secure or arrest?

A. Yes.

Q. Can you tell me a little bit more about that incident?

A. It was a individual behind a wheel. His car was parked facing the wrong way on a one-way street, engine was off, and he was behind the driver seat passed out drunk.

So we went to extract him in the vehicle. He held on, and I used a drive stun, not probes, to the -- his back to try to get him to come with us.

It was effective and got him out.

Q. And approximately when did this occur?

A. I -- between 2005 and 2017. I'm not really quite sure on what the date would be --

Q. Okay.

A. -- it was while I was on the SWAT team. So that's all I do remember. It was when I was on the SWAT team --

Q. Okay.

A. -- I have to think back. It was probably 2005 to 2013, I guess, somewhere in there.

Q. Is that the only time that you can recall using your CEW in the field?

A. Yes, that's the only time I can recall.

Q. So based upon all of this training that you received on TASER CEWs prior to December of 2017, you -- would you agree that you knew at the time that use of less lethal use-of-force tools carries some amount of risk of injury?

A. Yes. They informed us that the

TASER, as we were talking about in class, is a dangerous weapon.

Q. And that it could cause serious and/or permanent injury, correct?

A. Yes.

Q. And you would agree that you knew at the time it was important to follow safety guidelines and use safety equipment when being trained on TASER CEWs, correct?

A. Yes.

Q. And you would also agree that even if you follow those safety guidelines and use the safety equipment during that training, that you can't completely eliminate all risk of injury?

A. I'm sorry. Could you say that again? You broke out a little bit on my end.

Q. Sure.

You would also agree that if you follow those safety guidelines and use the safety equipment, that when you are participating in that training, you cannot eliminate all risk of injury?

A. No, you -- 100 percent? No, I don't think you can risk that -- 100 percent.

Q. You also knew at that time that CEWs are weapons and they must be handled safely, correct?

A. Correct.

Q. You knew that CEWs deployed probes, correct?

A. Yes.

Q. Is that a yes?

A. Yes. I'm sorry. Yes, ma'am.

Q. You knew that the probes were sharp and could -- and that they were meant to penetrate skin, correct?

A. Yes, ma'am.

Q. And that you knew the probes also carried the possibility of ricocheting?

A. Off of a static target, yes.

Q. Well, does it have to be static? Could it also be a target that was moving that they could bounce off of things and ricochet?

A. I was just going off what I

remembered reading, their recommendations for the target, which was a firm target, though I know there was a question of it going through the target or ricocheting off of a static firm target.

Q. Oh, you're -- you're referring to the specific warning language that we reviewed?

A. Yes, ma'am.

Q. Okay. And I'm -- and fair enough. I'm asking more generally, though.

Based upon these nine different certifications that you attended, you learned, did you not, that probes could certainly ricochet off of objects?

A. Yes, I learned in the training that probes could definitely ricochet off of a static target.

Q. So are you suggesting that probes could not ricochet off of a moving target?

A. Anything's possible. You just asked me if that's what I learned in the class, and that's what I learned, is that on static targets,

they could ricochet. Anything else would just -- my be -- would be an assumption.

Q. Okay. You also learned that probes could cause penetration injuries to both hands and eyes, correct?

A. Yes.

Q. And that if a probe penetrated an eye, it could cause permanent injury?

A. Correct.

Q. And, in fact, that's probably just obvious by looking at the probes, correct?

A. One would think, yes.

Q. You also knew that by participating in TASER CEW training, there was, in fact, a risk of permanent injury?

A. Yes.

Q. And you knew that during CEW training, everyone acts as safety officers and anyone can call stop action if they see anything unsafe at any time?

A. They did state that, yes, you can call stop action; anyone can do it.

Q. And that was something that you knew --

A. Yes.

Q. -- prior to December 2017, correct?

A. Yes.

Q. And you also knew prior to December of 2017 that everyone had to wear protective eye gear during practical training?

A. Yes, while engaged in the scenarios, we were instructed to wear protective eye gear.

Q. And so you -- you conditioned that a little bit, saying while engaging in the scenarios, whereas the documentation says anywhere in the training area.

And so I want to hone in on that and find out is it -- is it your recollection that anytime you're in the practical training area, you have to wear protective eye gear?

A. Yes, it was during the -- if you're asking about the situation or the incident at hand, inside --

Q. I'm asking -- let me just interrupt

you there so I can make sure you understand the question --
A. Okay.
Q. -- I'm not yet asking about the training in December 2017, rather, I'm trying to find out, prior to that date, based upon these nine certification courses that you completed, what your understanding was prior to that date.
Okay?
A. Okay.
Is that -- yes, you should be --
Q. To that knowledge -- I want to make sure you knew at that time that whenever you're in that training area for practical training, that everyone needed to wear protective eye gear.
That's what TASER instructed, correct?
A. Yes.
MS. NGUYEN: Okay. So with that -- we've been going for about an hour and a half now since our last break. So I'm going to move into the next

section of my outline, so we'll go ahead and take about a five-minute break.

Does that work for everyone?

THE WITNESS: Can I get 10, please?

MS. NGUYEN: Ten? Fair enough.

We'll see you in 10.

THE VIDEOGRAPHER: Off the record at 12:46 p.m.

\- - -

(Whereupon, a recess was taken from 12:46 p.m. EST to 1:00 p.m. EST.)

\- - -

THE VIDEOGRAPHER: We're back on the record at 1:00 p.m.

BY MS. NGUYEN:

Q. Mr. Curran, I'd now like to discuss the training that you attended in December of 2017.

It's my understanding that that was a two-day instructor course, correct?

A. Yes, ma'am.

Q. How did you come to sign up for the instructor course?
A. I was informed by my training lieutenant -- I'm sorry -- by the lieutenant in charge of training that I would be attending the course.
Q. So did you have a choice as to whether to become TASER CEW instructor certified or not?
A. I don't -- to be honest, I don't recall.
Q. Is that something that you wanted to do is become a TASER CEW instructor?
A. It's in the realm of use of force, and I was considered the use-of-force expert. There was no reason why I wouldn't want to get all areas of use of force.
Q. Okay. At that time in December 2017, do you -- did you know how many TASER CEW instructors were at the Virginia Beach Police Department?
A. No, ma'am.

Q. Do you receive any type of pay increase if you become an instructor in a particular area?

A. Nope, there's no pay increase whatsoever in Virginia Beach for taking on different responsibilities.

Q. Okay. So who actually would register you for that course? Do you know?

A. I believe I would -- you -- to register for any course, you would write a memo, and then the captain's secretary would make the payment and sign you up for the course --

Q. Okay.

A. -- or you would sign up, and then they would bill the department, and the department would pay them.

Q. Now, I know in -- for this particular training, there was also an online portion.

So can you describe to me how that worked as far as the online portion and the two-day course? What part -- was it online and the other parts in person?

A. I'm not 100 percent, but I -- we could have done an online portion prior to the instructor actually -- the TASER instructor coming from -- coming to the department.

Q. Okay. And the two days, then, December 13th and 14th -- were both of those days at the police department?

A. Yes, it was.

Q. Where the master instructor was present for both of those days?

A. Yes.

Q. And so how were those days broken up as far as what you did, either classroom portion or practical portion?

A. I believe -- it's a little fuzzy. It's been a little while -- but I believe it was -- the first day was in the classroom, and then maybe a little bit of classroom in the morning on the second day. And then most of the second day, I believe, was spent in the gymnasium.

I can't recall 100 percent if there

was anything practical on the first day.

Q. Okay. So I'm going to show you Exhibits 18 and 19.

MS. NGUYEN: And Exhibit -- Exhibit 18 is, like, an online module. It's Bates AXON_CURRAN119 all the way through 135.

\- - -

(Deposition Exhibit Number 18, Online Modules, Bates stamped AXON_CURRAN000119 through AXON_CURRAN000135, marked for identification, as of this date.)

\- - -

THE WITNESS: Okay. I have it.

MS. NGUYEN: And then Exhibit 19 -- these kind of go hand in hand -- that's titled Version 20, New Instructor Certification Online Modules, and that's Bates AXON_CURRAN108 through 118.

\- - -

(Deposition Exhibit Number 19, Version 20, New Instructor Certification Online Modules, Bates stamped AXON_CURRAN000108 through AXON_CURRAN000118, marked for identification, as of this date.)

\- - -

MR. BUCCI: Just one second.

(Pause.)

THE WITNESS: Thanks.

Okay. I have it.

BY MS. NGUYEN:

Q. Okay. And so we'll first go to Exhibit 19. And as I said, the title there shows that this is Version 20, New Instructor Certification Online Modules.

And it shows that -- some screenshots of Axon Academy.

Do you recall receiving a link and instructions to go to Axon Academy and do this online portion?

A. Yes, I believe I did.
Q. Okay. And now, Exhibit 18 is a document -- a spreadsheet that actually shows what you logged in as the time and how much you spent on each page for Axon Academy.
Do you see that?
A. Okay. Yes, I do.
Q. Okay. On the first page -- just to familiarize us with this document, it's AXON_CURRAN 119 -- it says, User e-mail: scurran@vbgov.com.
Was that your e-mail at the time?
A. Yes, it was.
Q. Okay. And then your first and last name is shown as Shawn Curran.
Do you see that?
A. Yes.
Q. And then your TASER instructor course V.20 for First-Time/New Instructor is the course name.
Is --
A. Yes.

Q. -- that the course that you attended in December 2017?

A. I can't tell you that's exactly the name of it, but it's -- that's the course I was in, was an instructor course.

Q. Okay. And then over to the right, it shows Module Completion Date, and it says the date of December 4th, 2017, and then the time --

A. Okay.

Q. -- does that date of December 4th sound about right if you were to complete the online portion prior to your training on December 13th and 14th?

A. It probably is. I can't remember the exact date I filled out the online portion, but I know I had to do it prior to the actual class.

Q. Okay. And I will say that on, like, Bates -- if you go to Bates 125, it also shows the date of December 5th. So it looks like between December 4th and December 5th that you would have completed the online modules.

Does that sound correct to you?

A. That -- according to the dates, yes, that's what it seems to be, yeah.

Q. Okay. You don't have any reason to dispute those dates?

A. No, ma'am.

Q. Okay. So let's just go -- we aren't going to go through this entire thing, but I want to go through a few of the modules that you completed.

The first one shown here is titled Law Enforcement Warnings.

Do you see that?

A. Yes, ma'am.

Q. And so then I'm going to refer you to Exhibit 19. And this is actually the screenshot of where you were asked to review the law enforcement warnings. And it says, TASER Handheld CEW Warnings, Instructions, and Information: Law Enforcement. Download or read online. And then it has a next button.

Do you recall something like this during your online training?

A. I'm sure it was. I have no reason to think it wasn't --

Q. Okay.

A. -- but the exact screenshot I can't say was definitely it. But there's no reason why it shouldn't have been it.

Q. Okay. The next page is Bates 109. This shows warnings that were in effect at the time, which are dated March 1, 2013.

Do you see that?

A. Yes, ma'am.

Q. Okay. And would you agree that you would have gone through these warnings during that online course?

A. More than likely, yes.

Q. And then on Bates Page 112, we have those same warning boxes that we have reviewed previously, the first one pertaining to eye injury hazard; the second one, probe or electrode injury, punctures, scarring or infection hazard; and the last one, penetration injury.

Do you see those?

A. Yes.
Q. And then on Bates 114, in the box with the orange warning box, it states, again, the warning relating to probe, recoil or ricochet.
Do you see that as well?
A. I -- I see the title. It's a little hard to read the rest of the words, though.
Q. Yeah. It's a little bit smaller.
But these are the same warnings that we would have gone over previously, which was Exhibit 16?
A. Yes.
Q. Okay. And then if we can go to Bates 117 of that same exhibit, 19.
Here is the Law Enforcement Warnings — Verification.
Do you see that?
A. Yes.
Q. And it says, I hereby attest that I have opened, fully read and understand the TASER Handheld CEW Warnings, Instructions, and

Information: Law Enforcement document dated March 1, 2013.

And there's a place to either accept or decline, and then hit either Submit or Next.

Do you see that?

A. Yes.

Q. Now, before I ask the next question, I'm going to direct you to Exhibit 18 again. And the second line of Exhibit 18 is titled Law Enforcement Warnings — Verification.

Do you see that?

A. Yes.

Q. And it shows that you completed that page on December 4th, 2017 at approximately 1525.

Do you see that?

A. Yes.

Q. And so putting these two documents together, would you agree that you would have verified that you read and understood the law enforcement warnings?

A. Yes.

Q. And then the next line there on -- of

Exhibit 18, Bates 119 is Warning, Risks and Release Agreement.

Do you see that?

A. Yes.

Q. And that is dated December 4th, 2017 with a time stamp of 15:25:50.

A. Yes.

Q. Do you see that there?

A. Yes.

Q. And so that indicates that you would have seen this Warning, Risks and Release Agreement, which is on Exhibit 19, Bates 118.

Do you see that?

A. Did you say Page?

Q. Bates Page 118.

A. 118.

I'm only up to 116.

THE WITNESS: Scott, I only have 116.

MR. BUCCI: I'm sorry. What -- say that again, Amy?

MS. NGUYEN: It's Exhibit 19, and

it should be Bates 108 through Bates 118.
THE WITNESS: Wait. Hold on. It may have been trapped.
Nope. I got it. Sorry. It was underneath some other papers.
BY MS. NGUYEN:
Q. Okay. No problem.
A. Got it.
Q. All right. So Bates Number 118 would be where the Warning, Risks and Release Agreement is reviewed. And there's an option to download, read online and click next.
Do you see that?
A. Yes.
Q. And then it says at the bottom there, Students May Review Instructor/User Release Online (form attached to this e-mail).
You see that there?
A. Yes.
MS. NGUYEN: And that Warnings, Risks and Release Agreement is going to be Exhibit 20, and the Bates on that is

AXON_CURRAN37 and 38.

\- - -

(Deposition Exhibit 20, Instructor and User, Warnings, Risks and Release Agreement, Bates stamped AXON_CURRAN00037 through AXON_CURRAN00038, marked for identification, as of this date.)

\- - -

THE WITNESS: I have it.

BY MS. NGUYEN:

Q. Okay. Now, this document is titled Instructor and User, Warnings, Risk and Release Agreement. And it states at the top there an effective date of January 23rd, 2015, and it goes over important safety and health information, training CEW exposures.

Do you see those headings there?

A. Yes.

Q. Okay. And under Training CEW Exposures, it states, Eye protection is required for the CEW operator, observers, spotters and the

person being exposed to any probe deployment.
Do you see that?
A. That -- which -- which part was that on, again, ma'am? Thirty-seven or 38? It's very small.
Q. On -- it's on Page 37 --
A. Okay.
Q. -- and it's under the subheading Training CEW Exposures --
A. Okay. I gotcha.
Q. -- and it's the very last bold print there that states, Eye Protection.
A. Okay. I see it.
Q. Okay?
And you see where it says, Eye protection is required for the CEW operator, observers, spotters and the person being exposed to any probe deployment.
Do you see that?
A. Yes, ma'am.
Q. Okay. And then over in the right-hand column, there is a bold print that

states, Avoid sensitive areas.

Do you see that?

A. Yes.

Q. And it states, When practicable, avoid intentionally targeting the CEW on sensitive areas of the body, such as the face, eyes, head, throat, chest area, breast, groin, genitals or known preexisting injury areas.

Do you see that as well, Mr. Curran?

A. Yes, ma'am.

Q. And then below that, it -- with an orange warning box, it says, Eye Injury Hazard.

Are you there?

A. Yes, ma'am, I'm here --

Q. Okay --

A. -- I see it.

Q. -- and there, it says, A TASER probe, electrode or electrical discharge that contacts or comes close to an eye can result in serious injury, including permanent vision loss.

You see that?

A. Yes, ma'am.

Q. And you would agree that that is of a similar warning that we saw in the warnings that we just reviewed, correct?
A. Yes.
Q. Also on this document, at the bottom of Page 37, it has the same penetration injury warning.
Would you agree with that?
A. Yes.
Q. Okay. And then on the -- the next page, which is Bates 38, down below Safety Information: General Precautions --
A. Okay.
Q. -- it has the bold print, Keep body parts away from front of CEW or cartridge. Always keep your hands and body parts away from the front of the CEW and cartridge. If the CEW discharges unexpectedly, you could be injured.
Do you see that?
A. Yes.
Q. Okay. And do you recall reviewing this during the online portion that you completed

prior to your training?

A. Verbatim, but there's no -- I don't -- I can't recall verbatim, but there's no reason to believe that I didn't.

Q. Okay.

This also asks for any preexisting conditions on the second page there.

Did you have any preexisting conditions at that time, Mr. Curran, that you would have advised the master instructor of?

A. No, ma'am.

Q. Okay. The next column -- it states, Liability and Release Agreement.

The second paragraph states, I have read, fully understand and accept the risks. I have read, fully understand and accept the risks as stated in this document and TASER's current warnings and that these risks exist, whether or not I have preexisting injuries. With full knowledge of the risks, I voluntarily agree to participate in this TASER CEW training course.

Mr. Curran, is that an accurate

statement of when you completed this on -- online module?

A. Yes, I --

MR. BUCCI: Hold on. I want to object.

You're asking is this statement as it appeared on the document when he filled the online module? Is that the question?

MS. NGUYEN: Correct.

MR. BUCCI: Okay. In other words, he doesn't have any reason to think it's altered in any way.

Is that what you're getting at?

MS. NGUYEN: That's my first question, yes.

MR. BUCCI: All right. That's fine.

BY MS. NGUYEN:

Q. Mr. Curran, was that your understanding of my question as well?

A. I'm sorry. I'm a little confused.

Can you back up and ask me the question again?

Q. Sure.

So this statement -- you agree that that statement is accurate as it's in this document? You don't have any reason to disagree with this statement, correct?

A. Yeah. I don't remember the exact statement when I read it back then, but I have no reason to believe that this has been changed.

Q. Right. So as you sit here today, you believe that that's what you would have read at the time when you completed the online module?

A. At least -- I have no reason to believe I didn't.

Q. Okay. And, in fact, then, when we read it, as applied, you would agree that you fully understood the risks as they were explained in the warnings to you and that you accepted those risks by participating in the instructor training on December 13th and 14th, correct?

MR. BUCCI: I want to object on

the grounds the word "risks" is unduly vague and could encompass all sorts of stuff.

But go ahead and answer.

THE WITNESS: Due to -- yes, the -- the -- what you're talking about with the TASER being dangerous, yes, there are -- there are risks. I understood that.

BY MS. NGUYEN:

Q. Well -- and it's not just -- you know, I don't think we've ever talked about the TASER being dangerous, right? We never saw that word in the warnings, right?

A. I -- I don't -- you know what? I -- I don't think so. I can't say definitely, but it just talks about all the warnings, so . . .

Q. Let's just specifically go over the ones that we've reviewed today just so we make sure that we're clear.

You were told of the -- that CEWs carry a risk of injury, correct?

A. Yes.
Q. You understood that risk and you accepted that risk by participating in this training?
A. Yes.
Q. Okay. You understood that TASER CEWs also carried the risk of probe injuries and, in particular, injuries to the eye which could result in serious or permanent injury, correct?
A. Yes.
Q. Okay. And you accepted that risk when you participated in this training on December 13th and 14th of 2017, correct?
MR. BUCCI: Hold on. I'm going to object here. I mean, if what you're saying is that he accepted the risk of any injury ever occurring under any circumstances involved in the training, then I object. That's an improper question.
If you -- that -- that -- that is not what these materials say.

MS. NGUYEN: I -- you can state your objection, Scott. I believe my question was pretty straightforward.

BY MS. NGUYEN:

Q. So go ahead, Mr. Curran, if you can answer the question.

A. Can you ask it again for me, please -- with everything back and forth -- so I know exactly what you're saying?

Q. Yeah.

MS. NGUYEN: Cindy, can you please restate my question -- or read it back?

\- - -

(Whereupon, the certified stenographer read back the pertinent part of the record.)

\- - -

MS. NGUYEN: You have to go back to the previous question, Cindy, where I outlined the specific risks.

\- - -

(Whereupon, the certified

stenographer read back the
pertinent part of the record.)

\- - -

MR. BUCCI: I'm going to object --

MS. NGUYEN: Okay. Note your objection, Scott.

BY MS. NGUYEN:

Q. And then, Mr. Curran --

MR. BUCCI: -- don't interrupt me, but I have a continuing objection to this line of questioning.

MS. NGUYEN: Noted.

THE WITNESS: Good to go?

BY MS. NGUYEN:

Q. Yes.

A. Okay. Yes, in regards to any risk coming from the TASER, there are risks from that TASER. I understood that. It does penetrate, go through the eye. I understood that.

Q. And you opted to proceed with the training on December 13th and 14th knowing those risks, correct?

A. Yes.

Q. The paragraph -- it has bold print. I accept the risks.

You see that there?

A. Yes.

Q. And it states, Understanding the risks, I assume all risks inherent in CEW training and the CEW exposure, whether known or unknown, foreseen or unforeseen.

You see that?

A. Yes.

Q. And do you recall per -- let me -- strike that. Let me rephrase.

You agree that you assumed the specific risks that we have outlined today that are outlined in the warnings?

And if you need me to repeat those, I can.

A. Correct, I assumed the risks of the warnings that we've gone over numerous times about the penetration into the eye and that it does cause injury and that it's dangerous.

Q. The next paragraph -- it states, Release and hold harmless, in bold print.
Do you see that?
A. Yes.
Q. And it states, I release and hold harmless TASER, its agents, officers, directors, employees and distributors, my instructor, my law enforcement agency and the host agency from any and all claims, including, but not limited to, claims for strict liability, breach of warranty, failure to warn or any other theory of liability whatsoever, even if due to the negligence or gross negligence of the released parties. I specifically waive any statutory rights I may have regarding the release of unknown claims.
And, Mr. Curran, to you -- my question to you -- was that your understanding when you read this document as reflected in the online module?
MR. BUCCI: I'm going --
(Connectivity issues.)
CERTIFIED STENOGRAPHER: Excuse

me, Counsel, you're a little low. We can't hear you.

MR. BUCCI: I need to state an objection to the extent that it's Axon's claim that this document somehow changes the law of Virginia. I object to that.

But, otherwise, go ahead and answer.

THE WITNESS: Was this -- just so I'm clear, was this the online portion --

BY MS. NGUYEN:

Q. Correct.

A. -- or any part?

Q. Well, I'm just referring to the -- going off of the documents.

So if you'll recall, we went over Exhibit 19. And this is the last page of Exhibit 19. And here, it says to download or read online --

A. Okay.

Q. -- you have to do one of those before you can go to the next.

You see that?

A. Got you. Yes, ma'am.

Q. So does that indicate to you that you would have read it online? Also, you can refer to Exhibit 18, which is the third line down. And it says, Warning, Risks and Release Agreement, with the date of December 4th, 2017, the time of 15:25:50.

A. Yes. And if it was on the online, I must have downloaded it or read it. I would assume I did.

Q. Okay. And this document, Exhibit -- the last page of Exhibit 19, also indicates that the form was attached to an e-mail.

A. I can't recall that.

Q. That was going to be my next question.

Do you recall whether this document was sent to you via e-mail as well?

A. No, I do -- I don't recall that whatsoever.

Q. Okay. So at least with regard to

reading this online, the release-and-hold-harmless statement, that is -- would have been included in the document that you read online?

A. According to this, yes, yes.

Q. And then the last -- the next paragraph of this document is the bold print, I agree no one will sue released parties.

Do you see that?

A. Yes, I do see that.

Q. And it says, I promise that neither I nor anyone on my behalf will ever sue or bring any other legal action or claim against the released parties for anything related to my TASER CEW training?

A. I see that, yes.

Q. And that document also -- or excuse me -- that statement also would have been included in the document that you reviewed online?

A. Okay.

Q. You agree with that?

A. I -- yes, I -- like I said numerous times, it was a long document. I have no reason to believe it wasn't or that it has been altered.

I don't recall verbatim yes, it was. I don't recall that.

Q. Okay. Had you -- Mr. Curran, prior to this training, had you completed any online modules for TASER CEW certification?

A. I think just the modules we just talked about.

Q. Okay. So this was the first time you had a training where you first completed the online portion?

A. Yes, ma'am, as far as I can recall.

Q. Now, when you went to the in-person training on December 13th and 14th of 2017, do you recall receiving that same document, Exhibit 20, in person from the master instructor?

A. No, I don't recall receiving those documents at all.

The only thing I do recall about the -- any documents coming from TASER was that

they were all lost. We never got documents from TASER.

Q. What do -- what do you mean?

A. According to the TASER instructor, the documents never showed up. So on the first day of class, we didn't have documents; we didn't have any waivers; we didn't have any PowerPoints; he didn't have any booklets.

Q. You mean to -- for each student to receive their own copy?

A. Yes.

Q. Okay. But the PowerPoint -- the instructor still went over the PowerPoint presentation.

He just didn't have copies; is that accurate?

A. Yes.

Q. Okay. And then the warnings -- you reviewed the warnings online, but you didn't have a copy of the warnings during the in-person training; is that also accurate?

A. I saw it online, yes. Now -- yes; no

one had a copy of anything in the classroom.

Q. Okay. Now, is that different than from prior trainings? Did you receive copies of the documents in previous trainings that you attended?

A. Yes. I -- I'd probably say in 99 percent of the training, I've always received some type of booklet or handout from the instructor. We were supposed to get one for this training. Nothing showed up. They were lost.

So we didn't get any -- any kind of material, course material or anything else, for two days -- actually -- excuse me -- at all.

Q. Okay. And Mr. Nelson told you that they weren't available or didn't show up?

A. No. Actually, Mr. Nelson -- since I was the only Virginia Beach police officer there, he had me out of the classroom most of the day running back and forth from the classroom to our head office with our TASER instructor trying to find the documents or get something for the class or find out where they were at the airport.

So Mr. Nelson had me going back and forth pretty much most of the day trying to find the material.

Q. Now, these warnings that were in place at the time of this training were the same warnings that you would have received for your training, which we've already reviewed -- for the March 21st, 2017 training; the September 2nd, 2015 training; and the July 24th, 2013 training.

So we've gone over those warnings several times, and they were still the same ones that were in place in December of 2017.

Okay?

A. Okay.

Q. So my question to you is, You, then, would have received those warnings at those prior -- those three prior trainings that you attended, correct?

A. The warnings, but not this form that you are referring to. I don't believe ever seeing the legal and release agreement before.

Q. In -- in its printed form, is what

you're saying?
A. Yes.
Q. Right. Because we've already established you --
A. Yeah.
Q. -- saw it online, correct?
A. Yeah -- actually in the training itself; in the classroom, no.
Q. Okay. But the warnings -- you did receive copies of the warnings in your previous trainings?
A. Yes.
Q. Okay.
A. We may not have received a copy. It was on a PowerPoint. Because when you do a recert, you've already gone through the class, so they normally don't give you the PowerPoint every single time.
On a new user course, yeah, but on a recert department, not every time do you get a handout. Mostly, but sometimes it may be missed.

Q. Okay. Going back to Exhibit 18.
And I'm just going to go through a few of the slides.
So if we look at the first page, which is Bates 119, it shows that -- about three-fourths of the way down, it says, Introduction slides -- so it actually starts, you know -- let's see -- one, two, three, four, five -- the sixth line down. It says, Introduction New Certification.
And then it goes all the way down to show several introduction slides down to the verification exam.
Do you see that?
A. Yes, ma'am.
Q. And if you just look at the times, you can see that it's documenting the times that you reviewed each of those slides --
A. Okay.
Q. -- do you see that?
A. Yes.
Q. Okay. So then the next exhibit -- I

want to show you those slides, which is -- at least some of those slides, which is Exhibit 21.

MS. NGUYEN: And, Scott, this is Version 20, effective January 1 of 2016.

MR. BUCCI: The last page is 240?

\- - -

(Deposition Exhibit Number 21, In-House Instructor Course, Instructor Certification Course, Slides 1, 6, 13, 239 and 240, Bates stamped AXON_CURRAN000039, marked for identification, as of this date.)

\- - -

MS. NGUYEN: Yes.

THE WITNESS: Okay. I have it.

BY MS. NGUYEN:

Q. So Exhibit 21 -- the first page states, In-House Instructor Course.

Do you see that?

A. Yes.

Q. And this is the instructor course for

the X26, the X26P and the X2 models --
A. Yes.
Q. -- and at that time, you had the X2, correct?
A. Yes.
Q. Okay. Effective date: January 1, 2016.
Do you see that?
A. Yes, ma'am.
Q. And this is Version 20, which is the same version -- if you look at eight -- Exhibit 18, the same version that you completed online --
A. Okay.
Q. -- okay -- prior to your training.
A. Okay.
Q. Would you agree, then, that these slides would have been some of the slides that you reviewed in that online module?
A. I would assume they would be.
Q. Okay. And then if we go to Page 2 of Exhibit 21, it goes over the program

requirements.
Do you see that?
A. Yes, ma'am.
Q. And it says, Each person must complete, date, sign and return the release to instructor. The signed release must be returned to TASER.
Do you see that there?
A. Yes, ma'am.
Q. But as you sit here today, you can't recall specifically seeing a printed version of the release that you reviewed online; is that right?
A. No, I can't -- I don't recall seeing one --
Q. Okay.
A. -- it was talked about being provided to us at the class, but it never was.
Q. You recall there being specific conversation about the release or just the printed materials in general?
A. The actual printed materials

regarding all the PowerPoints and the release -- releases or the paperwork we needed to have signed.

Q. Okay. Going to the next page of Exhibit 21. This is the same slide we've gone over before about the safety rules, there being no live firearms and that every participant is a safety officer and -- and can call stop action.

So you agree this would have been a slide that you reviewed during that online module, correct?

A. Yes. I have no reason to believe it wouldn't be.

Q. Okay. And then the next page of Exhibit 21 goes over the targeting and to avoid the sensitive areas.

You agree that's another slide you would have reviewed online, as indicated by Exhibit 18, correct?

A. Yes, ma'am.

Q. And then the last page of Exhibit 21 is the photo we've gone over many times of an

individual that was hit in the eye with a probe.
And that slide would have been included in that online training in December of 2017, correct?
A. I believe so.
Q. Okay. And then if we go back to Exhibit 18.
It is -- starts on -- it's Bates 124, and it shows that you were also -- you also reviewed slides under Tactical Considerations.
Do you see that?
A. Yes, ma'am.
Q. Okay. And I want to show you some of those slides.
We'll start with -- scratch that. We just went over some of those slides.
A. Okay.
Q. Okay. So once you completed this online module, then you were able to attend the training in person on the 13th and 14th, correct?
A. Yes, ma'am.

Q. Now, do you -- you said that you did review the PowerPoint during the classroom portion; is that right?

A. I did not review the entire PowerPoint during the classroom portion. As I stated, Mr. Nelson had me running back and forth multiple times trying to locate the information of where the documents were, because apparently they were shipped from TASER/Axon and they never arrived. And somehow they got lost at the airport or lost prior to.

So we were trying to put together something, but our master instructor didn't have the documents needed.

Q. Okay. And -- and he -- you were under the impression that the documents were supposed to be sent from TASER and not provided by the master instructor?

A. That's what he said. He literally said that they were coming from TASER. And he, as far as I know, mentioned that he had to call somebody to find out where they were.

Q. Okay. So -- but as far -- were you in the classroom long enough to be able to say whether the PowerPoint was shown during the classroom portion?

A. Oh, I -- yes, when I was in and out, there was a -- a PowerPoint being shown, yes.

Q. Okay. And how many students would you estimate were in attendance during this training?

A. In the 20s, maybe -- maybe -- or late teens, high 20s, maybe -- something like that.

Q. So approximately -- somewhere -- approximately 20 or so students?

A. Anywhere between 15 and 30. So that's -- I can't give you an exact number or, you know, 20 or so, but somewhere in that ballpark.

Q. Okay. And was there anyone else in attendance that you knew?

A. No. Oh, I'm sorry. I take that back.

Yes. Pete Slovinsky from the

Norfolk Airport, as far as I can recall, was the only person I knew in that class.

Q. And how did you know Mr. Slovinsky?

A. He used to be a beach police officer.

Q. And do you know approximately when he left?

A. Oh, I -- I have no idea.

Q. Okay. And when he worked at Virginia Beach Police Department, in what capacity did you know him?

Did you work --

A. I think --

Q. -- together or --

A. -- I think he made the rank of sergeant, I think. And I just knew him from the street.

Q. And was he ever your sergeant?

A. No.

Q. Before this date, did you have any prior interaction with the master instructor, Mr. Richard Nelson?

A. No, ma'am.

Q. So I think you said it was all classroom that first day?

A. I believe it was. I -- I don't recall if there was a -- a static portion in the gym at -- in -- at the end of the first day. I don't recall.

Q. So what else was done during the first day other than reviewing the PowerPoint, to your knowledge?

A. I don't recall anything else other than the PowerPoint. I don't recall if we went to the gym at the end of the day. I'm not positive.

Q. Okay. On the second day, you mentioned that there may have been some classroom portion?

A. There may have been in the morning, yes, but what it was or how long it was, I don't recall. I know we probably met there to get everyone, you know, together, but after that, I don't recall how long it was.

Q. And then it's my understanding that

you moved into the gym area for the practical portion of the training; is that right?
A. I believe so, yes.
Q. And tell me how that worked.
Did -- did the entire class go over to the gym or only some people at a time? How did that work?
A. No. I believe the entire class went to the gym, and we were doing shooting on static targets.
Q. Okay. And that was prior to the lunch break?
A. Yes, ma'am.
Q. Prior -- during the deployment of the static targets, did Instructor Nelson go through the safety protocols?
A. I can't tell you definitely. I wasn't in the classroom each time.
Q. Well, do you recall -- I'm -- and I'm not saying what he did when you weren't there, obviously --
A. Yeah.

Q. -- I'm asking do you recall being present when Mr. Nelson went over the safety protocols?

A. I do not recall that at all.

Q. Do you recall there being an individual who checked each person prior to going into the gym for any weapons?

A. No, not on the static training portion.

Q. Okay. Do you recall Instructor Nelson telling everybody they should be wearing protective eye gear and -- and providing that to the students?

A. I don't recall. He -- he -- we had glasses, so I would assume that it was mentioned. I couldn't tell you it was mentioned right then when we got glasses, but everyone had to have -- have glasses on.

Q. Okay. So at some point, it was conveyed to you that everybody needed to wear protective eye gear, and it was provided to the students?

A. It was conveyed to the class. I can't tell you exactly if I was in there when that happened because I was running back and forth. But it -- every -- we had eye protection on --

Q. Okay --

A. -- but I can't be 100 percent.

Q. -- and -- and even before this training, based upon all the TASER trainings you had attended previously, you knew that during the practical portion, protective eyewear was required, correct?

A. During the practical portion, inside the area, you need to have eye protection on, yes.

Q. And when you say "inside the area," what are you referring to?

A. The designated area of the drill.

Q. Well -- but we're only shooting at static targets right now, right?

A. Yes.

Q. And was that taking place in a

designated area, or was it kind of throughout the gym?

A. It was taking place throughout the gym --

Q. Okay. And so --

A. -- they were set up on either side, left and right. So the entire time at that point, the gym was a designated area.

Q. Right. So anybody entering the gym needed to wear the protective eye gear --

A. Yes, ma'am.

Q. -- and that's what you understood, correct?

A. Yes.

Q. Okay. So tell me a little bit about how the deployments to the static target worked.

A. As far as I can recall, it was -- and I -- I might be messing up some of the other training, but as far as I recall, it was the shoot a target, reload, shoot a target -- or I'm sorry. Take that back. It was shoot a target, since it was the X2, transfer to the other probes

and then shoot the target again.

Q. Okay. And did you also understand that all of the students were also safety officers and that anybody can call stop action at any time that they saw anything unsafe?

A. I -- I -- to be honest, it wasn't really a thought of mine since we were doing static drills. That would just be an assumption.

Q. I think my -- my question, though, is more specific.

A. Yes.

Q. At that time, you're participating in practical training, correct?

A. Yes.

Q. Okay. And in practical training, you knew, based upon either that training or the prior TASER training, that at any time during practical training, all students or safety officers and anybody can call "stop action" at any time they don't -- they see something they believe is unsafe?

A. Correct. Sorry. I misunderstood

what you said the first time.

Q. That's okay.

Okay. So did you -- tell me how it -- how long the target deployments lasted and then when you transitioned over to the scenario-based training.

A. Maybe it was an hour for the -- one second.

Maybe it was an hour for the -- maybe it was an hour for the actual static training. And then we went to lunch, and then we came back and did the actual scenarios.

Q. Okay. And, Mr. Curran, are -- are you okay? Do you need to take a break or anything?

A. No. I was just getting -- I'm okay. I'm just getting a flash of pain. That's all.

Q. Okay. Just let me know if you -- if you need to take a break at any time.

A. I will. Thank you.

Q. Okay. So you went -- you finished the target training, you went to lunch, and you

reconvened.
And after lunch -- is that when the scenario-based training started?
A. Yes. Prior to going to lunch, Mr. Nelson asked me to be the -- told me to be the role player -- be one of the two role players. So when we came back from lunch, I went to the gym and set up --
Q. Okay.
A. -- I started getting the gear out, not the actual setting up, just the gear.
Q. And the gear would -- included what?
A. He needed to use many of our department's TASER suits that the role players use and use some of the, like, rubber weapons of an axe or -- or what not.
Q. The -- the prop weapons?
A. Yeah, basically.
Q. And the TASER suit, are you referring to the -- what's called the "Sim Suit"?
A. Yes, I believe so.
Q. Okay. And if I understand that

correctly, it's a thick black suit where, when you're deploying the training cartridges, they still have the -- the probes on them but that they aren't going to deliver the electricity; is that right?

A. It is my understanding that they're not supposed to deliver electricity, yes. They do pierce, but they don't -- they're not supposed to deliver electricity --

Q. Right.

A. -- I don't -- I'm sorry. Let me rephrase that.

I'm not sure if the suits are supposed to stop electric -- electricity coming from the TASER, so I can't say if they stop that. They're supposed to limit the penetration of the probe. I do know that.

Q. Right. So you aren't sure if the actual training probes used delivered electricity or not?

A. Yeah, I'm not quite sure. I don't believe they did, but I'm not 100 percent.

Q. Okay. They're called "inert cartridges." Have you --
A. Yeah --
Q. -- heard of that term before?
A. -- yes. Normally, it should just be a probe coming out --
Q. Right.
A. -- detached but no actual electrical current.
Q. So the point being, I assume, that you can still experience hitting your target during the scenario-based training --
A. Yeah.
Q. -- and that the suits would then prevent the probe from penetrating the role player; is that right?
A. Well, it doesn't prevent it completely. It just is supposed to limit it. Because it does go through the thigh area sometimes.
Q. Okay. Had you experienced that before --

A. I did on that day.

Q. -- seems like you had some experience with that.

A. Yeah, just that -- it got me a little bit in the leg that day. That was about it, but nothing -- just a little prick, nothing bad. It didn't go through.

Q. And when you were asked to be a role player, did you agree to do so?

A. Yeah. He said he needed me to be a role player, so I said okay.

Q. Okay. And you said there was one other role player as well?

A. Yes.

Q. Did you know who that individual was?

A. No. I don't think he did -- Mr. Nelson decided at that time. I don't believe so. I'm not positive. But I know it was some -- a different person from a different department.

Q. Okay. And then describe to me how the scenario training was set up.

How was it supposed to work?

A. Well, we were -- Mr. Nelson informed us that we were going to set it up this way using the folding mats that you lay on the ground that fold up to make, like, a square with an opening on each end. And then he informed us that the scenarios that he wanted done were going to take place inside of that box.

Q. Okay. And I'm going to show you Exhibit 22, which are some photos that were taken -- taken of that training area.

\- - -

(Deposition Exhibit Number 22, Photos of Training, Bates stamped AXON_CURRAN000104, AXON_CURRAN000154 through AXON_CURRAN000157, marked for identification, as of this date.)

\- - -

MS. NGUYEN: Scott, it's Bates 104, and then 154 through 157.

THE WITNESS: I have them.

BY MS. NGUYEN:
Q. Okay. Just going through each of those -- these photos, is that -- would you agree this is the gym where the training took place?
A. Yes.
Q. And that it -- these photos depict the mats that you just described standing upright?
A. Yes.
Q. And in each of these photos -- well, in most of them, I should say, there are individuals wearing the black Sim Suit.
Would you agree with that?
A. Yes.
Q. And is that -- do these photos accurately portray the training area on December 14th, 2017?
A. I would say every -- every part of it except that the -- the bench -- the black bench with the white rubber baton on it is further out than what it was.
These -- these pictures were taken

after I was injured.

Q. Okay. And -- and you're referring to -- let's be specific with the photos --

A. Okay. 104 --

Q. Okay.

A. -- 154, 155, 156 and 157.

Q. So in all of those photos, there's a black bench, and it looks like there's also kind of a plastic axe prop that was used in the scenario I assume?

A. Yeah, it was a rubber -- yeah, rubber prop.

Q. Okay. On top of the bench.

And you're saying the bench -- you believed the bench, at the time of the injury that you sustained, was closer to the mat?

A. Yes. It was used as a -- it was much closer so we had more cover.

Q. Okay. Anything else in these photos that were inconsistent with your recollection?

A. Not that I can think of.

Q. Can you identify anybody that is

depicted in these photos?

Obviously not the persons with the suits on, but there's some people depicted, like, in 156 and 157 --

A. The gentleman with the tan shirt, the tall one -- that is Pete Slovinsky. That was the gentleman I referred to that I knew.

Q. And that's on Bates 156?

A. Yes, ma'am.

Q. Okay.

A. And after that, I don't -- facewise, I can't really see it.

Q. Okay. What about the gentleman depicted in the blue shirt on Bates 157? Do you know who that is?

A. I -- I'm sorry. It's -- it's not a good photo, and it's -- it's kind of blurry to me. I can't really make it out perfectly.

Q. No, that's okay. If you can't depict them, that -- just let me know.

A. Yeah, I can't -- I can't see it --

Q. Okay.

A. -- not so far.

Q. And so what is your understanding as to why the mats were placed there, if you have one?

A. The reason for the mats being up there was to -- as far as my understanding, was to contain the scenario in that area. And these open areas was -- was where the role players were going to come from. Now, there was four scenarios, and the role players would come in from either of those corners.

And then the bench with the props on it was the designated safety area for role players.

Q. Okay. Did Mr. Nelson actually say that the scenarios should not go outside the mats?

A. Yes. He said they're supposed to stay inside of this area.

Q. And then you said -- you used the term "designated safety area."

A. Yes.

Q. Where would that be?
A. That bench, the black one with the props on it --
Q. Okay.
A. -- that is --
Q. Did that -- did that go for all benches or just that bench? Because --
A. No --
Q. -- I noticed there was another bench in another photo -- in photo --
A. No. Just that exact bench with those props was the area that was designated.
Q. And who designated that area as the safety area?
A. Mr. Nelson.
Q. Okay. So go ahead and -- if you can just describe to me, as you started the scenarios, how they went up to the point of injury.
A. There was four scenarios. I did the first one and the third one. The other role player did the second and the fourth.

We would start from this area when the student came in. Acting as a role player, we would try to come in or get their attention from either of these areas, the open corners.

So the first scenario was a gun scenario. So I would pull out a BB gun or a pellet gun and try to get a -- elicit a response from the student inside the box.

And then the second scenario was supposed to be just a simple passerby, no threat whatsoever. And then the third scenario that I did was supposed to be a verbally aggressive and threatening individual to get them to realize that it was an actual -- it was an assault situation.

And then the fourth scenario -- I believe that the other person -- the role player was doing was a deadly weapon, an axe or a pipe being swung at the officer to elicit another response.

Q. In each of these scenarios, it is -- what you're looking for is the student's

response, whether they respond with use of force or try to deescalate or whatever the scenario is?

A. Yeah, that's what I believe Mr. Nelson was looking for.

Q. And was it -- what was the scenario with the safety officer? Was there a designated safety officer for these scenarios, or was it still all students, or both?

A. Nelson. That was the person in charge being the designated safety person. He was overseeing all of it.

Q. Okay. So, to your knowledge, was there another person designated as a safety officer for these particular scenarios?

A. Designated -- no, no. Hum-um.

Q. Not to your knowledge?

A. No, ma'am.

Q. And was everybody in the gym area still wearing safety glasses at that time?

A. At which time, ma'am?

Q. During the scenario-based training.

A. I wasn't viewing everyone all the

time. When I was doing the scenarios, I had a mask on and did my scenario and then went back to the safety area. So I can't really tell you what all the other students were doing.

Q. Fair enough.

What was your understanding as to whether or not safety glasses were required anytime there was scenarios being ran in the gym?

A. My understanding was that if you were in that particular area, you would be wearing -- if you're outside the designated safety area, you're going to be wearing glasses.

Q. Okay. So other than the bench area -- is that what you're referring to -- the -- the bench area, you didn't have to wear glasses, but all other areas in the gym, you had to wear the glasses?

A. Yes, the bench area -- during a scenario, you had to wear -- excuse me -- the -- every place but the bench during a scenario, you had to wear glasses. The bench was -- that one

bench was our designated area to rest and recoup due to the fatigue from doing the scenarios and the heat from the helmet and the protective gear, because it's kind of heavy.

Q. Okay. And so was it only you and the other role player that could go into the designated safety area, then?

A. Yes, this was our designated safety area for the role players, yes.

Q. Okay. And because you were in the designated safety area, it was your understanding that you did not have to wear the safety glasses; is that right?

A. Well, I wouldn't be wearing safety glasses. I have a helmet. So we would take the helmet off right there and relax to the next scenarios because the scenarios unfold pretty quickly.

Q. Okay. And were you -- did you ask whether you can take the helmet off during those breaks?

A. We were -- we were instructed that

this is exactly where the safety area is for us to relax, take our equipment off, get a breather if need be before the next scenario --

Q. Okay.

A. -- that's what we were told.

Q. And so did, then, Instructor Nelson tell you that you could take your helmet off during those breaks in the safety area?

A. Yes, he said we could take the equipment off to get a breather but had to be in this area.

Q. Okay. And did he indicate to you that you could take the helmet off and put the glasses on?

A. No. That conversation never came up.

Q. Okay. So it was your understanding that during the breaks, as long -- you can go into the safety area and remove your helmet --

A. Yes.

Q. -- but outside the safety area, you needed to put your helmet back on?

A. Yes. The safety area was literally

just that small spot below the barricades -- or the -- the mats.

Q. And then everyone else in the gym not in that safety area was required to wear safety goggles, correct?

A. Yes, as far as I know, they were all supposed to wear safety goggles, yes.

Q. Okay. So you were running these scenarios.

How many scenarios, approximately, were ran before the subject incident occurred?

A. I would say maybe mid-40s. I think we were around Number 11 -- the 11th student or so, I think. So I think we were on Scenario 40.

Q. Okay. And so for those 39 -- approximately 39 scenarios prior to Scenario 40, did the scenario remain inside the mats?

A. As far as I recall, all my scenarios remained inside the mats. I think we may have gone out a foot or two. I can't say where the other role players' scenarios went -- ended up at. I wasn't watching. I was in that area.

So I know -- I think one or two of mine may have stepped out about a foot. And then as far as the other scenario -- the other role player, I don't know where theirs ended.

Q. Okay. Because I presume at that time, you were in -- behind the mat on the bench?

A. Every time.

Q. Okay. And when you were behind the mat on the bench, at any point other than the scenario where you were hit with the probe -- at any point, did you see either the student or role player go outside the mats?

A. When I was not role playing, no. I would -- had my head down, getting -- getting air and looking straight down. I wasn't watching the scenarios when I was --

Q. Okay.

A. -- when I had taken a break.

Q. Understood. So when you are not in the scenarios, you never see anybody go outside the mats, and when you're in the scenarios, you may have gone outside the mats 1 or 2 feet; is

that right?
A. Yeah, yes, because I could not tell where I was with those masks. So --
Q. Okay.
A. -- after I got up, I recognized I was -- may have been a foot or two out, but the scenario already unfolded at that point.
Q. Okay. At any time, then, prior to this incident, you could have called stop action if you saw anything unsafe, correct?
A. I'm sorry. Can you say that again to me, ma'am?
Q. Sure.
At any time prior to the scenario where you were struck with the probe, you could have called -- well, including that scenario -- let me just rephrase, then.
At any time during these scenarios, the 40-some scenarios that had occurred, you could have called stop action had you seen anything unsafe, correct?
A. Yes, if I saw something unsafe, I

could have called stop action, but that --

Q. Okay.

A. -- wasn't the case.

Q. But you did not call stop action at any point, correct?

A. No. I did not see anything.

Q. Okay. And do you recall any other student calling stop action prior to the -- the point that you were injured with the probe?

A. No.

Q. Okay.

MS. NGUYEN: Okay. We're going to go to the next exhibit. This is Exhibit 23. It's Bates 147 through 153.

\- - -

(Deposition Exhibit Number 23, Inter-Office Memorandum, Bates stamped AXON_CURRAN000147 through AXON_CURRAN000153, marked for identification, as of this date.)

\- - -

THE WITNESS: Okay. I have it.

BY MS. NGUYEN:

Q. Okay. So this is the interoffice memorandum drafted by Captain Jones, dated February 20th, 2018 to Deputy Chief Zucaro.

Have you seen this before, Mr. Curran?

A. Yes, a long time ago.

Q. Okay. And do -- do you -- did you know Captain Jones while you were at the department?

A. Yes. He was my -- he was my captain, and he was my sergeant on the SWAT team . . .

(Connectivity issues.)

CERTIFIED STENOGRAPHER: I'm sorry?

THE WITNESS: I said: And, I think, my lieutenant.

BY MS. NGUYEN:

Q. Sergeant, captain and lieutenant?

A. Possibly, yes.

Q. How long had you known him?

A. Since 2005. When I first came on the

SWAT team, he was the sergeant.

Q. Were you aware that he conducted an investigation into the incident giving rise to this lawsuit?

A. I heard of it, but no one was telling me that they were actively doing anything -- or doing one --

Q. Okay.

A. -- I normally -- as far as my understanding, any type of injury on the department, there's always some type of paperwork done or what happened, after accident report, you might say.

That's kind of standard.

Q. Okay. And then reviewing this interoffice memorandum when you did, did you become aware that he actually conducted an investigation and put this memo together with his findings?

A. Yes, I heard that they had one, and they did give me a copy a little while afterwards.

Q. Okay. So I'm going to refer you to Page Bates 150 of this document.

The third paragraph -- it states -- starts with The scenarios.

A. Um-hum.

Q. It says, The scenarios seem to always start inside of the "hot zone" and conclude outside of the accordion style mats. The mats do not designate what areas are in play, instead are used as obstacles or barriers for role players to use during this scenario --

A. Okay.

Q. -- do you agree with Captain Jones' statement?

A. No.

Q. And is that because you -- you thought that the mats were intended to contain the scenario as opposed to be using -- used as obstacles or barriers?

A. No. We were informed that that's -- we were informed that that is where the scenario is taking place, inside of that area.

Q. Meaning the mats should have contained the scenario; is that -- that's what you understand?

A. That's -- as far as I knew, that was their intention.

Q. Okay. And I -- I may have asked you this.

Do you recall each student being checked for weapons when they entered the gym?

A. No, I don't recall them being checked or even seeing them being checked. I was in the gym setting up when the other students were in the classroom, I assume, getting a brief or talking. I'm not quite sure.

And when they came back into the gym, I did not see any weapons checks. So when they went into the hallway to set up, I asked Pete Slovinsky to go do a weapons check on everyone just to make sure.

Q. And did you know from prior TASER training that they were supposed to be doing this weapons check?

A. They did -- no; all training.

Q. All training.

A. Yeah. I taught for 17 years. And if you're doing active roles -- role playing, you should make sure no one has picked up a weapon. Sometimes people have a tendency to come back from lunch and forget they have a gun or go to the bathroom and put their knife back in their pocket.

So you should always do a weapons check directly prior to the scenario starting, not rooms away. So . . .

Q. Okay. I'm going to refer you to Page 148.

A. Okay.

Q. It's the paragraph that starts with The aggressor.

A. Um-hum.

Q. The aggressor was required to wear a full safety suit to prevent injuries associated with the probes contacting the skin. All other persons in the gymnasium were required to wear

safety glasses at any time whether in the designated hot zone or not.

Do you agree with that statement?

A. He -- Mr. Nelson didn't designate that to me because I wasn't in the classroom before this scenario started; I was in the gym setting up.

Q. Okay. Well, even in the gym, at no -- you're saying that at no point, you were not aware of the requirement to wear safety glasses at all times?

A. I was given the information on the other things that you have said or showed me throughout the course of the day, but in that instance, I knew that this was my safety area designated.

I wasn't in the classroom for that brief that he may have given to the class, so I can't say exactly what was said or what wasn't said in the classroom.

Q. But whether -- my question is gen -- broader than that.

Whether it's in the classroom or in the gym, were you made aware that all persons in the gym were required to wear safety glasses at all times other than as outlined here, the aggressor who was in the full safety suit?

A. No. It was my understanding that everyone else watching the scenario would have to wear safety glasses, but the role player's safety area was the safe zone --

Q. Okay. And did --

A. -- the role player --

Q. -- you -- oh, go ahead. I'm sorry. I thought you were finished.

A. -- the role player itself would have to wear their mask while doing the role playing, but the safety area was the safety area.

Q. Okay. And other than you and the other role player, did you observe everyone else in the gym wearing safety glasses?

A. No. I -- I -- I think we covered this earlier. I didn't see what everyone else was doing. My mask is on. So when I was doing

the scenarios, you can't -- don't have very good peripheral vision.

And I'm not looking past the -- the student or the person I'm trying to engage. I'm kind of -- I need to look at them to incite a response, because it is fake training, you know, a simulation.

So I didn't see what all the other students were doing at that time.

Q. Okay. The statement goes on, Richard Nelson stated this was communicated to all participants as part of the safety brief before the class started.

I think we covered that.

You don't recall it being communicated to you by Mr. Nelson, correct?

A. No, not -- not prior to that -- not prior to that evolution starting or anything like that, no. I wasn't there.

Q. Mr. Nelson also commented that all participants were safety officers during the training evolutions.

That, you agree with.

I think we've acknowledged that you knew everyone was safety officers, correct?

A. I would say everyone would be safety officers if you're not involved in the actual scenario is what I'm trying to say. If you're an onlooker, absolutely. You could call stop, cease fire, end exercise, but when you're in the scenario, you can't really do that.

Q. Well, if you're in a scenario and you see something unsafe in a scenario, are you saying that as a role player, you couldn't call stop action?

A. Your primary job is to facilitate the role. You don't get to see every other safety violation.

If there was a safety violation off to my left that, say, a person took off their glasses, I'm not going to see that because I'm focusing on that. If it's directly in front of me, sure. And if the role player -- not the role player but the student that I'm trying to

elicit a response from does something unsafe, yes, I could do that. But as a role player, it's impossible to see everything going on. I have one job to do.

Q. Right. And I think my question was specific to you and what you saw. I'm not suggesting that you have to -- you had a role to see --

A. Okay. I'm sorry.

Q. -- everyone else or even an obligation.

My question simply was, Even if you're a role player and you're in the scenario, you are still a safety officer in that you can stay -- say stop action if you were to actually observe something unsafe --

A. Sure.

Q. -- isn't that correct?

A. Yes, that would be true. If you're able to see it, you should -- you can call it.

Q. Right.

Okay. The next paragraph says,

MPO Curran was participating as the aggressor and was wearing the full safety suit just prior to the injury. After several evolutions, he was replaced and given a chance to take a break. The safety suit includes a full helmet that has limited ventilation. MPO Curran stepped outside of the perimeter of the hot zone and sat on a bench along the makeshift wall. He appeared to be far enough away from the next scenario that had begun.

Do you agree with everything up until that point?

A. I'm just reading it again. Sorry. It takes me a little bit of time to read.

Q. Take your time.

(Whereupon, the witness reviews the material provided.)

THE WITNESS: Okay. Yeah, it seems about right, I believe.

BY MS. NGUYEN:

Q. Okay. He goes on, As he was sitting on the bench, he removed the helmet to get fresh

air. The next scenario had begun, and the role player officer stepped outside of the accordion walls close to where MPO Curran was sitting. The officer discharged his TASER toward the aggressor, who had also stepped outside of the accordion walls. One of the probes struck MPO Curran in his right eye. He had removed his helmet and had not yet put on the safety glasses.

Do you agree with all of those statements up until that point?

A. No, I do not.

Q. And what do you not agree with?

A. The portion about the safety glasses. Neither role players had safety glasses in our safety area. That was our designated safety area. So the part about not putting on glasses yet is not true.

Q. Okay. You're saying that you didn't have any glasses to put on when you took your helmet off?

A. No, ma'am. That was our designated safe area, so I didn't have glasses, and the

other role player didn't have safety glasses there.

Q. Okay. So I want to go to the scenario where you were actually struck by the probe.

Were you actually watching that scenario as you were sitting -- well, let me back up.

My understanding is you were behind the mat, sitting on the bench, correct?

A. Yes, I was behind the mat, sitting on the bench, head leaning forward as you -- like if you would just be leaning forward to stay underneath and taking some -- trying to get some air.

Q. Okay. And so your helmet was off at that time?

A. Yes.

Q. And how long would you estimate that your helmet was off before you were actually struck by the probe?

A. From as long as you see me sit

down -- probably about two seconds after that to the time the scenario ended. I -- I don't know how long -- it wasn't off for very long. The scenarios moved quickly, so . . .

Q. And describe to me what you saw in that scenario, if anything.

A. The only thing I recall seeing is looking up, seeing a flash and getting hit. That was it. I saw the weapon, I saw it pointed towards me, saw a flash. That was it as far as the scenario goes. Prior to that, I had my head down.

Q. Okay. Did you actually observe either the student or the role player stepping outside of the mats?

A. No. I heard noises, and when I looked up, they were already -- I don't know -- 15 or 20 feet outside of the hot zone into that safety area. And that's when I saw the weapon -- the TASER being pointed in my direction and flashed.

Q. And did you actually see the probes

deploy or come towards you at all?

A. No. I don't have -- that's -- they -- they move way too fast.

Q. And what happened next?

A. I got hit in the eye.

Q. Did you know at the time that you were hit what had happened or --

A. Oh, yeah --

Q. You knew --

A. -- I --

Q. -- right away?

A. -- I saw a flash and felt like someone hit me in the face with a sledgehammer. So I pretty much knew what happened.

Q. Okay.

MS. NGUYEN: I want to go next to Exhibit 24, which is Bates 100 to 101.

THE WITNESS: Yeah. We take a -- before we get started, can we take about 10 minutes?

MS. NGUYEN: Yes, we can.

THE WITNESS: Thank you very much.

MS. NGUYEN: All right --
THE VIDEOGRAPHER: We --
MS. NGUYEN: -- we'll be back in 10.
THE VIDEOGRAPHER: -- we are off the record at 2:21 p.m.

\- - -

(Whereupon, a recess was taken from 2:21 p.m. EST to 2:49 p.m. EST.)

\- - -

THE VIDEOGRAPHER: We're back on the record at 2:29 p.m. --
CERTIFIED STENOGRAPHER: No; I think it's 2:49, I think.
THE VIDEOGRAPHER: Oh, I'm sorry. You're right.
It's 2:49 p.m.
Back on the record at 2:49 p.m.
BY MS. NGUYEN:
Q. Okay. We'll go ahead and proceed.
Mr. Curran, where we left off, we were talking about the incident itself when you

were struck by the probe. And I want to refer to Exhibit 24, which is Bates 100 to 101.

\- - -

(Deposition Exhibit Number 24, Employer's Accident Report, Bates stamped AXON_CURRAN000100 through AXON_CURRAN000101, marked for identification, as of this date.)

\- - -

BY MS. NGUYEN:

Q. Can you hear me okay?

A. Yes, ma'am.

MR. BUCCI: I was just marking it for him.

THE WITNESS: Yeah, sorry.

MS. NGUYEN: Oh, okay. I wanted to make sure he wasn't freezing up.

THE WITNESS: I got it.

BY MS. NGUYEN:

Q. Okay. So this was an employer's accident report completed by the police department.

Have you seen this before, Mr. Curran?

A. I don't recall. I -- I don't -- I don't know.

Q. Okay. It has numbers for each box indicated. And I'm going to refer you to Number 18, which says, Date of injury or illness reported --

A. Okay.

Q. -- and it shows a date of December 14th, 2017.

Do you see that?

A. Yes.

Oh, lost her.

(Connectivity issues.)

MR. BUCCI: Amy?

CERTIFIED STENOGRAPHER: It looks like her camera's out.

MR. CASEY: Amy, you're muted.

MS. NGUYEN: Can you guys hear me?

MR. BUCCI: We can hear you but can't -- oh, there you go.

THE WITNESS: Yeah, you're back.
BY MS. NGUYEN:
Q. Okay. Sorry about that.
It had a date of injury or illness reported of December 14th, 2017.
Do you see that?
A. Yes.
Q. Okay. And it has your name down in Box 22?
A. Yes.
Q. And it says, Person to whom reported is Bryan Marshall.
Do you know who Bryan Marshall is?
A. That's -- he was the sergeant at the PDNT at training, down at Creeds Training Center.
Q. And is that the training center where the training took place?
A. No. That was actually at the law enforcement training center. We have an off-site training center in Creeds down in the county that does all the tactical stuff, the tactical fighting, shooting and everything. He's the

sergeant of that.

So he would be my immediate sergeant because I was working down there.

Q. Oh. So he -- I'm sorry.

You said he -- he was your immediate sergeant?

A. Yes.

Q. Okay. And so did you actually report this incident to him directly?

A. No. I -- I -- I can't remember if he was there or not at the scene, but I didn't report anything to anybody. I went to the hospital.

Q. Okay. So how do you think that this was reported to him? Do you have any information on that?

A. I'm sure somebody called him or told him that was on scene.

Q. Okay. But you don't recall having any direct conversation with him either that day or subsequently?

A. He may have -- I think he came to the

emergency room.
Q. Okay. That same day?
A. Yes. Whether it was the first hospital or the second hospital, I'm not really quite sure.
Q. Okay. And Box Number 42 -- it says, Describe fully how injury or illness occurred. And it states, IW was doing a scenario training in his protective suit, and when he switched roles, he took his helmet off. There was a TASER probe reflected off someone else's suit into his right eye. IW was transported via ambulance.
So what I wanted to ask you about is where it says, A TASER probe reflected off someone else's suit -- did you have knowledge of it reflecting off the suit?
A. No, ma'am.
Q. Had you heard that from anyone who was present during the incident?
A. When I was on the ground, I heard someone say, Well, maybe it deflected. And then someone went, Yeah, it deflected. So it kind of

was the pass-the-line-down information. One guy said it; everyone started to say it --

Q. Okay?

A. -- but I -- I did not see a deflection; I just saw the TASER pointed directly at me.

Q. Right. And you didn't see the probes at all, so you would defer to whoever says that they actually saw the probes?

A. I would -- no; I would probably defer to my doctor.

Q. Your doctor?

A. Yeah, I would refer to my doctor as being the one that would be able to say what they saw. I wouldn't refer to anyone at the scene because I don't believe you can actually see a TASER moving.

They're coming out at how many feet per second? So I don't know how anybody would see it deflect. So I can't say that that's the right information.

Q. Okay. Let me see if I understand

this.

So you would not -- you would not believe anybody who actually saw the incident or claimed that they saw the probes, but you would -- you would, instead, defer to your doctor as being able to say whether the probe deflected first before it hit your eye or not?

A. Yeah, I would go with a medical professional over the people in the classroom that were maybe 20, 30 feet away. I can't say that those people did see it or didn't see it. I don't know. I don't know them. I don't know how good their vision is. I don't know any of that.

So I can't say that what that person said is correct.

Q. Or incorrect, right? You can't say either way?

A. Yeah, I can't -- no, I can't say.

Q. Okay. And then to your knowledge, have any of your doctors given an opinion on whether the probe deflected or not?

A. I asked my first doctor, Dr. Elkins,

if it was -- if it came deflected or -- or if it was a straight shot, and she says, No, it was a straight shot straight into your eyeball.

Q. And that was Dr. Elkins, you said?

A. Yes. That was in a conversation a while -- I think it was the -- after the second surgery, maybe, or the first one. I can't really recall. I had multiple.

Q. So with regard to this statement by Bryan Marshall, you don't know where he obtained that information about it deflecting off of a suit?

A. Probably the same place I did, maybe one of the students that said it out loud. I don't know exactly where he got it from. I didn't ask him when he wrote the report or afterwards.

Q. So the answer to that is no, you don't know where he got that information?

A. No, ma'am.

Q. Okay. So with regard to the eye injury, I want to get some more information on

that.

How many surgeries have you had?

A. Three, so far.

Q. And can you give me the -- if you know, the dates or the approximate times of those surgeries?

A. One was the day of or -- or just past midnight of that day. The other two I'm not positive exactly what the dates are. Maybe February, maybe January -- I don't really know.

Q. So early 2018?

A. Early and mid-2018, yes, I believe so -- late 2017, and the other ones were early 2018, I believe, or mid.

Q. And first I want to talk about what -- what is the current diagnosis?

A. Medical term-wise? I -- I couldn't give you the exact medical terminology, not all of it. I know that I have an exploded iris. My retina was detached and stuck outside my eyeball. That was pushed back in -- I'm sorry -- sewn back in twice.

I'm developing band keratopathy, which is the whiting of an eye. So I'll develop calcium deposits over the top of the surface of the eye, kind of like you would see in the walking dead or on a zombie. The eye will white out. The only -- you have to have surgery, I believe, to get that out.

I have no usable actual vision in my eye. All I get is immense amount of light, because my iris has exploded and taken over about 99 percent of the color of my eye.

So the medical term for the actual eyeball, I guess, would be those things. The other things are -- the other issues with it are different, but as far as the medical determination, I think that's about it.

I've got -- all my muscles were cut, I think, three times, and they actually put a band -- a belt -- a buckle around my eye to try to keep my retina from detaching again, but that was in the hope of getting some vision. But I -- the cornea is too messed up and the retina

was too messed up to get anything.

Q. You indicated that you had three surgeries thus far.

Is there any surgeries planned for the future?

A. Depending on the amount of increasing pain, we might need to remove it. And what comes with that, I'm -- I'm not quite sure; or any advancements they -- they might make in -- in the department of the eye, you know, I'm not really quite sure.

Q. And so what have they told you with regard to the pain management?

A. You can't really do much about it. It's -- the ocular system is a completely different set of nerve groups. So your common medication, like oxycodone or all that other stuff -- it doesn't affect it.

So . . .

Q. So what -- what -- what is the factors that would determine whether or not you go on to have a surgery for the removal?

A. If I -- well, it would basically kind of be my decision on whether or not -- how long I can put up with the pain and constant feeling of your eyeball.

Q. And with regard to the pain, can you describe how often you experience pain and -- and the levels of the pain?

A. I would say every day. I can always have -- I always have some type of -- it's called being aware of your eye, where you can actually feel your eyeball inside of your head. So I can always feel it whenever it moves.

And then, every day, I'll get shooting pains in it. And then some days, it's massive amount of shooting pain. And then other times, it goes on for a couple seconds; other times, it goes on for, you know, half an hour, an hour.

Q. And so when you aren't experiencing the shooting pain, do you have pain otherwise without the shooting pain?

A. Yes. I have constant headaches due

to -- I believe the surgeries of cutting the muscles around the eye could be one part of it, the trauma to the eye and the -- the massive amount of light that my eyeball sucks in.

So even if you're wearing a patch or sunglasses, it stills sucks in a massive amount of light because the iris is exploded and doesn't shut.

So --

Q. I know that you mentioned, like, oxycodone not working, but is there any -- anything that you are currently prescribed to attempt to address the pain?

A. No. There's nothing I can take for the pain.

The only thing I can take is prednisone -- or prednisone, and that's just to try to keep the pressure up in my eye so it doesn't fall out of my head.

Q. And so at this point, is there -- what is the prognosis as to the vision loss? Is it -- is it permanent and there's no chance of

the vision ever returning?

A. No. The vision is completely permanently damaged and will never return.

Q. So we addressed the vision loss, pain, headaches.

What else -- I'm trying to get an idea of what you've -- what you experience on a daily basis as a result of this injury to the eye.

A. Okay. Well, besides of all the pain and whatnot that I have, I have massive dizzy spells; I have zero depth perception now; and my balance is shot. Because you kind of need your eyes and your ears to control your balance, and I only got one of the other one. So balance is shot.

As far as the dizziness, if I move my head too quickly, I'll get dizzy. So if I look back and forth at someone in -- in casual conversation and I do it too fast, I'll get a dizzy spell. If I stand up too quickly from, like, a crouching position -- like, if I pick

something up off the floor and I stand up too fast, I'll get dizzy and have to hold on to something.

If I move my head too quickly -- say, you're, like, driving a car, just looking left and right to cross the street or try to look up behind you to back up -- if I do that too fast, I'll get dizzy.

As far as the balance, can't run outside anymore because I tend to fall over, kind of lean to the one side. That, and also due to the amount of light coming in, it's impossible to run outside. So I'll stick to a treadmill. And even then, I can't really run on without holding on because I tend to lean just because I don't have that balance anymore.

The same thing with -- if I -- if I turn a corner too fast or if I lean my head too far to the right, I'll start to go that way.

As far as the depth perception, it pretty much kind of affects everything. I literally don't have stemmed wine glasses in my

house anymore because I broke them trying to hand a wine glass over, like, our bar area. I can't see how far away it is, so I busted off every single one of our stems. So we now have plastic wine glasses.

The depth perception also affects anything trying to fix around the house -- just trying to put a screwdriver into a screw, I can't see where it is, or grabbing a door. Or if someone has to hand me something, I just have to put my hand out, because if I go to grab it, I don't know how close or how far away they are.

I constantly walk into walls because -- especially corners, because on the right-hand side, I can't really judge how far my shoulder is from the doorway because I don't see on this side anymore.

The dizziness and all that things kind of affect every aspect of my life in regards to not just all the things I mentioned, but it really affects my daughter the most because she's 7, and I can't do all that fun

stuff anymore. Like, I can't jump on a trampoline because of the dizziness. I can't spin her around because of the dizziness.

I can't do a lot of things that I used to be able to do with her. Like, I can never ride a roller coaster because the up and down will get me dizzy. So all those things I used to be or wanted to do as a dad I can't do anymore because I literally will fall over or drop her or get sick.

And the same thing goes with airplane rides. The most -- I've been on an airplane twice now, and the longest I can be in the air is about an hour and 45 minutes. Anything longer than that, due to the air pressure and the eye, causes a massive headache.

It was so bad the other -- the last time I took a flight, it was about two and a half hours. I -- once we got off the plane, I had to go lay down for the rest of the day because just the amount of pressure that's caused on the eye.

I'm not sure if that's due -- because it's filled -- filled with oil or what the actual reasoning is, but the amount of pressure that gets put on it causes immense amount of pain.

Q. Thank you for that.

What are the doctors saying with regard to -- if you opt for the surgery to remove the eye, what do they anticipate, you know -- the symptoms that you described, what would that remedy?

A. They don't know anything on that as far as the dizziness, balance and depth perception -- obviously, the depth perception is not going to come back because it -- you need two eyes for that --

Q. More so, you know, like, the headaches -- would that --

A. Yeah, I asked the doctor about that, and she cannot guarantee that it's gone. You'll still have --

Q. Is that a hope with the surgery?

A. It would be a hope for the pain to be -- subside a little bit. But as she said she can't guarantee that, because I might have some other damage on nerve endings that she -- it's not her field of expertise. So that's why she's trying to send me to a neurologist to find out what's going on with everything else.

Q. And is that something that you intend to do in the near future, is to see a neurologist?

A. Oh, yes. I've been trying to set the appointment up for six or seven months now. It's just a question of getting it, someone who takes workmen's comp.

And then due to COVID, I've been trying to get the appointment -- I just got a letter about three weeks ago saying I can't even schedule an appointment until July. And then I probably won't be able to get in until October or November.

So --

Q. Due to COVID-19?

A. Due to just them being booked.

Q. Where are you leaning at this point with regard to the surgery?

A. I'm not quite sure yet. It's kind of one of those things where you weigh the pain versus being even more disfigured, because the eye on a glass eye doesn't move.

So my eye, right now, moves, so I don't look nearly as bad. But once I take it out, obviously, there's no going back whatsoever. It might be able to subside the amount of pain, but the dizziness, the depth perception and all the other stuff will still be there because it's -- it doesn't really affect it. That's more of the nerve endings and possibly neuro -- neurologist line of work.

So I haven't committed either way to it, but it's also one of those things that if -- what if they make advancements and I already cut it out. There's nothing on the horizon according to the doctor, but I don't want to take it out of my body because there's kind of

no going back from that, plus I don't want to look any more disfigured than I already am.

Q. When you talk about the disfigurement, is -- I notice today, for the deposition, you're wearing the patch over the eye.

Do you wear that patch on a regular basis, or are there times where you will take it off to where people can actually see the eye?

A. I'll take it off in a very dark room or very dim lighting. Other than that, I'm always wearing sunglasses or a patch.

But if I'm with my girlfriend, or whatever the case may be, I'll take it off. But for the most part, I'm wearing this thing 90 percent of the day.

Q. And do you currently drive?

A. Yes.

Q. And so was there any type of test that you had to go through to ensure that you're still able to operate a motor vehicle safely?

A. Nope. No. According to DMV, you

only need one eyeball.
Q. I'm sorry. I didn't get your answer first -- it cut out.
A. No, there's no extra test to take in order to drive. The only thing you would have to take is if you're -- I guess --
Q. Can you hear me okay?
A. Yes.
Can you hear me?
Q. Sorry. I still didn't get your answer. If you can just repeat your answer for me.
A. Okay.
No, there's no additional test to drive a vehicle.
Q. Okay. And so do -- do you feel that you're able to safely operate a motor vehicle?
A. It -- for the most part, yes. At times, I won't drive if my head hurts too bad or I'm having a bad -- really bad pain day, because that requires me to move my eye a lot more.
So if I do have to go someplace,

I'll have my girlfriend drive me, and I'll just kind of stare at the floor. This way, I'm not moving my eye too much -- eyes.

Q. How -- how often would you say that you feel like -- that you're able to drive versus not able to?

A. I would say more. I was able to drive more. Some days -- you know, kind of getting used to a lot of the pain. It still hurts, but it's kind of a given I'm going to have it. And then there's some days that are just, I would say, almost crippling after it starts to build.

So -- but more -- I would drive more than I would not drive.

Q. Have you sought any type of counseling since your injury?

A. Like mental counseling?

Q. Right. Any type of counseling just to kind of help you deal with the changes and to get you through, you know, what you're dealing with with regard to your injury and loss of

vision in that eye.

A. No.

Q. Is that something that you intend to do, or you don't really feel like you have the need?

A. I don't feel like it -- like I have the need.

Q. Are you still able to go on vacation since this incident? Obviously, most of us haven't done much of that in the past six months.

But other than the COVID-19 situation, have you had an opportunity to go on vacations and still attend social events?

A. I can still do the social events, but as far as -- like I said, if it requires flying, we've kind of put it out of the -- out of the realm of possibilities because it just -- it hurts. Driving isn't too bad. I can drive for a little bit, about an hour or so, and then I'll have to switch off and take a break.

But I'm able to go places, like visit family if need be, if I have a second

person with me.

Q. I have some questions about your employment.

MS. NGUYEN: So the -- the last two exhibits that I'm going to be referring to are 26 and 27.

Twenty-six is Bates 137 to 1 -- excuse me, 136 to 137.

- - -

(Deposition Exhibit Number 26, Damages Summary, Bates stamped AXON_CURRAN000136 through AXON_CURRAN000137, marked for identification, as of this date.)

- - -

MS. NGUYEN: And then Exhibit 27 is a memorandum from the City of Virginia Beach, Bates 462.

- - -

(Deposition Exhibit Number 27, Inter-Office Memorandum, Bates stamped AXON_CURRAN000462, marked

for identification, as of this date.)

\- - -

BY MS. NGUYEN:

Q. And so, first, with regard to Exhibit 26, this is titled Damages Summary, with your name and date of loss, 12/14/2017.

Have you seen this before?

A. I don't believe so.

Q. Do you know who actually compiled this information?

A. Yeah. I would assume my attorney. I mean --

Q. He's pointing to himself, so --

MR. BUCCI: We did --

BY MS. NGUYEN:

Q. -- Scott -- with Scott's admission, we --

MS. NGUYEN: I'm sorry, Scott. I can't hear you.

MR. BUCCI: This is my paralegal.

BY MS. NGUYEN:

Q. Okay. So with that statement, we'll say that this was prepared by your attorney's office. And it lists out into categories, it looks like, by provider: the Sentara -- Sentara Norfolk General Hospital; Virginia Center for Eye Surgery; on the back, Virginia Beach Hospital again; Emergency Physicians of Tidewater.

And then on the very bottom, it states, Lost wages.

Do you see that?

A. Yes, ma'am.

Q. And it says, $71,634.68 in annual salary. And then in parens, it says, Has not worked since date of incident.

You see that?

A. Yes, ma'am.

Q. And, first, is that a true statement, that you haven't worked since the date of the incident?

A. Well, no, I actually was on light duty -- limited light duty for a couple of

months, and then I have not worked since this -- since the retirement.

Q. And that's where my line of questioning was going. Because on Exhibit 27, we have the interoffice memorandum dated November 30th of 2018, and this is saying, Congratulations and Best Wishes to our December 1, 2018 Retirees.

And it has your name on there --

A. Um-hum.

Q. -- and so it looks like the -- your employment was not terminated or ended until that date; is that accurate?

A. That is true, that my deploy -- my employment with Virginia Beach department went until December 1st.

Q. Okay. And so were you receiving regular pay from the date of this incident, December 14th, 2017, until your retirement, December 1, 2018?

A. Yes. It was a -- I believe it was a mixture between from the City and workmen's comp

or CorVel. The only payment I didn't receive would be, like, the side jobs that I used to work as a police officer. I wasn't able to work those anymore.

But other than that, yes, until December 1st.

Q. Okay. So as far as from the Virginia Beach Police Department, you received that same -- your same salary up until that date, correct, December 1?

A. Yes --

Q. Okay. And --

A. -- I'm sorry. It wasn't the exact same salary. It kind of works differently. And I don't know the math equation behind workmen's comp when you're on limited light duty. So whether it was six -- whether it was that number, I can't say it was because they have a different math equation without taxes. So I don't know of exactly that number, but I was still getting paid.

Q. Okay. And would you think it was

something comparable to -- to the annual salary?
A. It was around that same -- maybe not the annual salary, but it was, I would say, comparable to after taxes. Because they only give you 66 and two-thirds. They don't give you your full salary.
So after taxes, yes, but it's not 71,000.
Q. Understood.
Okay. So then that figure after that -- going back to Exhibit 26, where it says, Total Past Lost Wages of $154,290, that would not be accurate, then, correct?
MR. BUCCI: Object. That's not the law of Virginia.
But go ahead.
THE WITNESS: Did you hear his portion?
MR. BUCCI: I stated an objection for the record, but, I mean, that's a collateral source.
But go ahead and answer the

question.

THE WITNESS: Okay.

Can you please repeat it so I make sure I get exactly what you want?

BY MS. NGUYEN:

Q. Right. If we're looking at your actual wages since the date of the incident, here, it says, Lost wages, and it calculates it, you know, given that you haven't worked -- given -- from the date of the incident, right?

A. Correct. I have not worked since this -- technically since December 1st for the City of Virginia Beach. So it's been over a year.

Q. Right. So it would be, you know, at this point, a year and a half of lost wages, correct -- approximately, if we're going from December 1, 2018?

A. Correct.

Q. And you mentioned that you had some side jobs while you were at Virginia Beach --

A. Um-hum.

Q. -- that you no longer perform?

A. Yes, ma'am. It was basically just, like, working part-time at a bank, securitywise, or working at a football game, securitywise, stuff like that.

Q. Okay. And that would be contracted on a one-off basis?

A. Yes.

Q. And could you estimate annually what you would receive in income from those side jobs?

A. Five or 6,000 a year, something like that, maybe. Three to six, depending on the year, depending on the amount of jobs I was able to work.

Q. And then while you were -- can you tell me again if -- how long did you work light duty following the incident?

A. I guess, after I got done with all my surgeries, I think I came back for, like, maybe a week or two and then had another surgery. And then after my final surgery where the doctor said she wasn't going to go in anymore -- I believe

that was maybe May or June -- I worked from June to December light duty -- limited duty. It was about five to four hours a day max.

Q. And why did you continue doing that, as opposed to retiring on December 1st?

A. I was made to retire. I didn't have a choice.

Q. What do you mean "made to retire"?

A. The department said, You're retiring due to your medical condition and your injury.

Q. And so have you done any type of assessment to determine what jobs may be available to you given your condition?

A. No. And until we -- I have not had an assessment yet due to the fact of all the --

Q. I'm sorry. Mr. Curran, I can't -- I can't hear you --

A. Okay.

Q. -- for some reason.

A. No, I have no assessment done yet. I'm still on no work until the doctors can figure out how to solve the depth perception -- not the

depth perception but the dizziness and some of the balance issues and the pain.

So, at this point, I've had no contact with a vocational expert, or anything like that, until we try to get that sorted out.

Q. And at this point, do you intend to try to reenter the workforce at any point in the future?

A. Possibly, but it depends on if we can get the issue squared away. Because if I'm still having these issues where I fall over or get massively dizzy, it's not really -- I'm kind of a danger to myself being anyplace. So I have to get this stuff squared out.

It would be great, but it doesn't -- I don't know if it's going to go that way.

Q. What about a job that you can work from home? Have you thought or looked into any of that type of employment?

A. Yeah. I can't stare at computer screens for very long --

Q. And what happens when you --

A. -- I get massive headaches. I have been -- I've already taken ibuprofen twice now. If you haven't noticed yet, I've been -- always constantly -- almost look away from the screen, because any type of -- the lights from the computers or having to stare gives me massive pain and headaches.

So I'm unable to stand in front of a computer for very long, plus I can't read it anymore because my vision in my left eye is now going.

Q. And -- and what -- what is -- what do the doctors say about the vision in your left eye? Do they hope that it's going to even out at some point, or do they anticipate that it's going to continue to deteriorate? What is the prognosis there, if any?

A. They do not know about that. I went from 20/17 to 20/50 due -- according to the doctors, your eyes are supposed to be independent, and what -- your body has no idea you even have eyes.

So what ended up happening is that when it does find out you have eyes, it does one of two things: it either attacks it or tries to heal it.

My eye -- body is attacking mine. So that's why I'm developing band keratopathy in the right eye, and that's why I no longer produce the fluid to keep the eye whole or round. So that's why I have to keep -- it was filled with oil, and I have to keep the drops in to keep the pressure up.

They don't really know -- there's no -- according to them, there's no actual medical thing to tell what's going to happen to the other eye. It depends how much strain it gets put on by having this eye or what my body does to it.

So it's kind of like a -- the only thing we do know is that the band keratopathy will continue to develop. At what rate, that's unknown. It could take a year; it could take 10 years. With that stuff, they don't -- can't

really put a time stamp on what's going to happen.

Q. What type of payments are you receiving of right now?

A. About $2,048, I believe, every two weeks.

Q. And who are you receiving that from?

A. CorVel, which is -- is workmen's comp, I believe.

Q. Any other payments that you're receiving?

A. No, ma'am.

MS. NGUYEN: Okay. I'm -- just give me one moment. I'm going to see if I have any other questions before I pass it on to Mr. Casey.

(Pause.)

BY MS. NGUYEN:

Q. Mr. Curran, have you spoken to any of the other students that were present during the training in December 2017 since the incident?

A. I have talked to Pete Slovinsky not

about the incident but just to try to facilitate contact information between my attorney and their depart -- their -- their department attorney.

But other than that, that's the only person I've talked to, as far as I can recall.

Q. And what was the purpose of facilitating between your counsel and -- and his department's counsel?

A. I believe that we were missing a piece of paperwork that one said they were sending to the other, but I'm not quite sure what it was. I can't remember. I just remember, like, I -- I offered to make contact with Pete to have him talk to his department attorney to have whatever paperwork Scott needed sent over. But what it was, I -- I can't tell you. That was a long time ago.

Q. Anybody else that you've spoken with?

A. Not that I can recall.

MS. NGUYEN: That's all the questions I have for now. I may have some follow-up after the other attorneys'

questions.

But I appreciate you answering all of my questions, Mr. Curran.

THE WITNESS: Thank you.

\- - -

EXAMINATION BY COUNSEL FOR DEFENDANT

RICHARD WILLIAM NELSON

\- - -

BY MR. CASEY:

Q. Mr. Curran, I'm Brian Casey. I represent Mr. Nelson. I just have a few questions for you to follow up on some of the testimony that you've given.

Can you hear me all right?

A. Yes, sir.

Q. Thank you.

Let me go back briefly to the -- your testimony in response to Ms. Nguyen's questions about your certification and recertification on the TASER CEW before the December 2017 course.

A. Okay.

Q. In those -- in each of those certifications and recertifications that occurred before the December 2017 course, did you wear eye protection at all times that you were in the practical portion of those courses?

A. I would probably say yes. I can't recall, but I would probably say yes. I -- they were all practical, so I'm going to -- I would assume so.

Q. And in those certifications and recertifications, were you in a training area with other students?

A. Yes.

Q. And during the time that you were in the training area with other students, were you sometimes, for lack of a better term, observing as they deployed the CEW probes into a static target?

A. Yes. Normally, you would form lines and kind of line up and wait your turn to go. So you couldn't help but see other people shoot their targets.

Q. And during the time that you were in line waiting for your turn to go, would you -- did you always wear eye protection?

A. I would say that I had it on. I would say I may have rubbed my eye and take it off for a time, maybe once ever. I can't say I did, but normally it would be -- it would be on unless directed otherwise.

Q. And what type of eye protection did you employ in those certifications and recertifications?

A. I believe it was normally glasses or sunglasses -- plastic glasses, whatever the case may be.

I couldn't tell you exact brand or anything like that.

Q. Was it -- was it -- were there -- were those glasses or sunglasses ones that you owned, or the -- were they supplied in -- as part of the course?

A. I believe it might have been both. If I was wearing plastic glasses, more than

likely, the department had them. If I was able to wear my sunglasses, they would have been my sunglasses.

Q. Now I want to direct your attention to the December 2017 course. You mentioned that on the first day of the course, that you spent some time trying to locate some documents or locate what happened to some documents.

Do you remember that testimony?

A. Yes, sir.

Q. And I think you mentioned that you were doing that with somebody else; is that correct?

A. No. I would go up -- well, I wasn't running back and forth with someone. Mr. Nelson asked me to go up to -- we had a TASER instructor, like I said before. Defensive tactics and TASER were two separate things.

So I was the DT guy, and there was another TASER guy who was in charge of the training and inventory. I would go up to him to see if we could locate some paperwork that we --

that Mr. Nelson might need as far as the lesson plans and stuff like that.

Q. And who -- and who was that person?

A. That was John Midgett.

Q. And where was he located?

A. He was located up at the Law Enforcement Training Academy up in the main office.

Q. So -- so is that in the same facility where the -- where the certification course is being held?

A. Yes. Our department is an old school. So Mr. Midgett and the training staff is all the way up front, and our classroom was all the way on the other side of the school.

Q. All right. What did Mr. Nelson ask you to do?

A. See if he could locate what happened to the lesson plans that were coming from TASER.

Q. And did he refer to -- did Mr. Nelson refer to them as "lesson plans"?

A. Yes, I believe it was "lesson plans"

in the paperwork, the exact wording -- I believe it was lesson plans -- or the PowerPoints or the handouts. It could have been any of those, to be honest, the amount of times we were looking for stuff. But we needed the paperwork to get everyone to see the training material.

Q. And -- and did he ask you to go talk to Mr. Midgett about that?

A. Yes. He asked me to help him locate the paperwork. I informed him that we have a TASER instructor -- or master TASER -- or the guy in charge of training right in this office. He said, Okay, see if he can get some -- some -- some course material for me or some paperwork for me.

And what -- we were unable to access it. I forget why. I don't know if Mr. Midgett had the -- access to all the stuff Mr. Nelson did, but as far as I could recall, we were not able to find the course material that was needed.

Q. Did you actually talk with

Mr. Midgett about this?
A. Yeah. And he even looked online. I believe we made a couple phone calls, and we were not able to get anything sent to us.
Q. And did you report that to Mr. Nelson?
A. Yes.
Q. And what did you tell him?
A. That I -- well, it went through the course of a -- I had to go multiple times back and forth to try to get updates and see if we could find anything. So numerous times, I would inform him that we haven't got a phone call back or we didn't find the paperwork or no one knows what it is.
And I think, on breaks, he actually made phone calls. I can't say 100 percent because I wasn't next to him when he did that, but I believe he was also trying to find the paperwork.
And as far as I could tell -- or as far as I remember, he determined or found out

that somehow they were either lost at the airport or just never showed up from FedEx.

Q. How did you -- did Mr. Nelson tell you that --

A. Yes.

Q. -- that -- that the paperwork was lost at the airport or didn't show up?

A. Yeah, I believe it was one or the other. Somehow, it was lost in transition to the airport or lost at the airport, because no one could find out where it was. I believe it says it was delivered.

Now, granted, this is a -- still I believe -- this was a while ago -- that he said it was delivered, and then they couldn't find it at the airport. I think.

Q. Did Mr. Midgett give you any information about what -- about his efforts to locate whatever this material was?

A. I believe he -- he sent some e-mails. I'm not positive. But he was -- made a few phone calls or tried to check a couple databases, I

believe, on TASER to get the information Mr. Nelson wanted.

Q. And did you speak to anyone else about this subject at the time other than Mr. Nelson and Mr. Midgett?

A. We -- I might have said something to the -- anyone that was there because the -- it's cubicles. So people may have overheard me, but I don't believe I directed actually to anyone about what was going on.

But, again, that's my best recollection. It was a while ago.

Q. The -- the second day, the day of the -- of the practical instruction, the day you were injured, were you issued any protective gear by somebody else for that day?

A. Issued? I don't believe I was issued anything. I think there was a box of glasses during our static drills.

I don't recall, though.

Q. Where was the box located?

A. It may have been in the gym or it may

have been in the classroom.

Q. And these are protective glasses -- protective eyewear?

A. Yes, sir.

Q. Did you see anybody else take some of the protective eyewear?

A. Take it as in?

Q. Use it from the box.

A. I might have grabbed it from the box. I don't -- I can't recall what everybody else did. I -- I'd be lying if I said I saw people take it. I don't recall that.

Q. When you did the static drill, you used protective eyewear, correct?

A. Yes.

Q. Did you use protective eyewear from that box, or did you have it from some other source?

A. I'm not really quite sure.

Q. Do you know who supplied the eyewear that was in the box?

A. I'm not 100 percent. I know we have

protective glasses that are in our little equipment room that we were using, because that's where we got our target stands and our other stuff like that. But I can't tell you exactly where the glasses came from.

It could have been from one of the boxes in there or it could have been from a box in the classroom. I'm not really quite sure.

Q. Do you recall receiving any verbal instructions about the use of protective eyewear during the practical portion of the course?

A. Which -- which -- you mean all in general or which practical portion, the morning or the afternoon, are you referring to?

Q. Well, let's -- let's start with the morning.

A. I don't recall anything being said about eyewear, but everyone was wearing it at the time.

So I -- I can't recall an exact instance where Mr. Nelson said, boom, boom, boom.

Q. In other words, you don't recall Mr. Nelson specifically addressing the subject of the use of protective eyewear in the morning for the practical portion of the course; is that right?

A. Not in the morning, I don't recall that.

Q. But everybody was using protective eyewear in the morning?

A. Yes, sir.

Q. Do you recall any verbal instruction with regard to the use of protective eyewear in the portion of the practical course that occurred after lunch?

A. No, sir. I wasn't in the classroom when he was briefing the students. He had me in the gym getting -- it was all of our gear that we had to use, like our mats and our suits and our inert weapons. So I was in there.

And I'm the one who had keys to it, since I was a DT coordinator and half of my plating gear is in there. I had the keys, so he

asked me to get everything out and start setting things up.

So we --

Q. So were you -- I'm sorry --

A. -- when he --

Q. -- I'm sorry. I interrupted.

A. That's all right.

-- when he was briefing the class, I was not in the classroom; I was in the gym.

Q. And were you the only person in the gym at that time?

A. I think in the beginning, but I can't remember if I was the only person before the class came in. I don't recall.

Q. Did you have any involvement in setting up the blue mats?

A. Yes, I believe I did help put the blue mats up or I was directed to.

Q. And did anyone assist you in doing that?

A. I believe there was other people in the gymnasium prior to assisting with it.

Q. Do you remember who assisted you?
A. It would be a guess. I -- it was -- maybe one of them was Pete Slovinsky, since he did help out with the rest of the course, bringing people back and forth from the classroom.
I can't tell you definite if it was him or not. That would just be an assumption.
Q. Do you recall if anybody told you where to put the -- put the blue mats?
A. Yes. Mr. Nelson instructed us how he wanted it set up.
Q. In other words, he told you which -- where -- where to locate each blue mat?
A. Yep. This one goes here, and that one goes there, that one goes there. Leave the spaces out for the corner and explained this is how it was set up.
Q. Where did you get the so-called Sim Suit?
A. From our training locker.
Q. That was a Virginia Beach Police

Department suit?
A. Yes, sir. I asked the -- the TASER coordinator if we could use them -- John Midgett -- and he said yes.
Q. Did Mr. Nelson give you any instructions about the use of the Sim Suit?
A. Not that I can recall.
Q. And the Sim Suit included a helmet portion, correct?
A. Yes. I believe it was pants, a top and a helmet.
Q. And the helmet portion had an eye protection that covered the face, correct?
A. It had a face shield, yes, sir.
Q. You testified a little bit earlier about a designated safety area.
Is that -- is that the correct designation -- the correct term for it?
A. Yes.
Q. I think that's what you -- I think that's how you described it.
A. Sure. That's what I would call it,

yeah, designated safety area.

Q. I understood you to mean that the designated safety area was the bench that's been shown in some of the photographs that we looked at earlier; is that right?

A. Yes. It would be from -- basically sitting on the bench, not standing at the bench but sitting down behind the cover of the mats.

Q. And what did Mr. Nelson tell you --

A. That --

Q. -- specifically with regard to that?

A. -- that this was the safety area for the role players and that this is where we would come to and rest --

Q. And -- I'm sorry.

A. -- and take a breather if need be because of the -- the suits are extremely hot.

Q. And did -- and where did that conversation take place?

A. In the gym.

Q. Who else was present for that conversation?

A. Maybe the other role player, I believe.

Q. Anybody else?

A. I can't recall off the top of my head, sir. There was people moving back and forth, so I couldn't tell you if someone was directly involved in that conversation.

Q. In that conversation, did Mr. Nelson specifically say to you that you did not need to wear eye protection when you were on the bench?

A. He said we can take our helmets off to get -- or take our equipment off to get air if need be. He did not -- as far as I can remember, did not use the word -- specific word "eye protection," but I believe it was I could take my helmet off if need be because I was in the safety area.

Q. So you recall Mr. Nelson telling you that you could take your helmet off?

A. Yes.

Q. Did he also tell you that after you took your helmet off, you did not need to wear

eye protection?
A. I don't recall him saying that part either --
Q. When you --
A. -- that --
Q. -- I'm sorry.
A. -- I'm sorry. Go ahead.
Q. I -- I -- I want to make sure you're finished. I don't want to interrupt you.
A. Oh, yeah, yeah. I was just saying I don't remember that specific item.
Q. When you took your helmet off while sitting -- seated on the bench, did you have the ability to put protective eyewear on?
A. No; there was none there.
Q. Did you have the ability to have protective eyewear on the bench with you?
A. I'm sure at some point, if -- if it was handed or taken, yeah, there -- there could have been underneath the bench, or something like that, possibly.
Q. And you had had such protective

eyewear in the morning during the static portion of the -- of the practical part of the course, correct?

A. Correct.

Q. Did you have any communication with Mr. Nelson after you were injured on that day?

A. After I was injured -- I know he talked to me. I heard a couple of lines that he said. I don't know if it was directed at me. But I do remember looking up and seeing him and him telling someone to keep pressure on my eye.

Q. Do you remember anything else that he said in the -- in the gymnasium?

A. Yes, but I can't say that it was directed at me.

Q. What -- what do you remember hearing him say?

A. I remember him voice -- his voice and him saying, "Holy shit, he didn't sign a waiver." But, like I said, I don't know if it was directed at me.

Q. Do you remember anything else that

you heard him say?

A. No. That kind of stuck out. I was in immense amount of pain at that point, so I can't tell you everything that was said. There was a lot of noises going around and kind of being in shock of not being able to see out of that, and the pain kind of superseded every -- a lot of the stuff.

Q. You were transported to the hospital in an ambulance, correct?

A. Yes.

Q. How did you get from the gymnasium to the ambulance?

A. Someone assisted me -- no, wait. I believe a gurney.

Q. Did any of the people who were involved in the training accompany you to the ambulance?

A. To the ambulance? Walking me out? I -- I'm not really quite sure, sir. They were bandaging my head up.

Q. Did you have any conversation with

Mr. Nelson at any time before the ambulance left?
A. I don't really recall, sir. He could have said something to me. I'm not positive.
I remember bits and pieces of it. Like, I remember somebody from the police department telling me my eye was open when I couldn't see, because I asked if my eye was open. I thought maybe it was stuck shut or something.
That was one little tidbit, but as far as other -- I don't remember anything else.
Q. Do you remember saying anything to Mr. Nelson after you were injured?
A. I think I said -- I think I asked him what happened, possibly, because it's kind of like "what happened." Because I had blood all over, and I asked if it was bleeding a lot, I believe, but -- I'm not 100 percent.
Q. Anything else -- did -- well, first of all, do you recall if he responded to you when you asked that?
A. No, I don't.

Q. Do you recall saying anything else to him other than that?

A. No, sir. There was a lot of noises, a lot of things going on. I just kind of get -- remember bits and pieces.

MR. CASEY: All right. Those are really all the questions I have for you. Thank you very much.

THE WITNESS: Thank you.

MR. BUCCI: I have just a few on -- on redirect.

CERTIFIED STENOGRAPHER: Excuse me, Counsel, you're a little low. You may have to move a little closer.

MR. BUCCI: How about now?

CERTIFIED STENOGRAPHER: That's better.

\- - -

EXAMINATION BY COUNSEL FOR PLAINTIFF

\- - -

BY MR. BUCCI:

Q. Mr. Curran, we've talked a lot today

about the risk of injury with TASER CEWs. I think we've gone over potential injuries in trainings with injuries to the hand, the head, the throat, the groin, the fingers.

In training with weapons, whether they're TASER CEW or batons or guns, wouldn't you agree that there are -- is always a risk of injury?

A. Yes, there is.

Q. If proper safety protocols are followed in your -- in the training in which you're injured, do you think there would be a risk of injury?

A. No.

Q. When you were in the designated safety area, where you were told to go to, did you believe you had a risk of injury there?

A. No.

Q. I think that you -- the video shows and you testified that there were 40 different scenarios before the scenario in which you were injured; is that correct?

A. I think we were up to 44, maybe.

Q. Okay. And during those times, from time to time, I think the video shows that both you and the other role player would take their helmets off; is that correct?

A. It showed -- it would show me take my helmet off between scenarios and then go to the designated safety area. The other role player took it off multiple times during the scenarios.

Q. At any time, did Mr. Nelson advise either you or, to your knowledge, the other role player that they should not take their helmet off or put on any kind of safety goggles?

A. No.

Q. All right. And, lastly, if you would turn to Number 24 -- Exhibit 24.

A. Got it.

Q. The second page.

A. Okay.

Q. The box titled, Describe clearly and in detail how the injury occurred, it says that MPO Shawn Curran was attending TASER instructor

training at LETA -- that's Law Enforcement Training Academy, correct?

A. Yes.

Q. -- he was scenario role playing in full protective gear. He finished his scenario and moved to the -- and had moved to the, quote, safe area, at which time, he took off his protective mask. The next scenario went outside of the established working perimeter, period.

Is that what happened?

A. Yes.

MR. BUCCI: No further questions.

MS. NGUYEN: I don't have any follow-up.

Do you, Brian, based upon Scott's questions?

MR. CASEY: No.

MS. NGUYEN: All right. I think that concludes this deposition.

Scott, read and sign?

MR. BUCCI: Yes, please.

THE VIDEOGRAPHER: I wanted to ask

if anybody besides our client's ordering a video. Then we can stay on the record now so I have that.

Nope?

Okay. We're off the record at 3:53 p.m.

(Witness excused.)

(Deposition concluded at 3:53 p.m. EST.)

C E R T I F I C A T E

STATE OF MARYLAND:

COUNTY OF PRINCE GEORGE'S:

I, Cindy L. Sebo, a Notary Public within and for the Jurisdiction aforesaid, do hereby certify that the foregoing deposition was taken before me, remotely pursuant to notice, at the time and place indicated; that said deponent was by me duly sworn remotely to tell the truth, the whole truth, and nothing but the truth; that the testimony of said deponent was correctly recorded remotely in machine shorthand by me and thereafter transcribed under my supervision with computer-aided transcription; that the deposition is a true record of the testimony given by the witness and that I am neither of counsel nor kin to any party in said action, nor interested in the outcome thereof.

_______________________________________

Cindy L. Sebo, RMR, CRR, RPR, CSR,
CCR, CLR, RSA, Courtroom Connect
Court Reporter, LiveLitigation

INSTRUCTIONS TO WITNESS

Please read your deposition over carefully and make any necessary corrections. You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it.

You are signing same subject to the changes you have noted on the errata sheet, which will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you. If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

E R R A T A

WITNESS: SHAWN MICHAEL CURRAN

DATE: June 22, 2020

CAPTION: Curran v. Axon Enterprise, et al.

PAGE LINE REASON FOR CHANGE:

____ ____ ______________________________

PAGE LINE REASON FOR CHANGE:

____ ____ ______________________________

PAGE LINE REASON FOR CHANGE:

____ ____ ______________________________

PAGE LINE REASON FOR CHANGE:

____ ____ ______________________________

PAGE LINE REASON FOR CHANGE:

____ ____ ______________________________

PAGE LINE REASON FOR CHANGE:

____ ____ ______________________________

PAGE LINE REASON FOR CHANGE:

____ ____ ______________________________

PAGE LINE REASON FOR CHANGE:

____ ____ ______________________________

PAGE LINE REASON FOR CHANGE:

____ ____ ______________________________

WITNESS: SHAWN MICHAEL CURRAN

DATE: June 22, 2020

CAPTION: Curran v. Axon Enterprise, et al.

PAGE LINE REASON FOR CHANGE:

____ ____ ____________________________________

PAGE LINE REASON FOR CHANGE:

____ ____ ____________________________________

PAGE LINE REASON FOR CHANGE:

____ ____ ____________________________________

PAGE LINE REASON FOR CHANGE:

____ ____ ____________________________________

PAGE LINE REASON FOR CHANGE:

____ ____ ____________________________________

PAGE LINE REASON FOR CHANGE:

____ ____ ____________________________________

PAGE LINE REASON FOR CHANGE:

____ ____ ____________________________________

PAGE LINE REASON FOR CHANGE:

____ ____ ____________________________________

PAGE LINE REASON FOR CHANGE:

____ ____ ____________________________________

ACKNOWLEDGMENT OF DEPONENT

I, ___________________________ , do hereby certify that I have read the foregoing pages, 1 to 305, and that the same is a correct transcription of the answers given by me remotely to the questions therein propounded under penalty of perjury, except for the corrections or changes in form or substance, if any, noted in the attached errata sheet.

_________ ______________________________

DATE SIGNATURE

Subscribed and sworn to before me this _____ day of____________, 20____.

My Commission expires:

______________________________

______________________________

A

**ability** 22:4,8 113:12 297:14 297:16
**able** 42:15 51:15 61:15 79:19 196:20 198:2 235:20 247:14 248:6 258:5 260:19 261:11 262:21 263:17 264:5,6,7 265:8 265:21 270:3 273:13 283:1 285:20 286:4 299:6
**absolutely** 234:7
**academy** 31:12 32:1,3,6,8,10 37:7,9 38:15 41:22 42:5,19 52:15 161:19 161:21 162:5 284:7 304:2
**accept** 167:3 174:15,16 181:3
**acceptable** 139:17
**accepted** 176:19 178:3,11,16
**access** 285:16,18
**accident** 15:10 51:22 227:12 242:5,21
**accompany** 299:17
**accordion** 228:8 237:2,6
**accurate** 174:22 176:5 187:16 187:21 269:13 271:13 307:15
**accurately** 212:16
**ACE** 141:5
**acknowledged** 234:2
**ACKNOWLE...** 310:1
**Acting** 217:2
**action** 85:5,14,20 95:4 107:17 113:12 153:19 153:22 185:13 195:8 205:4,19 224:9,20 225:1 225:4,8 234:13 235:15 306:17
**active** 230:4
**actively** 227:6
**activity** 34:3 85:4
**acts** 153:18
**actual** 53:9 64:13 98:11 148:6 163:16 194:22 206:10,12 207:11 208:19 209:8 217:14 234:5 251:8,12 259:3 272:7 277:13
**additional** 42:5 263:14
**address** 29:1 254:13
**addressed** 255:4
**addressing** 291:2
**adequately** 138:1
**adjunct** 34:11
**administered** 16:10
**Administrator** 2:8
**admission** 267:17
**adult** 28:20 29:6
**advanced** 37:13
**advancements** 252:9 261:19
**advice** 25:14
**advise** 303:10
**advised** 174:10
**affect** 252:18 257:19 261:14
**affirmative** 20:14
**aforesaid** 306:5
**afternoon** 290:14
**age** 29:12
**agency** 65:3 91:12 125:10 127:1 129:1 182:8,8
**agents** 182:6
**aggressive** 217:12
**aggressor** 230:17 230:19 232:5 236:1 237:5
**ago** 72:21 74:21 226:7 260:17 279:17 287:14 288:12
**agree** 46:5,9 50:6 57:12,16 58:2 58:11 60:3 70:6 98:8 107:22 113:14 116:17 117:5,11 122:14 123:17 132:12 141:15 143:13 145:4 145:16 149:19 150:6,11,18 165:12 167:18 173:1,8 174:20 176:4,17 181:14 185:8 185:22 193:17 195:9,17 210:9 212:3,13 228:13 231:3 234:1 236:11 237:9,12 302:7
**AGREED** 16:3,9 16:14,19
**agreement** 6:7 7:7 8:7 14:7 66:4 82:13 93:13 107:10 136:12 140:22 168:2,12 169:10,21 170:5,14 174:13 184:6 189:21
**ahead** 21:1,2,11 21:20 80:22 156:1 177:4 179:5 183:7 216:16 232:12 241:20 271:16 271:22 297:7
**aid** 102:3,17 144:6
**aim** 87:8,12 95:20 96:4
**aiming** 137:10
**air** 223:14 237:1 238:15 258:14 258:15 296:12
**airplane** 258:12 258:13
**airport** 188:22 197:11 199:1 287:2,7,10,10 287:16
**al** 1:7 308:4 309:3
**allow** 21:1 55:13 55:14 84:22 134:4
**allows** 51:10 52:14 53:8
**altered** 175:13 186:3
**ambulance** 246:12 299:10 299:13,18,19 300:1
**amount** 34:15 55:9 59:3 149:21 251:9 252:6 253:15 254:4,6 256:12 258:21 259:3,5 261:12 273:13 285:4 299:3
**Amy** 3:15 22:13 47:10 71:17 72:3 76:1 97:11 97:14 112:3 135:7 168:21 243:16,19
**amynguyen@a...** 3:20
**and/or** 90:10,13 90:14 150:4
**animal** 134:5
**annual** 12:6 13:6 125:18,21 126:15,18 128:13,18 129:3 142:17 143:18 268:13 271:1,3
**annually** 128:15 273:9
**answer** 19:4 20:12,14,22 21:2,10,20 24:7 24:15 25:7,10 26:16 70:5 177:4 179:6 183:8 249:18 263:2,11,11 271:22
**answering** 280:2
**answers** 310:6
**anticipate** 259:9 276:15
**anybody** 95:3 107:16 127:1 204:9 205:4,19 213:22 223:20 245:12 247:19 248:3 279:18 289:5 293:9 296:3 305:1

**anybody's** 135:3
**anymore** 256:10 256:16 257:1 257:17 258:1,9 270:4 273:22 276:10
**anyplace** 275:13
**Anything's** 152:20
**anytime** 35:13 154:17 219:8
**apartment** 29:3
**apparently** 197:8
**appear** 50:22 62:9 107:20 111:2
**appeared** 175:7 236:8
**appearing** 48:19
**appears** 50:4,18
**applied** 101:4 176:17
**appointment** 260:12,16,18
**appreciate** 280:2
**appropriate** 307:4
**approximate** 57:2 250:5
**approximately** 2:10 25:5 33:3 35:2 149:1 167:14 198:12 198:13 199:5 222:10,16 272:17
**April** 50:1 88:12 88:15 105:21 107:9 110:18 126:15
**area** 29:7,10 34:14 84:7,22 95:2 130:22 133:8 154:14 154:17 155:14 158:3 172:7 201:1 203:14 203:16,18 204:1,8 209:19 211:10 212:16 215:7,13,19,21 216:12,13,14 217:1 218:18 219:3,11,12,15 219:16,19 220:1,7,9,11 221:1,8,11,18 221:20,22 222:4,22 228:22 231:15 232:9,16,16 237:15,16,22 239:19 257:2 281:11,15 294:16 295:1,3 295:12 296:17 302:16 303:8 304:7
**areas** 52:18 58:2 74:6,10,12 87:15 95:21 130:21 131:2 145:3,12,18 157:17 172:1,6 172:8 195:16 215:8 217:4 219:17 228:9
**Arizona** 3:18
**Arm** 138:2
**arrangement** 16:21
**arrangements** 41:6
**arrest** 148:10
**arrived** 197:10
**arteries** 90:8
**aside** 77:10 146:2
**asked** 123:2 152:20 164:16 207:5 210:8 229:6,17 248:22 259:19 283:16 285:9 292:1 294:2 300:7,14,17,21
**asking** 22:21 24:17 81:14 84:14 140:2 152:10 154:20 154:22 155:4 175:6 202:1
**asks** 174:6
**ASP** 125:2
**aspect** 257:19
**assault** 217:14
**assessment** 274:12,15,20
**assigned** 36:18 128:4
**assignments** 34:12
**assist** 71:15 292:19
**assistance** 93:8
**assistant** 36:13
**assisted** 293:1 299:14
**assisting** 292:22
**associated** 230:20
**associate's** 29:19
**assume** 21:11 64:5 67:18 81:11,22 84:13 84:16 86:1 91:7 93:3 94:18 106:2 143:16 181:7 184:11 193:20 202:15 209:10 213:10 229:13 267:12 281:9
**assumed** 181:14 181:19
**assuming** 63:9
**assumption** 83:16 94:17 153:2 205:8 293:8
**attached** 5:11 169:17 184:14 307:10 310:9
**attacking** 277:5
**attacks** 277:3
**attempt** 254:13
**attempting** 148:9
**attend** 122:5 128:6 129:18 196:20 265:13
**attendance** 198:8 198:19
**attended** 38:15 146:14 147:15 152:12 156:18 163:1 188:5 189:18 203:10
**attending** 157:5 303:22
**attention** 85:11 90:13 103:10 217:3 283:4
**attest** 166:20
**attorney** 3:3,13 4:3 20:21 23:18 23:21 25:10 48:21 267:12 279:2,3,14 307:12
**attorneys** 21:17 48:19 279:22
**attorney's** 25:14 268:3
**attorney-client** 24:5,13
**August** 42:1 83:10 111:11 117:8,8,22 122:21
**authority** 16:7
**Authorized** 1:20 2:9
**available** 188:15 274:13
**avoid** 74:6,11 130:20 145:2 145:12,17 172:1,5 195:15
**avoided** 60:10,13
**aware** 42:7 66:22 123:11 227:2 227:17 231:10 232:2 253:10
**axe** 207:16 213:9 217:18
**Axon** 1:7 2:3 3:13,14 17:10 17:16 18:13 22:14 67:1 161:19,21 162:5 308:4 309:3
**AXONCURR...** 7:9 82:15
**AXONCURR...** 7:10 82:16
**AXONCURR...** 7:11 82:17
**AXONCURR...** 7:12 82:18
**AXONCURR...** 7:13 82:19
**AXONCURR...** 82:5
**Axon's** 91:17 183:4
**AXON_CURR...** 49:6 162:10
**AXON_CURR...** 14:14 192:11
**AXON_CURR...** 13:8 142:19
**AXON_CURR...** 13:9 142:20
**AXON_CURR...** 13:10 142:21
**AXON_CURR...** 13:11 142:22
**AXON_CURR...** 7:20 97:4
**AXON_CURR...**

7:21 97:5
**AXON_CURR...** 13:12 143:1
**AXON_CURR...** 13:13 143:2
**AXON_CURR...** 12:16 131:21
**AXON_CURR...** 12:17 131:22
**AXON_CURR...** 15:11 242:6
**AXON_CURR...** 15:12 242:7
**AXON_CURR...** 14:17 211:14
**AXON_CURR...** 13:21 161:5
**AXON_CURR...** 13:22 161:6
**AXON_CURR...** 13:16 160:11
**AXON_CURR...** 13:17 160:12
**AXON_CURR...** 15:15 266:12
**AXON_CURR...** 15:16 266:13
**AXON_CURR...** 15:7 225:18
**AXON_CURR...** 9:12 106:17
**AXON_CURR...** 15:8 225:19
**AXON_CURR...** 14:18 211:15
**AXON_CURR...** 14:19 211:16
**AXON_CURR...** 10:21 116:1
**AXON_CURR...** 10:22 116:2
**AXON_CURR...** 14:8 170:6
**AXON_CURR...** 14:9 170:7
**AXON_CURR...** 15:19 266:22
**AXON_CURR...** 11:17 121:19
**AXON_CURR...** 11:18 121:20
**AXON_CURR...** 5:15 46:19
**AXON_CURR...** 5:16 46:20
**AXON_CURR...** 12:8 126:1
**AXON_CURR...** 12:9 126:2
**AXON_CURR...** 12:10 126:3
**AXON_CURR...** 6:10 66:6
**AXON_CURR...** 6:11 66:7
**AXON_CURR...** 6:12 66:8
**AXON_CURR...** 6:13 66:9
**AXON_CURR...** 6:14 66:10
**AXON_CURR...** 8:9 93:15
**AXON_CURR...** 8:10,11 93:16 93:17
**AXON_CURR...** 8:12 93:18
**AXON_CURR...** 8:13 93:19
**AXON_CURR...** 9:9 106:14
**AXON_CURR...** 9:10 106:15
**AXON_CURR...** 9:11 106:16
**AXON_CURR...** 10:9 112:13
**AXON_CURR...** 10:10 112:14
**AXON_CURR...** 10:11 112:15
**AXON_CURR...** 10:12 112:16
**AXON_CURR...** 10:13 112:17
**AXON_CURR...** 10:14 112:18
**AXON_CURR...** 11:9 118:17
**AXON_CURR...** 11:10 118:18
**AXON_CURR...** 11:11 118:19
**AXON_CURR...** 11:12 118:20
**AXON_CURR...** 11:13 118:21
**AXON_CURR...** 11:14 118:22
**AXON_CURR...** 6:18 71:7
**AXON_CURR...** 6:19 71:8
**AXON_CURR...** 8:17 99:17
**AXON_CURR...** 8:18 99:18
**AXON_CURR...** 9:18 109:7
**AXON_CURR...** 9:19 109:8
**AXON_CURR...** 160:20
**AXON_CURR...** 93:9
**AXON_CURR...** 160:6
**AXON_CURR...** 113:10
**AXON_CURR...** 71:3
**AXON_CURR...** 99:12
**AXON_CURR...** 170:1
**AXON_CURR...** 142:14
**AXON_CURR...** 96:22 136:1
**AXON_CURR...** 121:15
**AXON_CURR...** 47:4 48:11
**AXON_CURR...** 65:19
**AXON_CURR...** 83:6
**a.m** 1:13 2:11 17:4,14 78:7,10 78:10,13

**B**

**back** 22:9 42:10 51:4 54:20 61:21 62:2 63:13 75:16 78:12 80:12 88:18 92:10 99:3 101:14 105:14 110:21 124:6 127:9 135:20 140:17 146:3 148:5,20 149:10 156:14 176:1,9 179:8 179:12,15,18 180:1 188:19 189:1 191:1 196:6 197:6 198:21 203:3 204:21 206:12 207:7 219:2 221:21 229:15 230:6,8 238:8 241:3,11,18 244:1 250:21 250:21 255:19 256:7 259:15 261:10 262:1 268:7 271:11 273:19 280:17 283:15 286:10 286:13 293:5 296:5
**backing** 134:3,6
**bad** 210:6 258:17 261:9 263:19 263:20,20 265:18
**badge** 141:8,10 141:14
**balance** 255:13 255:14,15 256:9,16 259:13 275:2
**ballpark** 198:17
**band** 251:1,19 277:6,19
**bandaging** 299:21
**bank** 273:3
**bar** 257:2
**barb** 133:7
**barricades** 222:1
**barriers** 228:10 228:19
**based** 70:7 140:7 149:17 152:11 155:6 203:9 205:16 304:15
**basic** 52:1 55:15 55:16,20,21
**basically** 23:16 32:20 207:18 253:1 273:2 295:6
**basis** 56:4 255:8 262:8 273:7
**Bates** 5:14 6:9,17 7:9,19 8:9,17 9:8,17 10:8,20 11:8 12:7,15 13:7,15,21 14:8 14:14,16 15:6 15:11,14,18 26:7,11 27:4,5 46:19 47:4 49:5 49:14 66:5,18 71:7 72:3 75:6

82:14 86:8 87:2 87:19 92:14 93:8,14 94:20 95:11,18 96:14 96:22 97:3 99:11,16 100:4 105:16 106:8 106:13 107:12 108:7 109:6 111:22 112:13 113:9,16 114:3 114:19 115:1 115:22 118:10 118:10,16 121:14 125:22 126:9 130:18 131:20 135:22 137:3 142:14 142:18 144:12 145:1,6 160:6 160:10,20 161:4 163:18 163:18 165:7 165:16 166:2 166:15 168:1 168:12,15 169:1,1,9,22 170:5 173:11 191:5 192:10 196:9 211:13 211:20 214:8 214:14 225:14 225:17 228:2 240:17 242:2,5 266:7,11,18,21
**bathroom** 230:8
**baton** 45:10 212:20
**batons** 43:13 302:6
**battery** 138:6
**bay** 52:1
**BB** 217:6
**bcasey@taylor...** 4:9
**beach** 4:7 19:13 28:2,11,16,18 28:21 29:2,3 30:11,17 31:10 31:22 32:7,8,16 37:17 38:11,14 38:18 42:4 52:7 52:17,20 54:18 58:2 64:12 65:2 65:4 139:7 141:17 148:1 157:20 158:5 188:17 199:4,9 266:18 268:7 269:15 270:8 272:13,21 293:22
**beginning** 2:10 292:12
**begins** 17:8
**begun** 236:10 237:1
**behalf** 2:11 185:12
**believe** 28:14 29:22 33:4,9,19 34:18 35:4 36:12 38:13 39:6 40:16 42:1 42:13,14 47:17 48:17 58:17 62:1 63:8 64:3 65:16 67:19 73:10 75:1 81:9 86:3,5 91:9 92:6,7 95:7 96:11 104:7 105:2 118:7 122:8 124:5,17 124:18 125:12 127:18 135:8 146:7,10 158:9 159:15,16,20 162:1 174:4 176:10,12,15 179:2 186:3 189:20 195:12 196:5 200:3 201:3,8 205:21 207:21 208:22 210:17 217:17 218:3 236:19 247:16 248:3 250:12,14 251:7 254:1 267:9 269:21 273:22 278:5,9 279:9 282:12 282:21 284:22 285:1 286:3,19 287:8,11,14,20 288:1,9,17 292:17,21 294:10 296:2 296:15 299:15 300:18 302:17
**believed** 213:15
**belt** 251:19
**bench** 212:19,19 213:8,13,14,15 215:12 216:2,7 216:9,11 219:14,16,19 219:21,22 220:1 223:6,9 236:8,22 238:10,12 295:3,7,7 296:10 297:13 297:17,20
**benches** 216:7
**Bensalem** 39:5
**best** 269:7 288:11
**better** 281:16 301:17
**beyond** 147:9
**big** 47:13 74:3
**bill** 158:15
**bit** 19:2 29:16 34:19 39:12 41:19 73:1 148:12 150:16 154:12 159:18 166:9 204:15 210:5 236:14 260:2 265:19 294:15
**bits** 300:4 301:5
**black** 208:1 212:12,19 213:8 216:2
**blast** 137:15,18
**bleeding** 300:17
**blocked** 102:7
**blood** 90:8 103:9 300:16
**blue** 214:14 292:16,18 293:10,14
**blurry** 214:17
**boards** 37:11
**body** 74:10 130:21 131:8 145:3 172:6 173:14,16 261:22 276:21 277:5,16
**bold** 171:11,22 173:14 181:2 182:2 185:7
**bone** 90:9,12 103:10
**book** 127:6
**booked** 261:1
**bookkeeping** 127:6
**booklet** 188:8
**booklets** 187:8
**boom** 290:21,21 290:22
**Boscov's** 39:4
**bottom** 50:1,9 72:11 83:8 88:10 100:10 107:3 116:12 169:15 173:5 268:9
**bounce** 134:4 151:21
**box** 103:14,14 104:14 109:17 132:7,18 133:16 166:2,3 172:12 211:7 217:8 243:5 244:9 246:6 288:18,21 289:8,9,17,21 290:7 303:20
**boxes** 165:17 290:7
**brand** 282:15
**brand-new-ins...** 50:17
**breach** 182:10
**break** 21:16,17 21:21 36:14 80:18 140:13 155:21 156:2 201:12 206:14 206:19 223:18 236:4 265:20
**breaks** 21:16 220:21 221:8 221:17 286:16
**breast** 130:22 133:8 172:7
**breather** 221:2 221:10 295:16
**BREIT** 3:4
**Brian** 4:5 27:1 98:4 99:22 100:6 280:10 304:15
**brief** 229:13 231:18 233:12
**briefing** 291:16 292:8
**briefly** 20:11 22:13 32:14 137:6 280:17
**bring** 185:12
**bringing** 293:5
**broader** 231:22
**broke** 77:16

104:11 150:16 257:1
**broken** 159:12
**brought** 84:6 85:10 95:2
**BROWN** 3:16
**Bryan** 244:12,13 249:10
**Bucci** 3:5 5:7 24:3,10,21 25:6 26:16,22 27:5 47:9,19 48:7,14 48:21 49:1 68:15 71:14 72:2 75:22 76:4 78:5 82:22 83:2 88:6,12,14,20 93:22 94:3 97:8 97:11,14 98:9 98:17 99:6,21 100:12,15,19 106:20 112:2,6 116:5 119:3,6,9 126:8,11 135:7 135:16 143:5,7 161:9 168:20 175:4,11,17 176:22 178:14 180:4,9 182:20 183:3 192:5 242:13 243:16 243:21 267:15 267:21 271:14 271:19 301:10 301:15,21 304:12,21
**buckle** 251:19
**BUCKNER** 3:4,6
**build** 264:13
**bullet** 85:3,8 128:22
**bump** 36:17
**burglaries** 34:13 34:15
**burn** 102:2,16
**busted** 257:3
**button** 164:20

**C**

**C** 3:1 4:1 17:1 306:1,1
**calcium** 251:3
**calculates** 272:8
**call** 46:7 85:14,20 95:4 107:17 113:12 153:19 153:22 195:8 197:21 205:4 205:19 225:4 234:7,12 235:20 286:13 294:22
**called** 19:16 21:17 26:7 39:4 207:20 209:1 224:9,16,20 225:1 245:17 253:9
**calling** 225:8
**calls** 34:7,9 85:5 286:3,17 287:22
**call-outs** 33:11
**camera's** 243:18
**CANTOR** 3:4
**capacity** 65:17 199:10
**capital** 87:12
**captain** 26:1 226:3,9,11,19 228:13
**captain's** 158:11
**CAPTION** 308:4 309:3
**car** 148:15 256:5
**carbine** 56:15 57:7
**care** 102:4,18 103:7 110:13 117:4 133:3,10
**carefully** 307:2
**carried** 151:17
178:7
**carries** 149:21
**carry** 39:14,17 177:22
**cartridge** 79:1 173:15,17
**cartridges** 79:1,8 91:3,19,22 123:18,22 129:7 130:8,14 140:9 144:7 146:21,22 147:5,8,12,20 208:2 209:2
**case** 1:5 22:17 26:10,21 225:3 262:14 282:13
**Casey** 4:5 5:6 98:7 243:19 278:16 280:9 280:10 301:6 304:17
**casual** 255:19
**categories** 268:4
**categorize** 37:16
**cause** 70:10 80:6 87:16 90:7 95:12,22 96:7 102:1,15 103:3 103:22 113:17 114:15 115:8 120:16 133:9 144:14 145:22 150:3 153:4,8 181:22
**caused** 258:22
**causes** 258:16 259:4
**causing** 86:12 108:3
**CCR** 1:19 306:21
**cease** 234:7
**center** 244:15,16 244:19,20 268:6
**certain** 34:2
**certainly** 18:21 114:14 152:13
**certificate** 129:4
**certification** 7:18 9:6 10:6 11:6 11:16 13:20 14:12 51:17 52:6 54:15 55:3 56:20 57:10 61:10,16 62:11 62:14 63:11,14 73:7 81:17 91:10 97:3 105:8 106:12 112:11 113:3 118:14 119:15 119:20 121:18 122:4,11 128:13 135:10 135:21 142:1 155:7 160:19 161:4,17 186:8 191:10 192:9 280:19 284:10
**certifications** 30:10 53:4 60:17 67:6 124:3 152:12 281:2,10 282:10
**certified** 2:4,6,6 2:7 16:6,15 18:8 24:8 51:12 53:16,21 56:11 61:18 63:6 64:12 68:16,22 69:5 78:2 124:15 126:17 136:9 157:8 179:14,22 182:22 226:14 241:13 243:17 301:12,16
**certify** 123:12 306:5 310:4
**certifying** 139:1
**CEW** 12:6 13:7 37:19,22 38:9 39:16 44:14 60:17 61:5,10 61:18 62:11 63:6,10 64:20 65:6 68:6 72:19 77:20 78:17,19 83:22 84:12,21 85:18 87:5 90:19 91:13,14 101:16 111:2 114:9 117:15 122:4 123:5 125:18,21 126:15 127:3 130:21 134:2 136:19 142:18 143:18 144:6,7 145:7,17 148:2 149:14 153:14 153:17 157:8 157:13,19 164:18 166:22 170:17,20,22 171:9,16 172:5 173:15,17,17 174:21 181:7,8 185:15 186:8 280:20 281:17 302:6
**CEWs** 79:4 108:3 113:17 120:15 125:7 142:6 144:14 146:13 149:18 150:9 151:3,7 177:21 178:6 302:1
**chance** 98:6 236:4 254:22
**CHANGE** 308:5 308:7,9,11,13 308:15,17,19 308:21 309:4,6 309:8,10,12,14

309:16,18,20
**changed** 176:10
**changes** 183:5 264:20 307:9 310:8
**charge** 36:16 127:5,5,6 157:5 218:10 283:20 285:12
**Charlotte** 127:10 127:18
**check** 26:4 47:20 229:18,22 230:11 287:22
**checked** 202:6 229:9,10,11
**checklist** 96:21 97:19
**checks** 229:16
**chest** 130:22 172:7
**Chief** 226:4
**children** 40:17
**choice** 123:2 136:17 157:7 274:7
**Cindy** 1:18 2:3 17:19 179:11 179:19 306:4 306:21
**circumstances** 178:18
**cities** 28:16
**City** 266:17 269:22 272:13
**claim** 183:5 185:13
**claimed** 248:4
**claims** 22:21 23:6 182:9,10,15
**class** 50:17 51:11 51:13 58:19 130:2,4 142:7 150:1 152:21 163:16 187:6 188:21 190:16 194:18 199:2 201:5,8 203:1 231:18 233:13 292:8,14
**classes** 51:10
**classroom** 44:15 53:15 54:7,13 55:10 68:20 69:16,22 76:10 77:17 93:6 106:6 111:21 119:22 122:5 125:16 129:18 130:4 159:13 159:17,18 188:1,18,19 190:8 197:2,5 198:2,4 200:2 200:15 201:18 229:13 231:5 231:17,20 232:1 248:9 284:14 289:1 290:8 291:15 292:9 293:6
**clear** 21:8 48:18 177:20 183:10
**clearly** 303:20
**click** 169:12
**client** 24:12
**client's** 305:1
**close** 43:9 89:19 102:8 104:19 110:2 172:19 237:3 257:12
**closer** 213:16,18 301:14
**clothing** 39:8 80:4
**CLR** 1:19 306:21
**coaster** 258:6
**collateral** 271:21
**colleagues** 19:14
**college** 30:3 31:15
**color** 251:11
**column** 63:19 171:22 174:12
**combat** 43:9
**come** 36:1 99:3 137:20 148:21 157:1 215:9,10 217:3 230:6 240:1 259:15 295:14
**comes** 57:8 104:19 110:2 172:19 252:7
**coming** 159:4,4 180:17 186:22 197:20 208:14 209:6 247:18 256:12 284:19
**commanded** 138:2
**commands** 36:9
**commented** 233:20
**comments** 98:19
**Commission** 310:18
**committed** 261:17
**common** 252:16
**communicated** 233:11,16
**communication** 18:22 24:20 298:5
**Communicatio...** 3:2
**communities** 34:1
**community** 32:21 33:18,22 34:5,8,10 35:17 35:19
**comp** 260:14 269:22 270:16 278:9
**company** 22:14 124:18
**comparable** 271:1,4
**compiled** 267:10
**complete** 91:13 128:6 163:11 194:5
**completed** 29:18 122:4 123:11 123:13 138:17 155:7 163:21 164:9 167:13 173:22 175:1 176:13 186:7 186:12 193:12 196:19 242:21
**completely** 17:15 150:14 209:18 252:15 255:2
**Completion** 163:7
**computer** 275:20 276:9
**computers** 276:6
**computer-aided** 306:14
**concise** 21:7
**conclude** 228:7
**concluded** 305:9
**concludes** 304:19
**condition** 85:12 85:14 274:10 274:13
**conditioned** 154:11
**conditions** 85:10 174:7,9
**conducted** 13:6 37:18 38:1 142:17 227:2 227:17
**conducting** 46:5 46:9
**conference** 23:21
**confused** 175:22
**Congratulations** 269:7
**Connect** 306:21
**connection** 53:17 68:17
**Connectivity** 68:21 182:21 226:13 243:15
**consent** 16:20
**consider** 59:7 69:15
**considerations** 143:21 196:11
**considered** 36:7 38:10 157:15
**consistent** 64:1 118:4 144:9
**consistently** 54:17
**constant** 253:3 253:22
**constantly** 257:13 276:4
**contact** 80:2 275:4 279:2,13
**contacting** 230:21
**contacts** 104:19 110:1 172:18
**contain** 215:7 228:17
**contained** 70:14 86:16 88:7 229:2
**content** 23:19 24:18 25:3 129:1
**contents** 143:19
**continue** 27:10 91:14 134:6 274:4 276:16 277:20
**Continued** 4:1 6:2 7:2 8:2 9:2 10:2 11:2 12:2 13:2 14:2 15:2
**continuing** 129:2 180:10

**contracted** 273:6
**control** 66:19 101:15 119:16 138:1 255:14
**conversation** 194:20 221:15 245:20 249:5 255:20 295:19 295:22 296:7,8 299:22
**conversations** 23:19
**conveyed** 202:20 203:1
**coordinate** 128:2
**coordinator** 33:8 33:12 35:21 37:5 38:5 291:21 294:3
**copies** 187:15 188:3 190:10
**copy** 70:19 86:19 187:10,20 188:1 190:14 227:21
**cornea** 251:22
**corner** 26:9 49:5 83:8 94:9 256:18 293:17
**corners** 215:11 217:4 257:14
**Corporation** 17:17
**correct** 31:2 32:3 36:2,20 39:17 44:6 45:12,16 48:21 50:11,14 50:21 60:14 61:7 63:7,9,12 64:5,17 67:2,7 69:20 70:11 74:17 77:8,14 77:20 78:19 79:1,9 80:7 81:8 83:1 86:4 88:1,16 89:10 90:21 91:3,10 92:2,3 100:1,21 102:20 105:8 106:4 107:17 107:18 108:4,9 108:10 110:4 110:18 111:18 113:22 114:17 115:9 116:21 117:20,21 120:1,2,7,12,17 120:22 121:4 122:21 123:5,8 124:4 129:19 129:22 130:3 132:22 136:19 137:11,20 138:3,7,14,21 139:18 144:21 145:18 146:15 147:1,7,16,22 150:4,9 151:5,6 151:8,14 153:5 153:9,11 154:4 155:17 156:21 163:22 173:3 175:10 176:7 176:21 177:22 178:9,13 180:22 181:19 183:12 189:18 190:6 193:4 195:11,19 196:4,21 203:12 204:13 205:13,22 222:5 224:10 224:21 225:5 233:16 234:3 235:18 238:10 248:15 270:10 271:13 272:11 272:17,19 283:13 289:14 294:9,13,17,18 298:3,4 299:10 302:22 303:5 304:2 310:5
**corrected** 135:9
**corrections** 307:3 307:5 310:8
**correctly** 97:17 138:6 208:1 306:11
**CorVel** 270:1 278:8
**could've** 92:6
**counsel** 1:19 2:2 2:8 16:4,20 17:21 18:12 22:13,14 23:12 24:9 25:4 53:17 68:22 183:1 279:7,8 280:6 301:13,19 306:16
**counseling** 264:17,18,19
**counsel's** 93:8
**count** 31:13 146:17
**county** 31:11 38:16 244:20 306:3
**couple** 32:19 96:15 253:16 268:22 286:3 287:22 298:8
**course** 6:8 9:7,7 10:6,7 11:6,7 14:11,12 66:4 66:20 70:20,21 86:20 106:12 106:13 112:11 112:11 113:3 118:14,15 119:15 142:8 156:21 157:2,6 158:8,10,12,21 162:18,19 163:1,4,5 165:14 174:21 188:12 190:19 192:8,9,19,22 231:14 280:21 281:3 282:20 283:5,6 284:10 285:14,20 286:10 290:11 291:4,13 293:4 298:2
**courses** 36:1 55:12 56:4 72:19 114:9 146:18 155:7 281:5
**court** 1:1 2:4,7 17:11,19 18:1 20:7,15 28:10 306:22 307:16
**Courtroom** 306:21
**cover** 135:11 213:18 295:8
**covered** 232:20 233:14 294:13
**COVID** 260:15
**COVID-19** 260:22 265:11
**CPR** 51:11,12,14
**created** 121:8
**Creeds** 244:15,20
**crime** 34:3
**crippling** 264:12
**cross** 256:6
**crouching** 255:22
**CRR** 1:18 306:21
**CSR** 1:18 306:21
**cubicles** 288:8
**culled** 62:18
**Curran** 1:4,12 2:2 5:3,14 17:9 17:10 18:4,16 19:9,10 22:3 25:2,9,17 27:12 28:8 29:13 30:13 39:19 40:17 46:18 48:5,17 57:12 60:3 66:15,21 69:12 70:7 72:18 76:19 78:15 89:9 90:18 94:20 101:18 104:4 117:13 119:13 122:3,15,18 127:2 128:17 129:9 134:10 136:3 141:10 143:12 146:11 156:17 162:15 172:9 174:9,22 175:20 179:5 180:8 182:16 186:6 206:13 226:6 236:1,6 237:3,7 241:21 243:2 274:16 278:19 280:3 280:10 301:22 303:22 308:2,4 309:1,3
**CURRAN40** 143:8
**current** 29:12 80:3 86:19 129:6 144:19 174:17 209:9 250:16
**currently** 22:3,7 28:8 30:13 39:19 40:6 254:12 262:17
**curriculum** 52:17
**custody** 41:1,8
**cut** 69:1 73:16 251:17 261:19 263:3
**cutoff** 59:8
**cuts** 69:10
**cutting** 254:1

## D

**D** 17:1
**dad** 258:8
**daily** 255:8
**damage** 102:3,17 260:4
**damaged** 255:3
**Damages** 15:14 266:11 267:6
**danger** 275:13
**dangerous** 98:15 98:21 150:2 177:7,13 181:22
**dark** 262:10
**dart** 90:7,10 103:3,9 133:7
**databases** 287:22
**date** 26:4 30:19 47:1 61:16 66:11 71:10 72:11 73:3 82:20 88:10 89:5 92:20 93:20 94:10 97:6 99:10,19 100:9 106:18 109:9 112:5,19 116:3 117:10 119:1 121:21 122:20 124:11 126:4 128:1,4,5 131:13 132:1 142:1 143:3,12 143:13 149:4 155:6,8 160:13 161:7 163:7,8 163:10,15,19 170:8,15 184:7 192:13 193:6 194:5 199:19 211:17 225:20 242:8 243:7,10 244:4 266:14 267:2,7 268:15 268:19 269:13 269:18 270:9 272:7,10 307:7 308:3 309:2 310:13
**dated** 108:19 115:14 165:9 167:1 168:5 226:3 269:5
**dates** 56:21 61:20 164:1,4 250:5,9
**dating** 40:4,13,15
**daughter** 257:21
**day** 42:2 63:3 159:17,19,20 160:1 187:6 188:18 189:2 200:2,5,8,12,14 210:1,5 231:14 245:20 246:2 250:7,8 253:8 253:13 258:20 262:16 263:20 274:3 283:6 288:13,13,14 288:16 298:6 310:16
**days** 159:5,6,10 159:12 188:13 253:14 264:8 264:11 307:13
**dead** 251:5
**deadly** 217:18
**deal** 264:20
**dealing** 59:2,4 120:9 140:1,3 264:21
**December** 22:9 27:15 30:21 33:14 40:14 42:2 77:6 104:5 134:12 146:15 147:16 149:18 154:4,6 155:5 156:18 157:18 159:6 163:2,8 163:10,13,19 163:20,20 167:14 168:5 176:21 178:13 180:21 184:7 186:16 189:12 196:3 212:17 243:11 244:5 269:7,16,19,20 270:6,10 272:12,18 274:2,5 278:21 280:21 281:3 283:5
**decided** 210:17
**decision** 253:2
**deck** 68:8
**declares** 16:11
**decline** 167:4
**deemed** 307:15
**deep** 23:4
**deescalate** 218:2
**deescalation** 37:15
**Defendant** 2:3 3:13 4:3 18:12 280:6
**Defendants** 1:8
**defense** 35:20
**defensive** 33:7,11 35:17 37:4,7,11 38:5 43:7 50:16 52:11,18,19 53:2 54:16 57:13 283:17
**defer** 247:8,10 248:5
**define** 44:11
**definite** 85:22 293:7
**definitely** 74:18 152:16 165:5 177:16 201:17
**deflect** 247:20
**deflected** 246:21 246:22 248:7 248:21 249:1
**deflecting** 249:11
**deflection** 247:5
**Delaware** 41:12
**delay** 19:2
**deliver** 80:3 208:4,7,9
**delivered** 208:19 287:12,15
**Demonstration** 137:8
**depart** 279:3
**department** 19:14 25:19 27:22 28:1,3 30:17 31:14,22 32:16 35:15 37:8,10,17 38:12,20 39:4 41:20 52:15,18 55:22 56:6 61:6 61:21 64:14,21 65:15 139:7 141:17 147:13 148:2 157:21 158:15,16 159:4,7 190:20 199:9 210:19 226:10 227:11 242:22 252:10 269:15 270:8 274:9 279:3,14 283:1 284:12 294:1 300:6
**department's** 207:14 279:8
**depending** 58:19 124:22 252:6 273:12,13
**depends** 59:17 124:17,20 275:9 277:15
**depict** 212:6 214:19
**depicted** 114:16 214:1,3,14
**depicting** 77:3 120:20
**deploy** 44:20 79:3,5,9 91:19 91:22 124:1 144:7 148:2 240:1 269:14
**deployed** 79:7 92:5 96:7 123:18 130:7 140:8,11 146:21 147:5,8 147:19 151:7 281:17
**deploying** 46:1 91:3 130:13 134:2 146:20 147:11 208:2
**deployment** 74:2 74:9 103:18 123:15 148:7 171:1,18 201:14
**deployments** 204:16 206:4
**deponent** 306:8 306:11 310:1
**deposing** 307:12
**deposition** 1:11 2:1 5:12 6:4 7:4 8:4 9:4 10:4 11:4 12:4 13:4 14:4 15:4,21 16:5,16,17 17:3 17:9,15 18:19 18:20 19:19 20:5 23:10 24:2 25:5 46:17 49:10 60:22 66:2 71:5 82:11 89:2 93:11 97:2 99:14 106:11 109:2 112:10 115:18 118:13 121:17 125:20 131:16 142:16

160:9 161:2 170:3 192:7 211:12 225:16 242:4 262:5 266:10,20 304:19 305:9 306:6,14 307:2 307:10,13,15
**deposits** 251:3
**depth** 255:12 256:20 257:6 259:13,14 261:12 274:22 275:1
**Deputy** 226:4
**describe** 158:19 210:20 216:17 239:5 246:7 253:6 303:20
**described** 212:7 259:10 294:21
**DESCRIPTION** 5:12 6:4 7:4 8:4 9:4 10:4 11:4 12:4 13:4 14:4 15:4
**designate** 228:9 231:4
**designated** 203:18 204:1,8 215:13,21 216:12,13 218:6,10,13,15 219:12 220:1,7 220:8,11 231:2 231:16 237:15 237:21 294:16 295:1,3 302:15 303:8
**designation** 294:18
**designed** 80:1
**detach** 90:11
**detached** 209:8 250:20
**detaching** 251:20
**detail** 27:19 41:19 303:21
**detectives** 37:8
**deteriorate** 276:16
**determination** 251:16
**determine** 129:1 252:21 274:12
**determined** 286:22
**develop** 37:13 251:2 277:20
**developing** 37:9 251:1 277:6
**device** 38:11 44:19,19 64:17 66:19 74:9 78:21 101:16 117:19,20,20 118:6 119:16 124:15,17,20 124:22 126:17 137:13 138:10
**devices** 44:4 45:7 45:10 69:19 70:4,10 78:19 86:12 95:12 101:21 125:9
**diagnosis** 250:16
**diagrams** 51:22
**dictates** 87:9,13 96:5
**difference** 117:17
**different** 29:1 32:4 34:4 37:13 67:17 98:5 100:2 140:13 146:18 152:11 158:6 188:2 210:19,19 251:15 252:16 270:18 302:20
**differently** 270:14
**dim** 262:11
**direct** 49:3,13 109:12 116:11 167:8 245:20 283:4
**directed** 282:8 288:9 292:18 298:9,15,21
**direction** 239:20
**directly** 230:11 234:20 245:9 247:5 296:7
**directors** 182:6
**disagree** 58:15 176:6
**discharge** 103:15 104:18 110:1 172:18
**discharged** 103:19 104:8 237:4
**discharges** 173:18
**disclosed** 26:9,21
**discuss** 60:16 156:17
**discussed** 90:20 117:7 120:6 136:22
**discussing** 78:16 113:11
**disfigured** 261:6 262:2
**disfigurement** 262:4
**disorder** 140:2
**dispute** 164:4
**disqualify** 137:14
**distance** 103:22
**distribute** 144:19
**distributors** 182:7
**District** 1:1,2 17:11,12
**dive** 23:4
**divide** 44:13
**divided** 54:10
**DIVISION** 1:3
**dizziness** 255:17 257:18 258:2,3 259:13 261:12 275:1
**dizzy** 255:11,18 255:21 256:2,8 258:7 275:12
**DMV** 262:22
**Dobson** 4:12 17:18
**doctor** 247:11,12 247:13 248:6 248:22 259:19 261:21 273:21
**doctors** 248:20 259:7 274:21 276:13,20
**document** 66:18 97:16,20 98:10 98:12 126:14 138:16 140:7 143:17 162:3,9 167:1 170:12 173:5 174:17 175:7 176:6 182:18 183:5 184:12,18 185:3,7,17,19 186:2,17 228:2
**documentation** 154:13
**documenting** 191:17
**documents** 26:9 28:5 88:7 167:17 183:15 186:20,22 187:1,5,6 188:4 188:21 197:8 197:14,16 283:7,8
**doing** 18:19 45:14 59:18 128:3 201:9 205:7 217:18
219:1,4 220:2 227:6,7 229:21 230:4 232:15 232:22,22 233:9 246:8 274:4 283:12 292:19 307:6
**door** 257:9
**doors** 137:15,18
**doorway** 257:16
**double** 33:8
**download** 164:19 169:11 183:18
**downloaded** 184:10
**Dr** 248:22 249:4
**draft** 26:3
**drafted** 26:1,2 226:3
**Draw** 138:9
**drill** 203:18 289:13
**drills** 205:8 288:19
**drive** 3:7 148:6,8 148:19 262:17 263:5,15,19 264:1,5,8,14,15 265:18
**driver** 148:17
**driving** 256:5 265:18
**drop** 258:10
**drops** 277:10
**drunk** 148:17
**DT** 283:19 291:21
**due** 65:8 103:8 127:2,14,16 177:5 182:12 220:2 253:22 256:12 258:15 259:1 260:15 260:22 261:1 274:10,15 276:19

**duty** 18:5 306:8
**duplicates** 107:20
**duration** 25:12
**duty** 33:8 36:18 268:22,22 270:16 273:17 274:2,2

**E**

**E** 3:1,1 4:1,1 17:1 17:1 306:1,1 308:1
**earlier** 55:19 74:19 232:21 294:15 295:5
**earliest** 61:9
**early** 250:11,12 250:13
**ears** 255:14
**easier** 47:12 72:6
**Eastern** 1:2 17:12
**ebuckner@bre...** 3:11
**ECD** 8:15 9:14 9:16 10:16,18 99:15 100:3 101:14,15 102:1 109:2,5 115:19,21
**education** 29:15 30:3,10
**effect** 72:13 83:14 94:15 101:3 107:8 108:16 113:7 116:10 143:14 146:5 165:8
**effective** 87:3,15 94:10 95:19 142:13 143:13 148:22 170:15 192:4 193:6
**efforts** 287:18
**eight** 115:16
131:14 193:11
**either** 23:21 35:13,13 46:3 50:20 63:6 134:13 159:13 167:3,4 204:6 205:16 215:11 217:4 223:11 239:14 245:20 248:17 261:17 277:3 287:1 297:3 303:11
**electric** 208:14
**electrical** 13:6 104:18 110:1 142:17 172:18 209:8
**electricity** 208:4 208:7,9,14,19
**electrode** 101:10 102:12 104:18 110:1,7 132:19 165:19 172:18
**electronic** 66:19 101:15 119:15
**elicit** 217:7,19 235:1
**eliminate** 150:14 150:22
**Elkins** 248:22 249:4
**ELLIOTT** 3:6
**else's** 246:11,15
**embarrass** 23:4
**embedded** 75:12 89:19 90:11 133:7
**emergency** 246:1 268:8
**employ** 282:10
**employed** 30:14 30:16 139:6
**employee** 141:11
**employees** 182:7
**employer's** 15:10 242:5,20
**employment** 30:20 33:14 38:17 39:2,10 52:7 54:18 56:5 266:3 269:12 269:15 275:19
**encompass** 177:2
**ended** 33:14 41:22 222:21 223:4 239:2 269:12 277:1
**endings** 260:4 261:15
**ends** 93:9
**Energy** 37:18 38:2
**enforcement** 6:17 7:16 9:15 10:18 12:13 31:9 71:6 89:3 98:1 109:4 115:21 129:6 129:22 131:18 144:5 164:11 164:17,19 166:16 167:1 167:10,20 182:8 244:19 284:7 304:1
**engage** 233:4
**engaged** 154:9
**engaging** 154:12
**engine** 148:16
**ensure** 262:20
**entail** 51:9 52:13
**entailed** 55:7
**entails** 33:22 37:5
**entered** 229:9
**entering** 204:9
**Enterprise** 1:7 2:3 3:13,14 17:10 18:13 308:4 309:3
**Enterprises** 17:16
**entire** 129:5 164:7 197:4 201:5,8 204:7
**entry** 81:2
**equally** 41:8
**equation** 270:15 270:19
**equipment** 45:19 45:21 46:11 58:5 60:5 150:8 150:13,20 221:2,10 290:2 296:12
**errata** 307:4,6,9 307:12 310:10
**especially** 257:14
**ESQUIRE** 3:5,6 3:15,16 4:5
**essentially** 131:4
**EST** 1:13 2:11 17:4 78:10,10 156:12,12 241:9,9 305:10
**established** 190:4 304:9
**estimate** 198:8 238:19 273:9
**et** 1:7 308:4 309:3
**ethics** 51:20
**evenly** 54:10
**events** 22:8 265:13,14
**everybody** 202:11,20 218:18 289:10 291:8
**evolution** 233:18
**evolutions** 233:22 236:3
**exact** 56:21 76:21 77:1,2 114:11 123:21 163:15 165:4 176:8 198:15 216:11 250:18 270:13
282:15 285:1 290:20
**exactly** 55:9 64:8 65:9 81:10 84:15 163:3 179:9 203:2 221:1 231:19 249:15 250:9 270:20 272:4 290:4
**exam** 138:17 191:13
**EXAMINATI...** 5:1,4 18:12 280:6 301:19
**examined** 18:6
**example** 45:10 45:22 46:1
**excuse** 19:21 24:8 26:13 30:2 53:16 111:22 124:8 137:9 143:6 182:22 185:17 188:13 219:20 266:8 301:12
**excused** 305:8
**exercise** 85:13 234:8
**exhibit** 5:12 6:4 7:4 8:4 9:4 10:4 11:4 12:4 13:4 14:4 15:4,21 46:14,17 48:3,5 48:7 49:4 54:20 56:17 60:18,19 61:8 65:19 66:2 67:22 71:2,5 73:18 75:17 77:10 80:12,17 82:4,9,11 86:8 87:20 88:5,8 89:2,10,13 92:10 93:7,11 96:20 97:2,19 99:4,8,9,14

100:20 101:2 105:14 106:8 106:11 108:18 109:2 110:20 110:22 111:20 112:7,8,10 115:12,13,18 118:9,13 119:14 120:4 120:15 121:2 121:13,14,17 123:4 125:17 125:20 128:12 131:12,16 132:5 135:6,9 135:20 136:6 139:15 140:17 140:21 142:11 142:11,16 146:2,4 160:4,5 160:9,17 161:2 161:15 162:2 164:15 166:12 166:15 167:8,9 168:1,12,22 169:22 170:3 183:17,18 184:5,12,13 186:18 191:1 191:22 192:2,7 192:18 193:12 193:22 195:5 195:15,19,21 196:7 211:9,12 225:13,14,16 240:17 242:2,4 266:10,16,20 267:6 269:4 271:11 303:16
**exhibits** 5:9,11 6:2 7:2 8:2 9:2 10:2 11:2 12:2 13:2 14:2 15:2 47:12 98:22 160:3 266:5
**exist** 174:18
**expectation** 58:8 59:15,16
**expected** 58:4,13 58:22 59:6,21
**experience** 31:10 209:11 210:2 253:6 255:7
**experienced** 209:21
**experiencing** 253:19
**expert** 37:11 157:15 275:4
**expertise** 260:5
**expires** 310:18
**explain** 35:12
**explained** 176:18 293:17
**exploded** 250:19 251:10 254:7
**exposed** 171:1,17
**exposure** 181:8
**exposures** 170:17 170:21 171:9
**extended** 42:16
**extent** 23:5 183:4
**extra** 263:4
**extract** 148:18
**extremely** 295:17
**eye** 46:2 75:12 76:12,21 77:8 80:10 88:1 89:20 96:16 104:6,17,19 108:8,9 109:17 110:2 115:3,8 116:13,19 121:4 132:9 133:8 134:20 145:21 153:8 154:7,10,18 155:15 165:18 170:21 171:12 171:15 172:12 172:19 178:8 180:19 181:21 196:1 202:12 202:21 203:4 203:14 204:10 237:7 240:5 246:12 248:7 249:21 251:2,4 251:5,9,11,19 252:10 253:10 254:2,3,18 255:9 258:16 258:22 259:9 261:7,7,8 262:6 262:9 263:21 264:3 265:1 268:6 276:10 276:14 277:5,7 277:8,15,16 281:3 282:3,5,9 294:12 296:10 296:14 297:1 298:11 300:6,7
**eyeball** 249:3 250:20 251:13 253:4,11 254:4 263:1
**eyeglasses** 46:1
**eyes** 74:10 87:16 95:21 96:7 134:21 135:3 145:18 153:5 172:7 255:14 259:16 264:3 276:20,22 277:2
**eyewear** 134:1 203:11 289:3,6 289:14,16,20 290:10,18 291:3,9,12 297:14,17 298:1
**e-mail** 99:2 162:10,12 169:17 184:14 184:19
**e-mailed** 26:22 47:17
**e-mails** 287:20

F

**F** 306:1
**face** 172:6 240:13 294:13,14
**facewise** 214:11
**facilitate** 60:2 234:14 279:1
**facilitating** 279:7
**facility** 284:9
**facing** 148:15
**fact** 57:16 68:1 84:10 91:12 95:3 117:18 128:17 138:20 141:16 153:10 153:14 176:16 274:15
**factors** 252:21
**fail** 307:14
**failure** 182:11
**faint** 24:9
**fair** 21:13 42:20 44:8 61:4 83:17 108:11 121:6 134:18 140:8 152:9 156:6 219:5
**Fairless** 30:7
**fake** 233:6
**fall** 254:19 256:10 258:9 275:11
**familiar** 37:20 64:11
**familiarize** 162:9
**family** 265:22
**far** 39:10 61:9 130:11 148:7 158:20 159:13 186:14 197:21 198:1 199:1 204:17,19 215:1,6 222:6 222:18 223:3 227:9 229:4 236:9 239:10 250:3 251:15 252:3 255:17 256:9,19,20 257:3,12,15 259:13 265:15 270:7 279:5 284:1 285:19 286:21,22 296:13 300:11
**fast** 134:22 135:4 240:3 255:20 256:2,8,18
**fatigue** 220:2
**February** 226:4 250:10
**FedEx** 287:2
**feel** 61:19 253:11 253:12 263:16 264:5 265:4,6
**feeling** 253:3
**feet** 49:1 138:11 138:12 223:22 239:18 247:18 248:10
**Felps** 40:1,3
**felt** 240:12
**Ferrara** 65:13
**field** 42:8,9 138:11 148:3,6 149:14 260:5
**fighting** 244:22
**figure** 271:10 274:21
**fill** 63:1
**filled** 163:15 175:8 259:2,2 277:10
**final** 273:21
**find** 26:13 57:1 61:15 97:9 154:16 155:6 188:21,22 189:2 197:22

260:6 277:2 285:20 286:12 286:14,19 287:11,15
**findings** 227:19
**fine** 80:20 175:18
**finger** 137:9,14
**fingers** 114:4 137:15 302:4
**finished** 206:21 232:13 297:9 304:5
**fire** 55:20 234:8
**firearms** 43:15 45:11 46:2 54:21 55:13,15 55:16,18,21 56:13 57:13 84:6,22 95:2 107:16 113:11 127:10 195:7
**firing** 129:6 137:9,10
**firm** 134:3 152:2 152:4
**first** 18:5 29:17 31:6 32:17,21 42:2,20 47:14 51:2,2 61:17 63:5 64:11 77:21 94:9 100:9 102:3,11 102:17 110:7 111:3,14 119:13 128:22 135:12 137:8 140:1,19 141:2 142:14 159:17 160:1 161:14 162:8,14 164:10 165:18 175:15 186:11 186:12 187:5 191:4 192:18 200:2,5,8 206:1 216:21 217:5
226:22 246:3 248:7,22 249:7 250:15 263:3 267:5 268:18 283:6 300:19
**First-Time/New** 162:19
**five** 137:13 191:9 273:11 274:3
**five-minute** 156:2
**fix** 257:7
**flash** 206:17 239:8,10 240:12
**flashed** 239:21
**flight** 258:18
**floor** 256:1 264:2
**fluid** 277:8
**flying** 265:15
**focuses** 34:10
**focusing** 234:20
**fold** 211:4
**folding** 211:3
**follow** 25:13 46:7 58:4,9 150:7,12 150:19 280:12
**followed** 119:20 302:11
**following** 273:17
**follows** 18:6
**follow-up** 279:22 304:14
**foot** 222:20 223:2 224:6
**football** 273:4
**force** 43:4 52:3 52:21 60:7 140:2 157:14 157:17 218:1
**foregoing** 306:6 310:4
**foreseen** 181:9
**Forest** 3:7
**forget** 230:7 285:17
**form** 68:8 169:17 184:14 189:19 189:22 281:19 310:9
**formal** 20:6
**format** 119:21
**forth** 179:8 188:19 189:2 197:6 203:4 255:19 283:15 286:11 293:5 296:6
**Forty-five** 29:14
**forward** 19:5 48:2 238:12,13
**found** 286:22
**four** 33:20 59:20 63:22 88:18,20 106:9 191:8 215:9 216:20 274:3
**fourth** 63:19 216:22 217:16
**frame** 57:2 62:17
**free** 61:19
**freezing** 242:17
**frequently** 108:12
**fresh** 236:22
**front** 47:15 48:3 48:6,8 66:14 80:17 88:18 89:10 137:15 173:15,17 234:20 276:8 284:14
**full** 19:8 118:1 126:18 141:2 174:19 230:20 232:5 236:2,5 271:6 304:5
**fully** 166:21 174:15,16 176:18 246:7
**fun** 257:22
**functional** 144:6
**further** 16:9,14 16:19 212:20 304:12
**future** 252:5 260:9 275:8
**fuzzy** 159:15
**FYI** 47:10
**F-E-L-P-S** 40:3
**F41s** 49:19

**G**

**G** 17:1
**game** 273:4
**gas** 39:11
**gate** 57:5
**gear** 37:12 46:2 154:8,10,18 155:15 202:12 202:21 204:10 207:10,11,12 220:3 288:15 291:17,22 304:5
**gen** 231:21
**general** 35:18 50:13 51:5,5,8 51:16 52:5 73:1 84:19 140:20 173:12 194:21 268:6 290:13
**generally** 73:5 85:17 152:10
**genitals** 74:11 131:1 133:8 172:8
**gentleman** 214:5 214:7,13
**GEORGE'S** 306:3
**getting** 23:18 24:4,11 47:9 175:14 206:16 206:17 207:10 223:14,14 229:13 239:8 251:21 260:13
264:9 270:20 291:17
**girl** 41:4
**girlfriend** 39:21 262:13 264:1
**girlfriend's** 39:22
**give** 19:3 21:2 27:8 51:11 97:8 97:12 190:17 198:15 227:21 250:4,18 271:5 271:5 278:14 287:17 294:5
**given** 18:19 84:17 231:12 231:18 236:4 248:20 264:10 272:9,10 274:13 280:13 306:15 310:6
**gives** 276:6
**giving** 227:3
**glass** 257:2 261:7
**glasses** 202:15,17 202:18 218:19 219:7,13,17,18 219:22 220:12 220:15 221:14 231:1,11 232:3 232:8,19 234:19 237:8 237:13,14,16 237:19,22 238:1 256:22 257:5 282:12 282:13,18,22 288:18 289:2 290:1,5
**Glen** 3:7
**go** 18:20 20:11 21:1,2,11,20 29:15 32:3,6 41:18 42:5 43:2 46:13 55:14 60:21 61:3

63:18 65:18
66:17 68:10
72:6,15 75:16
77:17 78:3
80:22 82:3,6
88:4 107:19
108:15 110:21
111:3 113:9
115:12 118:8
120:3 124:7
130:18 131:3
131:11 132:5
133:21 135:20
136:15 137:6
140:13,16,18
140:20 141:19
146:3 156:1
160:17 161:14
161:21 163:18
164:6,7,8
166:14 177:4
177:18 179:5
179:18 180:13
180:18 183:7
183:22 191:2
193:21 196:6
201:5,15
209:19 210:7
215:16 216:6
216:16 220:6
221:17 223:12
223:20 225:13
229:18 230:7
232:12 238:3
240:16 241:20
243:22 248:8
252:22 256:19
257:11 258:20
262:20 263:22
265:8,12,21
271:16,22
273:22 275:16
280:17 281:20
282:2 283:14
283:16,21
285:7 286:10
297:7 302:16
303:7

**goes** 61:20 62:2 83:19 120:15 143:5,7 170:15 191:11 193:22 195:15 233:10 236:21 239:11 253:16,17 258:11 293:15 293:16,16

**goggles** 222:5,7 303:13

**going** 19:5 20:19 21:11,15 22:20 25:13 26:6 37:13 41:5,18 46:13 47:11 49:3,9,13 51:1 60:16,18,20,21 61:2 63:13 65:18 69:3 70:1 73:2 74:5 75:5 75:16 76:1 80:12,13 82:3 83:5 86:7 88:4 89:12 92:10 93:7 96:20 99:9 100:20 105:14 105:15 106:7 107:19 108:15 110:21 111:1 111:21 113:9 116:11 118:9 124:6 125:16 130:17 131:14 135:5 140:16 141:19 146:3 151:22 152:3 155:20,22 160:2 164:7,14 167:8 169:21 178:14 180:4 182:20 183:15 184:16 189:1 191:1,2 195:4 202:6 207:4 208:4 211:2,6,8 212:2 215:9 219:13 225:12 228:1 230:13 234:19 235:3 243:6 259:15 260:7 261:10 262:1 264:10 266:5 269:4 271:11 272:17 273:22 275:16 276:11,14,15 277:14 278:1 278:14 281:8 288:10 299:5 301:4

**good** 18:16,17 180:13 214:17 233:1 248:13

**gotcha** 171:10

**grab** 257:11

**grabbed** 289:9

**grabbing** 257:9

**grade** 29:17

**graduate** 30:6 42:15

**graduated** 31:7 32:13

**GRANA** 3:4

**granted** 287:13

**great** 135:14 275:15

**groin** 172:7 302:4

**gross** 182:13

**ground** 211:3 246:20

**grounds** 16:5 177:1

**group** 59:5,8 81:2

**groups** 252:16

**guarantee** 259:20 260:3

**guess** 65:13 149:11 251:13 263:6 273:18 293:2

**guesstimate** 39:1

**guidelines** 143:21 145:7 150:8,12 150:19

**gun** 217:5,6,7 230:7

**guns** 302:6

**gurney** 299:15

**guy** 19:16 247:1 283:19,20 285:11

**guys** 97:15 243:20

**gym** 200:5,12 201:1,6,9 202:7 204:2,4,8,9 207:8 212:4 218:18 219:9 219:17 222:3 229:9,12,16 231:6,8 232:2,3 232:19 288:22 291:17 292:9 292:11 295:20

**gymnasium** 159:21 230:22 292:22 298:13 299:12

**H**

**half** 42:14 155:21 253:17 258:19 272:16 291:21

**halfway** 75:7 89:14 111:7

**hallway** 229:17

**hand** 70:20 77:20 86:20 114:20 120:21 154:21 160:17,18 257:2,10,11 302:3

**handed** 297:19

**handgun** 56:1,1

**Handheld** 10:16 115:19 164:18 166:22

**handle** 77:20 78:19 91:14

**handled** 45:9,11 61:5 63:10 69:19 151:4

**handling** 44:19

**handout** 188:8 190:21

**handouts** 285:3

**hands** 153:4 173:16

**hands-on** 52:20 53:4

**handwriting** 122:17 136:4

**handy** 60:19

**happen** 27:3 277:14 278:2

**happened** 203:3 227:12 240:4,7 240:14 283:8 284:18 300:15 300:16 304:10

**happening** 277:1

**happens** 275:22

**hard** 166:8

**harmless** 182:2,6

**hazard** 101:11 102:13,15 104:17 109:18 110:8 116:14 131:8 132:9,20 165:19,20 172:12

**hazards** 108:8

**head** 20:13 130:16,22 145:3 172:7 188:20 223:14 238:12 239:11 253:11 254:19 255:18 256:4

256:18 263:19 296:5 299:21 302:3
**headache** 258:16
**headaches** 253:22 255:5 259:18 276:1,7
**heading** 74:3 75:9
**headings** 170:18
**headline** 100:9
**head/throat** 87:8 87:13 96:5
**heal** 277:4
**health** 8:16 9:17 10:19 12:14 98:1 99:16 100:4 109:6 115:22 131:19 170:16
**hear** 53:19 69:12 183:2 242:11 243:20,21 263:7,9 267:20 271:17 274:17 280:14
**heard** 209:4 227:5,20 239:16 246:18 246:20 298:8 299:1
**hearing** 77:22 298:16
**heart** 131:1
**heat** 220:3
**heavy** 220:4
**held** 32:15 33:13 148:19 284:11
**helmet** 220:3,15 220:16,20 221:7,13,18,21 236:5,22 237:8 237:20 238:16 238:20 246:10 294:8,11,12 296:16,19,22
297:12 303:7 303:12
**helmets** 296:11 303:5
**help** 60:2 76:1 264:20 281:21 285:9 292:17 293:4
**Hey** 97:14 127:2
**high** 30:5,6 198:11
**higher** 87:9,13 96:5
**highest** 29:17
**Hills** 30:8
**hired** 31:14,21 32:9
**history** 5:13 27:22 46:18
**hit** 138:11,11 167:4 196:1 223:10 239:8 240:5,7,13 248:7
**Hits** 87:14
**hitting** 209:11
**hold** 34:16 47:19 48:8 88:21 169:2 175:4 178:14 182:2,5 256:2
**holding** 256:15
**Hollywood** 19:16
**Holy** 298:19
**home** 275:18
**hone** 154:15
**honest** 62:19 126:20 129:11 157:10 205:6 285:4
**hope** 251:21 259:22 260:1 276:14
**hopefully** 20:21 99:4
**horizon** 261:20
**hospital** 245:13 246:4,4 268:6,7 299:9
**host** 182:8
**hot** 228:7 231:2 236:7 239:18 295:17
**hour** 155:21 206:7,9,10 253:17,18 258:14 265:19
**hours** 53:12,13 55:9,10 63:19 63:22 258:19 274:3
**house** 29:1,4 257:1,7
**Hum-um** 218:15
**hurts** 263:19 264:10 265:18

**I**

**ibuprofen** 276:2
**ID** 141:5
**idea** 49:21 64:22 104:9,13 105:13 141:7 199:7 255:7 276:21
**identification** 46:21 66:11 71:9 82:20 89:4 93:20 97:6 99:19 106:18 109:9 112:19 116:3 119:1 121:21 126:4 132:1 143:3 160:13 161:7 170:8 192:12 211:17 225:20 242:8 266:14 267:1
**identify** 123:4 136:18 213:22
**ignored** 75:2
**illness** 243:7 244:4 246:7
**immediate** 34:14 90:12 245:2,5
**immediately** 85:10
**immense** 251:9 259:4 299:3
**impact** 103:20
**impacting** 76:12
**impair** 22:4,8
**imperative** 307:11
**implement** 57:20
**important** 8:15 9:16 10:18 12:14 46:6,10 98:1 99:15 100:3 109:5 115:21 131:19 150:7 170:16
**impossible** 59:3 235:3 256:13
**impression** 197:16
**improper** 178:19
**incident** 22:9 25:20 40:14 77:6 104:4 134:11 148:13 154:20 222:11 224:9 227:3 241:22 245:9 246:19 248:3 265:9 268:15 268:20 269:18 272:7,10 273:17 278:21 279:1
**incite** 233:5
**include** 35:7 38:4 39:16 44:9 52:20,21 53:1 54:7 129:4 145:18 147:3 147:14,17
**included** 70:4 74:16 76:10,16 86:4 91:17 95:8 105:3 185:3,19 196:3 207:12 294:8
**includes** 43:6 80:9 236:5
**including** 35:20 89:21 90:9 104:20 110:3 116:20 123:14 129:5 132:14 145:3 172:20 182:9 224:16
**income** 273:10
**inconsistent** 213:20
**incorporated** 55:10
**incorrect** 248:16
**increase** 158:2,4
**increasing** 252:6
**independent** 63:5 276:21
**index** 5:1,9 6:2 7:2 8:2 9:2 10:2 11:2 12:2 13:2 14:2 15:2 47:17
**indicate** 62:11 86:18 117:9 184:3 221:12
**indicated** 195:18 243:6 252:2 306:8
**indicates** 50:10 51:3 138:16 141:22 168:10 184:13
**indicating** 113:17 135:17 139:16
**individual** 77:7 87:22,22 96:16 108:8 114:5 115:3 121:3 127:4 134:13

139:3 148:9,14 196:1 202:6 210:15 217:13
**individuals** 59:5 212:12
**inert** 209:1 291:19
**infection** 90:14 101:10 102:3 102:12,17 110:8 132:20 165:20
**inform** 286:13
**information** 8:16 9:15,17 10:17 10:20 12:13,15 44:17 98:2 99:16 100:4 109:4,6 115:20 115:22 131:18 131:20 140:20 164:19 167:1 170:16 173:12 197:7 231:12 245:15 247:1 247:21 249:11 249:19,22 267:11 279:2 287:18 288:1
**informed** 149:22 157:3 211:1,5 228:20,21 285:10
**inherent** 181:7
**initial** 50:20 81:17 118:1 119:19
**injured** 173:18 213:1 225:9 288:15 298:6,7 300:13 302:12 302:22
**injuries** 60:6 87:16 96:8 114:16 120:21 121:9 153:4 174:19 178:7,8 230:20 302:2,3
**injury** 57:14,18 57:21 70:10 74:8 80:6 86:12 87:9,14 89:21 90:3,8,15 95:12 95:22 96:6 101:10 102:12 102:22 103:3,7 103:8 104:1,17 104:20 108:3,8 109:17 110:3,8 110:12,13 113:17 114:10 114:12 115:9 116:13,20 117:3,4 120:16 131:1 132:9,14 132:19,21 133:10 144:15 145:22 149:21 150:4,14,22 153:8,15 165:19,20,21 172:8,12,20 173:6 177:22 178:9,17 181:22 213:15 216:19 227:10 236:3 243:7 244:4 246:7 249:22 255:8 264:17,22 274:10 302:1,8 302:13,17 303:21
**inside** 39:8 154:21 203:13 203:16 211:7 215:19 217:8 222:17,19 228:7,22 253:11
**instance** 134:10 231:15 290:21
**instruct** 24:6 51:16
**instructed** 24:14 25:9 84:11,12 154:10 155:16 220:22 293:11
**instruction** 65:6 288:14 291:11
**instructions** 9:14 10:17 12:12 36:10 45:16 109:3 115:20 131:17 161:21 164:18 166:22 290:10 294:6 307:1
**instructor** 13:19 14:6,11,12 35:18,18 50:5,7 50:11,13,16,19 50:20,21 51:4,5 51:8,16 52:6,11 53:3,10 54:15 54:21 55:21 56:12,14 58:1,8 58:12,21 59:5 59:12,21 60:1 65:2,5 67:3 68:10 70:15 75:2 85:4,11,13 86:17 113:21 123:12 128:3 139:8,16 140:10 142:8 146:14 147:15 156:21 157:2,8 157:13 158:2 159:3,3,9 160:19 161:3 161:16 162:18 162:19 163:5 170:3,13 174:10 176:20 182:7 186:18 187:4,13 188:9 188:20 192:8,9 192:19,22 194:6 197:13 197:18 199:20 201:15 202:10 221:6 283:17 285:11 303:22
**instructors** 58:17 60:2 64:20 70:19 86:19 157:20
**Instructor/User** 169:16
**instructs** 20:22
**intend** 260:8 265:3 275:6
**intended** 228:17
**intention** 23:3 229:5
**intentionally** 74:11 130:20 172:5
**interaction** 199:20
**interested** 306:17
**internal** 90:8
**International** 6:6 7:6 8:6 66:3 82:12 93:12
**interoffice** 25:19 25:22 226:2 227:16 269:5
**interrupt** 135:8 154:22 180:9 297:9
**interrupted** 292:6
**interrupting** 19:1
**interviews** 20:2
**Inter-Office** 15:6 15:18 225:17 266:21
**introduce** 22:12
**introduced** 105:11
**introduction** 191:7,10,12
**inventory** 283:21
**investigation** 227:3,18
**involved** 53:14 128:21 178:18 234:5 296:7 299:17
**involvement** 292:15
**involves** 57:14,14 57:17
**in-house** 14:11 22:14 192:8,19
**in-person** 186:15 187:20
**in-service** 127:22 128:1
**iris** 250:19 251:10 254:7
**ironed** 23:14
**issue** 99:22 275:10
**issued** 288:15,17 288:17
**issues** 68:21 182:21 226:13 243:15 251:14 275:2,11
**item** 297:11
**items** 45:5
**IW** 246:8,12

**J**

**January** 170:15 192:4 193:6 250:10
**job** 1:16 33:7 234:14 235:4 275:17
**jobs** 37:6 270:2 272:21 273:10 273:13 274:12
**John** 284:4 294:4
**Johnny** 65:12,17 139:2
**joined** 61:21

**joining** 31:10 32:10 38:14,18 61:6
**joint** 40:22 41:7 52:16
**Jones** 26:1 226:3 226:9 228:13
**judge** 257:15
**July** 112:4 113:4 118:11 119:16 124:11 125:15 133:14 189:9 260:18
**jump** 258:1
**jumps** 71:13
**June** 1:13 17:4 17:13 111:4 113:8 116:10 274:1,1 308:3 309:2
**Jurisdiction** 306:5
**justification** 74:12 131:2
**justified** 87:10,14 96:6

**K**

**keep** 60:19 173:14,16 251:20 254:18 277:8,9,10,11 298:11
**Kelly** 99:3
**Kendra** 4:12 17:18
**keratopathy** 251:1 277:6,19
**keys** 291:20,22
**kin** 306:16
**kind** 31:14 44:13 44:15 55:12 145:10 160:17 188:11 204:1 213:8 214:17 220:4 227:14 233:5 246:22 251:4 253:1 255:13 256:11 256:21 257:19 261:4,22 264:2 264:8,10,20 265:16 270:14 275:12 277:18 281:20 299:2,5 299:7 300:15 301:4 303:13
**knew** 133:13 149:19 150:6 151:3,7,12,16 153:13,17 154:2,6 155:13 198:19 199:2 199:15 203:10 205:16 214:7 229:4 231:15 234:3 240:9,14
**knife** 230:8
**know** 18:22 19:2 20:14 21:8,18 23:4 36:8 38:1 44:14 49:15 53:7 58:20 62:13 64:10 69:9 72:4,22 75:21 80:15,20 81:13 83:13 91:16 92:16 98:3,13,14 104:10 105:10 111:17 116:18 123:22 124:14 125:1,2 127:1 127:13,16,21 129:17 134:12 134:15,17 135:12 141:6 152:2 157:19 158:8,17 163:16 177:12 177:15 179:9 191:8 197:21 198:16 199:3,5 199:10 200:19 200:20 206:18 208:17 210:15 210:18 214:15 214:20 222:6 223:1,4 226:9 229:20 233:6 239:2,17 240:6 243:4 244:13 247:19 248:12 248:12,12,13 249:10,15,19 250:5,10,19 252:10 253:17 254:10 257:12 259:10,12,17 264:8,21 267:10 270:15 270:19 272:9 272:15 275:16 276:18 277:12 277:19 285:17 289:20,22 298:7,9,20
**knowing** 180:21
**knowledge** 65:15 124:21 155:12 174:20 200:9 218:12,16 246:15 248:19 303:11
**known** 114:14 115:6 131:1 172:8 181:8 226:21
**knows** 286:14
**Kohl's** 38:20

**L**

**L** 1:18 2:3 3:15 16:1 306:4,21
**label** 97:18
**labeled** 97:17 100:5
**lack** 281:16
**Langhorne** 29:5
**language** 152:7
**large** 59:2
**laser** 138:12
**Laskin** 4:6
**lasted** 206:4
**lastly** 303:15
**late** 198:10 250:13
**launcher** 44:1,2
**law** 6:16 7:16 9:15 10:18 12:13 31:9 71:6 89:3 97:22 109:4 115:20 129:6,21 131:18 144:5 164:11,16,19 166:16 167:1,9 167:19 182:7 183:6 244:18 271:15 284:6 304:1
**lawsuit** 227:4
**lay** 211:3 258:20
**lead** 36:7
**leader** 36:13
**lean** 256:11,15,18
**leaning** 238:12 238:13 261:2
**learn** 67:9 78:21
**learned** 67:15 80:5 84:20 152:12,15,21 152:22 153:3
**learning** 44:18 44:19 83:21 85:18 87:4
**leave** 79:17 293:16
**left** 78:15 107:3 199:6 204:7 234:18 241:21 256:6 276:10 276:13 300:1
**leg** 210:5
**legal** 1:21 16:7 17:20 185:13 189:21
**lesson** 284:1,19 284:21,22 285:2
**LETA** 304:1
**lethal** 37:5 38:5 38:10 149:20
**letter** 57:10 260:17
**letters** 87:12
**letting** 69:9 116:18
**let's** 78:5 99:7 123:2 136:17 164:6 177:18 191:8 213:3 290:15,15
**level** 87:9,14 96:6 139:17
**levels** 253:7
**liability** 174:13 182:10,11
**License** 6:7 7:7 8:7 66:4 82:13 93:13
**lieu** 16:10
**lieutenant** 157:4 157:4 226:17 226:19
**life** 23:5 28:20 29:6 257:19
**light** 251:9 254:4 254:7 256:12 268:21,22 270:16 273:16 274:2
**lighting** 262:11
**lights** 276:5
**limit** 138:13 208:16 209:18
**limited** 182:9 236:6 268:22 270:16 274:2
**line** 167:9,22

180:11 184:5 191:9 261:16 269:3 281:20 282:2 308:5,7,9 308:11,13,15 308:17,19,21 309:4,6,8,10,12 309:14,16,18 309:20
**lines** 281:19 298:8
**link** 161:20
**list** 49:18
**listed** 35:7 45:5
**listen** 36:9
**lists** 268:4
**literally** 49:11 197:19 221:22 256:22 258:9
**litigation** 16:4
**little** 19:2 29:16 34:19 39:12 41:4,19 72:6 73:1 148:12 150:16 154:12 159:15,16,18 166:7,9 175:22 183:1 204:15 210:4,6 227:21 236:14 260:2 265:19 290:1 294:15 300:10 301:13,14
**live** 28:15 29:10 41:11,16 84:6 95:1 107:16 113:11 144:7 195:7
**lived** 28:12,20 29:1,2,4
**LiveDeposition** 1:20 2:9
**LiveLitigation** 306:22
**LiveNote** 2:7
**lives** 41:12
**living** 28:9 41:6
**load** 78:22
**locate** 197:7 283:7,8,22 284:18 285:9 287:19 293:14
**located** 62:12 92:13 284:5,6 288:21
**locker** 293:21
**logged** 162:4
**long** 25:4 28:12 33:16 34:16 38:21 40:4,9 42:12 53:11 55:7 186:2 198:2 200:18 200:21 206:4 221:17 226:7 226:21 238:19 238:22 239:3,3 253:2 273:16 275:21 276:9 279:17
**longer** 58:22 258:15 273:1 277:7
**longest** 258:13
**look** 36:9 49:4 50:12 56:22 61:19 62:8 106:7 125:16 191:4,16 193:11 233:5 255:19 256:7 261:9 262:2 276:4
**looked** 239:17 275:18 286:2 295:4
**looking** 27:9 97:16 98:11 100:1 143:12 153:11 217:22 218:4 223:15 233:3 239:8 256:5 272:6 285:4 298:10
**looks** 31:1 43:3 49:19,22 52:9 62:2,8 97:14 136:16 163:19 213:8 243:17 268:5 269:11
**loose** 103:22
**lose** 68:15
**loss** 38:19 39:3 75:8,13 89:15 89:21 104:21 110:4 116:21 132:15 172:20 254:21 255:4 264:22 267:7
**lost** 53:17 68:17 68:17 73:11 187:1 188:10 197:10,11 243:14 268:10 271:12 272:8 272:16 287:1,7 287:9,10
**lot** 258:4 263:21 264:9 299:5,8 300:17 301:3,4 301:22
**loud** 249:14
**Louis** 29:20
**low** 183:1 301:13
**lower** 26:8 49:4 94:8
**lumped** 62:16 63:2
**lunch** 201:12 206:11,22 207:2,4,7 230:7 291:14
**lung** 90:9
**lying** 289:11
**Lynnhaven** 39:7 39:8

**M**

**M** 3:5,6 5:13 46:18
**machine** 306:12
**Magna** 1:21 17:20
**main** 117:17 284:7
**maintain** 52:5
**majority** 34:2
**makeshift** 236:8
**Mall** 39:7,9
**manage** 35:21
**management** 252:13
**manager** 38:20
**managing** 35:14
**maneuvers** 52:15
**manipulations** 52:16
**manner** 16:21
**manual** 70:15 86:17
**March** 26:5 72:11 94:16 101:4 105:3 131:13 142:1 142:13 143:13 143:15 146:5,9 165:9 167:2 189:8
**mark** 102:1,16
**marked** 15:21 46:14,20 66:10 71:8 82:19 89:4 93:19 97:5 99:18 106:17 109:8 112:18 116:2 118:22 121:20 126:3 131:22 143:2 160:12 161:6 170:7 192:11 211:16 225:19 242:7 266:13 266:22
**marking** 242:13
**married** 39:20
**Marshall** 244:12 244:13 249:10
**MARYLAND** 306:2
**mask** 219:2 232:15,22 304:8
**masks** 224:3
**massive** 253:15 254:3,6 255:11 258:16 276:1,6
**massively** 275:12
**master** 159:9 174:10 186:18 197:13,18 199:20 285:11
**mat** 134:14 213:16 223:6,9 238:10,11 293:14
**material** 6:7 7:7 8:7 44:16 66:3 82:12 93:12 188:12,12 189:3 236:17 285:6,14,20 287:19
**materials** 67:1,11 67:16 68:8 69:15 86:10 87:21 142:13 178:22 194:21 194:22
**math** 270:15,19
**matrix** 43:2 46:15 60:20 61:20 80:13 92:11 110:22 124:7 140:18 141:16 146:19
**mats** 211:3 212:7 215:3,5,17 222:2,17,19 223:12,21,22 228:8,8,17

229:1 239:15 291:18 292:16 292:18 293:10 295:8
**matter** 16:11 17:9 37:11
**max** 274:3
**ma'am** 19:12 20:4 21:14 22:2 22:19 23:8 27:16 28:4,7,22 29:11 30:4,12 30:15,18 31:3 32:4,11 33:15 34:22 35:5 36:11,21 37:21 38:3,7 39:15,18 40:18 41:14,17 42:7,11,22 43:5 43:8,10 45:3,8 45:13,17 49:8 49:21 50:8 51:7 52:4,8,12 54:9 55:2,5 56:18 57:22 61:13 63:21 64:18 66:16 67:8,13 68:9,12 69:13 69:17,21 73:4 74:4,7,14 75:4 75:10,15 76:8 76:14 79:2 85:1 85:7,16 87:6,18 89:17 90:17 91:11 93:1,5 94:13,18 95:6,9 95:16 96:2,10 96:13,18 101:19,22 111:19 116:16 117:16 119:18 120:13 121:5 121:11 122:13 122:16,22 123:6,9,16 124:13 128:8 130:5 132:17 136:11,14 137:12,17,21 138:4,15,19,22 139:5,10 140:6 151:11,15 152:8 156:22 157:22 164:5 164:13 165:11 171:4,20 172:10,14,22 174:11 184:2 186:14 191:15 193:9 194:3,9 195:20 196:13 196:22 199:22 201:13 204:11 214:9 218:17 218:20 224:12 237:21 242:12 246:17 249:20 268:12,17 273:2 278:12
**mean** 44:12 178:15 187:3,9 267:13 271:20 274:8 290:12 295:2
**meaning** 36:22 229:1
**means** 49:20
**meant** 151:13
**Media** 17:8
**medical** 27:1 90:13 102:4,18 103:10 133:3 133:10 143:22 248:8 250:17 250:18 251:12 251:15 274:10 277:14
**medication** 252:17
**medications** 22:4 22:7
**member** 33:9
**memo** 25:19,22 26:3 158:10 227:18
**memorandum** 15:6,18 225:17 226:3 227:16 266:17,21 269:5
**mental** 264:18
**mentioned** 27:12 27:17 38:15 41:15 139:4,21 197:21 200:15 202:15,16 254:10 257:20 272:20 283:5 283:11
**mentions** 75:19
**Merit** 2:4
**messed** 251:22 252:1
**messing** 204:18
**met** 23:20 200:19
**Michael** 1:12 2:2 5:3 18:4 19:9 308:2 309:1
**mid** 250:14
**middle** 69:1 107:3 132:7 141:9 145:11
**Midgett** 284:4,13 285:8,17 286:1 287:17 288:5 294:4
**midnight** 250:8
**mid-2018** 250:12
**mid-40s** 222:12
**mind** 45:1
**mine** 26:19 71:13 205:7 223:2 277:5
**minimum** 92:1 123:22 129:3 130:13
**minimum-of-t...** 123:19
**minutes** 240:20 258:14
**missed** 77:21 190:22
**missing** 279:9
**misunderstood** 205:22
**Mitchell** 65:12 139:2
**mixture** 269:22
**mobile** 50:2
**model** 64:7,8,11 81:7,10,13,15 81:16 82:1 93:4 106:4 111:18 117:14,18 118:2 120:10 121:7 122:9 136:9,13
**models** 193:1
**module** 160:5 163:7 175:2,8 176:13 182:19 193:19 195:11 196:20
**modules** 13:15 13:20 160:10 160:19 161:4 161:17 163:21 164:8 186:8,9
**moment** 278:14
**Monday** 1:13 17:4,13
**Montgomery** 31:11 38:16
**months** 40:11,16 42:13 260:12 265:10 269:1
**morning** 18:16 18:17 159:19 200:17 290:13 290:16 291:3,6 291:9 298:1
**mother** 40:22 41:7
**motor** 262:21
263:17
**move** 48:1 98:19 99:2,7 134:21 135:3,5 155:22 240:3 255:17 256:4 261:7 263:21 301:14
**moved** 201:1 239:4 304:6,6
**moves** 253:12 261:8
**moving** 151:20 152:19 247:17 264:3 296:5
**MPO** 236:1,6 237:3,7 303:22
**multiple** 67:6 123:2 136:17 197:7 249:8 286:10 303:9
**multishot** 44:2
**muscles** 251:17 254:2
**muted** 243:19

**N**

**N** 3:1,17 4:1,5 16:1 17:1
**name** 19:8 22:13 39:22 40:2 51:19 122:14 141:2 162:15 162:20 163:4 244:8 267:7 269:9
**names** 19:11 65:6
**nature** 23:1 51:13
**near** 260:9
**nearly** 261:9
**necessary** 307:3
**neck** 133:8
**need** 20:14 21:16 51:11 57:20 181:17 183:3 203:14 206:14

206:19 221:3 233:5 252:7 255:13 259:15 263:1 265:5,7 265:22 284:1 295:16 296:9 296:13,16,22
**needed** 34:9 45:19 102:4,18 125:11 129:17 129:21 133:3 140:3 155:15 195:2 197:14 202:20 204:10 207:13 210:10 221:21 279:15 285:5,21
**needs** 59:12
**negligence** 182:12,13
**neighborhoods** 34:2,11
**neither** 185:11 237:14 306:16
**Nelson** 4:3 188:14,16 189:1 197:6 199:21 201:15 202:2,11 207:5 210:17 211:1 215:15 216:15 218:4,9 221:6 231:4 233:11 233:16,20 280:7,11 283:15 284:1 284:16,20 285:18 286:6 287:3 288:2,5 290:21 291:2 293:11 294:5 295:9 296:8,18 298:6 300:1,13 303:10
**nerve** 103:9 252:16 260:4 261:15
**nerves** 90:10
**neuro** 261:16
**neurologist** 260:6 260:10 261:16
**never** 36:19 67:3 177:13 187:1,5 194:18 197:9 221:15 223:20 255:3 258:6 287:2
**new** 13:19 37:12 50:10 81:16 120:10 121:7 122:9 160:18 161:3,16 190:19 191:10
**newer** 117:14 118:6
**Nguyen** 3:15 5:5 18:10,15 22:13 24:16 25:1,8 26:20 27:3,9,11 47:3,16 48:1,4 48:11,15,16 49:2 53:18 54:1 54:2,4,5 65:18 66:13 68:18 69:3,8,11 71:2 71:21 72:9 73:13 76:6 78:14 82:3,7 83:1,4 88:3,9 88:13,15 89:8 94:2,5,7 96:20 97:10,13 98:16 98:18 99:7 100:7,14,16,21 101:1 106:6 107:1 108:15 109:11 111:20 112:4,8 113:1 115:11 116:7,8 118:8 119:5,12 121:13 122:2 125:14 126:6,9 126:13 131:11 132:4 135:14 135:18,19 142:10 143:6,9 143:11 155:19 156:6,16 160:4 160:16 161:13 168:22 169:6 169:20 170:11 175:10,15,19 177:10 179:1,4 179:11,18 180:5,7,12,14 183:11 192:3 192:15,17 211:19 212:1 225:12 226:1 226:18 236:20 240:16,21 241:1,3,19 242:10,16,19 243:20 244:2 266:4,16 267:4 267:16,19 268:1 272:5 278:13,18 279:20 304:13 304:18
**Nguyen's** 280:18
**nicknames** 19:11 19:15
**nine** 40:11 146:17 152:11 155:7
**noises** 239:16 299:5 301:3
**Nope** 158:4 169:4 262:22 305:4
**Norfolk** 1:3 199:1 268:6
**normally** 77:17 84:3 91:5 124:19 130:9 190:17 209:5 227:9 281:19 282:7,12
**north** 29:7
**Notary** 2:10 306:4
**Note** 180:5
**noted** 17:21 180:12 307:9 310:9
**notes** 23:14 25:17 25:18 70:18 86:18 87:11 129:5 131:4
**notice** 262:4 306:7
**noticed** 43:22 85:12 216:9 276:3
**November** 94:11 115:15 260:20 269:6
**number** 5:12 6:4 7:4,15 8:4 9:4 10:4 11:4 12:4 13:4 14:4 15:4 17:8 20:11 24:11,18 25:3 25:11 26:12 27:4 46:17 48:9 63:19 64:13 66:2 71:5,13 75:6 81:13 82:4 82:11,22 86:8 89:2 93:8,11 94:4,20 97:2 98:18 99:1,14 100:20 101:2 106:11 109:2 112:10 115:18 118:13 119:4 121:17 123:21 125:20 126:10 131:16 133:2 135:22 139:22 140:1 141:8,10 141:12,14 142:14,16 160:9 161:2 169:9 192:7 198:15 211:12 222:13 225:16 242:4 243:7 246:6 266:10 266:20 270:17 270:20 303:16
**numbered** 27:6
**numbers** 26:7 49:5,14 72:4 121:14 243:5
**numerous** 34:14 181:20 186:1 286:12

**O**

**O** 16:1 17:1
**oath** 16:10
**object** 16:5 24:3 24:10 134:6 175:5 176:22 178:15,19 180:4 183:6 271:14
**objection** 21:2 25:6 179:2 180:6,10 183:4 271:19
**objections** 16:21 20:20
**objects** 134:7 152:14
**obligation** 235:11
**observe** 79:19 232:18 235:16 239:13
**observers** 170:22 171:17
**observing** 85:13 281:16
**obstacles** 228:10 228:19
**obtained** 29:21 249:10
**obtaining** 44:17
**obvious** 153:11

**obviously** 20:6 22:20 36:1,17 201:21 214:2 259:14 261:10 265:9
**OC** 43:11 45:10 125:3
**occasion** 130:12
**occur** 60:6 74:9 149:2
**occurred** 22:10 27:15 61:10 104:5 222:11 224:19 246:7 281:2 291:13 303:21
**occurring** 178:17
**occurs** 85:12
**oceanfront** 32:18
**October** 50:3 61:11 63:14 68:2 72:14 260:19
**ocular** 252:15
**offered** 279:13
**Offhand** 84:1
**office** 188:20 268:4 284:8 285:12
**officer** 20:1 31:8 32:13 34:5,6 36:7 37:14 39:6 39:13 85:9 127:2 138:1,5 139:1 188:17 195:8 199:4 217:19 218:6,7 218:14 235:14 237:2,4 270:3
**officers** 35:9,14 35:21,22 153:18 182:6 205:4,19 233:21 234:3,5
**off-site** 244:19
**oh** 28:22 47:8 53:18 64:22 73:12 112:8 125:4 141:13 148:5 152:6 198:5,20 199:7 232:12 240:8 241:15 242:16 243:14,22 245:4 260:11 297:10
**oil** 259:2 277:10
**okay** 19:4,6,7,18 20:1,5,17,18 21:3,4 22:1,20 23:9,11,13,17 24:16 25:22 26:18 29:9 31:21 33:21 37:3,6,22 38:9 38:21 39:2,13 41:18 45:4 46:3 46:13 47:7,8 48:13 49:3,9,18 49:22 50:18 51:1 52:2 53:5 53:18 54:1,20 56:3 57:12 58:20 59:7,11 59:19 61:1,8 62:7,21 63:4,16 64:10,16 65:1 67:14,21 68:3,4 68:5 69:8,12 72:1,10,17 73:14,20,21 74:1 75:16 76:4 76:5,7,9 77:5 77:10,18 78:6 79:7,18 81:1 82:2 83:5,7,11 83:18 84:5 85:2 85:3 86:2,7 89:7,9,12 91:8 91:16 92:9,10 92:15,18 93:6 94:6,19 95:10 96:19 98:16 99:6,7 100:12 100:14,19 101:2,8,14,20 103:6,13 104:10,14 105:14,18 107:2 109:14 109:15 110:20 111:6,14,20 113:2,16 114:2 114:14,19 115:11 116:9 117:7 118:4,8 119:9,13 120:14 121:12 122:1,10,20 124:2,6,21 125:13 126:11 126:14,22 127:8,12,20 128:10,22 129:15 130:6 130:10,17 132:3,6 134:18 135:5 136:3,6 136:12,15,21 137:2 140:15 140:16 141:13 141:15,19,21 142:9 143:17 146:2,11 147:14 149:5,9 152:9 153:3 155:3,9,10,19 157:18 158:7 158:13 159:5 160:2,15 161:12,14 162:2,7,8,14 163:6,9,17 164:3,6 165:3,7 165:12 166:14 169:7 170:12 170:20 171:7 171:10,13,14 171:21 172:15 173:10,13,21 174:5,12 175:11 176:16 178:6,11 180:5 180:16 183:20 184:12,22 185:21 186:6 186:11 187:12 187:18 188:2 188:14 189:13 189:14 190:9 190:13 191:1 191:19,22 192:16 193:6 193:14,15,16 193:21 194:16 195:4,14 196:6 196:14,18,19 197:15 198:1,7 198:18 199:8 200:14 201:11 202:10,19 203:6 204:5,15 205:2,15 206:2 206:3,13,14,16 206:18,21 207:9,22 209:1 209:21 210:11 210:12,20 211:8 212:2 213:2,4,5,13,19 214:10,13,19 214:22 215:15 216:4,16 218:12 219:14 220:5,10,19 221:4,12,16 222:8,15 223:5 223:8,17 224:4 224:8 225:2,7 225:11,12,22 226:2,8 227:8 227:15 228:1 228:12 229:6 230:13,15 231:8 232:10 232:17 233:10 235:9,22 236:18,21 237:18 238:3 238:16 239:13 240:15 241:20 242:11,16,20 243:5,9 244:3,8 245:8,14,19 246:2,6 247:3 247:22 248:19 249:21 255:10 263:7,13,16 268:2 269:17 270:7,12,22 271:10 272:2 273:6 274:18 278:13 280:22 285:13 303:2 303:19 305:5
**old** 29:7 40:19 284:12
**oldest** 50:2
**once** 31:7 32:13 126:17 196:19 258:19 261:9 282:6
**ones** 35:7 62:12 177:19 189:11 250:13 282:18
**one's** 93:2
**one-off** 273:7
**one-way** 148:16
**online** 13:15,20 158:18,20,21 159:2 160:5,10 160:19 161:4 161:17,22 163:12,15,21 164:20,22 165:14 169:12 169:17 173:22 175:2,8 176:13 182:19 183:10 183:19 184:4,9

185:1,4,20 186:7,13 187:19,22 190:6 193:13 193:19 194:12 195:10,18 196:3,20 286:2
**onlooker** 234:7
**open** 215:8 217:4 300:6,8
**opened** 166:21
**opening** 211:4
**operate** 262:21 263:17
**operator** 170:22 171:16
**opinion** 248:20
**opportunity** 22:15 79:11 265:12
**opposed** 126:18 228:18 274:5
**opt** 259:8
**opted** 180:20
**option** 169:11
**orange** 104:15 109:16,17 116:13 132:8 133:17 166:3 172:12
**order** 263:5
**ordering** 305:1
**organ** 90:12 103:9
**organs** 90:9
**original** 5:11 307:12
**outcome** 306:18
**outline** 156:1
**outlined** 120:11 146:18 179:20 181:15,16 232:4
**outside** 215:16 219:12 221:20 223:12,20,22 228:8 236:6 237:2,5 239:15 239:18 250:20 256:10,13 304:8
**overheard** 288:8
**overseeing** 218:11
**overview** 143:22
**owned** 282:19
**oxycodone** 252:17 254:11

**P**

**P** 3:1,1 4:1,1 16:1 17:1
**page** 5:4,12 6:4 7:4 8:4 9:4 10:4 11:4 12:4 13:4 14:4 15:4 49:12 49:14,18 56:17 61:2,11 62:3 63:13 66:17 70:2,3 71:12 72:15 73:14,21 75:5,7,20 76:7 80:14 82:7 83:5 86:7 87:2,19 89:13 92:19 94:9,19 95:10 95:17 96:3,14 101:6,9 105:16 105:20 107:12 108:6 109:13 109:15 110:6 111:1,3,8 114:2 116:11,12 117:1,2 119:13 120:3,14 121:2 123:3 124:7,8 128:12 130:17 131:7 132:5,8 133:16 139:14 139:22 140:19 141:2,9,20 143:17 144:3,3 144:12 145:1,6 145:10 162:5,8 165:7,16 167:14 168:14 168:15 171:6 173:6,11 174:7 183:17 184:13 191:4 192:5,18 193:21 195:4 195:14,21 228:2 230:14 303:18 308:5,7 308:9,11,13,15 308:17,19,21 309:4,6,8,10,12 309:14,16,18 309:20
**pages** 62:9 88:18 88:18,20 100:18 106:9 115:16 120:19 126:7 131:14 136:16 310:5
**paid** 270:21
**pain** 206:17 252:7,13 253:3 253:5,6,7,15,20 253:20,21 254:13,15 255:5,10 259:5 260:1 261:5,12 263:20 264:9 275:2 276:7 299:3,7
**pains** 253:14
**painstakingly** 146:12
**pants** 294:10
**paper** 63:2 91:1
**papers** 169:5
**paperwork** 74:20 195:2 227:11 279:10,15 283:22 285:1,5 285:10,14 286:14,20 287:6
**paragraph** 103:6 103:14 133:22 174:14 181:2 182:1 185:7 228:3 230:16 235:22
**paragraphs** 90:2
**paralegal** 267:21
**parens** 268:14
**parents** 29:4,9 41:15
**parked** 148:15
**part** 35:19 47:14 102:14 130:3 131:8 136:21 158:21 171:3 179:16 180:2 183:13 212:18 233:12 237:16 254:2 262:15 263:18 282:19 297:2 298:2
**participant** 58:13 58:18,22 85:9 195:7
**participants** 58:3 58:9 59:13,22 95:14 233:12 233:21
**participate** 174:21
**participated** 178:12
**participating** 150:21 153:13 176:20 178:3 205:12 236:1
**particular** 70:1 84:5 86:3 95:20 130:12 139:8 158:3,17 178:8 218:14 219:11
**parties** 2:12 16:20 182:13 185:8,14
**parts** 123:5 136:19 158:22 173:15,16
**party** 16:4 306:17
**part-time** 273:3
**pass** 113:22 122:7 144:6 278:15
**passed** 95:13 148:17
**passerby** 217:10
**pass-the-line-d...** 247:1
**patch** 254:5 262:5,7,12
**patrol** 32:18,20 33:16,17 34:5,6 34:13
**pause** 19:4 161:10 278:17
**pay** 158:1,4,16 269:18
**payment** 158:12 270:1
**payments** 278:3 278:10
**PC** 4:4
**PDNT** 244:15
**pellet** 217:7
**penalty** 16:12 310:7
**pending** 21:20
**penetrate** 80:1 116:19 151:14 180:18
**penetrated** 153:7
**penetrates** 115:7
**penetrating** 114:4 209:15
**penetration** 90:3 90:7 102:2,16 102:22 103:3,7 103:8 110:12 110:12 114:15 117:3,3 120:21

153:4 165:21 173:6 181:21 208:16
**Pennsbury** 30:7
**Pennsylvania** 29:5 30:8 41:16
**people** 59:3,8,11 59:19 65:8 201:6 214:3 230:6 248:9,11 262:9 281:21 288:8 289:11 292:21 293:5 296:5 299:16
**people's** 135:2
**percent** 85:22 123:7 138:20 151:1,2 159:1 159:22 188:7 203:7 208:22 251:11 262:16 286:17 289:22 300:18
**percentage** 132:21
**perception** 255:12 256:20 257:6 259:14 259:14 261:13 274:22 275:1
**perfectly** 214:18
**perform** 273:1
**performed** 139:16
**perimeter** 236:7 304:9
**period** 304:9
**periodic** 43:3
**periodically** 67:2 67:16 69:10
**peripheral** 233:2
**perjury** 16:12 310:8
**permanent** 75:8 75:12 89:15,21 104:21 110:3 115:8 116:20 132:15 145:22 150:4 153:8,15 172:20 178:9 254:22
**permanently** 255:3
**person** 16:10 23:21 46:4 48:20 62:22 92:7 127:18 128:2 134:5 140:4 158:22 171:1,17 186:18 194:4 196:21 199:2 202:6 210:19 217:17 218:9 218:10,13 233:4 234:18 244:11 248:14 266:1 279:5 284:3 292:10 292:13
**personal** 23:1,5
**persons** 214:2 230:22 232:2
**pertaining** 165:18
**pertains** 140:22
**pertinent** 179:16 180:2
**Pete** 198:22 214:6 229:18 278:22 279:13 293:3
**PETER** 3:16
**peterbrown@a...** 3:21
**Pgs** 1:17
**Philadelphia** 29:8 39:5
**phone** 23:21,22 24:2 286:3,13 286:17 287:21
**photo** 76:11,15 76:18,20,21 77:1,2,7 87:22 96:15 108:7,12 114:3,8,11,12 114:16,20 115:2 121:3 195:22 214:17 216:10,10
**photographs** 295:4
**photos** 14:16 211:9,13 212:3 212:6,10,15 213:3,7,19 214:1
**physically** 16:15
**Physicians** 268:8
**pick** 128:1 255:22
**picked** 230:5
**pictures** 212:22
**piece** 279:10
**pieces** 300:4 301:5
**pierce** 208:8
**pipe** 217:18
**place** 120:11 125:15 134:11 139:12 167:3 189:5,12 203:22 204:3 211:7 212:4 219:21 228:22 244:17 249:13 295:19 306:7
**placed** 215:3
**places** 265:21
**Plaintiff** 1:5 3:3 301:19
**plane** 258:19
**planned** 252:4
**plans** 284:2,19,21 284:22 285:2
**plastic** 213:9 257:5 282:13 282:22
**plating** 291:22
**play** 228:9
**player** 207:6 209:16 210:9 210:11,13 216:22 217:2 217:17 220:6 223:4,12 232:11,14,18 234:12,21,22 235:2,13 237:2 238:1 239:14 296:1 303:4,8 303:12
**players** 207:7,14 215:8,10,14 220:9 222:21 228:10 237:14 295:13
**player's** 232:8
**playing** 223:13 230:4 232:15 304:4
**please** 18:1 19:1 19:8 21:1,18 156:5 179:8,11 272:3 304:21 307:2,6
**plus** 262:1 276:9
**pneumothorax** 90:9
**pocket** 230:9
**point** 18:22 19:1 21:6,16 58:21 85:3,8 90:10 103:3,9 105:10 108:11 129:1 133:7 202:19 204:8 209:10 216:18 223:9 223:11 224:7 225:5,9 231:9 236:12 237:10 254:20 261:2 272:16 275:3,6 275:7 276:15 297:18 299:3
**pointed** 239:9,20 247:5
**pointing** 267:14
**points** 52:16 90:7
**police** 19:14 28:2 30:17 31:6,7,12 31:22 32:1,8,12 32:16 37:17 38:11 41:20 52:1,17 61:6 139:7 141:17 148:1 157:20 159:7 188:17 199:4,9 242:21 270:3,8 293:22 300:5
**policing** 32:21 33:18,22 34:1,8 34:10 35:17,19
**policy** 125:10
**popped** 102:7
**portion** 44:15,17 54:8 55:10 68:20 69:16,19 69:22 76:10 77:14,15,19 78:16,18 90:20 93:7 102:11 105:7 106:7 111:21 119:22 119:22 122:6 123:11,14 125:16 129:18 130:4,7 137:1 138:17,18 139:15 158:18 158:20 159:2 159:13,14 161:22 163:12 163:15 173:22 183:10 186:13 197:3,5 198:4 200:4,16 201:2 202:9 203:11 203:13 237:13

271:18 281:5 290:11,13 291:4,13 294:9 294:12 298:1
**portions** 45:15 55:11 137:7
**portray** 212:16
**position** 31:4 33:12,13,18,22 34:17 35:2 38:8 137:14 255:22
**positions** 32:15 35:6,10 50:21 137:9
**positive** 31:20 53:13 55:9 63:8 64:9 81:11 114:12 127:11 200:13 210:18 250:9 287:21 300:3
**possibilities** 265:17
**possibility** 108:3 147:18 151:17
**possible** 34:12 92:4 103:19 152:20
**possibly** 51:19 53:12 60:15 65:12 226:20 261:16 275:9 297:21 300:15
**potential** 302:2
**PowerPoint** 68:8 68:11 69:14 75:17 76:16 77:12 144:4 187:12,13 190:15,17 197:2,5 198:3,6 200:8,11
**PowerPoints** 187:7 195:1 285:2
**prac** 77:11
**practicable** 172:4
**practical** 44:9,11 44:12,17 45:4,6 45:14,19 46:6 46:10 54:7,12 57:17 58:3 60:6 69:18 77:13,15 77:17,18 78:16 78:18 90:20 105:7,11 119:22 122:6 123:10,14 130:7 137:1,7 138:18 139:15 154:8,17 155:14 159:14 160:1 201:1 203:11,13 205:13,15,18 281:5,8 288:14 290:11,13 291:4,13 298:2
**practice** 134:2,3
**Precautions** 173:12
**Precinct** 32:22
**prednisone** 254:17,17
**preexisting** 131:1 172:8 174:6,8 174:19
**preferred** 144:8
**preparation** 25:5
**prepare** 23:9 24:2
**prepared** 268:3
**prescribed** 254:12
**present** 2:11 4:11 16:16 20:7 48:20 95:3 159:10 202:2 246:19 278:20 295:21
**presentation** 129:5,19 187:14
**presentations** 76:17
**pressure** 52:16 254:18 258:16 258:21 259:4 277:11 298:11
**presume** 223:5
**pretty** 23:15 49:10 54:17 179:3 189:2 220:17 240:14 256:21
**prevent** 209:15 209:17 230:20
**prevention** 38:19 39:4
**previous** 67:17 103:2 111:18 117:18,20 139:22 179:19 188:4 190:10
**previously** 86:10 87:21 93:4 95:19 109:22 117:7 120:6 132:13 165:18 166:11 203:10
**prick** 210:6
**primarily** 34:6,8
**primary** 234:14
**PRINCE** 306:3
**print** 171:11,22 173:14 181:2 182:2 185:7
**printed** 26:8 122:15 189:22 194:11,21,22
**printed-out** 27:21
**prior** 22:16 25:10 28:15,22 29:2,3 30:2 31:10 32:9 38:17 39:2,3,5 39:7 40:16 61:16,19 70:21 77:5 107:21 136:9 146:13 149:18 154:4,6 155:6,8 159:2 163:12,16 174:1 186:6 188:3 189:17 189:17 193:15 197:11 199:20 201:11,14 202:6 205:17 207:4 222:16 224:8,14 225:8 229:20 230:11 233:17,18 236:2 239:11 292:22
**privilege** 24:5,13
**privileged** 23:20 24:20
**probably** 33:4 62:5 67:12 72:6 85:21 149:11 153:10 163:14 188:6 200:19 239:1 247:10 249:13 260:19 281:6,7
**probe** 75:11 76:12 77:7,8 79:20 88:1 89:18 90:10 96:16 101:10 102:12 103:2,8 103:15,18,19 103:22 104:5,8 104:11,18 108:9 110:1,7 115:3,7 116:18 120:21 121:4,9 132:14,19 133:7,18 134:12,19 145:11,21 148:6 153:7 165:19 166:4 171:1,18 172:17 178:7 196:1 208:17 209:6,15 223:10 224:15 225:9 238:5,21 242:1 246:11 246:14 248:6 248:21
**probes** 79:9,12 80:5 87:15 90:6 95:21 96:6 114:3,15,20 121:8 134:4 137:20 148:20 151:7,12,16 152:13,16,18 153:3,11 204:22 208:3 208:19 230:21 237:6 239:22 247:7,9 248:4 281:17
**problem** 34:10 97:13 102:10 169:7
**problems** 18:21
**proceed** 94:17 107:10 180:20 241:20
**proceeding** 70:21
**produce** 277:8
**product** 6:16 7:15 8:15 9:16 10:19 71:6 89:3 97:22 99:15 100:3 109:5 115:21 144:20
**professional** 2:5 248:9
**prognosis** 254:21 276:17
**program** 42:9 127:17 193:22
**promise** 185:11
**prop** 207:17

213:9,12
**proper** 137:8 302:10
**propounded** 310:7
**props** 215:12 216:3,12
**protection** 170:21 171:12 171:16 203:4 203:14 281:4 282:3,9 294:13 296:10,15 297:1
**protective** 46:2 134:1 154:7,10 154:18 155:15 202:12,21 203:11 204:10 220:3 246:9 288:15 289:2,3 289:6,14,16 290:1,10 291:3 291:8,12 297:14,17,22 304:5,8
**protocols** 46:7 57:21 58:5,9 60:4 201:16 202:3 302:10
**provide** 27:19 102:3,17 133:3
**provided** 74:16 74:19 75:3 128:5 194:17 197:17 202:21 236:17
**provider** 268:5
**providing** 202:12
**proximity** 89:20 104:19 110:2
**Public** 2:10 306:4
**pull** 135:14 217:6
**puncture** 90:11 132:19
**punctures** 165:20
**purpose** 279:6
**pursuant** 306:7
**pushed** 250:21
**put** 31:13 110:20 115:11 140:10 197:12 221:13 221:21 227:18 230:8 237:8,19 251:18 253:3 257:8,11 259:4 265:16 277:16 278:1 292:17 293:10,10 297:14 303:13
**putting** 167:17 237:16
**p.m** 156:9,12,12 156:15 241:6,9 241:9,12,17,18 305:6,9

**Q**

**quarter** 43:9
**question** 21:1,10 21:12,20,21 26:17 54:3,6 60:12 69:2,6 73:1 84:18 125:6 152:3 155:2 167:7 175:9,16,21 176:2 178:20 179:3,6,12,19 182:17 184:17 189:15 205:9 231:21 235:5 235:12 260:13 272:1
**questioning** 180:11 269:4
**questions** 21:8 22:16,21,22 25:11 123:3 136:17 266:2 278:15 279:21 280:1,3,12,19
301:7 304:12 304:16 310:7
**quick** 76:2
**quickly** 107:19 220:18 239:4 255:18,21 256:4
**quite** 30:1 57:10 60:21 65:16 67:4 125:1 149:4 208:21 229:14 246:5 252:8,11 261:4 279:11 289:19 290:8 299:20
**quote** 304:6

**R**

**R** 3:1 4:1 17:1 306:1 308:1,1
**ran** 219:8 222:11
**random** 138:2
**range** 47:4 134:1
**rank** 199:14
**rate** 277:20
**read** 145:14 164:19 166:8 166:21 167:19 169:12 174:15 174:16 176:9 176:12,17 179:12,15 180:1 182:18 183:19 184:4 184:10 185:4 236:14 276:9 304:20 307:2 310:4
**reading** 152:1 185:1 236:13
**ready** 80:21,22
**real** 76:1
**realize** 140:19 217:13
**really** 149:4 205:7 214:12
214:18 219:3 234:9 246:4 249:7 250:10 252:10,14 256:14 257:15 257:21 261:14 263:20 265:4 275:12 277:12 278:1 289:19 290:8 299:20 300:2 301:7
**realm** 157:14 265:17
**Real-Time** 2:5,8
**reason** 42:17 75:1 86:2,5 91:8 95:7 96:11 105:2 146:6,10 157:16 164:3 165:1,5 174:4 175:12 176:6 176:10,14 186:2 195:12 215:5 274:19 307:4 308:5,7,9 308:11,13,15 308:17,19,21 309:4,6,8,10,12 309:14,16,18 309:20
**reasonable** 58:7
**reasoning** 259:3
**recall** 19:22 22:8 39:11 53:11 55:7 56:16,19 61:17 64:20 65:1,5,9 68:6 72:18,20 76:18 76:20,21 77:1,5 83:21 84:11,14 85:18 87:4 105:12 114:8 122:3 123:21 126:16,21 128:16,20 129:12,14
130:11 147:11 148:5,7 149:14 149:16 157:11 159:22 161:20 164:21 173:21 174:3 181:12 183:16 184:15 184:18,20 186:4,5,14,17 186:19,21 194:11,14,19 199:1 200:4,6 200:10,11,19 200:21 201:19 202:1,4,5,10,14 204:17,19 222:18 225:7 229:8,10 233:15 239:7 243:3 245:19 249:8 279:5,19 281:7 285:19 288:20 289:10 289:12 290:9 290:17,20 291:1,6,11 292:14 293:9 294:7 296:4,18 297:2 300:2,20 301:1
**recalled** 130:13
**recalling** 67:19
**receipt** 307:13
**receive** 45:18 47:16 144:5 158:1 187:10 188:3 190:10 270:1 273:10
**received** 30:11 42:21 43:3 45:6 45:15 51:3 52:10 53:4 55:4 56:20 62:17 63:11 65:6 110:17 118:5 123:7 138:20

142:5 146:7,13 149:18 188:7 189:6,16 190:14 270:8
**receiving** 161:20 186:17,19 269:17 278:4,7 278:11 290:9
**recert** 82:1 91:21 128:2,3 190:16 190:20
**recertification** 50:20 61:15 62:14 63:18 64:2 81:3,7,14 81:18 83:22 91:13,20 92:20 93:3 105:21 106:3 111:8,15 124:10,16 126:19 127:3 127:14,16 128:14,19 129:4,9 143:19 280:20
**recertifications** 67:7 124:3 281:2,11 282:11
**recertified** 125:11
**recerts** 91:6
**recess** 78:9 156:11 241:8
**recognize** 32:2
**recognized** 224:5
**recoil** 133:18 166:4
**recollection** 63:5 64:2,4 118:5 136:8 144:10 154:16 213:20 288:12
**recommendation** 91:17,18
**recommendati...** 152:1
**recommended** 46:11 67:10 128:15,18
**reconvened** 207:1
**record** 17:7,22 25:21 27:18,20 27:21 47:22 48:18 56:22 78:3,7,13 156:8 156:15 179:16 180:2 241:6,12 241:18 271:20 305:2,5 306:15
**recorded** 306:11
**records** 27:2 30:22 117:9
**recoup** 220:1
**recruit** 31:6 32:13
**redirect** 301:11
**reduce** 57:21
**reenter** 275:7
**refer** 37:18 49:9 61:2 80:13 89:12 92:12 131:7 164:14 184:4 228:1 230:13 242:1 243:6 247:13 247:15 284:20 284:21
**reference** 43:22 60:21
**referenced** 63:14
**referred** 55:18 101:15 214:7
**referring** 26:6 28:2 38:1 54:20 139:11 152:6 183:14 189:20 203:17 207:19 213:2 219:15 266:6 290:14
**reflected** 182:18 246:11,14
**reflecting** 246:16
**reflects** 63:19 67:22
**refresh** 136:8
**regard** 90:21 107:13 110:12 117:3 120:6 121:9 123:10 125:9 134:11 146:13 184:22 249:9,21 252:13 253:5 259:8 261:3 264:22 267:5 291:12 295:11
**regarding** 182:15 195:1
**regardless** 60:4
**regards** 180:16 257:20
**register** 158:7,10
**Registered** 2:4,5
**regular** 34:5,6 56:4 262:7 269:18
**reinstall** 138:6
**related** 185:14
**relates** 23:6
**relating** 133:18 136:7 166:4
**relax** 220:16 221:2
**release** 14:7 168:2,11 169:10,16,21 170:5,13 174:13 182:2,5 182:15 184:6 189:21 194:5,6 194:12,20 195:1
**released** 66:20 67:22 107:4 113:4 119:16 182:13 185:8 185:14
**releases** 67:10 195:2
**release-and-ho...** 185:2
**reload** 92:8 137:13 138:11 204:20
**remain** 222:17
**remained** 222:19
**remedy** 259:11
**remember** 73:2 77:2 91:21 112:7 149:7 163:14 176:8 245:10 279:12 279:12 283:9 286:22 292:13 293:1 296:13 297:11 298:10 298:12,16,18 298:22 300:4,5 300:11,12 301:5
**remembered** 152:1
**remote** 1:11,19 2:1,8 16:5 17:3 17:16
**remotely** 16:17 48:19 306:7,9 306:11 310:6
**removal** 90:13 252:22
**remove** 79:14 138:5 221:18 252:7 259:9
**removed** 236:22 237:7
**repeat** 73:15 102:6 181:17 263:11 272:3
**rephrase** 21:9 181:13 208:12 224:17
**replaced** 236:4
**report** 15:10 51:14 227:12 242:5,21 245:8 245:12 249:16 286:5
**reported** 1:18 243:8 244:5,11 245:15
**reporter** 1:19,20 2:4,5,6,6,7,7,9 2:9 17:19 18:1 20:7,15 306:22
**reporting** 16:17 16:22
**report-writing** 51:13
**represent** 280:11
**request** 17:16 21:19
**require** 42:4 90:12 91:12 103:10 133:10
**required** 63:1 170:21 171:16 203:12 219:7 222:4 230:19 230:22 232:3
**requirement** 123:20 137:22 147:10 231:10
**requirements** 123:13 128:13 129:3,9,13 137:1,7 139:17 139:21 143:20 144:4,10 194:1
**requires** 263:21 265:15
**research** 50:8,10
**reside** 40:21
**residence** 28:13
**residential** 34:12
**residing** 40:6,9
**respective** 2:12
**respond** 34:9 218:1

**responded** 300:20
**responding** 33:10 37:10
**responds** 34:7
**response** 217:7 217:20 218:1 233:6 235:1 280:18
**responsibilities** 158:6
**rest** 48:19 166:8 220:1 258:20 293:4 295:14
**restate** 179:12
**result** 75:12 89:20 90:14 104:20 110:3 116:20 132:14 172:19 178:9 255:8
**retina** 250:20 251:20,22
**retire** 274:6,8
**Retirees** 269:8
**retirement** 269:2 269:19
**retiring** 274:5,9
**return** 194:5 255:3 307:11
**returned** 194:6
**returning** 255:1
**review** 25:18 68:7 70:14,21 86:16 105:15 108:4 113:21 120:16 129:4,5 129:21 144:4,5 144:19 164:16 169:16 197:2,4
**reviewed** 23:14 25:16 27:13 28:6 69:14 73:7 86:10 95:18 103:1 146:8 152:7 165:17 169:11 173:3 177:19 185:19 187:19 189:7 191:18 193:19 194:12 195:10 195:18 196:10
**reviewing** 30:22 43:2 44:16 72:18 173:21 200:8 227:15
**reviews** 236:16
**Richard** 4:3 199:21 233:11 280:7
**Richmond** 3:8
**ricochet** 133:18 151:21 152:14 152:16,19 153:1 166:5
**ricocheted** 134:13,15
**ricocheting** 151:17 152:4
**ride** 258:6
**rides** 258:12
**rifle** 57:6
**rifles** 56:15
**right** 20:3 25:20 26:8 33:6 47:6 47:13 49:13 50:15 57:4 74:22 77:3 81:15 83:2,8 87:7 93:4 94:3 100:15 101:21 118:2 119:9 128:9 137:22 138:18 139:4,9 142:5 163:6,11 169:9 175:17 176:11 177:13 177:14 190:3 194:13 197:3 201:2 202:16 203:20,20 204:7,9 208:5 208:10,18 209:7,16 220:13,16 224:1 235:5,21 236:19 237:7 240:11 241:1 241:16 246:12 247:7,21 248:16 256:6 256:19 261:8 264:19 272:6 272:10,15 277:7 278:4 280:14 284:16 285:12 291:5 292:7 295:5 301:6 303:15 304:18
**rights** 182:14
**right-hand** 49:5 94:9 171:22 257:15
**rise** 227:3
**risk** 57:14,17,21 86:11 87:9,14 96:6 121:9 144:14 149:21 150:14,22 151:2 153:14 170:13 177:22 178:2,3,7,11,16 180:16 302:1,7 302:13,17
**risks** 14:7 168:1 168:11 169:10 169:21 170:4 174:15,16,18 174:20 176:18 176:20 177:1,8 179:20 180:17 180:22 181:3,7 181:7,15,19 184:6
**Risk-Free** 70:5
**RMR** 1:18 306:21
**Road** 4:6
**role** 35:8 36:15 207:6,6,14 209:15 210:8 210:11,13 215:8,10,13 216:21 217:2 217:17 220:6,9 222:21 223:4 223:11,13 228:10 230:4 232:8,11,14,15 232:18 234:12 234:15,21,22 235:2,7,13 237:1,14 238:1 239:14 295:13 296:1 303:4,8 303:11 304:4
**roles** 230:4 246:10
**roller** 258:6
**room** 16:16 246:1 262:10 290:2
**rooms** 37:12 230:12
**round** 277:9
**RPR** 1:18 306:21
**RSA** 1:19 306:21
**rubbed** 282:5
**rubber** 207:15 212:20 213:11 213:11
**rules** 18:20 20:10 83:20 94:21 107:13 113:11 120:7,11 195:6
**run** 256:9,13,14
**running** 188:19 197:6 203:3 222:8 283:15

**S**

**S** 3:1 4:1 16:1,1 17:1
**safe** 138:2 232:9 237:22 304:7
**safely** 151:4 262:21 263:17
**safety** 8:16 9:16 10:19 12:14 45:16,18,21 46:7,11 57:20 58:5 60:4,4,5 83:19,22 84:4 85:9 94:21 98:1 99:15 100:3 107:13 109:5 113:11 115:22 120:6,11 131:19 150:7,8 150:12,13,19 150:20 153:18 170:16 173:11 195:6,8 201:16 202:2 205:3,18 215:13,21 216:14 218:6,7 218:10,13,19 219:3,7,12 220:7,8,11,12 220:14 221:1,8 221:18,20,22 222:4,4,7 230:20 231:1 231:10,15 232:3,5,8,8,16 232:16,19 233:12,21 234:3,4,15,17 235:14 236:2,5 237:8,13,14,15 237:15 238:1 239:19 294:16 295:1,3,12 296:16 302:10 302:16 303:8 303:13
**Saint** 29:20
**salary** 268:14 270:9,14 271:1

271:3,6
**sat** 19:18 20:2 236:7
**saw** 19:17 85:19 87:20 109:22 173:2 177:13 187:22 190:6 205:5 224:10 224:22 235:6 239:5,9,9,10,19 240:12 247:5,9 247:15 248:3,4 289:11
**saying** 20:16 24:17 73:5 125:4 144:13 154:12 178:16 179:9 190:1 201:20 213:14 231:9 234:12 237:18 259:7 260:17 269:6 297:2,10 298:19 300:12 301:1
**says** 26:5 49:6 50:10 52:10 61:14 63:17,22 66:19 70:4,18 74:2,6,8 81:2 83:9 86:15 87:11 90:3,6 92:20 96:4 97:18 101:9 102:1,11 104:15 105:20 109:17 111:8 113:2 117:12 119:14 128:14 131:4,7 133:2 141:5 144:18 154:13 162:10 163:7 164:17 166:20 169:15 171:15 172:12 172:17 183:18 184:6 185:11 191:6,9 194:4 228:6 235:22 243:7 244:11 246:6,14 247:8 249:2 268:13 268:14 271:11 272:8 287:11 303:21
**sbucci@breitc...** 3:10
**scar** 102:2,16
**scarring** 90:14 132:19 165:20
**scenario** 139:22 140:1 147:9,12 210:21 213:10 215:7 217:5,6,9 217:11,16 218:2,5 219:2 219:20,21 221:3 222:14 222:16,17 223:3,10 224:7 224:14,16 228:11,18,21 229:2 230:11 231:6 232:7 234:6,9,10,11 235:13 236:9 237:1 238:4,7 239:2,6,11 246:8 302:21 304:4,5,8
**scenarios** 105:10 140:10,14 154:9,13 206:12 211:6 215:10,16 216:18,20 217:21 218:7 218:14 219:1,8 220:2,17,17 222:9,10,16,18 222:21 223:16 223:20,21 224:18,19 228:4,6 233:1 239:4 302:21 303:7,9
**scenario-based** 147:4 206:6 207:3 209:12 218:21
**scene** 36:8 245:11,18 247:15
**schedule** 127:22 260:18
**school** 30:5,6 31:15 50:13,16 51:5,9 52:11 54:22 57:4 284:13,15
**schools** 37:13
**Scott** 3:5 26:20 27:10 47:3 99:1 108:19 168:18 179:2 180:6 192:3 211:19 267:17,19 279:15 304:20
**Scottsdale** 3:18
**Scott's** 267:17 304:15
**scratch** 196:16
**screen** 102:7 276:4
**screens** 275:21
**screenshot** 164:15 165:4
**screenshots** 161:19
**screw** 257:8
**screwdriver** 257:8
**scurran@vbgo...** 162:11
**seat** 148:17
**seated** 297:13
**Sebo** 1:18 2:4 17:19 306:4,21
**sec** 75:22
**second** 27:8 48:9 80:19 83:5 88:21 93:22 94:19 97:8,11 97:12 106:20 120:3 133:6 138:12 140:3 159:19,20 161:9 165:19 167:9 174:7,14 200:14 206:8 216:22 217:9 246:4 247:19 249:6 265:22 288:13 303:18
**seconds** 137:14 138:13 239:1 253:16
**secretary** 158:11
**section** 156:1
**secure** 148:10
**security** 39:6,13
**securitywise** 273:3,4
**see** 20:13 47:8 49:7 51:6 55:1 56:16 61:10,12 62:10 63:15 70:16,22 71:1 72:10 74:3,13 75:9,14 76:13 79:12 80:16 81:4 83:9,12 84:8 85:6,15 86:13,22 87:17 89:14,16,22 90:4,16 92:22 94:9,12,20 95:5 95:15,18 96:1,9 96:17 101:12 102:5,14 103:4 103:11,13,16 104:2,15,22 105:22 107:5 107:12,14 109:19 110:6,9 110:14 111:5 111:12 113:5 113:10,13,18 114:6,21 115:4 116:15 119:17 120:5,20 122:12 123:2 124:12 125:4 131:5,9 132:10 132:16,18 133:4,11,17,19 134:8,19 136:17 137:4 137:16 140:5 142:2 144:1,13 144:16 145:8 145:13 153:19 156:7 162:6,16 164:12 165:10 165:22 166:6,7 166:18 167:5 167:11,15 168:3,8,13 169:13,18 170:18 171:2 171:13,15,19 172:2,9,16,21 173:19 181:4 181:10 182:3 184:1 185:9,10 185:16 191:8 191:14,17,20 192:20 193:8 194:2,8 196:12 205:20 214:12 214:21 223:11 223:20 225:6 229:16 232:21 233:8 234:11 234:15,19 235:3,8,20 238:22 239:22 243:12 244:6 247:4,7,16,20 247:22 248:11

248:11 251:4 257:3,9,16 260:9 262:9 268:11,16 278:14 281:21 283:22 284:18 285:6,13 286:11 289:5 299:6 300:7
**seeing** 76:18,20 77:3 114:8 189:21 194:11 194:14 229:11 239:7,8 298:10
**seen** 96:15 115:2 132:13 168:11 224:20 226:5 243:1 267:8
**select** 138:10
**self-defense** 37:14
**send** 260:6
**sending** 279:11
**sends** 67:4
**sense** 45:2 81:19 81:20
**sensitive** 74:6,9 95:20 130:21 131:8 133:7 145:3,12,17 172:1,6 195:16
**sent** 97:15,18 99:2 184:19 197:17 279:15 286:4 287:20
**Sentara** 268:5,5
**sentence** 133:6
**separate** 38:7 44:22 283:18
**separately** 40:7
**September** 99:11 100:10 101:3 189:8
**sergeant** 36:20 37:2 199:15,17 226:12,19
227:1 244:14 245:1,2,6
**sergeants** 36:15
**serious** 87:16 89:20 90:15 95:22 96:8 104:1,20 110:3 115:8 116:20 132:14 133:9 144:14 145:22 150:3 172:19 178:9
**service** 34:7,9
**Services** 1:21 17:20
**serving** 35:7
**set** 77:10 146:2 204:6 207:8 210:21 211:2 229:17 252:16 260:11 293:12 293:18
**setting** 37:7,8 207:11 229:12 231:7 292:1,16
**seven** 94:5 260:12
**seventh** 81:2
**sewn** 250:21
**shaking** 20:13
**sharp** 79:20 80:6 151:12
**Shawn** 1:4,12 2:2 5:3,13 17:9,10 18:4 19:9 46:18 122:15 162:15 303:22 308:2 309:1
**sheet** 307:4,7,9 307:12 310:10
**shield** 294:14
**shipped** 197:9
**shirt** 23:15 214:5 214:14
**shit** 298:19
**shock** 299:6
**shoot** 79:16 92:8 92:8 204:20,20 204:21 205:1 281:21
**shooting** 55:11 91:1 201:9 203:19 244:22 253:14,15,20 253:21
**short** 37:19
**shorthand** 2:6 306:12
**shot** 44:1 80:9 249:2,3 255:13 255:16
**shotgun** 56:2
**shoulder** 257:16
**show** 93:7 160:2 188:15 191:12 192:1 196:14 211:8 287:7 303:6
**showed** 187:5 188:10 231:13 287:2 303:6
**shown** 77:3,7 96:12 108:12 129:19 162:15 164:10 198:3,6 295:4
**shows** 76:11 96:15 108:7 114:19 115:2 121:3 123:1 126:14 136:6 139:15 161:15 161:18 162:3 163:7,18 165:8 167:13 191:5 196:9 243:10 302:19 303:3
**shut** 254:8 300:8
**siblings** 41:9
**sic** 40:20
**sick** 258:10
**side** 204:6 256:11 257:15,17 270:2 272:21 273:10 284:15
**sign** 132:8 157:1 158:12,14 194:5 298:19 304:20 307:6
**SIGNATURE** 310:13
**signed** 194:6 195:3
**significant** 74:8 103:21
**signing** 307:8
**Sim** 134:13 207:20 212:12 293:20 294:6,8
**similar** 20:6 173:2
**simple** 217:10
**simply** 24:18 235:12
**simulation** 233:7
**single** 39:19,21 44:1 60:11 190:18 257:4
**single-shot** 64:17 117:20
**sir** 280:15 283:10 289:4 291:10 291:15 294:2 294:14 296:5 299:20 300:2 301:3
**sister** 41:10
**sit** 63:4 74:22 176:11 194:10 238:22
**site** 138:12
**sitting** 236:21 237:3 238:7,10 238:11 295:7,8 297:13
**situation** 87:9,13 96:5 104:8 154:20 217:15 265:12
**situations** 36:5,6
**six** 36:12 49:1 100:17 260:12 265:10 270:17 273:12
**sixth** 191:9
**size** 58:19
**skin** 80:1,4 102:2 102:16 151:14 230:21
**sledgehammer** 240:13
**slide** 70:3 75:2,17 75:18 76:9,11 83:19 84:5 86:3 86:9 87:7,20 94:21 95:18 107:13 113:10 120:5,12,20 128:12 130:19 144:13 195:5 195:10,17 196:2
**slides** 6:8 7:8 8:8 9:7 10:7 11:7 12:6 14:13 66:5 77:12 82:13 93:13 106:13 112:12 118:15 125:21 191:3,7 191:12,18 192:1,2,10 193:18,18 196:10,15,17
**Slovinsky** 198:22 199:3 214:6 229:18 278:22 293:3
**small** 59:4,8 90:7 103:2 145:10 171:5 222:1
**smaller** 64:14 166:9
**sniper** 43:17 56:15 57:3,6

**social** 265:13,14
**solve** 78:3,5 274:22
**somebody** 197:22 245:17 283:12 288:16 300:5
**someplace** 263:22
**somewhat** 20:5
**soon** 99:5
**sorry** 31:16,18,19 33:4 41:2,5 69:7 73:16 100:12 102:6 112:6 150:15 151:11 157:4 168:20 169:4 175:22 198:20 204:21 205:22 208:11 214:16 224:11 226:15 232:12 235:9 236:13 241:15 242:15 244:3 245:4 250:21 263:2,10 267:19 270:13 274:16 292:4,6 295:15 297:6,7
**sorted** 275:5
**sorts** 177:2
**sought** 264:16
**sound** 64:1 163:11,22
**source** 271:21 289:18
**so-called** 293:19
**space** 307:4
**spaces** 293:17
**Spark** 138:2
**speak** 22:16 24:1 41:13 288:3
**speaking** 73:6
**special** 33:2 34:20
**specialized** 30:9 55:17 56:12 57:8
**specific** 73:2,3 125:6 127:1 152:7 179:20 181:15 194:19 205:10 213:3 235:6 296:14 297:11
**specifically** 60:17 61:4 62:18 145:2 177:18 182:14 194:11 291:2 295:11 296:9
**specified** 58:6
**speculate** 65:7
**spell** 255:21
**spells** 255:12
**spent** 29:6 159:20 162:5 283:6
**spike** 34:3
**spin** 258:3
**split** 41:8
**spoke** 23:11,17 25:4
**spoken** 24:19 25:12 278:19 279:18
**sports** 39:8
**spot** 222:1
**spotters** 170:22 171:17
**spray** 43:11 45:11
**spreadsheet** 162:3
**square** 211:4
**squared** 275:10 275:14
**stack** 47:13
**staff** 284:13
**stamp** 168:6 278:1
**stamped** 5:14 6:9 6:17 7:9,19 8:9 8:17 9:8,17 10:8,20 11:9 12:7,15 13:8,15 13:21 14:8,14 14:16 15:7,11 15:14,19 46:19 66:6 71:7 82:14 93:14 97:4 99:16 106:14 109:6 112:13 116:1 118:17 125:22 131:20 142:19 160:10 161:5 170:5 192:11 211:13 225:18 242:6 266:11,22
**stand** 255:21 256:1 276:8
**standard** 18:20 91:5 92:7 124:19 227:14
**standing** 212:7 295:7
**stands** 290:3
**staple** 72:5
**stapler** 47:9
**stare** 264:2 275:20 276:6
**start** 47:10 69:6 71:20 83:15 111:14 196:16 217:1 228:7 256:19 290:15 292:1
**started** 31:1,5 32:12 40:15 41:21 42:1 207:3,10 216:17 231:6 233:13 240:19 247:2
**starting** 49:22 54:15 126:10 230:11 233:18
**starts** 71:17 191:7 196:8 228:4 230:16 264:12
**state** 19:8 153:21 179:1 183:3 306:2 307:3
**stated** 174:17 197:6 233:11 271:19
**statement** 70:6 89:15 175:1,6 176:4,5,7,9 185:2,18 228:14 231:3 233:10 249:9 268:2,18
**statements** 237:10
**states** 1:1 17:11 32:4 70:13 75:8 75:11 84:6 85:9 87:8 89:18 102:15 103:8 103:18 104:17 106:3 107:3 109:22 116:13 124:10 128:22 130:20 132:9 133:6,22 166:3 170:14,21 171:12 172:1,4 174:12,14 181:6 182:1,5 192:19 228:3 246:8 268:10
**static** 79:5,8,16 90:22 147:21 151:18,19 152:4,16,22 200:4 201:9,15 202:8 203:20 204:16 205:8 206:10 281:17 288:19 289:13 298:1
**stating** 132:13
**station** 39:12
**statutory** 182:14
**stay** 215:19 235:15 238:13 305:2
**stemmed** 256:22
**stems** 257:4
**stenographer** 16:6,15 18:8 24:8 53:16,21 68:16,22 69:5 78:2 179:15 180:1 182:22 226:14 241:13 243:17 301:12 301:16
**stenographic** 17:22
**Stephanie** 40:1
**stepped** 223:2 236:6 237:2,5
**stepping** 239:14
**Steve** 65:13,16
**stick** 134:4 256:13
**stills** 254:6
**STIPULATED** 16:3,9,14,19
**stop** 85:4,5,14,20 95:4 107:17 113:12 144:18 153:19,22 195:8 205:4,19 208:14,15 224:9,20 225:1 225:4,8 234:7 234:13 235:15
**stopped** 33:10
**store** 39:4,8
**stores** 38:20
**straight** 223:15 249:2,3,3
**straightforward** 179:3
**strain** 277:15

**street** 3:17 35:12 42:2,6 148:16 199:16 256:6
**strict** 182:10
**strike** 98:19 134:5,7 181:13
**strikes** 89:19
**struck** 104:5 134:14,19 224:15 237:6 238:4,21 242:1
**structure** 133:9
**stuck** 250:20 299:2 300:8
**student** 85:4,13 187:9 217:2,8 222:13 223:11 225:8 229:8 233:4 234:22 239:14
**students** 70:20 86:21 113:20 169:16 198:7 198:13 202:13 202:22 205:3 205:18 218:8 219:4 229:12 233:9 249:14 278:20 281:12 281:15 291:16
**student's** 113:12 217:22
**study** 144:6
**stuff** 26:15 43:6 52:1 177:3 244:21 252:18 258:1 261:13 273:5 275:14 277:22 284:2 285:5,18 290:4 299:8
**stun** 148:6,8,19
**style** 228:8
**subheading** 74:6 171:8
**subject** 37:11 80:2,3 103:20 222:11 288:4 291:2 307:8
**Submit** 167:4
**Subscribed** 310:15
**subsequent** 43:1
**subsequently** 47:11 245:21
**subside** 260:2 261:11
**substance** 98:11 310:9
**successfully** 123:13 138:18
**sucks** 254:4,6
**sue** 185:8,12
**suggesting** 152:18 235:7
**suggests** 124:18
**suit** 134:13 207:19,20 208:1 212:12 230:20 232:5 236:2,5 246:9 246:11,15,16 249:12 293:20 294:1,6,8
**Suite** 3:7 4:6
**suits** 207:14 208:13 209:14 214:3 291:18 295:17
**Summary** 15:14 266:11 267:6
**summation** 98:21
**summer** 32:19
**summonses** 34:8
**sunglasses** 254:6 262:12 282:13 282:18 283:2,3
**superseded** 299:7
**supervise** 35:8
**supervising** 35:11,12,14
**supervision** 306:13
**supervisory** 35:8
**supplied** 46:3 282:19 289:20
**supposed** 188:9 197:17 208:7,8 208:14,16 209:18 210:22 215:18 217:10 217:12 222:7 229:21 276:20
**sure** 20:1,12 30:1 32:17 48:2 49:11 57:10 65:17 67:4,12 67:12 73:2,8 78:5 84:1,2 97:10 102:10 114:10,12 124:1 125:1 133:22 134:3 137:19 140:21 149:4 150:17 155:1,13 165:1 176:3 177:20 208:13,18,21 224:13 229:14 229:19 230:5 234:21 235:17 242:17 245:17 246:5 252:8,11 259:1 261:4 272:4 279:11 289:19 290:8 294:22 297:8 297:18 299:20
**surface** 251:3
**surgeries** 250:2,6 252:3,4 254:1 273:19
**surgery** 249:7 251:6 252:22 259:8,22 261:3 268:7 273:20 273:21
**surgical** 90:13
**surveillance** 27:14
**suspicious** 140:4
**sustained** 213:16
**SWAT** 33:6,8,11 35:20 36:4,14 43:19,21 44:4 55:19 56:7,9,9 62:6 63:1 65:9 149:6,8 226:12 227:1
**swear** 16:7 18:2
**switch** 122:8 265:20
**switched** 246:9
**switching** 121:7
**sworn** 18:5,9 306:8 310:15
**swung** 217:19
**symbol** 116:13
**symptoms** 259:10
**system** 252:15
**Systems** 2:8

**T**

**T** 16:1,1 306:1,1 308:1
**tactic** 53:3
**tactical** 36:4,6 143:21 196:10 244:21,21
**tactics** 33:2,7,12 34:21 35:18,20 37:7,12 43:4,7 50:2,16 52:11 52:18,19 54:17 57:13 283:18
**tactics/less** 37:5 38:5
**take** 21:18,21 62:7 70:1 122:6 148:5 156:2 198:20 204:21 206:14,19 211:6 220:15 220:20 221:2,7 221:9,13 236:4 236:15 240:18 240:19 254:14 254:16 261:9 261:22 262:8 262:10,14 263:4,6 265:20 277:21,21 282:5 289:5,7 289:12 295:16 295:19 296:11 296:12,15,19 303:4,6,12
**taken** 2:2 17:15 78:9 122:9 156:11 211:10 211:10 212:22 223:18 241:8 251:10 276:2 297:19 306:6
**takes** 236:14 260:13
**talk** 23:22 24:12 104:6 250:15 262:3 279:14 285:7,22
**talked** 177:12 186:10 194:17 278:22 279:5 298:8 301:22
**talking** 35:11 91:1 95:19 101:20 108:7 150:1 177:6 229:14 241:22
**talks** 86:11 87:3 95:1,12 103:7 103:15 128:13 130:19 143:18 144:3 145:1,6 145:11 177:17
**tall** 214:6
**tan** 214:5
**target** 79:6,8,15 79:17 87:3,4

91:2,4 95:19 103:20 133:22 134:7 138:11 138:12 140:11 144:8 151:18 151:20 152:2,2 152:4,5,17,19 204:16,20,20 204:21 205:1 206:4,22 209:11 281:18 290:3
**targeting** 74:11 130:19,20 143:20 145:2 145:11,12 172:5 195:15
**targets** 134:3 147:20,22 152:22 201:10 201:15 203:20 281:22
**TASER** 6:6 7:6 7:18 8:6,15 9:6 37:17 38:1,9 39:16 44:14 60:17 61:5,5,10 61:14,18 62:11 62:14 63:6,10 63:13 64:2,20 65:6 66:2,19,22 67:3,4,6,10 70:4,10,14,19 72:19 73:6 74:9 75:11 76:20 77:8,20 78:17 81:2,3 82:11 83:22 84:4,12 84:21 85:18 86:11,16,20 87:5 89:18 90:6 91:13,18 92:20 93:11 95:12 97:2 99:14 100:3 104:18 105:21 106:11 109:22 111:8 111:10 113:3 114:9 117:15 119:15 120:16 122:4,11 124:10 125:2,7 127:3 128:18 137:13 138:9 141:22 144:14 144:20 145:17 146:13 148:2 149:18 150:1,9 153:14 155:16 157:8,13,19 159:3 162:18 164:17 166:21 172:17 174:21 177:7,13 178:6 180:17,18 182:6 185:14 186:8,22 187:2 187:4 188:20 194:7 197:17 197:20 203:9 205:17 207:14 207:19 208:15 229:20 237:4 239:20 246:10 246:14 247:5 247:17 280:20 283:16,18,20 284:19 285:11 285:11 288:1 294:2 302:1,6 303:22
**TASERs** 98:14 98:20 128:21
**TASER's** 129:3 174:17
**TASER/Axon** 197:9
**tasked** 34:11 36:15 51:20,22
**taught** 145:16,20 230:3
**taxes** 270:19 271:4,7
**TAYLORWA...** 4:4
**teach** 51:10,12 52:14 53:3,8 54:14,16 55:13 56:3,12 57:4
**teaching** 56:9,14 57:6 128:21
**team** 33:2,7,9 36:4,13,14 56:7 56:9,10 62:6 63:1 65:9 149:7 149:8 226:12 227:1
**technically** 272:12
**teens** 198:11
**tell** 22:5 23:20 25:3 26:11 33:21 37:4 41:6 41:21 49:20 61:9 62:13,19 64:8 66:21 67:21 72:3 76:15 81:10 84:15 94:14 107:7 129:11 148:12 163:3 201:4,17 202:16 203:2 204:15 206:3 219:3 221:7 224:2 273:16 277:14 279:16 282:15 286:8 286:21 287:3 290:4 293:7 295:9 296:6,21 299:4 306:9
**telling** 25:2 202:11 227:5 296:18 298:11 300:6
**tells** 20:22
**Ten** 156:6
**tend** 256:10,15
**tendency** 230:6
**term** 209:4 215:21 251:12 281:16 294:18
**terminated** 269:12
**terminology** 250:18
**term-wise** 250:17
**test** 7:19 11:16 96:21 97:3,19 121:18 122:7,9 122:11 123:8 135:10,22 136:7 144:7 262:19 263:4 263:14
**testified** 18:6 294:15 302:20
**testimony** 16:11 280:13,18 283:9 306:10 306:15
**Thank** 18:10 37:3 48:15 54:4 108:21 116:6,7 206:20 240:22 259:6 280:4,16 301:8,9
**Thanks** 69:8 119:10 161:11
**theirs** 223:4
**theory** 182:11
**thereof** 306:18
**thick** 208:1
**thigh** 209:19
**thing** 31:15 50:15 125:3 131:4 164:7 186:21 239:7 254:16 256:17 258:11 262:15 263:5 277:14,19
**things** 34:15 51:13,18 98:14 151:21 231:13 251:13,14 257:18,20 258:4,7 261:5 261:18 277:3 283:18 292:2 301:4
**think** 19:4 33:19 35:2 51:21 57:3 58:21 65:11 73:11 88:8 127:9 135:1,3 149:10 151:2 153:12 165:2 175:12 177:12 177:16 186:9 199:12,14,15 200:1 205:9 210:16 213:21 222:12,14,14 222:19 223:1 226:17 232:20 233:14 234:2 235:5 241:14 241:14 245:14 245:22 249:6 251:16,18 270:22 273:19 283:11 286:16 287:16 288:18 292:12 294:20 294:20 300:14 300:14 302:2 302:12,19 303:1,3 304:18
**third** 74:5 89:13 184:5 216:21 217:11 228:3
**Thirteen** 119:7
**thirty** 307:13
**Thirty-seven** 171:4
**thought** 41:2 205:7 228:17 232:13 275:18 300:8

**threat** 217:10
**threatening** 217:13
**three** 33:19 38:22 40:16 42:13,14 59:10,11,19 126:6 189:17 191:8 250:3 251:18 252:2 260:17 273:12
**three-fourths** 92:19 105:20 109:16 124:9 191:6
**three-page** 82:9
**throat** 74:10 87:16 95:21 96:7 130:22 133:9 172:7 302:4
**tidbit** 300:10
**Tidewater** 268:8
**time** 17:14 19:17 20:20,20 31:14 33:9 35:16 40:14 41:8 42:9 42:16,18,18,20 56:1,7 57:2 60:11 62:17 63:1,3 64:15,19 67:9,14 70:13 73:9 79:4,12 83:14 86:16 91:18 92:12 113:20 114:15 115:7 117:15 128:17 133:14 138:13 144:18 146:8 149:13 149:15,20 150:7 151:3 153:20 155:13 157:18 162:4 162:12 163:8 165:9 168:6 174:9 176:13 184:7 186:11 189:5 190:18 190:20 193:3 201:6,18 204:7 205:5,12,17,20 206:1,19 210:17 213:15 218:19,20 219:1 223:6,7 224:8,14,18 226:7 231:1 233:9 236:14 236:15 238:17 239:2 240:6 258:18 278:1 279:17 281:14 282:1,6 283:7 288:4 290:19 292:11 300:1 303:3,3,10 304:7 306:7
**times** 24:1,12,19 25:3,11 58:13 58:18 59:1,13 59:22 96:15 115:2 137:13 181:20 186:2 189:11 191:16 191:17 195:22 197:7 231:11 232:4 250:5 251:18 253:16 253:17 262:8 263:19 281:4 285:4 286:10 286:12 303:2,9
**tissue** 102:2,17
**title** 36:18,19 37:2 49:19 98:10 100:2 125:17 142:11 161:15 166:7
**titled** 118:11 160:18 164:10 167:9 170:12 267:6 303:20
**today** 17:13 22:5 23:10 63:4 74:22 176:11 177:19 181:15 194:10 262:4 301:22
**told** 67:13 70:10 134:16,16 177:21 188:14 207:5 221:5 245:17 252:12 293:9,13 302:16
**ton** 51:18
**tools** 39:14 52:22 53:2,5 149:21
**top** 101:9 130:15 170:14 213:13 251:3 294:10 296:4
**total** 88:19,20 100:17 146:22 271:12
**track** 127:15
**tracked** 127:13 127:19
**trade** 31:15
**traffic** 34:7
**train** 57:9
**trained** 64:15 65:10 81:16 150:9
**training** 5:13 6:6 7:6 8:6 14:16 25:21 27:15,18 27:20,22 30:10 36:1 37:8,9,9 37:14 41:19 42:5,8,9,21 43:2,4,17,21 44:3,4,9,10,14 44:16 45:4,6,15 45:20 46:6,10 46:15,18 50:5 50:11 51:22 52:13 53:9 54:6 55:6,7,8,14 56:8,22 57:8,13 57:17 58:4 59:17 60:7,20 61:20 62:16,22 63:3,20 65:8 66:3 67:1,10,16 67:18,22 68:2,6 68:7,20 69:15 70:1,7 72:14 73:3 74:17,19 76:11 77:6,14 77:19 78:17 79:18 80:13 82:12 83:15 84:4,7,12,21,22 85:18 86:4 87:5 88:5 90:19,21 90:22 92:11,13 93:12 94:15 95:2,4,8 96:12 101:5 105:4,6 105:11,15 107:8,21 108:13,17 110:18,22 111:2,11 113:8 114:9 116:10 117:9,10,22 118:1 123:17 124:6,8 125:14 127:5,6,7,11 128:7 129:2 133:14 134:2 137:3 139:9,11 140:17,18 141:1,16 142:5 142:12 143:15 145:17 146:9 146:12,14,18 146:19,22 147:4,9,12,15 149:17 150:13 150:21 152:15 153:14,18 154:8,14,17 155:5,14,14 156:18 157:3,5 158:18 163:12 164:22 170:17 170:20 171:9 174:1,21 176:21 178:4 178:12,18 180:21 181:8 185:15 186:7 186:12,16 187:21 188:7 188:10 189:5,7 189:8,9,9 190:7 193:15 196:3 196:21 198:9 201:2 202:8 203:9 204:19 205:13,15,16 205:17,18 206:6,11,22 207:3 208:2,19 209:12 210:21 211:10,13 212:4,16 218:21 229:21 230:1,2 233:6 233:22 244:15 244:15,16,17 244:19,20 246:8 278:21 281:11,15 283:21 284:7 284:13 285:6 285:12 293:21 299:17 302:5 302:11 304:1,2
**trainings** 58:4 188:3,4 189:17 190:11 203:9 302:3
**trampoline** 258:2
**transcribed** 306:13
**transcript** 5:11 307:14,15

**transcription** 306:14 310:6
**transfer** 204:22
**transferred** 56:7
**transition** 287:9
**transitioned** 206:5
**transported** 246:12 299:9
**trapped** 169:3
**trauma** 254:3
**travel** 103:21
**treadmill** 256:14
**trial** 20:9 22:17
**tried** 287:22
**tries** 277:3
**trouble** 77:22
**true** 79:4 147:6 235:19 237:17 268:18 269:14 306:15
**truth** 22:5 306:9 306:9,10
**try** 19:3 21:8 69:3 148:20 217:3,7 218:2 251:19 254:18 256:6 275:5,7 279:1 286:11
**trying** 37:12 51:21 155:5 188:20 189:2 197:7,12 233:4 234:6,22 238:14 255:6 257:1,7,8 260:6 260:11,16 283:7 286:19
**turn** 75:20 78:22 78:22 101:6 256:18 281:20 282:2 303:16
**Twenty-six** 266:7
**twice** 250:22 258:13 276:2
**two** 25:10 38:22 40:5 57:6 88:17 90:2 91:19,22 92:7 99:1 111:2 120:19 123:18 123:22 124:1 124:19,22 125:2,2,12 129:7 130:8,13 139:20 140:9 140:12 144:7 146:21 147:19 159:5 167:17 188:13 191:8 207:6 222:20 223:1 224:6 239:1 250:8 258:18 259:15 266:5 273:20 277:3 278:5 283:18
**two-cartridge** 123:14 147:10
**two-day** 156:21 158:21
**two-shot** 117:19 118:6
**two-thirds** 271:5
**type** 59:17 84:3 140:2 158:1 188:8 227:10 227:11 253:9 262:19 264:16 264:19 274:11 275:19 276:5 278:3 282:9
**typically** 26:8

**U**

**U** 16:1
**Uh-huh** 125:8
**umbrella** 38:6
**Um-hum** 22:2 23:2 111:9 133:20 228:5 230:18 269:10 272:22
**unable** 276:8 285:16
**underneath** 169:5 238:14 297:20
**understand** 21:6 22:18 23:7 67:5 79:22 81:12 144:19 155:1 166:21 174:15 174:16 205:2 207:22 229:3 247:22
**understanding** 68:5,19 81:21 101:17 117:14 121:10 129:8 129:12 137:19 155:8 156:20 175:21 181:6 182:17 200:22 208:6 215:2,6 219:6,10 220:11 221:16 227:10 232:6 238:9
**understood** 21:11 167:19 176:18 177:9 178:2,6 180:18 180:19 204:12 223:19 271:9 295:2
**unduly** 177:1
**unexpectedly** 173:18
**unfold** 220:17
**unfolded** 224:7
**unforeseen** 181:9
**Unfortunately** 122:19
**uniform** 32:17,20 33:16,17
**unintended** 134:5
**unique** 18:18
**unit** 138:1,10
**United** 1:1 17:11
**University** 29:20
**unknown** 140:2 181:9 182:15 277:21
**unload** 79:1
**unsafe** 85:10,11 85:14,19 113:13 153:20 205:5,21 224:10,21,22 234:11 235:1 235:16
**untethered** 103:15,21,22 104:8,11
**update** 12:6 13:7 67:1,15 125:18 125:21 126:15 126:18 129:2 142:18 143:18
**updated** 67:18,20
**updates** 286:11
**upright** 212:8
**usable** 251:8
**use** 19:14 20:8 43:4 44:4,18 45:6 52:2,20 58:5 60:7 102:1 102:15 143:21 145:7 149:20 150:8,12,19 157:14,17 207:13,15,15 218:1 228:11 289:8,16 290:10 291:3 291:12,18 294:3,6 296:14
**user** 6:7 7:18 9:6 9:7 10:6,6 11:6 11:6 12:6 13:7 14:6 66:4,19 70:20 92:20 97:3 105:21 106:12,12 111:8,15 112:10,11 113:2 118:14 118:14 119:14 124:10 125:18 125:21 126:15 129:3 135:9,21 142:5,18 143:18 162:10 170:4,13 190:19
**Users** 81:2
**use-of-force** 37:10 38:11 39:14 42:21 52:21 53:2,5 57:17 58:3,12 149:20 157:15

**V**

**v** 1:6 308:4 309:3
**vacation** 265:8
**vacations** 265:13
**vague** 177:2
**various** 43:4 123:4
**vascular** 133:9
**vehicle** 148:19 262:21 263:15 263:17
**ventilation** 236:6
**verbal** 290:9 291:11
**verbally** 20:12 217:12
**verbatim** 174:2,3 186:4
**verbiage** 84:16
**verification** 166:17 167:10 191:13
**verified** 167:19
**verify** 136:22
**version** 13:19 66:20 83:9

94:10 107:4
113:3 118:11
119:16 122:10
126:15 135:21
142:12 160:18
161:3,16 192:4
193:10,11,12
194:11
**versus** 17:10
81:15 261:6
264:5
**vessel** 103:9
**vessels** 90:8
**video** 3:2 25:20
27:13,14
302:19 303:3
305:2
**videographer**
4:12 17:6,18
47:21 78:6,12
156:8,14 241:2
241:5,11,15
304:22
**videotaped** 1:11
2:1 20:8
**viewing** 218:22
**violation** 234:16
234:17
**Virginia** 1:2 3:8
4:7,7 17:12
19:13 28:2,11
28:11,16,18,21
29:2,3 30:11,17
31:10,22 32:7,8
32:16 37:17
38:11,14,18
41:20 42:4 52:7
52:17,19 54:18
58:1 61:6 64:12
65:2,4 139:7
141:17 148:1
157:20 158:5
183:6 188:17
199:9 266:18
268:6,7 269:15
270:8 271:15
272:13,21
293:22
**vision** 75:8,13
89:15,21
104:21 110:4
116:21 132:15
172:20 233:2
248:13 251:8
251:21 254:21
255:1,2,4 265:1
276:10,13
**visit** 265:22
**vocational** 275:4
**voice** 298:18,18
**voluntarily**
174:20
**V.20** 162:19

**W**

**wages** 268:10
271:12 272:7,8
272:16
**wait** 148:5 169:2
281:20 299:14
**waiting** 47:21
282:2
**waive** 16:21
182:14
**waiver** 298:19
**waivers** 187:7
**walk** 32:14
257:13
**walking** 251:5
299:19
**wall** 236:8
**walls** 237:3,6
257:13
**want** 29:15 48:2
72:15 78:3
135:7,11,11
137:6 140:18
140:21 154:15
155:12 157:16
164:7 175:4
176:22 192:1
196:14 238:3
240:16 242:1
249:22 250:15
261:21 262:1
272:4 283:4
297:8,9
**wanted** 32:2
157:12 211:6
242:16 246:13
258:8 288:2
293:12 304:22
**warn** 182:11
**warning** 70:9
73:14,17 95:11
96:4 97:22
101:10 102:12
103:1 104:15
108:2 109:17
109:21 113:17
116:13,18
120:15 132:8
132:13,20,21
133:17,17
134:8 152:7
165:17 166:3,4
168:1,11
169:10 172:12
173:2,7 184:6
**warnings** 6:16
7:15 9:14 10:16
12:12 14:6
70:14,19 71:3,6
72:10,16,19
73:3,7,19,22
74:2,16 75:3,5
75:19 86:16,20
88:4,11 89:3
95:13 99:10
101:3 103:2
105:3 108:4,16
109:3 110:7,11
110:16 113:21
115:14,19
116:9 117:2
120:17 129:6
129:22 131:8
131:12,17
143:20 144:5
144:13,20
146:4,8 164:11
164:17,18
165:8,13
166:10,16,22
167:10,20
169:20 170:4
170:13 173:2
174:18 176:19
177:14,17
181:16,20
187:18,19,20
189:4,6,10,16
189:19 190:9
190:10
**warranty** 182:10
**wasn't** 19:17
61:15 86:6
128:20 165:2
186:3 201:18
205:6 218:22
222:22 223:15
225:3 231:5,17
231:19 233:19
239:3 242:17
270:3,13
273:22 283:14
286:18 291:15
**watch** 58:13,18
58:22 59:3,6,12
59:21 137:14
**watching** 222:22
223:15 232:7
238:6
**way** 20:15 35:13
35:20 50:3 80:1
92:19 109:16
124:9 148:15
160:6 175:13
191:6,11 211:2
240:3 248:17
256:19 261:17
264:2 275:16
284:14,15
**weapon** 13:7
37:18 38:2
142:18 150:2
217:18 230:5
239:9,20
**weapons** 33:2
34:21 55:22
57:8 151:4
202:7 207:15
207:17 229:9
229:16,18,22
230:10 291:19
302:5
**wear** 46:2,10
134:1 154:7,10
154:18 155:15
202:20 204:10
219:17,18,20
219:22 220:12
222:4,7 230:19
230:22 231:10
232:3,8,15
262:7 281:3
282:3 283:2
296:10,22
**wearing** 202:11
212:12 218:19
219:11,13
220:14 232:19
236:2 254:5
262:5,12,15
282:22 290:18
**week** 273:20
**weeks** 260:17
278:6
**weigh** 261:5
**went** 30:7 31:11
32:18,21 33:1
33:17 34:20
51:5 57:3 67:5
68:7 73:6 75:18
77:12,13
140:12 148:18
183:16 186:15
187:13 196:17
200:11 201:8
202:2 206:11

206:21,22 207:7 216:18 219:2 222:21 229:17 245:12 246:22 269:15 276:18 286:9 304:8
**weren't** 139:21 188:15 201:20
**we'll** 18:20 19:4 44:14 75:20 83:15 99:3,4 111:14 115:12 124:7 132:5 156:1,7 161:14 196:16 241:3 241:20 268:2
**we're** 24:4 26:6 46:13 60:20 65:18 75:16 78:12 79:8 82:3 101:20 105:14 106:7 108:15 110:21 113:9 135:5 140:16 141:19 146:3 156:14 177:20 203:19 225:12 241:11 272:6 272:17 305:5
**we've** 48:18 96:15 98:22 103:1 115:2 120:5 132:13 146:11 155:20 177:12,19 181:20 189:7 189:10 190:3 195:5,22 234:2 265:16 301:22 302:2
**whatnot** 255:11
**whatsoever** 158:5 182:12 184:21 217:11 261:11
**Wheatstone** 28:10
**wheel** 148:14
**white** 212:20 251:5
**whiting** 251:2
**WILLIAM** 280:7
**Wilmington** 41:12
**wine** 256:22 257:2,5
**wire** 103:21 104:12
**Wishes** 269:7
**witness** 16:7,11 18:2,9 24:6,14 26:14,18 47:6 48:13 53:20 71:12,19 72:1,8 73:11 76:3,5 82:6 83:3 89:7 94:6 100:22 106:21 112:21 116:6 119:7,10 122:1 126:12 132:3 143:10 156:4 160:15 161:11 168:18 169:2 170:10 177:5 180:13 183:9 192:16 211:21 225:22 226:16 236:16 236:18 240:18 240:22 242:15 242:18 244:1 271:17 272:2 280:4 301:9 305:8 306:16 307:1 308:2 309:1
**Wolf** 127:10
**wondering** 62:15
**word** 177:1,14 296:14,14
**wording** 285:1
**words** 97:17 166:8 175:11 291:1 293:13
**work** 53:15 156:3 199:11 201:7 210:22 261:16 270:2,3 273:14 273:16 274:21 275:17
**worked** 39:3,7 78:22 158:20 199:8 201:4 204:16 268:15 268:19 269:1 272:9,11 274:1
**workforce** 275:7
**working** 245:3 254:11 273:3,4 304:9
**workmen's** 260:14 269:22 270:15 278:8
**works** 270:14
**wouldn't** 60:11 91:9 157:16 195:13 220:14 247:15 302:6
**write** 158:10
**writing** 51:14
**written** 122:9
**wrong** 148:15
**wrote** 249:16
**www.MagnaL...** 1:22

**X**

**X** 1:4,9
**X-ray** 114:20
**X2** 111:10,16 117:9,13,18 118:2 119:15 119:20 122:11 123:17 124:10 136:10 141:22 193:1,3 204:22
**X23** 135:9
**X26** 7:18 64:7 66:19 97:3,19 113:3 135:21 136:7,13,19 193:1
**X26P** 193:1

**Y**

**yeah** 26:16 45:22 71:21 72:2 92:8 97:15 98:9 100:7 112:4 125:5 147:11 164:2 166:9 176:8 179:10 190:5,7,19 201:22 207:18 208:21 209:3 209:13 210:4 210:10 213:11 213:11 214:21 218:3 224:2 230:3 236:18 240:8,18 242:15 244:1 246:22 247:13 248:8,18 259:19 267:12 275:20 286:2 287:8 295:1 297:10,10,19
**year** 31:16 34:19 40:11 50:19 272:14,16 273:11,13 277:21
**years** 29:7 32:19 33:3,4,6,20 35:3 36:13 38:22 40:5 57:6 62:8 72:21 74:21 124:19 124:22 125:2,3 125:12 230:3 277:22
**Yep** 43:12 100:16 106:1 107:15 108:5 135:18 138:8 145:9 293:15
**Y2K** 42:3

**Z**

**zero** 255:12
**zombie** 251:5
**zone** 144:8 228:7 231:2 232:9 236:7 239:18
**zones** 87:3,5 95:19
**Zoom** 3:2 18:19
**Zucaro** 226:4

**$**

**$154,290** 271:12
**$2,048** 278:5
**$71,634.68** 268:13

**1**

**1** 1:17 5:13 6:8 7:8 8:8 9:8 10:7 11:7 12:7 14:13 17:8 33:14 46:14,17 48:5 49:4 54:20 56:17 60:18 66:5,20 80:12 82:13 92:10 93:13 105:14 106:13 110:22 111:11 112:12 118:15 125:21 133:2 139:22 140:17,21 142:13 143:13 165:9 167:2 192:4,10 193:6 223:22 266:7 269:8,20 270:10 272:18 310:5

**1st** 30:21 67:22 72:11 108:20 117:8,22 122:21 131:13 269:16 270:6 272:12 274:5
**1:00** 156:12,15
**10** 7:8 9:14 33:6 82:13 108:18 109:2 110:20 123:2 138:13 156:4,7 240:20 241:4 277:22
**10:13** 1:13 2:11 17:4,14
**100** 4:6 85:22 123:7 138:20 151:1,2 159:1 159:22 203:7 208:22 240:17 242:2 286:17 289:22 300:18
**101** 8:8 93:14 240:17 242:2
**104** 211:20 213:4
**106** 9:12
**1065** 87:2
**1066** 82:8 87:19
**107** 10:7 112:12
**108** 10:8 112:12 169:1
**109** 9:19 165:7
**11** 7:8 10:6 33:5 35:2 36:13 82:14 111:20 112:2,7,8,10 115:12 222:13
**11th** 222:13
**11:19** 78:7,10
**11:33** 78:10,13
**112** 10:14 165:16
**114** 166:2
**115** 10:22
**116** 168:17,19
**117** 10:8 112:12 166:15
**118** 11:14 160:21 168:12,15,16 169:1,9
**1189** 94:1
**119** 162:10 168:1 191:5
**1194** 94:20
**1195** 95:11
**12** 10:16 33:3,4 35:3 94:1 112:7 115:13,18 119:8 138:12
**12th** 105:21
**12/14/2017** 267:7
**12:46** 156:9,12
**120** 9:8 106:13
**1206** 4:6
**121** 11:8,18 118:16
**122** 11:8 118:16
**123** 7:8 82:14
**124** 7:8 82:14 196:9
**125** 12:10 163:18
**1291** 95:18
**1292** 96:4
**1293** 93:9 94:2 96:14
**13** 11:6 14:13 72:21 74:21 118:9,13 119:3 119:6,14 121:2 192:10
**13th** 81:3 139:12 159:6 163:13 176:21 178:13 180:21 186:16 196:21
**13.0** 66:20
**131** 11:8 12:17 118:16
**135** 160:7
**136** 266:8
**137** 266:7,8
**1378** 107:12
**1379** 106:8
**14** 11:16 121:13 121:17
**14th** 159:6 163:13 176:21 178:13 180:21 186:16 196:21 212:17 243:11 244:5 269:19
**14.2** 83:9 135:21
**1418** 141:5
**142** 13:13
**147** 225:14
**148** 230:14
**1491** 106:9 108:7
**15** 12:6 111:22 125:17,20 128:12 137:14 198:14 239:18
**15:25:50** 168:6 184:8
**150** 228:2
**1525** 167:14
**153** 225:14
**154** 211:20 213:6
**155** 213:6
**156** 213:6 214:4,8
**1566** 111:22
**157** 211:20 213:6 214:4,14
**1573** 113:16
**16** 12:12 94:10 131:12,16 132:5 135:6 146:4 166:12
**16th** 94:16
**160** 13:17
**161** 13:22
**1615** 141:8
**1672** 114:3
**1673** 114:19
**1682** 112:1 115:1
**17** 13:6 107:4 142:11,16 230:3
**170** 14:9
**1753** 118:10
**17800** 3:17
**18** 5:5 13:15 113:3 118:11 119:16 122:10 146:22 160:3,5 160:9 162:2 167:8,9 168:1 184:5 191:1 193:12 195:19 196:7 243:7
**1883** 118:10
**19** 13:19 111:4 126:15 160:3 160:17 161:2 161:15 164:15 166:15 168:12 168:22 183:17 183:18 184:13
**192** 14:14
**1952** 71:18,21
**1954** 75:6
**1955** 71:3,22
**1965** 99:12
**1993** 39:18
**1997** 31:19
**1999** 31:1 38:15 42:3

**2**

**2** 6:6,8 12:7 65:19 66:2,5,17 67:22 72:15 73:14,21 75:17 77:10 125:22 128:12 140:1 193:21 223:22
**2nd** 189:8
**2:19-cv-617** 1:6
**2:21** 241:6,9
**2:29** 241:12
**2:49** 241:9,14,17 241:18
**20** 13:19 14:6 142:12 160:18 161:3,16 169:22 170:3 186:18 192:4 193:10 198:13 198:16 239:18 248:10 310:16
**20s** 198:10,11
**20th** 226:4
**20/17** 276:19
**20/50** 276:19
**2000** 31:18,18 42:10 88:9
**2005** 50:1,12 51:4 52:10 54:16 62:5 63:6 149:3 149:11 226:22
**2006** 33:10 62:5 63:7 66:20 68:1
**2007** 31:19 57:4 61:11 63:15 64:3 68:2 72:11 72:14,20 73:18 78:17 86:10 87:21 90:21
**2008** 83:10 88:10 88:14,15
**2009** 81:3 83:15 84:14 86:4 88:5 90:18 91:9 94:11 99:10,11 100:11 101:3 139:12
**2010** 92:13 94:16 95:8 96:12 101:4 105:3,6 107:4 108:20
**2011** 105:21 107:9 110:18 112:4 113:4 115:15 118:11 119:16
**2012** 28:14,17,18 111:4,11 113:8 116:10 117:8 117:22 122:21
**2013** 124:11 125:15 126:15 129:10 131:13

133:14 149:11 165:9 167:2 189:9
**2014** 29:22
**2015** 29:22 170:15 189:9
**2016** 192:4 193:7
**2017** 22:9 27:15 40:14 50:4 77:6 104:5 134:12 142:1,13 143:13,15 146:5,9,15 147:16 149:3 149:19 154:4,7 155:5 156:19 157:18 163:2,8 167:14 168:5 178:13 184:7 186:16 189:8 189:12 196:4 212:17 243:11 244:5 250:13 269:19 278:21 280:21 281:3 283:5
**2018** 26:5 30:21 33:14 226:4 250:11,14 269:6,8,20 272:18
**2020** 1:13 17:4,13 308:3 309:2
**21** 14:11 28:10 192:2,7,18 193:22 195:5 195:15,21
**21st** 142:1 143:15 189:8
**211** 14:19
**22** 1:13 14:16 17:4 211:9,12 244:9 308:3 309:2
**22nd** 17:13
**225** 15:8
**23** 12:7 15:6 125:22 225:14 225:16
**23rd** 170:15
**2300** 28:10,22
**23226** 3:8
**23451** 4:7
**23456** 28:11
**239** 14:13 192:10
**24** 15:10 240:17 242:2,4 303:16 303:16
**24th** 124:11 125:15 133:14 189:9
**240** 14:13 192:5 192:10
**242** 15:12
**25** 15:21 29:7 136:17
**26** 15:14 266:6,10 267:6 271:11
**266** 15:16,19
**27** 15:18 266:6,16 266:20 269:4
**28th** 88:12,15
**280** 5:6

**3**

**3** 6:16 71:2,5 73:18 75:5 109:13,15
**3rd** 51:4
**3/16/2010** 92:21
**3:53** 305:6,9
**30** 124:7 198:14 248:10 307:13
**30th** 99:11 100:10 101:3 115:15 269:6
**301** 5:7
**305** 310:5
**31** 61:11 63:14 68:2
**31st** 42:2 52:10
**310** 1:17
**32** 6:8 66:5
**37** 171:6 173:6
**38** 170:1 171:4 173:11
**39** 222:15,16

**4**

**4** 7:6 82:4,11,22 86:8 87:20 101:6,9 132:5
**4th** 163:8,10,20 167:14 168:5 184:7
**40** 53:12 55:8 222:14,16 302:20
**40-millimeter** 44:1,1,5
**40-some** 224:19
**400** 3:7
**42** 143:17 246:6
**43** 144:3
**44** 144:12 303:1
**45** 258:14
**46** 5:16
**462** 266:18
**47** 145:1
**486** 137:3
**487** 96:22

**5**

**5** 7:15,15 50:12 88:5,8 89:2,10 105:16 116:11 116:12
**5th** 163:19,20
**5/3** 50:12
**50** 53:12
**506** 110:6
**517** 121:15
**530** 124:8
**532** 111:1
**534** 105:16
**536** 92:14
**538** 80:14 81:1
**541** 61:2,11 62:3 63:13
**542** 62:9
**543** 62:9
**544** 62:9
**546** 49:14 56:17
**547** 141:20
**551** 47:5 48:12
**593** 141:14
**593253** 1:16

**6**

**6** 7:18 8:8 14:13 93:13 96:20 97:2,19 101:7 117:2 133:16 135:9,20 192:10
**6,000** 273:11
**60** 55:8
**61** 145:6
**623.326.6016** 3:19
**624-6221** 1:21
**66** 6:14 271:5
**675** 126:9
**698** 130:18

**7**

**7** 8:6,8 9:8 10:7 11:7 33:10 40:20 93:7,11 93:13 106:13 112:12 118:15 257:22
**7th** 26:5
**70** 143:8
**71** 6:19 143:5,7
**71,000** 271:8
**712** 66:18
**7130** 3:7
**74** 6:8 66:5
**746** 70:2,3
**75** 6:9 66:5
**757.625.7300** 4:8
**789** 75:20 76:7
**790** 65:20

**8**

**8** 8:15 9:8 10:7 11:7 99:9,14 100:20 101:2 106:13 112:12 117:2 118:15 133:16 138:11
**804.888.9501** 3:9
**82** 7:13
**85th** 3:17
**85255** 3:18
**866** 1:21
**89** 7:16

**9**

**9** 9:6 106:8,11
**90** 262:16
**93** 8:13
**949** 86:8
**97** 7:21
**98** 31:12,19
**99** 8:8,18 42:1 93:14 188:7 251:11

# Exhibit 3



EXHIBIT
DEPOSITION 22 6.22.20
exhibitsticker.com

AXON_CURRAN000104





AXON_CURRAN000156





AXON_CURRAN000157





# Exhibit 4

# (videos on thumb drive, filed by hand)

**IN THE UNITED STATES DISCTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

SHAWN CURRAN,

Plaintiff,

v. Case No. 2:19-cv-617

AXON ENTERPRISE, INC., et al.

Defendants.

**EXHIBIT 4 TO PLAINTIFF'S REPLY IN OPPOSITION TO DEFENDANT NELSON'S MOTION FOR SUMMARY JUDGMENT**

**SURVEILANCE VIDEO AND CLIPS**

Plaintiff has hand-delivered a thumb drive to the court, to be attached to his Reply in Opposition to Defendant Nelson's Motion for Summary Judgment as Exhibit 4, which contains the following videos:

| File Name | Time Stamp | Description |
|---|---|---|
| Full Video | 0:0 – 48:23 | Entire available surveillance video of Axon TASER instructor training box drills |
| Clip 1 | 22:47 – 23:59 | Two scenarios; first shows inactive role player without helmet on; second scenario goes far outside the box |
| Clip 2 | 25:19 – 25:50 | Two scenarios; first shows inactive role player without helmet on; second scenario goes outside the box with the inactive, unhelmeted role player behind the active role player when weapon discharged |
| Clip 3 | 28:23 – 28:40 | One scenario; weapon discharge occurs outside the box with observers behind the role player |
| Clip 4 | 30:26 – 31:41 | Two scenarios; first shows inactive role player without helmet on during active scenario; second shows weapon discharge outside box, in front of bench and Nelson, and end of scenario shows inactive role player without helmet |
| Clip 5 | 32:10 – 32:36 | One scenario; inactive role player without helmet standing near Nelson; weapon discharged with unhelmeted inactive role player behind active role player |

| | | |
|---|---|---|
| Clip 6 | 33:09 – 33:38 | One scenario; inactive role player without helmet on talking to Nelson while action goes outside the box |
| Clip 7 | 33:47 – 34:35 | Incident scenario; role player (Curran) finishes scenario, removes helmet and sits on bench in front of Nelson; next scenario goes far outside of box in front of Nelson, weapon discharged with Curran behind active role player and Curran is struck in eye by TASER probe |

# Exhibit 5

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

(NORFOLK DIVISION)

\- - - - - - - - - - - - - - - - x

SHAWN CURRAN, :

Plaintiff, :

vs. : Case No. 2:19-cv-617

AXON ENTERPRISE, INC., et al., :

Defendants. :

\- - - - - - - - - - - - - - - - x

VIDEOTAPED DEPOSITION OF MATTHEW FAUBION

Conducted virtually via remote videoconference

July 10, 2020

Reported by:

Misty Klapper, RMR, CRR

Job No.: 599043

July 10, 2020

4:03 p.m.

Taken pursuant to notice, before Misty Klapper, Registered Professional Reporter, Certified Realtime Reporter, and Notary Public.

APPEARANCES:
(ALL APPEARANCES VIA REMOTE VIDEOCONFERENCE)

ELLIOTT M. BUCKNER, ESQUIRE
BREIT CANTOR GRANA BUCKNER
7130 Glen Forest Drive, Suite 400
Richmond, Virginia 23226
(804) 888-9501
E-mail: sbucci@breitcantor.com
ebuckner@breitcantor.com
COUNSEL FOR THE PLAINTIFF

AMY L. NGUYEN, ESQUIRE
PETER BROWN, ESQUIRE
AXON ENTERPRISE, INC.
17800 North 85th Street
Scottsdale, Arizona 85255
(623) 326-6016
E-mail: amynguyen@axon.com
peterbrown@axon.com
COUNSEL FOR THE DEFENDANT AXON ENTERPRISE, INC.

BRIAN N. CASEY, ESQUIRE
TAYLORWALKER PC
1206 Laskin Road, Suite 100
Virginia Beach, Virginia 23451
(757) 625-7300
E-mail: bcasey@taylorwalker.com
COUNSEL FOR THE DEFENDANT RICHARD NELSON

ALSO PRESENT:
SOL TRAN, VIDEO OPERATOR

C O N T E N T S


| WITNESS: | EXAMINATION BY: | PAGE: |
|---|---|---|
| Matthew Faubion | Mr. Brown | 6, 87 |
| | Mr. Buckner | 47, 92 |
| | Mr. Casey | 82 |


E X H I B I T S


| NO.: | DESCRIPTION: | PAGE: |
|---|---|---|
| 46 | Handwritten statement of Matthew Faubion dated 12-14-17 | 28 |

P R O C E E D I N G S

VIDEO OPERATOR: We are now on the record. This begins videotape number 1 in the deposition of Matthew Faubion in the matter of Shawn Curran versus Axon Enterprise, Inc. et al. in the United States District Court for the Eastern District of Virginia.

Today is Friday, July 10, 2020 and the time is 4:03 p.m. This deposition is being held remotely at the request of Axon Enterprise Corporation, Inc.

The videographer is Sol Tran and the court reporter is Misty Klapper, both of Magna Legal Services. All counsel and parties present will be noted on the stenographic record.

Will the court reporter please swear in the witness.

MS. REPORTER: Sir, would you hold up your driver's license for the camera or any form of identification.

(Witness did as requested.)

MS. REPORTER: Thank you, sir.

Would you raise your right hand.

Whereupon:

MATTHEW FAUBION,

was called for examination, and, after being duly sworn, was examined and testified as follows:

MS. REPORTER: Thank you. Please proceed, Mr. Brown.

EXAMINATION BY COUNSEL FOR DEFENDANT

AXON ENTERPRISE, INC.

BY MR. BROWN:

Q. Good afternoon. Could you please state your name for the record, please, your full name?

A. Matthew Faubion.

Q. And have you been deposed before, Mr. Faubion?

A. I have not.

Q. Okay. I'd like to cover a handful of rules at the outset then.

The first is that we ask that you

please answer out loud, verbally, rather than just shaking your head yes or no.
Does that make sense?
A. It does.
Q. Okay. And please also wait for the questioning attorney to state their entire question and if there are objections for the -- from the other attorneys for their objections before answering. And if you don't understand a question, please let us know.
Does that make sense?
A. Okay. It does.
Q. And if -- if you do answer a question, we'll assume that you understood it.
Is that fair?
A. That's fair.
Q. Okay. And if we need to -- if you -- if you'd like to take a break, please let us know. Before taking the break, you will have to answer any questions that are pending before taking that break. Okay?
A. Okay.

Q. Do you understand that you are here today because you were a witness to an incident on December 14, 2017 that occurred at a training in Virginia Beach?
A. I do.
Q. Are you familiar with the acronym CEW?
A. I am.
Q. And do you understand that that is shorthand for conducted electrical weapon?
A. That's correct.
Q. Okay. I'll -- I -- I and the other attorneys will likely be using that acronym throughout, so I just wanted to confirm that our understanding was the same.
A. Okay.
Q. Do you also understand that Mr. Curran, Mr. Shawn Curran, has brought suit against Axon and Master Instructor Nelson?
A. Yes.
Q. Do you recall preparing a witness statement in relation to the incident on

December 14, 2017?
A. I do.
Q. Have you had the chance to review that statement prior to today?
A. I have.
Q. And did that -- did your review refresh your memory as to the incident on December 14, 2017?
A. It did.
Q. Okay. And are you presently employed by the Suffolk Police Department?
A. I am.
Q. And what is your current position there?
A. I'm a sergeant.
Q. And how long have you been a sergeant at Suffolk Police Department?
A. Since September of 2019.
Q. And prior to being a sergeant there, what previous positions did you have at Suffolk PD?
A. I've been a detective and a street

officer.

Q. And approximately how long were you in each of those roles?

A. I was a street officer from May of 2011 until 2014, the -- the end of 2014. And then from 2014 until September of 2019 I was a detective.

Q. Okay. And as a sergeant, is it accurate to say that you have a supervisory position at Suffolk Police Department?

A. That's correct.

Q. And have you -- in your time at Suffolk Police Department, have you served as an instructor in any capacity?

A. I have.

Q. And what -- what times did you participate as an instructor or with an instructive capacity?

A. I'm a general instructor and also a TASER instructor and a firearms instructor.

Q. And do you have special training or certifications?

A. In reference to being an instructor?

Q. In -- in regards to being an instructor or any other special training or certification related to your roles at Suffolk Police Department.

A. I do. Mainly my certifications are related to firearms and TASER, but I've attended --

Q. Okay. Have you --

A. -- a specialty course while as a detective as well.

MS. REPORTER: Sorry. You were cut off. Could you repeat that?

THE WITNESS: I was just saying that I've also -- yes. I've also attended specialized training in reference to being a detective, particularly focusing on white collar crimes.

BY MR. BROWN:

Q. Okay. Have you had -- aside from your TASER instructor training and your firearms training, have you had other use of force

training?
A. Just generalized training, nothing specific, and a normal, like, in-service training.
Q. And -- and would that in-service training incorporate things like defensive tactics or close quarters combat?
A. It would.
Q. Would it also include training on using a baton?
A. Baton, an ASP, and deescalation techniques, things of that nature.
Q. Okay. In practical training -- in any practical training, would you agree that there is a risk of injury?
A. That's correct.
MR. BUCKNER: Object to the form of the question for practical.
But if you understood what he meant by practical, Sergeant -- I think you may have because you've already answered -- that's fine.
THE WITNESS: I -- I would say that

in any training that involves dynamic movement, there is an inherent risk involved in that and you just -- as -- as an instructor you have to take steps to minimize that risk as much as possible.

BY MR. BROWN:

Q. Okay. And would you characterize your TASER instructor training, your firearms training and the other trainings that you mentioned as qualifying as practical in that sense?

A. I would.

Q. Okay. And when you're engaged in that type of practical training, do you agree that it's important to follow all safety protocols?

A. That's correct.

Q. And from your perspective, why is that important?

A. In order to minimize any risk that's involved with the training.

Q. Would you agree that when engaged

in -- in practical training that it's important to use safety equipment?

A. It is.

Q. Why is that?

A. Safety equipment is one part of the process that can help prevent injuries.

Q. Do you agree that participants in practical trainings are expected to follow safety protocols and use safety equipment?

A. If an instructor requires safety equipment or gives specialized instruction on how to be safe during an exercise, the students or participants should follow those instructions.

Q. And do you think that it's -- it's reasonable to follow those instructions as a participant in those practical trainings?

A. I do.

MR. BUCKNER: Object to the form of the question, but I think you've already answered, Sergeant.

BY MR. BROWN:

Q. In regard to the December 14, 2017

training, do you recall how many days -- let me start over.

In regard to the December 2017 training that you attended, do you recall how many days it was in total?

A. I do not recall.

Q. Do you recall that there was a classroom portion?

A. Yes.

Q. And do you recall that there was a -- a separate portion not conducted in the classroom in -- that I would -- let me start over.

Do -- do you recall that there was a separate portion of the training that was not in the classroom?

A. I do.

Q. And where was that conducted, that second?

A. In the training academy there was a gymnasium that we did exercises in.

Q. Okay. In terms of your attendance, did your department schedule your attendance for

you?

A. As far as signing up for the class, my --

Q. Yeah. How was it that you --

A. -- have a training --

Q. -- came --

A. Yes. We have a training coordinator that sets up our -- our attendance for us. So if we were interested or required to attend certain training, we send the information to the training coordinator and they set it up for us unless there's --

Q. Okay.

A. -- a specific instance where they -- they have occasionally required us to sign up for our own training.

Q. I'm sorry. You cut off at the very end. There have been occasions --

A. There have been occasions where they have requested that we fill out the application or, you know, if there's required paperwork, sometimes they do ask us to fill that out to

assist them. But for the most part, the majority of the time training is done through a training coordinator.

Q. Okay. And in terms of your CEW training historically, what was your initial certification? When was that done?

A. I don't recall. I -- I would think that it was probably done when I was going through the basic law enforcement academy. And that would have been in 2011 and I would have just been as a CEW user.

Q. Okay. And do you recall, was -- that law enforcement academy, that would have been at Suffolk Police Department, right?

A. No. Suffolk is part of a -- a -- a joint academy, Hampton Roads Criminal Justice Training Academy.

Q. Okay. And at that time in 2011, you were in basic law enforcement training to be employed at Suffolk Police Department?

A. That's correct.

Q. And do you recall what CEW -- what

TASER CEW you were initially certified to use?
A. I was initially certified on the X26.
Q. Okay. And then since that, roughly, 2011 certification, have you had subsequent recertifications?
A. I have. Suffolk acquired X2s and I was recertified on using those. And most recently I've also attended the TASER 7 certification class as well.
Q. Okay. And have you been recertified on the X26 as well?
A. Only as far as in the annual recertification requirements.
Q. Okay. In -- in your certification and recertifications, do you recall them including both a classroom and a practical portion?
A. Yes.
Q. Okay. Turning back to the December 2017 training, this was -- was this the first instructor training that you had attended?
A. For TASER, yes, it was.

Q. I should -- to clarify, then, I should say was this the first TASER CEW instructor training that you had attended on December -- in December 2017?

A. Yes, it was.

Q. Okay. Why were you interested in becoming a -- a CEW instructor?

A. I like being an instructor. I like teaching new people the proper techniques on -- whether specifically to TASER or, you know, more generally, just law enforcement techniques that we use. I want to make sure that specifically (remote transmission interference) the Suffolk Police Department that we can be the best that we can be, we have the best officers, and they have the most knowledge and training so that when they go out on the street and they're performing their duties they can do the best that they can.

Q. Okay. In your TASER CEW certifications and recertifications, do you recall reviewing PowerPoint slides?

A. I do.

Q. And do you recall reviewing slides that included warnings in relation to the TASER CEWs?

A. I do.

Q. Do you recall those warnings including addressing specifically the possibility of permanent vision loss and penetration injuries?

A. I do.

Q. Do you recall being instructed or viewing slides on the safety officer in these trainings?

A. Specifically to say I reviewed a slide on it, I do not recall; but I do know that in the training a safety officer was covered.

Q. Okay. And what was your understanding of -- of the safety officer's role?

A. In addition to one person being designated a safety officer, all participants are also responsible for ensuring that there's a safe environment that's going on. But the one specific person that was assigned that is

supposed to view the overall exercise and ensure that it is proceeding in a safe manner.

Q. Okay. And during the -- you mentioned earlier that you recalled having a classroom portion during the December 2017 training; is that accurate?

A. Yes.

Q. And do you recall about how many students were in attendance during the classroom portion?

A. Specific number, no, I do not recall. I would definitely say that it was more than 10, but probably less than 30.

Q. Okay. Did you know -- was there anyone else there from the Suffolk Police Department?

A. Yes, Officer Grayson Craun.

Q. Okay. And did you know Officer Grayson Craun? Had you met him prior to this classroom portion on December 13, 2017?

A. Yes, I had.

Q. And how would you come to know

Officer Grayson Craun prior to that classroom portion?

A. Suffolk is not that large of a department. So I know everyone pretty much that works there. But also, because of Officer Craun's position as a member of the neighborhood enforcement team, when I was a detective we worked closely with the neighborhood enforcement team, whether it be trying to apprehend suspects for cases or just general neighborhood canvasses and things of that nature. So we worked closely together.

Q. Okay. So is it fair to say that you had a professional relationship with Grayson Craun prior to the classroom portion?

A. That's correct.

Q. Had you interacted prior to the classroom portion with Master Instructor Richard Nelson?

A. Not that I recall, no.

Q. During that classroom portion, do you recall reviewing PowerPoint slides in general?

A. Yes.
Q. And is it accurate to say that those slides covered topics such as the safety officer and warnings relating to TASER CEWs?
A. So going back to a previous statement that I made specific to the safety officer, I don't recall if there was a slide on it or if it was just something that was generally discussed. But, yes, warnings in general were covered on the PowerPoint slides.
Q. Okay. Once the classroom segment had concluded, is it accurate to say that there was subsequently a practical portion that followed that?
A. Yes, that's correct.
Q. And that practical portion took place the day after the classroom session?
A. I don't recall if it was a one-day or two-day class, but it took place after the classroom portion.
Q. Okay. And before -- after the -- the classroom portion had concluded and before

beginning the practical portion, was it your understanding that CEW use, including CEW use during training, carries some risk of injury?

A. Yes.

Q. Was it also your understanding at that time that CEWs are weapons that must be handled safely?

A. Yes.

Q. Was it your understanding at that time that CEWs deployed probes?

A. Yes.

Q. And you understood at that time that the probes are sharp and meant to penetrate skin?

A. Yes.

Q. And you understood that -- at that time that the probes could cause penetration injuries?

A. Yes.

Q. Were you aware at that time that during CEW training, every participant is able to call stop action anytime they see something unsafe?

A. Whether the command be stop action or a similar command like index, yes, anyone could call that.

Q. What was the second command that you mentioned?

A. Index, short -- it's typically referred to as end exercise, but index is the shortened version of that.

Q. Understood. Was there a distinction to you between when stop action would be called versus when end exercise would be called?

A. No, there was no distinction. They both mean the same thing.

Q. Okay. And -- and what was your understanding of what they would mean?

A. If anyone were to call out stop action or end exercise, all movement should stop. Any CEWs should be placed on safe and everyone will maintain their position, to include continuing to wear their safety equipment.

Q. Okay. And in terms of safety equipment during that practical portion or just

prior to beginning that practical portion, was it your understanding that the attendees had to wear protective eye gear at all times?

A. That's correct.

Q. Turning to the -- the incident involving Mr. Curran specifically, do you recall what sort of location the practical training took place in?

A. It was similar to a gymnasium.

Q. Okay. I'm going to share my screen here for a moment, so bear with me.

Does this picture look familiar to you or does the location -- let me restate.

Does the location depicted in this picture look familiar to you?

A. Yes, that is representative of what the training space looked like.

Q. Okay. I'm going to scroll down to the next one.

And does this also fit with your recollection of the training space?

A. It does.

Q. Okay. As does this one?
A. It does.
Q. And this one as well?
A. It does.
Q. Okay. And finally, this one too?
A. It does.
Q. Do these images, from your recollection, accurately depict the area where the scenarios were conducted?
A. It does.
Q. What did you consider to be the training area during the practical portion?
A. The training area was everything in this room, and I considered it to be that due to the fact that in addition to CEWs, we were also using airsoft pistols to simulate our lethal weapon -- weapon options.
So the student instructors that were not participating were supposed to be staged back in a hallway, but even then, those in the staging area were still able to be struck by the BBs. So even in that staging area, people were still

wearing eye protection.

Q. Okay. And you mentioned what types of devices were in your possession. You mentioned a -- a -- an -- an -- an airsoft pistol, as well as the CEWs; is that true?

A. That's correct.

Q. And aside from those items, is it accurate to say that any other weapons were prohibited in the entire gym?

A. That's correct.

Q. And similarly, as you had mentioned, the safety glasses were required in the entirety of the training area, not just within the blue mat area; is that accurate?

A. That's correct.

Q. Okay. I'd like to turn now to a different document. This will be Exhibit 46.

(Thereupon, Deposition Exhibit Number 46 was marked for identification.)

BY MR. BROWN:

Q. Mr. Faubion, do you recognize this

document? Let me zoom in a little bit.
A. I do. That's the statement that I wrote on the date of the incident.
Q. Okay. And was this statement something that you prepared voluntarily?
A. I was requested to provide a statement, but I was not forced or told that I must require -- provide a statement.
Q. Okay. Who -- who instructed you about the preparation of this statement?
A. I do not recall who specifically requested a statement to be done.
Q. Okay. So I want to begin with the first full paragraph here. Actually, before I do so, I want to call your attention to where it says date and then there's a colon.
Do you see that?
A. I do.
Q. And you see the -- the following -- the continuation of that line says December 14, 2017?
A. Yes.

Q. Would it be accurate to say that that date is the date on which this practical portion that you are recounting in your statement was conducted?
A. That's correct.
Q. Okay. And the -- the first line in that main -- that first paragraph there says, On 12-14-2017, I was in the gymnasium at VBLETA for TASER instructor practicals.
Did I read that correctly?
A. Yes.
Q. Okay. And bear with me for a moment here. I'm going to scroll through.
This is actually the final page of your written statement and this last paragraph states -- let me know if I read this correctly -- I went first and provided instruction to Officer Craun. After he went, we stood off to the side to watch the next students go through.
Did I read that correctly?
A. That's correct.
Q. Okay. And in terms of what you're

describing there, when you say you went first, what do you mean by that?

A. So I was first told how to go through the scenario. I went through the scenario first and then we were instructed to then teach the next student how to go through the scenario.

Q. Okay. And -- and as your -- your statement says in the final paragraph here, after you had done your -- after you had gone through the scenario, then you were -- you -- your role next was to instruct Officer Craun.

A. That's correct.

Q. And after Officer Craun's scenarios were concluded, you recount that both of you stood off to the side to watch the next students.

Is it accurate to say that you then observed the rest of the scenarios that followed yours and Officer Craun's?

A. We have the opportunity to do so. I do not recall if we stood there the entire time and watched all the students. Once we were completed -- once we had completed what we were

supposed to do as far as instructing and participating, then we were free to move about in the gymnasium. But for the most part, yes, we -- we stood there. And I know that at least myself, if not also Officer Craun, we also recorded some of the scenarios so that we could use them as training aids when we went back to Suffolk.

Q. I see. Okay. You -- your video cut out there for a moment. Are you still there, Mr. Faubion?

A. Yes, I'm still here.

Q. Okay. Just wanted to -- to confirm.

Do you recall the -- in general the -- the questions I asked you previously about stop action?

A. I do.

Q. And during the scenario that you went through, do you recall calling stop action?

A. No.

Q. Do you recall anyone else calling stop action during your scenario?

A. No.

Q. And when you provided instruction to Officer Craun after the conclusion of your scenarios, do you recall anyone calling stop action during his scenarios?
A. No.
Q. And to your recollection, while you were present in the gymnasium while the subsequent scenarios were being conducted, do you recall stop action being called during any of those?
A. I do not.
Q. Do you recall being told that the scenarios could never go outside the blue mat area?
A. No.
Q. What was your understanding of the blue mats and their role in the scenarios?
A. They serve multiple purposes. They were placed behind which one of the role players could stage so that the person participating in the scenario could not see what they were doing, whether it be if they were coming out with a

weapon or if they were coming out with no weapon, and it also was a guideline, if you would. You would try to stay in those areas, but they were left open with knowing the fact that it's possible that the action may spill out from those areas.

Q. Okay. Going back to your statements a moment ago, is it accurate to say that you do not recall calling stop action yourself --

A. Correct.

Q. -- at any point during the training?

And you don't recall anyone else calling stop action at any point during the training?

A. I do not.

Q. Okay. Is the reason for that due to your impression that these trainings would be conducted in a safe manner?

MR. BUCKNER: Object to leading.

Go ahead, Sergeant.

BY MR. BROWN:

Q. You may answer, Sergeant Faubion.

A. I would say that there were no incidents that required the use of the command stop action. Up until the point with the incident involving Officer Curran everything was flowing as it should, so there was no need for those commands.

Q. Okay. Do you recall Master Instructor Nelson stating that the area outside of the blue mats was a safe zone?

A. I do not recall.

Q. Do you recall Master Instructor Nelson stating that inside the mats was a hot zone?

A. I do not recall that.

Q. Okay. Let me turn back to your statement, so I'm going to share my screen again.

Okay. So looking at the first page of your statement here, you recount about right in the middle of this first paragraph that -- well, let me back up.

Your second sentence states that Around 1315 a practical scenario was being

conducted during which time a student was using a TASER CEW against a role player in a black protective suit.

Did I read that correctly?

A. That's correct.

Q. And then the next sentence in the first paragraph of your statement says, Another role player, Shawn Curran, was not participating during this scenario and was seated behind a blue mat, which was set up as a barrier.

Is that accurate?

A. That's correct.

Q. This mat was one of four being used, true?

A. That's correct.

Q. Okay. And as you mentioned earlier, your -- your statement states that The role players would hide behind the mats while not participating and while beginning the scenario.

Is that accurate?

A. That's correct.

Q. So while you are observing -- at this

point in time while you're observing you've completed your scenario and can you estimate approximately how many scenarios had been completed prior to reaching the one involving Shawn Curran?

A. No, I do not recall how many there were.

Q. Okay. Is it accurate to say that you had observed more than four or five scenarios run through prior to this?

A. I would say that that is fair.

Q. Okay. And during the time of your observation, were you wearing protective glasses?

A. I was.

Q. And were -- do you recall the presence of other observers nearby while you were also observing yourself?

A. I do.

Q. And do you recall whether they were wearing protective glasses or other eye protection?

A. They were.

Q. And was this in accordance with the safety protocols that Master Instructor Nelson had established?

A. That's correct.

MR. BUCKNER: Object to foundation.

Go ahead.

BY MR. BROWN:

Q. During your classroom training prior you mentioned earlier that you had gone over various warnings in relation to TASER CEWs; is that true?

A. That's correct.

Q. And do you recall what that classroom component covered in terms of the safety -- the protective equipment?

A. At a minimum, it was eye protection for observers, and if you were -- if you were in a role play scenario where you had the potential to be struck by a CEW probe, then you were also supposed to be wearing a protective suit as well, which included a -- a full head covering with a face shield.

Q. Okay. And -- and this requirement that you recounted applied whether or not you were in the blue mat area?
A. The requirement for eye protection was for everyone inside the gym and the staging area in the hallway.
Q. Okay. Do you recall who provided the glasses, the safety glasses?
A. The master instructor provided the safety glasses.
Q. Okay. Turning back to your statement again, we're looking at the first page and the -- the second paragraph here. It states that, I observed the student fire his TASER CEW at the participating role player; is that correct?
A. That's correct.
Q. And then it continues, I then heard Officer Curran yell out and fall to the floor to the right, from my position of the mat he was behind.
Is -- did I read that correctly?
A. That's correct.

Q. And you describe your statement here on -- the second paragraph of the first page then recounts Officer Curran lying on the ground, grabbing his face and then, after you walk over to him and observe the situation, you state that, I began looking for a first aid kit in the equipment room connected to the gymnasium, correct?
A. That's correct.
Q. Do you recall receiving direction from anyone to do this or you -- you decided to do that yourself?
A. I did not receive any direction to do that. I did it on my own with Officer Craun.
Q. Okay. And around this time that you're describing in the second paragraph, do you recall anyone calling stop action?
A. I do not recall.
Q. Okay. I'm looking now at the -- the final page of your statement. First paragraph here states that We were instructed to have eye protection in the form of safety glasses provided

by Instructor Nelson or our personal eyeglasses.
Did I read that correctly?
A. That's correct.
Q. Looking now at the -- the final paragraph again, we reviewed already the -- the first sentence there about you going first and instructing Officer Craun and then standing off to the side.
The last sentence there that you have states that No problems occurred with the other students until the incident with Officer Curran.
And when you state that there were no problems, what -- what do you mean by that?
A. I would mean that there were no major safety incidents that required a stop action or an end scenario to be called.
Q. Okay. And you mentioned earlier that during your scenario, there was no call for stop action, correct?
A. Correct.
Q. Is it accurate to say that the only stop action -- let me restart.

You don't recall stop action being called at -- at any point during this training on December 14, 2017?

A. I don't recall, no.

Q. Okay. Prior to the incident with Officer Curran, do you recall seeing any scenarios going outside of the blue mat area?

A. I do.

Q. And, as I believe you've indicated previously, you don't recall anyone calling stop action at any point during this December 14, 2017 training, correct?

A. That's correct.

Q. Prior to the incident with Officer Curran, did you observe anyone removing their protective helmet as a role player?

A. Yes.

Q. And can you describe that occurrence for me?

A. I recall that it was hot inside the gymnasium, so when there would be downtime when we were just discussing ways to improve the

techniques that were being used, oftentimes the role players would -- who were wearing the full body suits would take off their helmets or their head coverings.

Q. Okay. And you stated that there's -- from your testimony it sounds as though there's a time period between scenarios.

Is that accurate, where no -- let me rephrase.

There's a time period between scenarios in which there is not an active scenario being conducted?

A. Correct. There were time periods when there was an active scenario going on. After -- after each active scenario there was also a time to discuss what had occurred.

Q. Okay. And it was at the conclusion of the active scenario and before the beginning of the next scenario that you witnessed other role players removing their protective headgear?

A. That's correct.

Q. And is it accurate to say, then, that

you did not call stop action then because you did not perceive a safety issue?

A. That's correct.

Q. When participating in your scenario, was it your impression that it was conducted safely?

A. Yes.

Q. Do you recall whether the scenario that you participated in went outside the blue mat area?

A. I do not recall.

Q. Do you recall seeing other scenarios going outside the blue mat area?

A. I do recall that, yes.

Q. And at those times you did not call stop action; is that accurate?

A. That's correct.

Q. Is it accurate, then, to say that you did not see anything unsafe?

A. That's correct.

Q. While you were going through your own scenario, as well as subsequently, when you

instructed Officer Craun and observed the later scenarios, did you have confidence that Master Instructor Nelson was conducting this training in a safe manner?

A. As a whole, yes. Obviously, with any scenario and any training, there are obviously things that can be improved upon. But, yes, on the whole I felt that it was conducted in a safe manner.

Q. And would those instances worthy of discussion be something that was raised in the time period between the scenarios that we discussed earlier?

A. If it was something that was more urgent, yes, it would have been something that was brought up during that time. Other -- for other instances it was mostly myself and Officer Craun talking to each other in terms of how would -- how we would improve those situations for when we were conducting training back at our agency.

Q. Okay. Just give me a few moments

here, please.

Okay. Thank you, Sergeant Faubion. I -- i may have additional followup after Mr. Buckner.

MR. BROWN: But Mr. Buckner, your questions.

EVENING SESSION (5:00 p.m.)

EXAMINATION BY COUNSEL FOR PLAINTIFF

BY MR. BUCKNER:

Q. Sergeant Faubion, good afternoon. And am I pronouncing that correctly? Is it Faubion?

A. Yes, sir.

Q. Sergeant Faubion, my name is Elliott Buckner and I represent Officer Curran in this matter that he's brought related to the injuries he sustained on December 14, 2017. I know you understand that's why you're here, because you were there that day and you're one of the witnesses, right?

A. That's correct.

Q. Okay. Let me start with you today asking a question about some of your testimony that you provided when Mr. Brown was asking you questions.

I think you said -- there it is. I think you said that everybody in the gym had to wear protective eyewear, but if you were in an

area where you could be struck by CEW, you were required to be in a protective suit.

Is that correct?

A. Not entirely. The protective suit was only for the role player in the scenario. No one else was wearing a protective suit.

Q. Right. And -- and is that because no one else -- it -- it wasn't anticipated that anyone else would be struck by a CEW?

A. That was correct.

Q. And I assume that the reason for that is because, consistent with the warnings that Axon gave, in addition to injuries to the eye if you're struck with a TASER probe, you could also be struck in other areas of your body, sensitive areas that could cause serious injury or damage or even death; is that right?

A. That's correct.

Q. And those include head, neck, heart, areas like that?

A. That's correct.

Q. And TASERs are dangerous, they're

weapons, aren't they?
A. That's correct.
Q. And as weapons, they can cause serious injury, harm, death and you've got to take special precautions when you're using them to try to minimize the risk of that harm, injury, death, correct?
MR. BROWN: Object to the form.
(Remote transmission interference.)
I'm sorry.
BY MR. BUCKNER:
Q. Sergeant Faubion, did you hear my question?
A. That we have to take special precautions to avoid injuries or potential death that comes throughout the use of a TASER?
Q. Yes, sir.
MR. BROWN: I'm going to object to that question --
BY MR. BUCKNER:
Q. But you?
MR. BROWN: -- on foundation and

form.

You may answer, Sergeant Faubion.

THE WITNESS: Yes. I would say that whenever we're using any type of weapon, we need to take precautions to ensure that we are not causing undue injury or death.

BY MR. BUCKNER:

Q. And when you're using a TASER even in training, if you don't use those -- take those special precautions, you increase the risk of harm, injury or death, fair?

A. That's correct.

Q. Did I hear you correctly that you are -- in addition to being TASER certified, you're also an instructor for firearms?

A. That's correct.

Q. So as part of your -- let me ask, are you certified as a firearms instructor?

A. I am.

Q. And is -- in your role as a firearms instructor, do you train other police officers on

the use and safe use of firearms?

A. I do.

Q. And does that include live firing weapons?

A. It does.

Q. And does that include live firing weapons at both indoor ranges and outdoor ranges?

A. When it comes to Suffolk, we don't have any indoor ranges that we used, so all of my experience in both instructing and qualifying has been on outdoor ranges.

Q. Okay. I -- even though you haven't been at an indoor range, I bet you can still answer my next question, which is:

When participants in firearm training are actively engaged in firing their weapons, other people are not permitted to be down range of the firing line; is that right?

A. That's correct.

Q. And they're not permitted to be down range of the firing line when the line is hot. And do you know what I mean when I say when the

line is hot?

A. I do. It's when the weapons that are -- you're using have the ability to fire projectile because they're -- they are loaded, or their magazines are -- have been inserted inside of them.

Q. Individuals are not permitted to be down range when the weapons are hot because they are at risk of being struck by that projectile and injured, harmed or killed, correct?

A. That's correct.

Q. And individuals are not permitted to stand near, adjacent to or behind a target during a live fire exercise, correct?

MS. REPORTER: Sorry. Could you repeat that?

BY MR. BUCKNER:

Q. Individuals are not permitted to stand near, adjacent to or behind a target during a live fire exercise; is that correct?

A. That's correct, other than there are specialty firearms ranges that have positions

near the targets where it's required to make quick changes to targets. But, yes, generally speaking, no one should be down range or near a target.

Q. But -- but when those individuals make those changes to those targets on the specialized range, the -- the range isn't hot at that point, correct?

A. Correct.

Q. Sergeant, were you the very first person to go through practical training that day?

A. I was.

Q. And did you remain in the gym and observe the remainder of the training when the rest of the participants go through their training?

A. I believe I was there the whole time. I -- I may have walked back to the staging area at some point, but I was -- I was in the gymnasium for, like I say, at least most of the time.

Q. Were you in the gym the entire time

from when you finished your scenario, finished your training, finished serving as a safety officer through the incident involving Officer Curran?

A. Yes, unless -- like I said, unless there was a time that I had walked back to the staging area, yes, I was in the gymnasium the entire time between me finishing up as the safety officer and the incident involving Officer Curran.

Q. Okay. And I know you've already testified that at no time did anyone call stop action at all that day; is that correct?

A. That's correct.

Q. All right. Sergeant, I want to show you a video taken of that day. I'm going to share my screen with you in just a second. Okay?

All right. Do you see a still of the -- the video?

A. I do.

Q. All right. And is this the -- is this the box drill, the practical drill that you

all were going through on that day of training?
A. That's correct.
Q. And I -- I know it's not HD quality, but do you know which of these people in this gym -- and I -- I'm not -- I suspect it was this gentleman here, but do you know which one was Mr. Nelson? Are you able to pick him out?
A. No, I'm not able to pick out Mr. Nelson.
Q. Do you have any recollection what Mr. Nelson was wearing that day?
A. I -- I don't. I know -- in -- in my head, thinking back on it, I would say that it was either a red or a black shirt, but I don't recall which one.
Q. Okay. All right. Sergeant, I'm going to play the video for you now. And would you please let me know if you have any problems seeing the video in motion?
A. Okay.
Q. We've had some issues with it transmitting, so hold on one second.

Is the video moving for you?
A. It is.
Q. All right. I just paused it.
Do you see my cursor on the screen?
A. Your cursor is to the right over the person in the black protective suit?
Q. Yes, it is. All right. So the timestamp on the video is 28:27. Do you see that in the lower left-hand corner of my screen?
A. I do.
Q. Okay. At 28:27 is it fair to say that the role player, the aggressor, had just come out from behind the blue mat and was getting ready to enter the box created by those mats?
A. That's correct.
Q. And that was typical of the scenarios that were run that day; is that right?
A. That's correct.
Q. All right. Let me hit play again.
Okay. I've paused it and e paused it at 28:32. My cursor now is on the role player, correct, the aggressor?

A. That's correct.

Q. And the gentleman in what appears to be a gray-colored shirt right behind the gentleman with the red shirt, he's the participant that's -- actually has the TASER in his hand; is that right?

A. I can't see what is in his hands, but he would be the person participating in the scenario that either has a TASER, the airsoft pistol or, if it was no force needed, no weapon in their hand.

Q. Okay. All right. Let me hit play again.

All right. So it's 28:35 now and from the last time I've paused it to this time, did we see the participant and the role player exit the box created by the mats?

A. That's correct.

Q. And did we see the participant discharge a TASER into the role player consistent with the scenario that was being run?

A. From my screen I can't see it being a

TASER, but it -- the actions of the role player are consistent with being a TASER.

Q. All right. Where my cursor is is the participant that has the weapon, correct?

A. Correct.

Q. Would you consider the people standing here that are in the path of the -- where he's pointing his weapon to be down range of that weapon?

A. I would.

Q. And way -- the way the participant and the role player are configured at this present time when the weapon was discharged, if he missed the role player, he risks hitting the individuals that are off of the mat; is that correct?

A. If the probe was to come loose from the wires, yes.

Q. And that -- and that is a known risk of those probes. It's part of the training, correct?

A. That's correct.

Q. And these individuals, let's just assume that each one of them has eye protection on. They are still at risk of that probe because they're not wearing the same suit that the role players were wearing, correct?

A. That's correct.

Q. They were at risk of being struck in sensitive areas like their head, their neck or their heart?

A. That's correct.

Q. Sergeant Faubion, with all of that, do you believe that a stop action should have been called as soon as the participant came out of the box, turned and pointed his weapon in a direction that caused the other individuals observing the drill to be down range from his weapon?

MR. BROWN: Object to form and foundation.

BY MR. BUCKNER:

Q. You can answer, sir.

MR. BROWN: You may answer,

Sergeant Faubion.

THE WITNESS: Based on this being me being taught how to be an instructor, I did not know whether or not that would qualify as something that would cause a stop action. I can say that this is not -- not necessarily saying this specific incident that we're looking at on the video, but of people coming outside of the blue mat areas where there are -- or where there are observers outside, that was something that Officer Craun and myself were discussing that we should not have that present during scenarios that we were running back at Suffolk.

BY MR. BUCKNER:

Q. And why is that?

A. Due to the risk of those individuals being struck by either TASER probes or the airsoft BBs.

Q. And to your knowledge, did Instructor Nelson at any time provide any

remedial training to any participants in the class regarding participants coming outside of the box and pointing their weapon in the direction of someone who may not have adequate protection?

MR. CASEY: Objection to form.

MR. BROWN: Object to foundation. Form.

BY MR. BUCKNER:

Q. You can answer, Sergeant.

A. No, I do not recall.

Q. All right. Sergeant, bear with me for just a second.

Okay. Sorry about that.

All right. Sergeant, I've jumped ahead now to 29:29 in the video. Do you see that on your screen?

A. I do.

Q. Okay. And it looks like we've got the next participant coming into the box to go through their scenarios. This person I presume to be the student instructor in training and then

we've got one of the role players back here.

Is that all accurate? And I -- and I tell you what, Sergeant, let me do this. Let me play a little bit so I can put it in context for you. It's hard to do that with a still. Hold on.

Okay. Do -- does that look to be -- the gentleman in the red at 29:36 inside the box, does he look like he's going to be the participant in the scenario based on where he's standing?

A. Yes, either the participant or the instructor.

Q. All right. And this would be the student instructor if the gentleman in the red is the participant in the scenario?

A. Correct.

Q. And do you know whether this is Mr. Nelson standing off to the side? Did he -- and let me ask you a different question first.

Did Mr. Nelson observe all of the scenarios?

A. I believe so.

MR. BROWN: Object to foundation.

BY MR. BUCKNER:

Q. Was there any time that you noted that Mr. Nelson was not present in the gym when scenarios were going on?

A. Not that I recall.

Q. All right. And this is one of the role players standing off to the side; is that correct?

A. That does appear to be someone wearing one of the black protective suits, yes.

Q. Okay. Let me play a little bit more.

All right. So I've stopped at 29:46. And the last time I stopped it it looks like the other role player came up from behind the blue mat where they had that bench setup that you saw in the pictures that Mr. Brown asked you about; is that correct?

A. That's correct.

Q. And that second role player now has walked behind the mats and it appears that he's

getting ready to enter the box to proceed with the scenario, correct?

A. That's correct.

Q. And the other role player, who we've already identified and I've got my cursor on, he's not wearing his helmet right there, correct?

A. Correct. It does not appear that he is wearing a helmet.

Q. Okay. Let me run it a little further.

Okay. So that's -- I just stopped it at 29:53 and that's the end of the scenario, correct?

A. It appears so, because the role player is on the ground.

Q. All right. During the pendency of that scenario, while it was being run, did the inactive role player ever put his helmet on?

A. Not that I could see.

Q. All right. So a -- a scenario was run without the role player who wasn't actively participating having a helmet on.

Do you know whether he had glasses on?

A. No, I don't know if he did have glasses on or not.

Q. And based on his proximity to where the simulation took place, should he be fully protected? In other words, if he's going to be standing up there, should he have both his suit and his helmet on to protect him because he's close to the -- where a TASER discharge could go off?

A. I would say that he should at least have some form of eye protection on.

Q. Okay. Do you know whether any corrective action was taken following this simulation to talk to him about having his helmet or glasses on?

A. Not that I recall.

Q. Okay. So did -- did seeing the video refresh your recollection at all, Sergeant, because I think you said that you don't recall any of them having their helmets off during an

actual live simulation. We've just seen that one did, in fact happen.

So is it possible that there were times during training that day when the role players did not have their helmet on when there was an actual live scenario taking place?

MR. BROWN: Object to foundation.

BY MR. BUCKNER:

Q. You can answer, Sergeant.

A. Yes. And I can say that I was present during this incident because at the bottom part of the screen there's an individual in a white or a tan shirt. I'm the person immediately to the left of him. And immediately to the left of me is Officer Craun.

Q. Right. So the gentleman that I've got my cursor on right now, dark pants, light-colored shirt, at least a bald spot, then is that -- is that the person you were talking about that you used as a reference point?

A. I did.

Q. And then as we're looking at the

video to that gentleman's left, the next person closest to him on his left is you?

A. That's correct.

Q. And that's Officer Craun that you're talking to?

A. That's correct.

Q. And Sergeant Faubion, is it fair to say that -- let -- well, actually, let me take a step back.

I think you had mentioned before that there was an instruction that everybody in the class is a safety officer, if they see something they're supposed to say something; is that right?

A. That's correct.

Q. There was also a designated safety officer for each -- each scenario, correct?

A. That's correct.

Q. And that person was supposed to be actively observing the scenario and the surroundings to see if there was anything done unsafely, correct?

A. That's correct.

Q. And was the master instructor also observing and responsible for ensuring that the training was conducted safely?

MR. CASEY: Objection to form and foundation.

BY MR. BUCKNER:

Q. Sergeant, you can answer.

A. That's correct.

Q. And is it safe to say that while everyone is a safety officer and should say something if they see something, the primary responsibility during the -- during these scenarios is with the designated safety officer and the master instructor conducting the training?

MR. CASEY: Objection to form.

MR. BROWN: Object to foundation.

MS. REPORTER: I'm sorry?

MR. BROWN: It -- I was -- I was objecting to Mr. Buckner's question. It calls for a legal conclusion.

BY MR. BUCKNER:

Q. Sergeant Faubion, you can go ahead.

A. Yes, the primary parties responsible are the instructor and the safety officer.

Q. At any time -- at any time during your training over that two-day period -- excuse me one moment.

At any time during your training over that two-day period, did Mr. Nelson ever provide training to you or, to your knowledge, anyone else regarding specific safety violations to be on the lookout for when you were the designated safety officer for a simulation?

A. I do not recall any specific thing that we were supposed to look for, no.

Q. Okay. Sergeant, I think you also testified -- I'll pop it -- pop this off of there. So that was -- the final one we ended up on was 29:35 on the video, just in case I didn't say it.

Sergeant, I think you also testified that you and Officer Craun recorded some of the

scenarios to use as -- as training aids back in Suffolk; is that correct?

A. That's correct.

Q. Do you both still have those videos?

A. I know that I have some of them, like around three, I think.

Q. Okay. If -- if I provide you with my contact information, is that something that you'd be able to get to me that I could then share with the other attorneys?

A. Yes.

Q. All right. What would be the best way for me to get my contact information to you?

A. If you would just send me an E-mail.

Q. All right. What is your E-mail, sir?

A. M as in Mary, F as in Frank, A-U, B as in boy, I-O, N as in November at Suffolk VA, like the abbreviation for Virginia, dot U.S. So that's first initial, last name at suffolkva.us.

Q. Terrific. I'll -- I'll send you an E-mail with all my contact information and whenever I receive it I'll share it with the

others. And would you mind checking with Officer Craun to see if he has any that he'd be willing to share with us?

A. I can do that, yes.

Q. Terrific. Thank you.

Sergeant Faubion, have you ever participated in a box drill before December 14, 2017?

A. A box drill being that we were inside of the standing blue mats?

Q. Yeah. And I probably should have started that a little bit differently and I apologize. I kind of jumped ahead. You're not the first deposition we've taken. And when we took some other depositions, including that of Mr. Nelson, he referred to this as a box drill where you set up the mats to create a confined space, a box, with openings for the role players to come into.

And so when I say box drill, it's -- it's the one that you participated in on December 14, 2017.

Is that fair?
A. Okay. I do not recall any other trainings that I've been in that have involved standing mats with spaces in between them.
Q. Have you ever participated in any training that simulated a box drill like this using any other materials?
A. No. The only -- the closest thing that I've been in is just being in a small room.
Q. Do you know who set up this drill like this with the mats and the placement of the bench that you saw in the prior pictures that Mr. Brown went through with you?
A. No, I don't know who did that.
Q. You didn't participate in setting it up at all, did you?
A. Not that I recall, no.
Q. Okay. Do you recall what you were told about this drill in advance?
A. I mean, there were several different drills, but specifically to how we were supposed to interact? Is that what your question is?

Q. Yes.

A. The -- the main scenario was supposed to take place inside of the blue mats and you would typically start out a -- a lot of times with your eyes closed if you were the participant and then you would open your eyes at the command of the instructor and you would then react based on what you then observed and what the role player was presenting.

Q. So was it your understanding before you went into the gym that day that the scenario was intended to be played out inside the confines of the four mats?

A. Whenever it was possible to do so, yes.

Q. Did -- did Mr. Nelson ever instruct you or, to your knowledge, anyone else about how far outside the mats was permissible or how far outside the mats you could go during a scenario?

A. No, he did not.

Q. And in your statement that you've already reviewed at length with Mr. Brown -- I'm

not going to go through it all with you again, but you did reference that -- the mats, which were set up as a barrier. By that did you mean that the mats were intended to contain the action of the scenario?

A. It was designed to hide from view what the role players were doing to start out the scenarios. And ideally, you would want to stay inside those. But I don't recall any specific direction saying that if we were to spill outside of the barriers that anything was supposed to stop.

Q. And when you say ideally it was supposed to stay inside the barriers, what do you mean by that?

A. So if you could take action, whether it be -- if it was just verbal or using a -- your CEW or your pistol that you were provided, if you could conclude what you needed to inside of that, then we should have -- you know, again, not saying specifically that we were told that, but that was my understanding, we would want to keep

as much as we could inside of the mats.
Q. And part of the reason for that is safety, right?
A. Part of it is safety and part of it is to force a response if -- if there was no limit, there are no confines to our movement, it would open us up to other use of force options that weren't necessarily what we were trying to do in that mode of instruction.
Q. And were those the two reasons why, when you and Officer Crown were -- Craun were talking about it, you said that when you implemented it back in Suffolk, you were going to keep the action within the confines of the box?
A. Well, one of the things that we discussed was not using a box generally. But if we were going to do something where we were limiting the size, yes, we would want to keep everything inside the box.
Q. Okay. Do you recall Mr. Nelson discussing with Mr. Curran anything about what he was supposed to do when he wasn't actively

engaged in a scenario?
A. No, I do not recall.
Q. Do you recall any discussions that Mr. Nelson had with Mr. Curran about what he was supposed to do when he was back in by -- behind the mat where the bench was?
A. No, I do not.
Q. Did you hear Mr. Nelson say anything to either of the role players, Mr. Curran or the other one, about whether they could take their helmets off at any time?
A. No, I do not recall.
Q. All right. So as you sit here today, you have no knowledge of what, if anything, if anything at all, was said by Mr. Nelson to the two role players about where they were supposed to be located, what they were supposed to do when they weren't actively participating in the scenario or what they were supposed to do regarding taking their helmet off during the training?
A. That's correct.

Q. Do you recall Mr. Nelson ever telling you or anyone else in the training that the entire gym was a hot area, an action area in play, that the entire gym was -- was permissible for the action to take place when the scenarios were playing out?

A. I don't specifically recall any specific terms like a hot area. I -- like I previously stated, I do recall that we were supposed to have eye protection on both inside the gym area and inside the staging area.

Q. This -- well, the staging area, was that the hallway?

A. That's correct.

Q. Was there risk of getting an injury to the eye while you were out in the hallway? Was that open to the gym somehow? I'm envisioning a closed-off hallway with a door.

A. I believe that there were doors, but I know that people -- and in my memory of it that people were going in and out of those doors. So if you were standing there, you did have to have

eye protection on as well.
Q. Okay. You had referenced in between scenarios there was some downtime.
During that downtime did people take their eyeglasses off, their safety glasses?
A. Individuals wearing safety glasses, I do not recall anybody doing that, but I do recall the role players taking off their helmets.
Q. And we know now that they took off their helmets not only during the downtime, but also during at least one live scenario.
A. That's correct.
Q. And Sergeant Faubion, I appreciate your patience here. Mr. Brown did a good job of covering a lot of ground. I'm trying not to be duplicative of those efforts late on a Friday afternoon, so bear with me. I'll see if I can skip through a few things.
So I think you've already testified that, to your knowledge, there was never a time when Mr. Nelson wasn't present during this -- the active scenarios; is that right?

A. I believe so, yes.

Q. I think you also testified that there wasn't ever a time, to your knowledge, when Mr. Nelson wasn't actively observing the conduct of those scenarios; is that right?

A. That's correct.

Q. And to your knowledge, was there ever a time when Mr. Nelson couldn't have called stop action during one of the scenarios, anything that would have prevented him from doing that?

A. I know -- I can't say that it was specific to during scenarios. I know that there were times when he got phone calls that he had to answer, but I can't specifically say whether or not it was during an active scenario or if it was during one of the downtimes. But I do know there were times that we were in the gym that he received phone calls.

Q. Okay. Was there ever a time when Mr. Nelson wasn't the lead instructor in charge of the scenarios?

A. As we were all -- this was a

instructor class. We were supposed to take on the role of the instructor during the scenarios. So in that aspect, as far as the ones that were giving the commands, each time a new student came up they were, quote/unquote, the lead instructor providing the instruction. But, again, to my knowledge, Mr. Nelson was present during those times.

Q. And -- and that's an important distinction, so let me try to rephrase that a little bit.

Understanding that each of the students participating in the class rotated through four scenarios where they were the student instructor for the scenario, right?

A. Correct.

Q. But there was only one actual instructor for all of the class, and that was Mr. Nelson, not a student instructor, but the instructor for the class?

A. To my knowledge, yes.

Q. To your knowledge, did anyone else

ever come in and relieve him of his instructor duties while the scenarios were going on? Did anybody else come in and say all right, this guy is in charge while I go to the bathroom or go take a lunch break or anything like that? Did that ever happen?

A. Not that I recall, no.

Q. All right. Sergeant, that's all I've got for you for right now. I'm not sure if Mr. Casey has anything for you.

A. Okay.

Q. Thank you.

MS. REPORTER: Could we take a short break? I'm sorry.

MR. CASEY: Yeah, that's fine.

MR. BUCKNER: Sure.

THE WITNESS: Okay.

VIDEO OPERATOR: It's 5:38 p.m. --

MR. BROWN: A five-minute break?

MR. BUCKNER: Does -- does five minutes work?

THE WITNESS: Yes, that's fine for

me.

MR. BUCKNER: All right. Why don't we be ready to go in five minutes. It's getting late for all of us on the East Coast.

MS. REPORTER: Thank you.

(Thereupon, a brief recess was taken.)

VIDEO OPERATOR: The time is 5:42 p.m. We're back on the record.

EXAMINATION BY COUNSEL FOR DEFENDANT RICHARD NELSON

BY MR. CASEY:

Q. Sergeant Faubion, good afternoon. I'm Brian Casey. I represent Richard Nelson. And I'll have a few questions for you, but not very many.

Are -- can you hear me okay?

A. I can.

Q. Good. I want to talk a little bit about the scenarios.

Did the scenarios help train students to assess whether the role player posed a threat

and to respond accordingly?
A. They did.
Q. And did the scenarios help train the students to act quickly after they encountered the role player?
A. They did.
Q. And why is learning to act quickly after encountering the role player part of the scenario training, to your understanding?
A. Because every time as law enforcement officers when we're dealing with a situation, there's going to be something unexpected that happens and we need to be able to act in a quick and appropriate manner so that we can have the safest outcome possible for all those involved.
Q. And is it generally safer to -- a -- a safer outcome when the officer in the field acts quickly to address the situation?
A. I mean, I would say that depends on the situation. There -- there are some situations where being patient may be better, but generally when faced with a -- an immediate use

of force situation, then yes, you would want the officer to react quicker rather than slower.

Q. And going back to the scenarios, did the scenarios then end when the student -- after the student had assessed the situation and responded?

A. That's correct.

Q. And about how long did the scenarios take from the time the student first encountered the role player, assess the situation and responded for the scenario to then end?

A. I would have said maybe around 30 seconds. They're not very long at all.

Q. All right. And during those seconds that the scenario was occurring, did the student and the role player sometimes move around or did they stay stationary?

A. They moved around.

Q. And what -- what prompted them to move around, as you observed?

A. Most of the movement was based on the student reacting to the movements of the role

player.

Q. Can you describe that?

A. So if the role player entered the scenario area and had some sort of weapon, we are taught as police officers to create distance between us and the threat, so the student would then back away from the role player to create distance.

Q. And in some of those scenarios where the student backed away from the role player to create distance because the role player had a weapon, in some of those scenarios the student backed out of the four corners of the box, correct?

A. That's correct.

Q. And did the role player sometimes follow the students, the ones who were acting as aggressors with weapons?

A. That's correct.

Q. And is that a situation where both the student and the role player would end up outside of the box before the scenario ended?

A. That's correct.

Q. But regardless of where the student and the role player moved or ended up when the scenario ended, the scenario generally ended quickly; is that right?

A. That's correct.

Q. And that's because one of the points of the scenarios is to train students to quickly assess the possible threats and respond?

A. That's correct.

Q. Now, you mentioned earlier in your testimony that you -- that you observed that Instructor Nelson on the whole conducted the training in a safe manner.

Do you remember that testimony?

A. That's correct.

Q. Do you agree that even when an instructor on the whole conducts training in a safe manner, a participant or a student can still do something that is not safe?

A. That's correct.

Q. And do you agree that an instructor

cannot control all of the actions or conduct of a participant or a student during training?

A. That's correct.

Q. And in this particular case or this particular training that we're talking about on December 14, 2017, if someone in the gymnasium in Virginia Beach did not wear eye protection during an active scenario, that person is doing something that's not safe.

Do you agree with that?

A. That's correct.

Q. And that person would not have been following the safety protocol or rules, correct?

A. That's correct.

Q. Sergeant, I think those are all the questions I have. Thank you.

A. Okay.

FURTHER EXAMINATION BY COUNSEL FOR DEFENDANT AXON ENTERPRISE, INC.

BY MR. BROWN:

Q. Sergeant, I have some additional questions for you in relation to the cartridges

that you were allowed to bring into the training room on December 14, 2017.

Can you describe whether those were the ordinary cartridges that you would carry if you were holding your CEW in the field or not?

A. They were not.

Q. And how were they different from the cartridges that you would carry in the field ordinarily?

A. The training cartridges do not include electric -- electric -- excuse me.

The -- the wires don't conduct electricity.

Q. Okay. So it's your understanding of those training cartridges that they are not able to deliver charge to a subject?

A. The particular ones that we were using that day, correct, they do not deliver a charge.

Q. Okay. And is their purpose, then, to assist the participants with targeting so they get a sense of how the darts are propelled out of

the cartridge? Is that accurate?

A. I'm sorry. Could you rephrase the question?

Q. Yes. Is it accurate to say that the training cartridges that you were using on December 14, 2017 during the -- the practical portion, these cartridges were for the purpose of the trainees to understand how the darts would be propelled out of a TASER CEW cartridge; in other words, to assist them with targeting, to understand how to -- to aim their device?

A. Yes, that's correct.

Q. Okay. Are you aware of an area other than the eyes that could be struck by a dart and suffer permanent injury in the absence of electrical current being delivered?

A. I know that we are training to avoid when you're on the -- when you're looking at the front of a person, you're trained to avoid the genitals, the breasts, the neck, the face and the head, and then on the rear of a person you're trained to avoid the neck and the head. Those

are all areas that have increased danger involved with them.

Q. Okay. And do you think that the -- the increased risk for those areas is equal for the training cartridges, as compared to the traditional cartridges that you would carry for your CEW on duty?

A. I think when there's electricity involved, there's more risk. But in terms of probe strike, those are equally as dangerous just in terms of the probes striking that area.

Q. Okay. In regard to the probes, you understand that those -- they're attached to wire. You mentioned the -- the wire earlier, correct?

A. Correct.

Q. And do you know whether that -- the wire in those training cartridges was sufficiently long to enable a dart to strike an observer?

A. I know that when -- it's -- it's dependent on the -- the placement of the

observer. When we were learning how to be the instructor, oftentimes the observers were closer than -- for -- for instance in the video that we watched where I identified myself, at that point we were standing far away, but there were times where someone was closer to the area. So it would have been possible for one of them to have been struck.

But generally, no. Everybody else was farther away. So unless the probe broke off of the wire, they would not have been struck.

Q. Okay. And one of the reasons for the safety glasses is in case there is such an incident where the -- the probe becomes untethered from the wire, in your understanding; is that accurate?

A. That's correct.

Q. Okay. Is it accurate to say that in comparison to the other sensitive areas that you identified a moment ago, probes striking eyes can cause permanent injury?

A. That's correct.

Q. Okay.

MR. BROWN: Mr. Buckner, do you have additional questions?

MR. BUCKNER: I -- I do. Very, very quickly.

FURTHER EXAMINATION BY COUNSEL FOR PLAINTIFF

BY MR. BUCKNER:

Q. Sergeant Faubion, you were just talking about the -- whether the wire in the cartridge is sufficiently long to strike an observer and you said that it's possible some of them were close enough that they could have been struck, others could have been struck if the probe broke off the wire.

Is that correct?

A. That's correct.

Q. And you were then asked is that the reason why the glasses were required in this case, in case it broke and becomes untethered from the wire.

I think you said yes to that, right?

A. That's a part of it, yes.

Q. And that was my question to you, that's only part of it. I mean, you -- that's -- the glasses is one protective measure. You also want to make sure -- that's one of the reasons why you don't point the loaded TASER even with a practice round at somebody that doesn't have full body protection, correct?

A. That's correct.

Q. Mr. Casey was asking you some questions about the speed at which the training occurs, the training scenarios occur.

Do you recall that line of questioning?

A. I do.

Q. And the speed of the scenario is only the active scenario, that is, when the role player comes into the box and the participant is required to engage with the role player until that scenario is concluded. That piece occurs quickly, correct?

A. That's correct.

Q. But once the scenario is ended, that

specific scenario is ended, there's nothing that has to occur quickly, right? Between the end of one scenario to the start of the next scenario, there's nothing that requires speed?

MR. BROWN: Sergeant Faubion, your video went out.

THE WITNESS: Yeah, my phone just cut off.

Can you see me again?

BY MR. BUCKNER:

Q. Yes.

A. Okay. So yes, your question was after the scenario was done, that was the only part that required speed after that and the breakdowns and then setting up for the next scenario, no, there was nothing else that required speed.

Q. So if something occurred during an actual active scenario, it shouldn't have happened. Whether it's a safety issue or something else, there was time for Mr. Nelson to issue corrective instructions to discuss the

problem; to -- to correct safety issues or whatever it may have been, he had time to do that, correct?

MR. CASEY: Objection to form and foundation.

THE WITNESS: That's correct.

BY MR. BUCKNER:

Q. And to your knowledge, that was never done during the entirety of the training on December 14th that in between the end of a scenario and the start of the next scenario that Mr. Nelson provided safety corrective instructions?

MR. CASEY: Object to foundation.

MR. BROWN: Same objection.

THE WITNESS: I can't say that that never happened, no.

BY MR. BUCKNER:

Q. Well, and my question was to your knowledge did it ever happen.

A. Not that I recall, no.

Q. Okay.

MR. BUCKNER: That's all I have.

MS. REPORTER: Signature?

MR. BUCKNER: Brian, did that prompt anything for you?

MR. CASEY: You want me to keep asking questions?

MR. BUCKNER: I really don't, but I feel an obligation to at least ask, be a nice guy and ask.

MR. CASEY: Appreciate the ask. I'm done. Thanks.

MR. BUCKNER: And, Sergeant, none -- none of us represent you, but I will tell you that in Virginia you've got the right after you've been deposed to review the transcript and see if there's any errors in the transcript and you can make corrections to those errors. The court reporter would send it to you, you'd have to read it, you'd write on an errata sheet what those corrections are, you send it back to The court Reporter or you can

waive that and the court reporter will type up the transcript exactly as it's been taken today and you're done with your deposition.

And you just have to advise the court reporter whether you would like to read and sign or whether you would like to waive that.

THE WITNESS: I will waive.

MR. BUCKNER: All right. That's an excellent choice late on a Friday as well.

All right. Sergeant, I will send you that E-mail so that you have my contact information so that you can provide the videos and I will share that with counsel once I receive them.

Thank you for your time late on a Friday. Very much appreciated.

THE WITNESS: Okay.

MR. CASEY: Thank you, Sergeant.

MR. BUCKNER: Thanks.

MS. REPORTER: Please don't leave.

MR. BROWN: Thank you, Sergeant.

VIDEO OPERATOR: It's 5:59 p.m.

This concludes the deposition of Sergeant Matthew Faubion. We're off the record.

(Thereupon, signature having been waived, at 5:59 p.m. the deposition was concluded.)

CERTIFICATE OF NOTARY

I, MISTY KLAPPER, the officer before whom the foregoing deposition was taken, do hereby certify that the witness whose testimony appears in the foregoing deposition was duly sworn by me; that the testimony of said witness was taken by me in shorthand and thereafter reduced to typewriting by me; that said deposition is a true record of the testimony given by said witness; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken; and, further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

_________________________

Misty Klapper

Notary Public

**A**
**abbreviation** 70:18
**ability** 52:3
**able** 24:20 27:21 55:7,8 70:9 83:13 88:15
**absence** 89:15
**academy** 15:19 17:9,13,16,17
**accurate** 10:9 21:6 23:2,12 28:8,14 30:1 31:16 34:8 36:11,20 37:8 41:21 43:8,22 44:16,18 62:2 89:1,4 91:16,18
**accurately** 27:8
**acquired** 18:6
**acronym** 8:6,13
**act** 83:4,7,13
**acting** 85:17
**action** 24:21 25:1 25:10,17 32:15 32:18,21 33:4,9 34:5,9,13 35:3 40:17 41:15,19 41:22 42:1,11 44:1,16 54:13 59:12 60:6 65:15 74:4,16 75:14 77:3,5 79:9 99:13,19
**actions** 58:1 87:1
**active** 43:11,14 43:15,18 78:22 79:15 87:8 93:16 94:19
**actively** 51:16 64:21 67:19 75:22 76:18 79:4
**acts** 83:18
**actual** 66:1,6
80:17 94:19
**addition** 20:18 27:15 48:13 50:15
**additional** 46:3 87:21 92:3
**address** 83:18
**addressing** 20:6
**adequate** 61:4
**adjacent** 52:13 52:19
**advance** 72:19
**advise** 97:5
**afternoon** 6:13 47:4 78:17 82:13
**agency** 45:21
**aggressor** 56:12 56:22
**aggressors** 85:18
**ago** 34:8 91:20
**agree** 12:14 13:14,22 14:7 86:17,22 87:10
**ahead** 34:20 38:6 61:16 69:2 71:13
**aid** 40:6
**aids** 32:7 70:1
**aim** 89:11
**airsoft** 27:16 28:4 57:9 60:20
**al** 1:8 5:6
**allowed** 88:1
**AMY** 3:8
**amynguyen@a...** 3:11
**annual** 18:12
**answer** 7:1,13,20 34:22 50:2 51:14 59:21,22 61:10 66:9 68:7 79:14
**answered** 12:21 14:20
**answering** 7:9
**anticipated** 48:8
**anybody** 78:7 81:3
**anytime** 24:21
**apologize** 71:13
**appear** 63:11 64:7
**APPEARANC...** 3:1,2
**appears** 57:2 63:22 64:14 99:5
**application** 16:20
**applied** 39:2
**appreciate** 78:13 96:10
**appreciated** 97:18
**apprehend** 22:10
**appropriate** 83:14
**approximately** 10:2 37:3
**area** 27:8,12,13 27:21,22 28:13 28:14 33:14 35:8 39:3,6 42:7 44:10,13 48:1 53:18 54:7 77:3,3,8,11,11 77:12 85:4 89:13 90:11 91:6
**areas** 34:3,6 48:15,16,20 59:8 60:10 90:1 90:4 91:19
**Arizona** 3:10
**aside** 11:20 28:7
**asked** 32:14 63:18 92:17
**asking** 47:17,18 93:9 96:6
**ASP** 12:11
**aspect** 80:3
**assess** 82:22
84:10 86:9
**assessed** 84:5
**assigned** 20:22
**assist** 17:1 88:21 89:10
**assume** 7:14 48:11 59:2
**attached** 90:13
**attend** 16:9
**attendance** 15:21 15:22 16:8 21:9
**attended** 11:8,15 15:4 18:8,21 19:3
**attendees** 26:2
**attention** 29:15
**attorney** 7:6 99:16
**attorneys** 7:8 8:13 70:10
**avoid** 49:15 89:17,19,22
**aware** 24:19 89:13
**Axon** 1:8 3:9,12 5:5,11 6:11 8:19 48:13 87:19
**A-U** 70:16

**B**
**B** 4:8 70:16
**back** 18:19 23:5 27:19 32:7 34:7 35:15,20 39:11 45:21 53:18 54:6 55:13 60:15 62:1 67:9 70:1 75:13 76:5 82:10 84:3 85:7 96:22
**backed** 85:10,13
**bald** 66:18
**barrier** 36:10 74:3
**barriers** 74:11,14
**based** 60:2 62:10 65:5 73:7 84:21
**basic** 17:9,19
**bathroom** 81:4
**baton** 12:10,11
**BBs** 27:21 60:20
**bcasey@taylor...** 3:17
**Beach** 3:16 8:4 87:7
**bear** 26:11 30:12 61:12 78:17
**becoming** 19:7
**began** 40:6
**beginning** 24:1 26:1 36:19 43:18
**begins** 5:3
**believe** 42:9 53:17 59:12 63:1 77:19 79:1
**bench** 63:17 72:12 76:6
**best** 19:14,15,18 70:12
**bet** 51:13
**better** 83:21
**bit** 29:1 62:4 63:13 71:12 80:11 82:19
**black** 36:2 55:14 56:6 63:12
**blue** 28:13 33:13 33:17 35:9 36:9 39:3 42:7 44:9 44:13 56:13 60:10 63:16 71:10 73:3
**body** 43:3 48:15 93:7
**bottom** 66:12
**box** 54:22 56:14 57:17 59:14 61:3,20 62:8 64:1 71:7,9,16 71:18,20 72:6

75:14,16,19 85:13,22 93:17
**boy** 70:17
**break** 7:18,19,21 81:5,14,19
**breakdowns** 94:15
**breasts** 89:20
**BREIT** 3:3
**Brian** 3:15 82:14 96:3
**brief** 82:7
**bring** 88:1
**broke** 91:10 92:14,19
**brought** 8:18 45:16 47:10
**Brown** 3:8 4:3 6:9,12 11:19 13:6 14:21 28:21 34:21 38:7 46:5 47:18 49:8,18,22 59:18,22 61:7 63:2,18 66:7 68:17,19 72:13 73:22 78:14 81:19 87:20 92:2 94:5 95:15 98:1
**Buckner** 3:3,3 4:4 12:17 14:18 34:19 38:5 46:4 46:5 47:3,9 49:11,20 50:8 52:17 59:20 60:16 61:9 63:3 66:8 68:6 69:1 81:16,20 82:2 92:2,4,7 94:10 95:7,18 96:1,3 96:7,12 97:10 97:21
**Buckner's** 68:20

**C**

**C** 4:1 5:1
**call** 24:21 25:3,16 29:15 41:18 44:1,15 54:12
**called** 6:6 25:10 25:11 33:9 41:16 42:2 59:13 79:8
**calling** 32:18,20 33:3 34:9,13 40:17 42:10
**calls** 68:21 79:13 79:18
**camera** 5:21
**CANTOR** 3:3
**canvasses** 22:11
**capacity** 10:14 10:18
**carries** 24:3
**carry** 88:4,8 90:6
**cartridge** 89:1,9 92:10
**cartridges** 87:22 88:4,8,10,15 89:5,7 90:5,6 90:18
**case** 1:7 69:19 87:4 91:13 92:19,19
**cases** 22:10
**Casey** 3:15 4:5 61:6 68:4,16 81:10,15 82:12 82:14 93:9 95:4 95:14 96:5,10 97:20
**cause** 24:16 48:16 49:3 60:5 91:21
**caused** 59:15
**causing** 50:6
**certain** 16:9
**CERTIFICATE** 99:1
**certification** 11:4 17:6 18:4,9,14
**certifications** 10:22 11:6 19:20
**certified** 2:17 18:1,2 50:15,19
**certify** 99:4
**CEW** 8:7 17:4,11 17:22 18:1 19:2 19:7,19 24:2,2 24:20 36:2 38:19 39:14 48:1,9 74:18 88:5 89:9 90:7
**CEWs** 20:3 23:4 24:6,10 25:18 27:15 28:5 38:10
**chance** 9:3
**changes** 53:2,6
**characterize** 13:7
**charge** 79:20 81:4 88:16,19
**checking** 71:1
**choice** 97:11
**clarify** 19:1
**class** 16:2 18:9 23:19 61:2 67:12 80:1,13 80:18,20
**classroom** 15:8 15:11,15 18:16 21:5,9,20 22:1 22:15,18,21 23:11,17,20,22 38:8,13
**close** 12:7 65:10 92:12
**closed** 73:5
**closed-off** 77:18
**closely** 22:8,12
**closer** 91:2,6
**closest** 67:2 72:8
**Coast** 82:5
**collar** 11:18
**colon** 29:16
**combat** 12:7
**come** 21:22 56:13 58:17 71:19 81:1,3
**comes** 49:16 51:8 93:17
**coming** 33:22 34:1 60:9 61:2 61:20
**command** 25:1,2 25:4 35:2 73:6
**commands** 35:6 80:4
**compared** 90:5
**comparison** 91:19
**completed** 31:22 31:22 37:2,4
**component** 38:14
**conclude** 74:19
**concluded** 23:12 23:22 31:14 93:19 98:8
**concludes** 98:3
**conclusion** 33:2 43:17 68:21
**conduct** 79:4 87:1 88:12
**conducted** 1:14 8:10 15:11,17 27:9 30:4 33:8 34:18 36:1 43:12 44:5 45:8 68:3 86:13
**conducting** 45:3 45:20 68:14
**conducts** 86:18
**confidence** 45:2
**configured** 58:12
**confined** 71:17
**confines** 73:12 75:6,14
**confirm** 8:14 32:12
**connected** 40:7
**consider** 27:11 58:6
**considered** 27:14
**consistent** 48:12 57:20 58:2
**contact** 70:8,13 70:21 97:14
**contain** 74:4
**context** 62:4
**continuation** 29:20
**continues** 39:17
**continuing** 25:20
**control** 87:1
**coordinator** 16:7 16:11 17:3
**corner** 56:9
**corners** 85:13
**Corporation** 5:12
**correct** 8:11 10:11 12:16 13:17 17:21 22:16 23:15 26:4 28:6,10,15 30:5,21 31:12 34:10 36:5,12 36:15,21 38:4 38:12 39:15,16 39:22 40:8,9 41:3,19,20 42:12,13 43:13 43:21 44:3,17 44:20 47:15 48:3,10,18,21 49:2,7 50:13,17 51:19 52:10,11 52:14,20,21 53:8,9 54:13,14 55:2 56:15,18 56:22 57:1,18 58:4,5,16,21,22 59:5,6,10 62:17 63:10,19,20 64:2,3,6,7,13 67:3,6,14,16,17 67:21,22 68:8 70:2,3 76:22

77:14 78:12 79:6 80:16 84:7 85:14,15,19 86:1,6,10,16,21 87:3,11,13,14 88:18 89:12 90:15,16 91:17 91:22 92:15,16 93:7,8,20,21 95:1,3,6
**corrections** 96:18 96:21
**corrective** 65:15 94:22 95:12
**correctly** 30:10 30:16,20 36:4 39:21 41:2 47:5 50:14
**counsel** 3:6,12,18 5:15 6:10 47:2 82:11 87:18 92:6 97:16 99:11,16
**course** 11:10
**court** 1:1 5:7,14 5:18 96:19,22 97:1,6
**cover** 6:20
**covered** 20:15 23:3,9 38:14
**covering** 38:21 78:15
**coverings** 43:4
**Craun** 21:17,19 22:1,15 30:18 31:11 32:5 33:2 40:14 41:7 45:1 45:18 60:12 66:15 67:4 69:22 71:2 75:11
**Craun's** 22:6 31:13,18
**create** 71:17 85:5 85:7,11
**created** 56:14
57:17
**crimes** 11:18
**Criminal** 17:16
**Crown** 75:11
**CRR** 1:20
**Curran** 1:5 5:5 8:18,18 26:6 35:4 36:8 37:5 39:18 40:3 41:11 42:6,15 47:9 54:4,10 75:21 76:4,9
**current** 9:13 89:16
**cursor** 56:4,5,21 58:3 64:5 66:17
**cut** 11:12 16:17 32:8 94:8

**D**

**D** 5:1
**damage** 48:16
**danger** 90:1
**dangerous** 48:22 90:10
**dark** 66:17
**dart** 89:14 90:19
**darts** 88:22 89:8
**date** 29:3,16 30:2 30:2
**dated** 4:11
**day** 23:17 47:13 53:11 54:13,16 55:1,11 56:17 66:4 73:11 88:18
**days** 15:1,5
**dealing** 83:11
**death** 48:17 49:4 49:7,15 50:7,12
**December** 8:3 9:1,8 14:22 15:3 18:19 19:4 19:4 21:5,20 29:20 42:3,11 47:11 71:7,22
87:6 88:2 89:6 95:10
**decided** 40:11
**deescalation** 12:11
**DEFENDANT** 3:12,18 6:10 82:11 87:19
**Defendants** 1:9
**defensive** 12:6
**definitely** 21:12
**deliver** 88:16,18
**delivered** 89:16
**department** 9:11 9:17 10:10,13 11:5 15:22 17:14,20 19:14 21:16 22:4
**dependent** 90:22
**depends** 83:19
**depict** 27:8
**depicted** 26:14
**deployed** 24:10
**deposed** 6:17 96:15
**deposition** 1:13 5:4,10 28:18 71:14 97:4 98:3 98:7 99:3,6,9 99:14
**depositions** 71:15
**describe** 40:1 42:18 85:2 88:3
**describing** 31:1 40:16
**DESCRIPTION** 4:9
**designated** 20:19 67:15 68:13 69:12
**designed** 74:6
**detective** 9:22 10:7 11:11,17 22:8
**device** 89:11
**devices** 28:3
**different** 28:17 62:20 72:20 88:7
**differently** 71:12
**direction** 40:10 40:13 59:15 61:4 74:10
**discharge** 57:20 65:10
**discharged** 58:13
**discuss** 43:16 94:22
**discussed** 23:8 45:13 75:16
**discussing** 42:22 60:13 75:21
**discussion** 45:11
**discussions** 76:3
**distance** 85:5,8 85:11
**distinction** 25:9 25:12 80:10
**District** 1:1,2 5:7 5:8
**DIVISION** 1:3
**document** 28:17 29:1
**doing** 33:21 74:7 78:7 79:10 87:8
**door** 77:18
**doors** 77:19,21
**dot** 70:18
**downtime** 42:21 78:3,4,10
**downtimes** 79:16
**drill** 54:22,22 59:16 71:7,9,16 71:20 72:6,10 72:19
**drills** 72:21
**Drive** 3:4
**driver's** 5:21
**due** 27:14 34:16 60:18
**duly** 6:7 99:6
**duplicative** 78:16
**duties** 19:18 81:2
**duty** 90:7
**dynamic** 13:1

**E**

**e** 4:1,8 5:1,1 56:20
**earlier** 21:4 36:16 38:9 41:17 45:13 86:11 90:14
**East** 82:4
**Eastern** 1:2 5:7
**ebuckner@bre...** 3:6
**efforts** 78:16
**either** 55:14 57:9 60:19 62:12 76:9
**electric** 88:11,11
**electrical** 8:10 89:16
**electricity** 88:13 90:8
**Elliott** 3:3 47:8
**employed** 9:10 17:20 99:12,16
**employee** 99:15
**enable** 90:19
**encountered** 83:4 84:9
**encountering** 83:8
**ended** 69:18 85:22 86:3,4,4 93:22 94:1
**enforcement** 17:9,13,19 19:11 22:7,9 83:10
**engage** 93:18
**engaged** 13:13,22 51:16 76:1
**ensure** 21:1 50:6
**ensuring** 20:20 68:2

**enter** 56:14 64:1
**entered** 85:3
**Enterprise** 1:8 3:9,12 5:6,12 6:11 87:19
**entire** 7:6 28:9 31:20 53:22 54:8 77:3,4
**entirely** 48:4
**entirety** 28:12 95:9
**environment** 20:21
**envisioning** 77:18
**equal** 90:4
**equally** 90:10
**equipment** 14:2 14:5,9,11 25:20 25:22 38:15 40:7
**errata** 96:20
**errors** 96:17,18
**ESQUIRE** 3:3,8 3:8,15
**established** 38:3
**estimate** 37:2
**et** 1:8 5:6
**EVENING** 47:1
**everybody** 47:21 67:11 91:9
**exactly** 97:2
**examination** 4:2 6:6,10 47:2 82:11 87:18 92:6
**examined** 6:7
**excellent** 97:11
**excuse** 69:6 88:11
**exercise** 14:12 21:1 25:7,11,17 52:14,20
**exercises** 15:20
**Exhibit** 28:17,18
**exit** 57:17
**expected** 14:8
**experience** 51:10
**eye** 26:3 28:1 37:20 38:16 39:4 40:21 48:13 59:2 65:13 77:10,16 78:1 87:7
**eyeglasses** 41:1 78:5
**eyes** 73:5,6 89:14 91:20
**eyewear** 47:22
**E-mail** 3:5,11,17 70:14,15,21 97:13

**F**

**F** 70:16
**face** 38:22 40:4 89:20
**faced** 83:22
**fact** 27:15 34:4 66:2
**fair** 7:15,16 22:13 37:11 50:12 56:11 67:7 72:1
**fall** 39:18
**familiar** 8:6 26:12,15
**far** 16:2 18:12 32:1 73:18,18 80:3 91:5
**farther** 91:10
**Faubion** 1:13 4:3 4:11 5:4 6:5,16 6:18 28:22 32:10 34:22 46:2 47:4,6,8 49:12 50:2 59:11 60:1 67:7 69:2 71:6 78:13 82:13 92:8 94:5 98:4
**feel** 96:8
**felt** 45:8
**field** 83:17 88:5,8
**fill** 16:20,22
**final** 30:14 31:8 40:20 41:4 69:18
**finally** 27:5
**financially** 99:17
**fine** 12:21 81:15 81:22
**finished** 54:1,1,2
**finishing** 54:8
**fire** 39:14 52:3,14 52:20
**firearm** 51:15
**firearms** 10:20 11:7,21 13:8 50:16,19,21 51:1 52:22
**firing** 51:3,6,16 51:18,21
**first** 6:22 18:20 19:2 29:14 30:6 30:7,17 31:1,3 31:4 35:17,19 36:7 39:12 40:2 40:6,20 41:6,6 53:10 62:20 70:19 71:14 84:9
**fit** 26:20
**five** 37:9 81:20 82:3
**five-minute** 81:19
**floor** 39:18
**flowing** 35:5
**focusing** 11:17
**follow** 13:15 14:8 14:13,15 85:17
**followed** 23:13 31:17
**following** 29:19 65:15 87:13
**follows** 6:7
**followup** 46:3
**force** 11:22 57:10 75:5,7 84:1
**forced** 29:7
**foregoing** 99:3,5
**Forest** 3:4
**form** 5:22 12:17 14:18 40:22 49:8 50:1 59:18 61:6,8 65:13 68:4,16 95:4
**foundation** 38:5 49:22 59:19 61:7 63:2 66:7 68:5,17 95:5,14
**four** 36:13 37:9 73:13 80:14 85:13
**Frank** 70:16
**free** 32:2
**Friday** 5:9 78:16 97:11,18
**front** 89:19
**full** 6:14 29:14 38:21 43:2 93:6
**fully** 65:6
**further** 64:10 87:18 92:6 99:14

**G**

**G** 5:1
**gear** 26:3
**general** 10:19 22:10,22 23:9 32:13
**generalized** 12:2
**generally** 19:11 23:8 53:2 75:16 83:16,22 86:4 91:9
**genitals** 89:20
**gentleman** 55:6 57:2,4 62:8,15 66:16
**gentleman's** 67:1
**getting** 56:13
64:1 77:15 82:4
**give** 45:22
**given** 99:10
**gives** 14:11
**giving** 80:4
**glasses** 28:12 37:13,20 39:8,8 39:10 40:22 65:1,4,17 78:5 78:6 91:13 92:18 93:3
**Glen** 3:4
**go** 19:17 30:19 31:3,6 33:13 34:20 38:6 53:11,15 61:20 65:10 69:2 73:19 74:1 81:4 81:4 82:3
**going** 17:8 20:21 23:5 26:10,18 30:13 34:7 35:16 41:6 42:7 43:14 44:13,21 49:18 54:16 55:1,17 62:9 63:6 65:7 74:1 75:13,17 77:21 81:2 83:12 84:3
**good** 6:13 47:4 78:14 82:13,19
**grabbing** 40:4
**GRANA** 3:3
**Grayson** 21:17 21:19 22:1,14
**gray-colored** 57:3
**ground** 40:3 64:15 78:15
**guideline** 34:2
**guy** 81:3 96:9
**gym** 28:9 39:5 47:21 53:13,22 55:5 63:5 73:11 77:3,4,11,17 79:17

**gymnasium** 15:20 26:9 30:8 32:3 33:7 40:7 42:21 53:20 54:7 87:6

**H**

**H** 4:8
**hallway** 27:20 39:6 77:13,16 77:18
**Hampton** 17:16
**hand** 6:3 57:6,11
**handful** 6:20
**handled** 24:7
**hands** 57:7
**Handwritten** 4:10
**happen** 66:2 81:6 95:20
**happened** 94:20 95:17
**happens** 83:13
**hard** 62:5
**harm** 49:4,6 50:12
**harmed** 52:10
**HD** 55:3
**head** 7:2 38:21 43:4 48:19 55:13 59:8 89:21,22
**headgear** 43:20
**hear** 49:12 50:14 76:8 82:17
**heard** 39:17
**heart** 48:19 59:9
**held** 5:11
**helmet** 42:16 64:6,8,18,22 65:9,16 66:5 76:20
**helmets** 43:3 65:22 76:11 78:8,10
**help** 14:6 82:21 83:3
**hereto** 99:17
**hide** 36:18 74:6
**historically** 17:5
**hit** 56:19 57:12
**hitting** 58:14
**hold** 5:20 55:22 62:5
**holding** 88:5
**hot** 35:12 42:20 51:21 52:1,8 53:7 77:3,8

**I**

**ideally** 74:8,13
**identification** 5:22 28:20
**identified** 64:5 91:4,20
**images** 27:7
**immediate** 83:22
**immediately** 66:14,14
**implemented** 75:13
**important** 13:15 13:19 14:1 80:9
**impression** 34:17 44:5
**improve** 42:22 45:19
**improved** 45:7
**inactive** 64:18
**incident** 8:2,22 9:7 26:5 29:3 35:4 41:11 42:5 42:14 54:3,9 60:8 66:11 91:14
**incidents** 35:2 41:15
**include** 12:9 25:19 48:19 51:3,6 88:11
**included** 20:2 38:21
**including** 18:16 20:6 24:2 71:15
**incorporate** 12:6
**increase** 50:11
**increased** 90:1,4
**index** 25:2,6,7
**indicated** 42:9
**individual** 66:12
**individuals** 52:7 52:12,18 53:5 58:15 59:1,15 60:18 78:6
**indoor** 51:7,9,13
**information** 16:10 70:8,13 70:21 97:14
**inherent** 13:2
**initial** 17:5 70:19
**initially** 18:1,2
**injured** 52:10
**injuries** 14:6 20:8 24:17 47:10 48:13 49:15
**injury** 12:15 24:3 48:16 49:4,6 50:7,12 77:15 89:15 91:21
**inserted** 52:5
**inside** 35:12 39:5 42:20 52:5 62:8 71:9 73:3,12 74:9,14,19 75:1 75:19 77:10,11
**instance** 16:14 91:3
**instances** 45:10 45:17
**instruct** 31:11 73:16
**instructed** 20:10 29:9 31:5 40:21 45:1
**instructing** 32:1 41:7 51:10
**instruction** 14:11 30:17 33:1 67:11 75:9 80:6
**instructions** 14:13,15 94:22 95:13
**instructive** 10:18
**instructor** 8:19 10:14,17,19,20 10:20 11:1,3,21 13:4,8 14:10 18:21 19:3,7,8 22:18 30:9 35:8 35:11 38:2 39:9 41:1 45:3 50:16 50:19,22 60:3 60:22 61:22 62:13,15 68:1 68:14 69:4 73:7 79:20 80:1,2,5 80:15,18,19,20 81:1 86:13,18 86:22 91:2
**instructors** 27:18
**intended** 73:12 74:4
**interact** 72:22
**interacted** 22:17
**interested** 16:9 19:6 99:18
**interference** 19:13 49:9
**involved** 13:3,21 72:3 83:15 90:1 90:9
**involves** 13:1
**involving** 26:6 35:4 37:4 54:3 54:9
**in-service** 12:3,5
**issue** 44:2 94:20 94:22
**issues** 55:21 95:1
**items** 28:7
**I-O** 70:17

**J**

**job** 1:21 78:14
**joint** 17:16
**July** 1:15 2:2 5:9
**jumped** 61:15 71:13
**Justice** 17:16

**K**

**keep** 74:22 75:14 75:18 96:5
**killed** 52:10
**kind** 71:13
**kit** 40:6
**Klapper** 1:20 2:16 5:14 99:2 99:21
**know** 7:10,19 16:21 19:10 20:14 21:14,18 21:22 22:4 30:16 32:4 47:11 51:22 54:11 55:3,4,6 55:12,18 60:4 62:18 65:1,3,14 70:5 72:10,14 74:20 77:20 78:9 79:11,12 79:16 89:17 90:17,21
**knowing** 34:4
**knowledge** 19:16 60:21 69:10 73:17 76:14 78:20 79:3,7 80:7,21,22 95:8 95:20
**known** 58:19

**L**

**L** 3:8
**large** 22:3
**Laskin** 3:16
**late** 78:16 82:4 97:11,17
**law** 17:9,13,19

19:11 83:10
**lead** 79:20 80:5
**leading** 34:19
**learning** 83:7 91:1
**leave** 97:22
**left** 34:4 66:14,15 67:1,2
**left-hand** 56:9
**legal** 5:15 68:21
**length** 73:22
**lethal** 27:16
**let's** 59:1
**license** 5:21
**light-colored** 66:18
**limit** 75:6
**limiting** 75:18
**line** 29:20 30:6 51:18,21,21 52:1 93:12
**little** 29:1 62:4 63:13 64:9 71:12 80:11 82:19
**live** 51:3,6 52:14 52:20 66:1,6 78:11
**loaded** 52:4 93:5
**located** 76:17
**location** 26:7,13 26:14
**long** 9:16 10:2 84:8,13 90:19 92:10
**look** 26:12,15 62:7,9 69:15
**looked** 26:17
**looking** 35:17 39:12 40:6,19 41:4 60:8 66:22 89:18
**lookout** 69:12
**looks** 61:19 63:15
**loose** 58:17
**loss** 20:7
**lot** 73:4 78:15
**loud** 7:1
**lower** 56:9
**lunch** 81:5
**lying** 40:3

**M**

**M** 3:3 70:16
**magazines** 52:5
**Magna** 5:15
**main** 30:7 73:2
**maintain** 25:19
**major** 41:14
**majority** 17:1
**manner** 21:2 34:18 45:4,9 83:14 86:14,19
**marked** 28:19
**Mary** 70:16
**master** 8:19 22:18 35:7,11 38:2 39:9 45:2 68:1,14
**mat** 28:14 33:13 36:10,13 39:3 39:19 42:7 44:10,13 56:13 58:15 60:10 63:17 76:6
**materials** 72:7
**mats** 33:17 35:9 35:12 36:18 56:14 57:17 63:22 71:10,17 72:4,11 73:3,13 73:18,19 74:2,4 75:1
**matter** 5:5 47:10
**Matthew** 1:13 4:3,10 5:4 6:5 6:16 98:4
**mean** 25:13,15 31:2 41:13,14 51:22 72:20 74:3,15 83:19 93:2
**meant** 12:19 24:13
**measure** 93:3
**member** 22:6
**memory** 9:7 77:20
**mentioned** 13:10 21:4 25:5 28:2 28:4,11 36:16 38:9 41:17 67:10 86:11 90:14
**met** 21:19
**middle** 35:19
**mind** 71:1
**minimize** 13:5,20 49:6
**minimum** 38:16
**minutes** 81:21 82:3
**missed** 58:14
**Misty** 1:20 2:16 5:14 99:2,21
**mode** 75:9
**moment** 26:11 30:12 32:9 34:8 69:7 91:20
**moments** 45:22
**motion** 55:19
**move** 32:2 84:16 84:20
**moved** 84:18 86:3
**movement** 13:2 25:17 75:6 84:21
**movements** 84:22
**moving** 56:1
**multiple** 33:18

**N**

**N** 3:15 4:1,1 5:1 70:17
**name** 6:14,15 47:8 70:19
**nature** 12:12 22:11
**near** 52:13,19 53:1,3
**nearby** 37:16
**necessarily** 60:7 75:8
**neck** 48:19 59:8 89:20,22
**need** 7:17 35:5 50:5 83:13
**needed** 57:10 74:19
**neighborhood** 22:7,8,11
**neither** 99:11
**Nelson** 3:18 8:19 22:19 35:8,12 38:2 41:1 45:3 55:7,9,11 60:22 62:19,21 63:5 69:9 71:16 73:16 75:20 76:4,8,15 77:1 78:21 79:4,8,20 80:7,19 82:11 82:14 86:13 94:21 95:12
**never** 33:13 78:20 95:8,17
**new** 19:9 80:4
**NGUYEN** 3:8
**nice** 96:9
**NORFOLK** 1:3
**normal** 12:3
**North** 3:9
**Notary** 2:18 99:1 99:21
**noted** 5:16 63:4
**notice** 2:16
**November** 70:17
**number** 5:3 21:11 28:19

**O**

**O** 4:1 5:1
**object** 12:17 14:18 34:19 38:5 49:8,18 59:18 61:7 63:2 66:7 68:17 95:14
**objecting** 68:20
**objection** 61:6 68:4,16 95:4,15
**objections** 7:7,8
**obligation** 96:8
**observation** 37:13
**observe** 40:5 42:15 53:14 62:21
**observed** 31:17 37:9 39:14 45:1 73:8 84:20 86:12
**observer** 90:20 91:1 92:11
**observers** 37:16 38:17 60:11 91:2
**observing** 36:22 37:1,17 59:16 67:19 68:2 79:4
**obviously** 45:5,6
**occasionally** 16:15
**occasions** 16:18 16:19
**occur** 93:11 94:2
**occurred** 8:3 41:10 43:16 94:18
**occurrence** 42:18
**occurring** 84:15
**occurs** 93:11,19
**officer** 10:1,4 20:11,15,19 21:17,19 22:1,6 23:3,6 30:18 31:11,13,18 32:5 33:2 35:4

39:18 40:3,14 41:7,11 42:6,15 45:1,18 47:9 54:3,4,9,10 60:12 66:15 67:4,12,16 68:10,13 69:4 69:13,22 71:2 75:11 83:17 84:2 99:2
**officers** 19:15 50:22 83:11 85:5
**officer's** 20:17
**oftentimes** 43:1 91:2
**okay** 6:20 7:5,12 7:17,21,22 8:12 8:16 9:10 10:8 11:9,20 12:13 13:7,13 15:21 16:13 17:4,12 17:18 18:3,10 18:14,19 19:6 19:19 20:16 21:3,14,18 22:13 23:11,21 25:14,21 26:10 26:18 27:1,5 28:2,16 29:4,9 29:13 30:6,12 30:22 31:7 32:8 32:12 34:7,16 35:7,15,17 36:16 37:8,12 39:1,7,11 40:15 40:19 41:17 42:5 43:5,17 45:22 46:2 47:16 51:12 54:11,17 55:16 55:20 56:11,20 57:12 61:14,19 62:7 63:13 64:9 64:11 65:14,19 69:16 70:7 72:2 72:18 75:20 78:2 79:19 81:11,17 82:17 87:17 88:14,20 89:13 90:3,12 91:12,18 92:1 94:12 95:22 97:19
**once** 23:11 31:21 31:22 93:22 97:16
**ones** 80:3 85:17 88:17
**one-day** 23:18
**open** 34:4 73:6 75:7 77:17
**openings** 71:18
**OPERATOR** 3:21 5:2 81:18 82:9 98:2
**opportunity** 31:19
**options** 27:17 75:7
**order** 13:20
**ordinarily** 88:9
**ordinary** 88:4
**outcome** 83:15 83:17 99:18
**outdoor** 51:7,11
**outset** 6:21
**outside** 33:13 35:8 42:7 44:9 44:13 60:9,11 61:2 73:18,19 74:10 85:22
**overall** 21:1

**P**

**P** 5:1
**page** 4:2,9 30:14 35:17 39:12 40:2,20
**pants** 66:17
**paperwork** 16:21
**paragraph** 29:14 30:7,15 31:8 35:19 36:7 39:13 40:2,16 40:20 41:5
**part** 14:5 17:1,15 32:3 50:18 58:20 66:12 75:2,4,4 83:8 92:22 93:2 94:14
**participant** 14:16 24:20 57:5,16 57:19 58:4,11 59:13 61:20 62:10,12,16 73:5 86:19 87:2 93:17
**participants** 14:7 14:13 20:19 51:15 53:15 61:1,2 88:21
**participate** 10:17 72:15
**participated** 44:9 71:7,21 72:5
**participating** 27:19 32:2 33:20 36:8,19 39:15 44:4 57:8 64:22 76:18 80:13
**particular** 87:4,5 88:17
**particularly** 11:17
**parties** 5:16 69:3 99:13,17
**path** 58:7
**patience** 78:14
**patient** 83:21
**paused** 56:3,20 56:20 57:15
**PC** 3:15
**PD** 9:21
**pendency** 64:16
**pending** 7:20
**penetrate** 24:13
**penetration** 20:7 24:16
**people** 19:9 27:22 51:17 55:4 58:6 60:9 77:20,21 78:4
**perceive** 44:2
**performing** 19:17
**period** 43:7,10 45:12 69:6,9
**periods** 43:13
**permanent** 20:7 89:15 91:21
**permissible** 73:18 77:4
**permitted** 51:17 51:20 52:7,12 52:18
**person** 20:18,22 33:20 53:11 56:6 57:8 61:21 66:13,19 67:1 67:18 87:8,12 89:19,21
**personal** 41:1
**perspective** 13:18
**PETER** 3:8
**peterbrown@a...** 3:11
**phone** 79:13,18 94:7
**pick** 55:7,8
**picture** 26:12,15
**pictures** 63:18 72:12
**piece** 93:19
**pistol** 28:5 57:10 74:18
**pistols** 27:16
**place** 23:16,19 26:8 65:6 66:6 73:3 77:5
**placed** 25:18 33:19
**placement** 72:11 90:22
**Plaintiff** 1:6 3:6 47:2 92:6
**play** 38:18 55:17 56:19 57:12 62:4 63:13 77:4
**played** 73:12
**player** 36:2,8 39:15 42:16 48:5 56:12,21 57:16,20 58:1 58:12,14 63:16 63:21 64:4,15 64:18,21 73:9 82:22 83:5,8 84:10,16 85:1,3 85:7,10,11,16 85:21 86:3 93:17,18
**players** 33:19 36:18 43:2,20 59:5 62:1 63:9 66:5 71:18 74:7 76:9,16 78:8
**playing** 77:6
**please** 5:18 6:8 6:13,14 7:1,5 7:10,18 46:1 55:18 97:22
**point** 34:11,13 35:3 37:1 42:2 42:11 53:8,19 66:20 91:4 93:5
**pointed** 59:14
**pointing** 58:8 61:3
**points** 86:7
**police** 9:11,17 10:10,13 11:5 17:14,20 19:14 21:15 50:22 85:5
**pop** 69:17,17
**portion** 15:8,11

15:14 18:17 21:5,10,20 22:2 22:15,18,21 23:13,16,20,22 24:1 25:22 26:1 27:12 30:2 89:7
**posed** 82:22
**position** 9:13 10:10 22:6 25:19 39:19
**positions** 9:20 52:22
**possession** 28:3
**possibility** 20:6
**possible** 13:5 34:5 66:3 73:14 83:15 86:9 91:7 92:11
**potential** 38:18 49:15
**PowerPoint** 19:21 22:22 23:10
**practical** 12:13 12:14,18,20 13:10,14 14:1,8 14:16 18:16 23:13,16 24:1 25:22 26:1,7 27:12 30:2 35:22 53:11 54:22 89:6
**practicals** 30:9
**practice** 93:6
**precautions** 49:5 49:15 50:5,11
**preparation** 29:10
**prepared** 29:5
**preparing** 8:21
**presence** 37:16
**present** 3:20 5:16 33:7 58:13 60:14 63:5 66:11 78:21 80:7
**presenting** 73:9
**presently** 9:10
**presume** 61:21
**pretty** 22:4
**prevent** 14:6
**prevented** 79:10
**previous** 9:20 23:5
**previously** 32:14 42:10 77:9
**primary** 68:11 69:3
**prior** 9:4,19 21:19 22:1,15 22:17 26:1 37:4 37:10 38:8 42:5 42:14 72:12
**probably** 17:8 21:13 71:11
**probe** 38:19 48:14 58:17 59:3 90:10 91:10,14 92:14
**probes** 24:10,13 24:16 58:20 60:19 90:11,12 91:20
**problem** 95:1
**problems** 41:10 41:13 55:18
**proceed** 6:9 64:1
**proceeding** 21:2
**process** 14:6
**professional** 2:17 22:14
**prohibited** 28:9
**projectile** 52:4,9
**prompt** 96:4
**prompted** 84:19
**pronouncing** 47:5
**propelled** 88:22 89:9
**proper** 19:9
**protect** 65:9
**protected** 65:7
**protection** 28:1 37:21 38:16 39:4 40:22 59:2 61:5 65:13 77:10 78:1 87:7 93:7
**protective** 26:3 36:3 37:13,20 38:15,20 42:16 43:20 47:22 48:2,4,6 56:6 63:12 93:3
**protocol** 87:13
**protocols** 13:16 14:9 38:2
**provide** 29:6,8 60:22 69:9 70:7 97:15
**provided** 30:17 33:1 39:7,9 40:22 47:18 74:18 95:12
**providing** 80:6
**proximity** 65:5
**Public** 2:18 99:21
**purpose** 88:20 89:7
**purposes** 33:18
**pursuant** 2:16
**put** 62:4 64:18
**p.m** 2:3 5:10 47:1 81:18 82:10 98:2,7

**Q**

**qualify** 60:5
**qualifying** 13:10 51:10
**quality** 55:3
**quarters** 12:7
**question** 7:7,10 7:14 12:18 14:19 47:17 49:13,19 51:14 62:20 68:20 72:22 89:3 93:1 94:12 95:19
**questioning** 7:6 93:13
**questions** 7:20 32:14 46:6 47:19 82:15 87:16,22 92:3 93:10 96:6
**quick** 53:2 83:13
**quicker** 84:2
**quickly** 83:4,7,18 86:5,8 92:5 93:20 94:2
**quote/unquote** 80:5

**R**

**R** 5:1
**raise** 6:3
**raised** 45:11
**range** 51:13,17 51:21 52:8 53:3 53:7,7 58:8 59:16
**ranges** 51:7,7,9 51:11 52:22
**reaching** 37:4
**react** 73:7 84:2
**reacting** 84:22
**read** 30:10,16,20 36:4 39:21 41:2 96:20 97:7
**ready** 56:14 64:1 82:3
**really** 96:7
**Realtime** 2:17
**rear** 89:21
**reason** 34:16 48:11 75:2 92:18
**reasonable** 14:15
**reasons** 75:10 91:12 93:4
**recall** 8:21 15:1,4 15:6,7,10,13 17:7,12,22 18:15 19:21 20:1,5,10,14 21:8,11 22:20 22:22 23:7,18 26:6 29:11 31:20 32:13,18 32:20 33:3,9,12 34:9,12 35:7,10 35:11,14 37:6 37:15,19 38:13 39:7 40:10,17 40:18 42:1,4,6 42:10,20 44:8 44:11,12,14 55:15 61:11 63:7 65:18,21 69:14 72:2,17 72:18 74:9 75:20 76:2,3,12 77:1,7,9 78:7,7 81:7 93:12 95:21
**recalled** 21:4
**receive** 40:13 70:22 97:16
**received** 79:18
**receiving** 40:10
**recertification** 18:13
**recertifications** 18:5,15 19:20
**recertified** 18:7 18:10
**recess** 82:7
**recognize** 28:22
**recollection** 26:21 27:8 33:6 55:10 65:20
**record** 5:3,17 6:14 82:10 98:5 99:10
**recorded** 32:5 69:22
**recount** 31:14 35:18
**recounted** 39:2

**recounting** 30:3
**recounts** 40:3
**red** 55:14 57:4 62:8,15
**reduced** 99:8
**reference** 11:1,16 66:20 74:2
**referenced** 78:2
**referred** 25:7 71:16
**refresh** 9:7 65:20
**regard** 14:22 15:3 90:12
**regarding** 61:2 69:11 76:20
**regardless** 86:2
**regards** 11:2
**Registered** 2:17
**related** 11:4,7 47:10 99:12
**relating** 23:4
**relation** 8:22 20:2 38:10 87:22
**relationship** 22:14
**relative** 99:15
**relieve** 81:1
**remain** 53:13
**remainder** 53:14
**remedial** 61:1
**remember** 86:15
**remote** 1:14 3:2 19:13 49:9
**remotely** 5:11
**removing** 42:15 43:20
**repeat** 11:13 52:16
**rephrase** 43:9 80:10 89:2
**Reported** 1:20
**reporter** 2:17,18 5:14,18,20 6:2 6:8 11:12 52:15 68:18 81:13 82:6 96:2,19,22 97:1,6,22
**represent** 47:9 82:14 96:13
**representative** 26:16
**request** 5:11
**requested** 6:1 16:20 29:6,12
**require** 29:8
**required** 16:9,15 16:21 28:12 35:2 41:15 48:2 53:1 92:18 93:18 94:14,17
**requirement** 39:1,4
**requirements** 18:13
**requires** 14:10 94:4
**respond** 83:1 86:9
**responded** 84:6 84:11
**response** 75:5
**responsibility** 68:12
**responsible** 20:20 68:2 69:3
**rest** 31:17 53:15
**restart** 41:22
**restate** 26:13
**review** 9:3,6 96:16
**reviewed** 20:13 41:5 73:22
**reviewing** 19:21 20:1 22:22
**Richard** 3:18 22:18 82:11,14
**Richmond** 3:4
**right** 6:3 17:14 35:18 39:19 47:14 48:7,17 51:18 54:15,18 54:21 55:16 56:3,5,7,17,19 57:3,6,12,14 58:3 61:12,15 62:14 63:8,14 64:6,16,20 66:16,17 67:13 70:12,15 75:3 76:13 78:22 79:5 80:15 81:3 81:8,9 82:2 84:14 86:5 92:21 94:2 96:15 97:10,12
**risk** 12:15 13:2,5 13:20 24:3 49:6 50:11 52:9 58:19 59:3,7 60:18 77:15 90:4,9
**risks** 58:14
**RMR** 1:20
**Road** 3:16
**Roads** 17:16
**role** 20:17 31:10 33:17,19 36:2,8 36:17 38:18 39:15 42:16 43:2,20 48:5 50:21 56:12,21 57:16,20 58:1 58:12,14 59:4 62:1 63:9,16,21 64:4,14,18,21 66:4 71:18 73:8 74:7 76:9,16 78:8 80:2 82:22 83:5,8 84:10,16 84:22 85:3,7,10 85:11,16,21 86:3 93:16,18
**roles** 10:3 11:4
**room** 27:14 40:7 72:9 88:2
**rotated** 80:13
**roughly** 18:3
**round** 93:6
**rules** 6:21 87:13
**run** 37:9 56:17 57:21 64:9,17 64:21
**running** 60:15

**S**

**S** 4:1,8 5:1
**safe** 14:12 20:20 21:2 25:18 34:18 35:9 45:4 45:8 51:1 68:9 86:14,19,20 87:9
**safely** 24:7 44:6 68:3
**safer** 83:16,17
**safest** 83:15
**safety** 13:15 14:2 14:5,8,9,10 20:11,15,17,19 23:3,6 25:20,21 28:12 38:2,14 39:8,10 40:22 41:15 44:2 54:2 54:8 67:12,15 68:10,13 69:4 69:11,13 75:3,4 78:5,6 87:13 91:13 94:20 95:1,12
**saw** 63:17 72:12
**saying** 11:14 60:7 74:10,21
**says** 29:16,20 30:7 31:8 36:7
**sbucci@breitc...** 3:5
**scenario** 31:4,4,6 31:10 32:17,21 33:21 35:22 36:9,19 37:2 38:18 41:16,18 43:12,14,15,18 43:19 44:4,8,22 45:6 48:5 54:1 57:9,21 62:10 62:16 64:2,12 64:17,20 66:6 67:16,19 73:2 73:11,19 74:5 76:1,19 78:11 79:15 80:15 83:9 84:11,15 85:4,22 86:4,4 87:8 93:15,16 93:19,22 94:1,3 94:3,13,16,19 95:11,11
**scenarios** 27:9 31:13,17 32:6 33:3,4,8,13,17 37:3,9 42:7 43:7,11 44:12 45:2,12 56:16 60:14 61:21 62:22 63:6 68:13 70:1 74:8 77:5 78:3,22 79:5,9,12,21 80:2,14 81:2 82:20,21 83:3 84:3,4,8 85:9 85:12 86:8 93:11
**schedule** 15:22
**Scottsdale** 3:10
**screen** 26:10 35:16 54:17 56:4,9 57:22 61:17 66:12
**scroll** 26:18 30:13
**seated** 36:9
**second** 15:18 25:4 35:21 39:13 40:2,16 54:17 55:22 61:13 63:21
**seconds** 84:13,14
**see** 24:21 29:17

29:19 32:8 33:21 44:19 54:18 56:4,8 57:7,16,19,22 61:16 64:19 67:12,20 68:11 71:2 78:17 94:9 96:16
**seeing** 42:6 44:12 55:19 65:19
**seen** 66:1
**segment** 23:11
**send** 16:10 70:14 70:20 96:19,21 97:12
**sense** 7:3,11 13:11 88:22
**sensitive** 48:15 59:8 91:19
**sentence** 35:21 36:6 41:6,9
**separate** 15:11 15:14
**September** 9:18 10:6
**sergeant** 9:15,16 9:19 10:8 12:20 14:20 34:20,22 46:2 47:4,8 49:12 50:2 53:10 54:15 55:16 59:11 60:1 61:10,12 61:15 62:3 65:20 66:9 67:7 68:7 69:2,16,21 71:6 78:13 81:8 82:13 87:15,21 92:8 94:5 96:12 97:12,20 98:1,4
**serious** 48:16 49:4
**serve** 33:18
**served** 10:13
**Services** 5:15
**serving** 54:2
**session** 23:17 47:1
**set** 16:11 36:10 71:17 72:10 74:3
**sets** 16:8
**setting** 72:15 94:15
**setup** 63:17
**shaking** 7:2
**share** 26:10 35:16 54:17 70:9,22 71:3 97:15
**sharp** 24:13
**Shawn** 1:5 5:5 8:18 36:8 37:5
**sheet** 96:21
**shield** 38:22
**shirt** 55:14 57:3,4 66:13,18
**short** 25:6 81:14
**shortened** 25:8
**shorthand** 8:10 99:8
**show** 54:15
**side** 30:19 31:15 41:8 62:19 63:9
**sign** 16:15 97:7
**signature** 96:2 98:6
**signing** 16:2
**similar** 25:2 26:9
**similarly** 28:11
**simulate** 27:16
**simulated** 72:6
**simulation** 65:6 65:16 66:1 69:13
**sir** 5:20 6:2 47:7 49:17 59:21 70:15
**sit** 76:13
**situation** 40:5 83:11,18,20 84:1,5,10 85:20
**situations** 45:20 83:21
**size** 75:18
**skin** 24:13
**skip** 78:18
**slide** 20:14 23:7
**slides** 19:21 20:1 20:11 22:22 23:3,10
**slower** 84:2
**small** 72:9
**Sol** 3:21 5:13
**somebody** 93:6
**soon** 59:13
**sorry** 11:12 16:17 49:10 52:15 61:14 68:18 81:14 89:2
**sort** 26:7 85:4
**sounds** 43:6
**space** 26:17,21 71:18
**spaces** 72:4
**speaking** 53:3
**special** 10:21 11:3 49:5,14 50:11
**specialized** 11:16 14:11 53:7
**specialty** 11:10 52:22
**specific** 12:3 16:14 20:22 21:11 23:6 60:8 69:11,14 74:9 77:8 79:12 94:1
**specifically** 19:10 19:12 20:6,13 26:6 29:11 72:21 74:21 77:7 79:14
**speed** 93:10,15 94:4,14,17
**spill** 34:5 74:10
**spot** 66:18
**stage** 33:20
**staged** 27:19
**staging** 27:20,22 39:5 53:18 54:7 77:11,12
**stand** 52:13,19
**standing** 41:7 58:7 62:11,19 63:9 65:8 71:10 72:4 77:22 91:5
**start** 15:2,12 47:16 73:4 74:7 94:3 95:11
**started** 71:12
**state** 6:14 7:6 40:5 41:12
**stated** 43:5 77:9
**statement** 4:10 8:22 9:4 23:5 29:2,4,7,8,10 29:12 30:3,15 31:8 35:16,18 36:7,17 39:11 40:1,20 73:21
**statements** 34:7
**states** 1:1 5:7 30:16 35:21 36:17 39:13 40:21 41:10
**stating** 35:8,12
**stationary** 84:17
**stay** 34:3 74:8,14 84:17
**stenographic** 5:17
**step** 67:9
**steps** 13:4
**stood** 30:18 31:15,20 32:4
**stop** 24:21 25:1 25:10,16,17 32:15,18,21 33:3,9 34:9,13 35:3 40:17 41:15,18,22 42:1,10 44:1,16
54:12 59:12 60:6 74:12 79:8
**stopped** 63:14,15 64:11
**street** 3:9 9:22 10:4 19:17
**strike** 90:10,19 92:10
**striking** 90:11 91:20
**struck** 27:21 38:19 48:1,9,14 48:15 52:9 59:7 60:19 89:14 91:8,11 92:13 92:13
**student** 27:18 31:6 36:1 39:14 61:22 62:15 80:4,15,19 84:4 84:5,9,15,22 85:6,10,12,21 86:2,19 87:2
**students** 14:12 21:9 30:19 31:15,21 41:11 80:13 82:21 83:4 85:17 86:8
**subject** 88:16
**subsequent** 18:4 33:8
**subsequently** 23:13 44:22
**suffer** 89:15
**sufficiently** 90:19 92:10
**Suffolk** 9:11,17 9:21 10:10,13 11:4 17:14,15 17:20 18:6 19:13 21:15 22:3 32:7 51:8 60:15 70:2,17 75:13
**suffolkva.us** 70:19

**suit** 8:18 36:3 38:20 48:2,4,6 56:6 59:4 65:8
**Suite** 3:4,16
**suits** 43:3 63:12
**supervisory** 10:9
**supposed** 21:1 27:19 32:1 38:20 67:13,18 69:15 72:21 73:2 74:11,14 75:22 76:5,16 76:17,19 77:10 80:1
**sure** 19:12 81:9 81:16 93:4
**surroundings** 67:20
**suspect** 55:5
**suspects** 22:10
**sustained** 47:11
**swear** 5:19
**sworn** 6:7 99:6

**T**

**T** 4:1,1,8
**tactics** 12:7
**take** 7:18 13:4 43:3 49:5,14 50:5,10 67:8 73:3 74:16 76:10 77:5 78:4 80:1 81:5,13 84:9
**taken** 2:16 54:16 65:15 71:14 82:8 97:3 99:4 99:7,14
**talk** 65:16 82:19
**talking** 45:18 66:19 67:5 75:12 87:5 92:9
**tan** 66:13
**target** 52:13,19 53:4
**targeting** 88:21 89:10
**targets** 53:1,2,6
**TASER** 10:20 11:7,21 13:8 18:1,8,22 19:2 19:10,19 20:2 23:4 30:9 36:2 38:10 39:14 48:14 49:16 50:9,15 57:5,9 57:20 58:1,2 60:19 65:10 89:9 93:5
**TASERs** 48:22
**taught** 60:3 85:5
**TAYLORWA...** 3:15
**teach** 31:5
**teaching** 19:9
**team** 22:7,9
**techniques** 12:12 19:9,11 43:1
**tell** 62:3 96:14
**telling** 77:1
**terms** 15:21 17:4 25:21 30:22 38:14 45:18 77:8 90:9,11
**Terrific** 70:20 71:5
**testified** 6:7 54:12 69:17,21 78:19 79:2
**testimony** 43:6 47:17 86:12,15 99:5,7,10
**Thank** 6:2,8 46:2 71:5 81:12 82:6 87:16 97:17,20 98:1
**Thanks** 96:11 97:21
**thing** 25:13 69:14 72:8
**things** 12:6,12 22:11 45:7 75:15 78:18
**think** 12:20 14:14,19 17:7 47:20,21 65:21 67:10 69:16,21 70:6 78:19 79:2 87:15 90:3,8 92:21
**thinking** 55:13
**threat** 82:22 85:6
**threats** 86:9
**three** 70:6
**time** 5:10 10:12 17:2,18 24:6,10 24:12,16,19 31:20 36:1 37:1 37:12 40:15 43:7,10,13,16 45:12,16 53:17 53:21,22 54:6,8 54:12 57:15,15 58:13 60:22 63:4,15 69:5,5 69:8 76:11 78:20 79:3,8,19 80:4 82:9 83:10 84:9 94:21 95:2 97:17
**times** 10:16 26:3 44:15 66:4 73:4 79:13,17 80:8 91:5
**timestamp** 56:8
**today** 5:9 8:2 9:4 47:16 76:13 97:3
**told** 29:7 31:3 33:12 72:19 74:21
**topics** 23:3
**total** 15:5
**traditional** 90:6
**train** 50:22 82:21 83:3 86:8
**trained** 89:19,22
**trainees** 89:8
**training** 8:3 10:21 11:3,16 11:21,22 12:1,2 12:4,6,9,13,14 13:1,8,9,14,21 14:1 15:1,4,14 15:19 16:5,7,10 16:10,16 17:2,2 17:5,17,19 18:20,21 19:3 19:16 20:15 21:6 24:3,20 26:7,17,21 27:12,13 28:13 32:7 34:11,14 38:8 42:2,12 45:3,6,20 50:10 51:15 53:11,14 53:16 54:2 55:1 58:20 61:1,22 66:4 68:3,15 69:6,8,10 70:1 72:6 76:21 77:2 83:9 86:14,18 87:2,5 88:1,10 88:15 89:5,17 90:5,18 93:10 93:11 95:9
**trainings** 13:9 14:8,16 20:12 34:17 72:3
**Tran** 3:21 5:13
**transcript** 96:16 96:17 97:2
**transmission** 19:13 49:9
**transmitting** 55:22
**true** 28:5 36:14 38:11 99:10
**try** 34:3 49:6 80:10
**trying** 22:9 75:8 78:15
**turn** 28:16 35:15
**turned** 59:14
**Turning** 18:19 26:5 39:11
**two** 75:10 76:16
**two-day** 23:19 69:6,9
**type** 13:14 50:4 97:2
**types** 28:2
**typewriting** 99:9
**typical** 56:16
**typically** 25:6 73:4

**U**

**understand** 7:9 8:1,9,17 47:12 89:8,11 90:13
**understanding** 8:15 20:17 24:2 24:5,9 25:15 26:2 33:16 73:10 74:22 80:12 83:9 88:14 91:15
**understood** 7:14 12:19 24:12,15 25:9
**undue** 50:6
**unexpected** 83:12
**United** 1:1 5:6
**unsafe** 24:22 44:19
**unsafely** 67:21
**untethered** 91:15 92:19
**urgent** 45:15
**use** 11:22 14:2,9 18:1 19:12 24:2 24:2 32:6 35:2 49:16 50:10 51:1,1 70:1 75:7 83:22
**user** 17:11
**U.S** 70:18

**V**

**VA** 70:17
**various** 38:10
**VBLETA** 30:8
**verbal** 74:17
**verbally** 7:1
**version** 25:8
**versus** 5:5 25:11
**video** 3:21 5:2 32:8 54:16,19 55:17,19 56:1,8 60:9 61:16 65:19 67:1 69:19 81:18 82:9 91:3 94:6 98:2
**videoconference** 1:14 3:2
**videographer** 5:13
**videos** 70:4 97:15
**videotape** 5:3
**VIDEOTAPED** 1:13
**view** 21:1 74:6
**viewing** 20:11
**violations** 69:11
**Virginia** 1:2 3:4 3:16,16 5:8 8:4 70:18 87:7 96:14
**virtually** 1:14
**vision** 20:7
**voluntarily** 29:5
**vs** 1:7

**W**

**wait** 7:5
**waive** 97:1,8,9
**waived** 98:7
**walk** 40:4
**walked** 53:18 54:6 63:22
**want** 19:12 29:13 29:15 54:15 74:8,22 75:18 82:19 84:1 93:4 96:5
**wanted** 8:14 32:12
**warnings** 20:2,5 23:4,9 38:10 48:12
**wasn't** 48:8 64:21 75:22 78:21 79:3,4,20
**watch** 30:19 31:15
**watched** 31:21 91:4
**way** 58:11,11 70:13
**ways** 42:22
**weapon** 8:10 27:17,17 34:1,1 50:5 57:10 58:4 58:8,9,13 59:14 59:17 61:3 85:4 85:12
**weapons** 24:6 28:8 49:1,3 51:4,7,16 52:2 52:8 85:18
**wear** 25:20 26:2 47:22 87:7
**wearing** 28:1 37:13,20 38:20 43:2 48:6 55:11 59:4,5 63:12 64:6,8 78:6
**went** 30:17,18 31:1,4 32:7,17 44:9 72:13 73:11 94:6
**weren't** 75:8 76:18
**we'll** 7:14
**we're** 39:12 50:4 60:8 66:22 82:10 83:11 87:5 98:4
**we've** 55:21 61:19 62:1 64:4 66:1 71:14
**white** 11:18 66:13
**willing** 71:3
**wire** 90:14,14,18 91:11,15 92:9 92:14,20
**wires** 58:18 88:12
**witness** 4:2 5:19 6:1 8:2,21 11:14 12:22 50:3 60:2 81:17 81:22 94:7 95:6 95:16 97:9,19 99:4,7,11
**witnessed** 43:19
**witnesses** 47:14
**words** 65:7 89:10
**work** 81:21
**worked** 22:8,12
**works** 22:5
**worthy** 45:10
**write** 96:20
**written** 30:15
**wrote** 29:3

**X**

**x** 1:4,10 4:8
**X2s** 18:6
**X26** 18:2,11

**Y**

**Yeah** 16:4 71:11 81:15 94:7
**yell** 39:18

**Z**

**zone** 35:9,13
**zoom** 29:1

**1**

**1** 5:3
**10** 1:15 2:2 5:9 21:12
**100** 3:16
**12-14-17** 4:11
**12-14-2017** 30:8
**1206** 3:16
**13** 21:20
**1315** 35:22
**14** 8:3 9:1,8 14:22 29:20 42:3,11 47:11 71:7,22 87:6 88:2 89:6
**14th** 95:10
**17800** 3:9

**2**

**2:19-cv-617** 1:7
**2011** 10:5 17:10 17:18 18:4
**2014** 10:5,5,6
**2017** 8:3 9:1,8 14:22 15:3 18:20 19:4 21:5 21:20 29:21 42:3,11 47:11 71:8,22 87:6 88:2 89:6
**2019** 9:18 10:6
**2020** 1:15 2:2 5:9
**23226** 3:4
**23451** 3:16
**28** 4:11
**28:27** 56:8,11
**28:32** 56:21
**28:35** 57:14
**29:29** 61:16
**29:35** 69:19
**29:36** 62:8
**29:46** 63:14
**29:53** 64:12

**3**

**30** 21:13 84:13
**326-6016** 3:10

**4**

**4:03** 2:3 5:10
**400** 3:4
**46** 4:10 28:17,19
**47** 4:4

**5**

**5:00** 47:1
**5:38** 81:18
**5:42** 82:10
**5:59** 98:2,7
**599043** 1:21

**6**

**6** 4:3
**623** 3:10
**625-7300** 3:17

**7**

**7** 18:8
**7130** 3:4
**757** 3:17

**8**

**804** 3:5
**82** 4:5
**85th** 3:9
**85255** 3:10
**87** 4:3
**888-9501** 3:5

**9**

**92** 4:4

# Exhibit 6

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

(NORFOLK DIVISION)

\- - - - - - - - - - - - - - - - x

SHAWN CURRAN, :

Plaintiff, :

vs. : Case No. 2:19-cv-617

AXON ENTERPRISE, INC., et al., :

Defendants. :

\- - - - - - - - - - - - - - - - x

VIDEOTAPED DEPOSITION OF JERRY SANDERS

Conducted virtually via remote videoconference

July 10, 2020

Reported by:

Misty Klapper, RMR, CRR

Job No.: 599043

July 10, 2020

1:07 p.m.

Taken pursuant to notice, before Misty Klapper, Registered Professional Reporter, Certified Realtime Reporter, and Notary Public.

APPEARANCES:
(ALL APPEARANCES VIA REMOTE VIDEOCONFERENCE)

ELLIOTT M. BUCKNER, ESQUIRE
BREIT CANTOR GRANA BUCKNER
7130 Glen Forest Drive, Suite 400
Richmond, Virginia 23226
(804) 888-9501
E-mail: sbucci@breitcantor.com
ebuckner@breitcantor.com
COUNSEL FOR THE PLAINTIFF

AMY L. NGUYEN, ESQUIRE
PETER BROWN, ESQUIRE
AXON ENTERPRISE, INC.
17800 North 85th Street
Scottsdale, Arizona 85255
(623) 326-6016
E-mail: amynguyen@axon.com
peterbrown@axon.com
COUNSEL FOR THE DEFENDANT AXON ENTERPRISE, INC.

BRIAN N. CASEY, ESQUIRE
TAYLORWALKER PC
1206 Laskin Road, Suite 100
Virginia Beach, Virginia 23451
(757) 625-7300
E-mail: bcasey@taylorwalker.com
COUNSEL FOR THE DEFENDANT RICHARD NELSON

ALSO PRESENT:

SHARON PANDAK, ESQUIRE
SOL TRAN, VIDEO OPERATOR

C O N T E N T S


| WITNESS: | EXAMINATION BY: | PAGE: |
| --- | --- | --- |
| Jerry Sanders | Mr. Brown | 6, 96 |
| | Mr. Buckner | 51, 105 |
| | Mr. Casey | 92 |


E X H I B I T S


| NO.: | DESCRIPTION: | PAGE: |
| --- | --- | --- |
| 45 | Written statement of Jerry A. Sanders | 32 |


Note: Exhibits marked and attached to original.


| EXHIBITS REFERRED TO: | PAGE: |
| --- | --- |
| Deposition Exhibit No. 22 | 24 |
| Deposition Exhibit No. 41 | 53 |

P R O C E E D I N G S

VIDEO OPERATOR: We are now on the record. This begins media number 1 in the deposition of Officer -- Officer Jerry Sanders in the matter of Shawn Curran versus Axon Enterprise, Inc., et al. in the United States District Court for the Eastern District of Virginia.

Today is Friday, July 10, 2020 and the time is 1:07 p.m. This deposition is being held remotely at the request of Axon Enterprise Corporation, Inc.

The videographer is Sol Tran and the court reporter is Misty Klapper, both of Magna Legal Services.

All counsel and parties present will be noted on the stenographic record. Will the court reporter please swear in the witness.

MS. REPORTER: Sir, would you hold up your ID for the camera?

THE WITNESS: Yes, ma'am.

MS. REPORTER: Thank you, sir.
Would you raise your right hand.
Whereupon:

JERRY SANDERS,

was called for examination, and, after being duly sworn, was examined and testified as follows:

MS. REPORTER: You may proceed, Mr. Brown.

EXAMINATION BY COUNSEL FOR DEFENDANT
AXON ENTERPRISE, INC.

BY MR. BROWN:

Q. Good afternoon.
A. Good afternoon, sir.
Q. Could you state your name, please, for the record?
A. Jerry Sanders.
Q. And, Mr. Sanders, have you been deposed before?
A. Couple decades ago, sir. It's been quite a while.
Q. Okay. So I want to run through some rules that you may be familiar with before we get

started.
The first is that we'd please ask you to answer aloud, rather than just nodding your head or shaking your head, so that we all have a clear answer and so the court reporter has a -- a clear answer as well.
And please also wait for the questioning attorney to get out the entire question and any objections from the other attorneys. If you don't understand a question, please let us know. And if you do answer a question, we will assume that you've understood it.
Does that make sense?
A. Yes, sir.
Q. Okay. And -- and if you do need a break at any point, please just let us know. The only request is that you first answer any question before you -- before we take that break.
Is that fair to you?
A. Yes, sir.
Q. Okay. And do you understand that the

purpose of this deposition today is due to you being a witness to an incident on December 14, 2017 that occurred at a training in Virginia Beach?

A. Yes.

Q. And are you familiar with the acronym CEW?

A. Yes, sir.

Q. What does that stand for to you?

A. Conducted electrical weapon.

Q. Okay. I will likely be using that acronym throughout, so when I say CEW, you understand that's -- I'll be referring to conducted electrical weapon?

A. Absolutely. Yes, sir.

Q. Okay. And are you aware that Mr. Shawn Curran has brought suit against Axon and Master Instructor Nelson arising out of that December 14, 2017 incident?

A. I was aware he was -- brought suit against Axon. I was not aware he brought suit against Mr. Nelson until now.

Q. Okay. Do you recall that you prepared a witness statement in relation to this incident?
A. I do recall, sir. I wrote a statement that day. I did not retain a copy of that statement.
Q. Okay. Have you had a -- a chance to review that statement prior to today, but after the day of the incident?
A. No, sir.
Q. Okay. I want to get into a little bit of your background and work.
Are you still with the Prince William RADC in Virginia?
A. Yes, sir.
Q. And just so -- to make sure I understand, can you tell me what RADC stands for?
A. Regional Adult Detention Center.
Q. Okay. And what is your current position there?
A. I am the first sergeant over human resources and training.

Q. And how long have you held that position?

A. I've been in this position between two and three years.

Q. Prior to that you were -- you were occupying some other positions at -- at RADC. Can you tell me what those were?

A. Yes. There for the better part of the last 13 years I have been an officer, master jail officer and sergeant and most recently now first sergeant in training.

Q. Okay. And when you say in training, can you help me understand what that means? Is there a -- a -- an equivalent that's not in training?

A. We have a training division here at our jail that provides in-service training to the veteran staff and provides basic training to new recruits.

I'm a permanent member, if you will, of the training team here at the ADC.

Q. Understood. And in your various

positions at -- you refer to it as the ADC?
A. Yes, sir. Adult Detention Center.
Excuse me.
Q. Okay. I just -- I was used to see
the RADC, so I wanted to make sure I -- I was
using consistent terminology.
Have you ever had a supervisory
position at the ADC?
A. Yes, sir, for approximately the last
seven years.
Q. And that would -- what position gave
you those responsibilities or positions?
A. Training sergeant and human resources
in training first sergeant.
Q. Okay. And -- and did those also
include instructor-type positions or oversight?
A. Yes, sir.
Q. And have you received any special
training or certifications while at ADC?
A. Yes, sir. I've received TASER
instructor certification.
Q. And aside from that, were there any

others or just that one?

A. Here at the ADC, sir, that's the only certification I've received.

Q. Okay. Prior to, you -- you said about 13 years ago -- or, excuse me -- about 13 years you've been at the ADC. Prior to that where were you employed?

A. I was employed for seven years at the Rappahannock Regional Criminal Justice Training Academy.

Q. And while you were there, did you receive special training or certifications?

A. Yes, sir. I --

Q. Which -- which special training or certifications did you receive there?

A. I received chemical agent instructor certification and driver's training instructor certification.

Q. Okay. Now, you mentioned your TASER instructor training.

Prior to 2017, had you received any CEW training?

A. Yes, sir.

Q. Do you recall when your very first initial certification on a CEW would have been?

A. Approximately 2009.

Q. Do you recall where that was?

A. I believe that was at Andrews Air Force Base. I do not recall who the instructor was.

Q. Okay. And do you remember which TASER CEW you received training on?

A. At that time, sir, it was the X26 version.

Q. Okay. And since 2009 have you received any additional certifications or recertifications on CEWs?

A. Yes, sir. Per Axon's policy, every other year I have recertified.

Q. Okay. And so in your trainings, whether it was your driver's training or chemical agent training or CEW training, you agree that -- that like all training, it involves a risk of injury?

A. Yes, sir.

Q. And that when engaged in practical training such as those, it's important to follow all safety protocols?

A. Yes, sir.

Q. Why is that important?

A. Well, to reduce the risk of injury to all persons involved.

Q. When engaged in practical training, you agree it's important to use safety equipment?

A. Yes, sir.

Q. And why is that?

A. Again, to protect the person involved, be it role playing -- depending on the type of training, of course, would mandate the safety equipment required. But to keep all participants safe to be able to conduct realistic training, as realistic as possible, without -- or minimizing real world injury.

Q. Do you also agree that participants in practical use of force trainings are expected to follow safety protocols and use safety

equipment?
A. Yes, sir.
Q. And do you think that's a reasonable expectation?
A. I do, yes, sir.
MR. BUCKNER: Object to the form of the question, but go ahead, Officer Sanders, you -- you can answer that.
THE WITNESS: I do believe it is a reasonable expectation that participants follow the established safety rules and utilize the established or the provided or necessary safety equipment.
BY MR. BROWN:
Q. Okay. Now, in terms of the training you received in December 2017, this was instructor training, correct?
A. Yes, sir.
Q. And how many days -- did it take place over several days?
A. I believe it was a two-day course, sir. I only attended one day, as I was

recertifying.

Q. Okay. Because you were recertifying on your TASER CEW training?

A. Yes, sir.

Q. Were you attending to become a CEW instructor?

A. I was attending to continue being a CEW instructor.

Q. I understand. Okay. And do you recall which date you attended the training in December 2017?

A. It was December 14th, sir.

Q. Okay. How did you end up signing up for this particular training on December 14, 2017?

A. We searched the Axon or TASER website for available classes to recertify our instructorships, myself and another from this agency. And Virginia Beach worked out best for our schedule as far as our training schedule here at RADC and distance from our agency.

Q. Okay. And in terms of why you signed

up, this was to obtain your -- your recertification as a TASER instructor.

Was that something that you were interested in doing or that the department required?

A. Well, both, sir.

Q. Okay. Why did you initially want to become a CEW instructor?

A. I am a -- a use of force instructor in the Commonwealth of Virginia, a firearms instructor as well, and a CEW being used in the continuum of force. It -- it made sense.

Q. Okay. And so you testified that you did not attend the -- the December 13th portion of the training; is that accurate?

A. That is correct. I did not attend.

Q. Okay. Prior to -- to your attendance on December 14th, did you perform any sort of online work for this training?

A. Yes, sir. There is -- there is online training that is required to -- to complete in order to attend that day of training

on December 14th.

Q. Okay. And in your experience from -- starting in 2009 doing various -- first your certification and then your recertifications, do you recall reviewing PowerPoint slides and warnings during those trainings?

A. Yes, sir.

Q. And do you recall what types of things the PowerPoint slides and warnings addressed?

A. Well, sir, as I'm sure you understand and likely know, the Axon -- the warnings in the TASER presentation is -- is very extensive chapter.

But in general, sir, it is a conducted electrical weapon. There is a risk of shock. There is a risk of the probe striking something you do not want them to strike. Treat the CEW as if it were a firearm to maintain safety. Do not fire the CEW in the area of the heart.

Sir, it is very extensive, if you're

looking for something specific.

Q. Yes. Do you recall warnings in -- in your various certifications and recertifications about eye injury?

A. Yes, sir. The warning is there is a risk of eye injury and all involved in practical exercises should wear eye protection.

Q. Okay. And you -- you recall those sorts of warnings both in -- in the PowerPoint slides and in the classroom portion and the -- the online review as well?

A. Yes, sir.

Q. Okay. So when you attended the -- the December 14, 2017 training at Virginia Beach, you understood, then, that -- that CEW use, whether in the field or in training, carries some risk of injury?

A. Yes, sir.

Q. Is it accurate to say that you understood CEWs are -- are weapons and must be handled safely?

A. Absolutely. Yes, sir.

Q. And at that time you understood that CEWs deployed probes?
A. Correct.
Q. And you also understood that the probes are sharp and meant to penetrate skin?
A. Yes, sir.
Q. Those probes being sharp means that they carried a risk of penetration injury as well; is that correct?
A. That is correct, sir.
Q. During CEW training -- let me start over.
Were you aware that during CEW training, a -- every participant is able to call stop action?
A. Yes, sir. That is made very clear.
Q. And what was your understanding of when stop action is called?
A. At any time any participant notices something potentially unsafe.
Q. Okay. And you also understood that the participants in trainings had to wear

protective gear, particularly eye -- eyeglasses, at all times?

A. Yes, sir.

Q. Specifically with regard to December 14, 2017, do you recall, over the course of the scenarios, whether your participation was towards the beginning or not?

A. Sir, the best I could recall I was in the middle of the pack, if you will.

Q. Okay. I didn't mean to interrupt you.

A. No, sir, I'm finished.

Q. Okay. Saying that you were in the middle of the pack, you had the opportunity to observe both -- before your actual scenario others going through similar scenarios?

A. No, sir. We were behind a -- a closed door in a hallway and we were led into the room one at a time.

Part of the scenario was our judgment on which level of force would be appropriate for the scenario presented to us. So the first time

I saw the scenario was when I was the participant.

Q. Okay. And subsequent your participation, were you able to remain where the training was conducted to observe subsequent scenarios?

A. Yes, sir.

Q. And you -- you did, in fact, observe subsequent scenarios; is that correct?

A. Yes, sir.

Q. Okay. And during your observation -- during your scenario and your observation of the subsequent scenarios, do you recall calling stop action?

A. No, sir.

Q. Do you recall other participants, trainees or observers, calling stop action?

A. No, sir.

Q. Okay. Was -- do you recall the -- the particular area in which the practical training was conducted?

A. It was in the middle of a gymnasium

floor. Maybe not the exact center of the gymnasium, but in the center area of the gymnasium floor.

Q. Okay. And can you describe your -- your recollection of how it was set up?

A. Yes, sir. There was a -- a open box, if you will, set up with -- I call them DT mats, but basically gymnastic-types [sic] mats stood up on their edge to create walls.

Q. Okay. I'm going to share my screen for a moment, so bear with me.

Okay. Can you see what this depicts, Mr. Sanders?

A. Yes, sir. Yes, sir. That is --

Q. And can you -- please go ahead.

A. That looks very similar to -- to this setup.

Q. And when you say setup, you mean the -- the training on December 14th that you attended?

A. Yes, sir.

Q. Okay. I'm going to scroll through

some of the -- this is also -- this -- this picture of Exhibit 22 is also consistent with what you recall about the gymnasium?

A. Yes, sir. It is very similar.

(Thereupon, Deposition Exhibit Number 22, previously marked for identification, was referred to.)

BY MR. BROWN:

Q. Okay. Is that also true of this one?

A. I don't want to say with certainty at that angle, sir. I presume these are pictures of the Virginia Beach gymnasium.

Q. Yes. And -- and one final one for you. This is Exhibit --

A. Yes, sir.

Q. -- 22.

A. That view looks familiar, yes, sir.

Q. Okay. And so you mentioned the blue mats earlier, this picture, this one. You -- you mentioned the familiarity of the -- the -- the blue mats. What was your understanding of their function?

A. Well, sir, each participant started off in the boundaries of those mats and we were instructed to close our eyes and when we were instructed to open our eyes, we were to respond appropriately to the situation we were faced with by a role-playing offender.

Q. Okay. And would the -- would the role players, let's call them, emerge from some of these blue -- from behind one of these blue mats?

A. Yes, sir. They would enter the box -- I don't want to misspeak, but yes, sir, they would enter the box with the participant and then the participant reacted to what they were faced with.

Q. Okay. And when you say box, what -- what are you referring to when you use that word?

A. Well, I recall this being identified as a box exercise. It is the only time I've ever participated in such an exercise, but I'm presuming box was what they referred to with the mats set up as such.

Q. Okay. Was it your understanding that the practical training was permitted to move outside the blue mat area?

A. It was my perception, yes, sir.

Q. And while you were in the gymnasium or the training area, were you -- let me start over.

Were you checked for weapons prior to entering the gymnasium?

A. Yes, sir.

Q. And you were prohibited from having weapons anywhere in the gym; is that accurate?

A. That is correct, sir, obviously not including the CEW. We had a CEW and we had a -- a mock firearm, if you will, a training firearm, but no -- not real --

Q. Okay.

A. -- weapons otherwise.

Q. Okay. And so aside from those, you and the other participants were prohibited from having those -- anything else in -- in the gym, not just within the blue mat area?

A. That is correct, yes, sir.

Q. Was it also true that you were required to wear safety glasses in the gymnasium?

A. Yes, sir.

Q. And that was true anywhere in the gymnasium?

A. Yes, sir.

Q. And going back to one of your -- your earlier statements, you mentioned that you had not done a box drill prior to December 14, 2017; is that accurate?

A. That is accurate. That is the first time I learned of it.

MS. REPORTER: One second, sir. One second, sir.

Could we go off the record?

MR. BROWN: Yes.

VIDEO OPERATOR: The time is 1:36 p.m. We're going off the record.

(Thereupon, a discussion was had off the record.)

(Thereupon, a brief recess was taken due to technical difficulties.)

VIDEO OPERATOR: The time is 1:40 p.m. We're back on the record.

BY MR. BROWN:

Q. Welcome back, Mr. Sanders. We encountered a -- a few technical difficulties there, but I recall we were discussing box drills.

Do you recall that discussion generally?

A. Yes, sir.

Q. Okay. And you had mentioned that December 14, 2017 was the first time you had -- you had participated in a box drill.

A. Yes, sir.

Q. Is it accurate to say, then, that you did not participate in a box drill the first time you were certified --

A. That is correct.

Q. -- on CEWs?

A. I did not.

Q. And was that first certification that you did also conducted by a master instructor?
A. Yes, sir.
Q. And that -- that training did not include a box drill?
A. No, sir.
Q. And when you were first certifying as an instructor, did that training include a box drill?
A. No, sir.
Q. Okay. And do you recall the -- the master instructor who was designated at the December 14, 2017 training you attended?
A. Yes, sir. That was Richard Nelson.
Q. And did -- did Master Instructor Nelson, do you recall him telling you or other participants that the area outside those blue mats was a safe zone?
A. I do not recall that, no, sir.
Q. Do you recall him telling you or the other participants that inside the mats was a hot zone?

A. I do not recall that terminology.

Q. Okay. I'd like to share my screen again here.

Can you make this document out okay, Mr. Sanders?

A. Yes, sir.

Q. And do you recognize what it is? Let me scroll down a little bit.

A. Yes, sir. This is the written statement I provided on December 14th.

Q. Okay. And at -- as we discussed a little bit earlier, you stated that you had done your scenario kind of in the middle of the pack; is that accurate?

A. Yes, sir.

Q. So prior to the incident involving Mr. Curran, you had completed your scenario and you were inside the gymnasium observing the remaining scenarios being carried out?

A. Yes, sir.

Q. Okay. And at that time while you were observing after completing your scenario,

you were wearing your safety glasses?
A. Yes, sir.
Q. Had it been communicated to you that -- by Master Instructor Nelson that everyone in the training area had to wear safety glasses, whether they were inside the blue mats or not?
A. That was my understanding, yes, sir.
Q. Was it also your understanding that the observers and the role players were considered safety officers?
A. Yes, sir.
Q. And as safety officers, anyone could call stop action at any time?
A. That is correct.
Q. Do you recall who provided the safety glasses that you wore?
A. They -- we were each provided a -- a pair by Axon.
Q. Okay. When you say by Axon, how did you actually pick up your pair of glasses?
A. They were sitting at my table in the classroom when I reported to class.

Q. Okay. And so at each seat, glasses were made available?

A. Yes, sir.

Q. Okay. But you -- you don't -- do you know who actually provided them and -- and placed them there or whose glasses they were?

A. I cannot speak to certainty on that, sir.

Q. Okay. Turning more specifically to your written statement, which I would like to add as an exhibit, which would make it Exhibit 45, if our -- our counting last time was accurate.

(Thereupon, Deposition Exhibit Number 45 was marked for identification.)

BY MR. BROWN:

Q. On the first line you state that On December 14, 2017 at about 1315 hours, I was observing the practical exercises for the TASER instructor course.

Is that correct?

A. Yes, sir.

Q. Okay. And the next sentence says, As one of the participants was appropriately firing the CEW at a role player.

Did I read that correctly?

A. You did, yes, sir.

Q. And what -- can you explain to me about what you mean by appropriately?

A. Based on our training in use of force, the actions the role player was providing to the participant warranted the use of a CEW to bring into control and compliance.

Q. Understood. Then looking at -- at lines four through five, after appropriately firing a CEW at a role player, your statement continues, one of the darts either missed or bounced off of the role player's protective suit and traveled beyond the role player.

Did I read that correctly?

A. Yes, sir.

Q. What was it that made you offer those possibilities, that either the dart had missed or bounced off of the role player's protective suit?

A. Well, I was close to the participant. Everybody was designated as a safety officer, but the participant that had just completed their scenarios was, I suppose, at a greater level of a safety officer for the next participant.

So whereas participants that have fulfilled both roles were -- were back at a safe distance, I was -- the very next participant after I did my exercises was -- was the participant involved when this incident occurred with Mr. Curran.

Q. I see. Do you happen to know who that participant was?

A. Yes, sir.

Q. Can you tell me more about that participant?

A. That --

MS. PANDAK: Objection to the form of the question. Do you want to know the name or what?

MR. BROWN: Yes. The name is sufficient.

THE WITNESS: Shawn Pickard.

BY MR. BROWN:

Q. Okay. And so you were describing a kind of distinction between safety officers in that everyone is considered a safety officer, but that in the scenario -- is it accurate to state that in the scenario immediately following a given participant's scenario, that first participant is the safety officer for the next scenario?

A. Yes, sir, that is correct.

Q. And what was your -- can you tell me more about your understanding of the -- the -- what that more specific safety officer's role was?

A. My understanding of that role was being up closer, having a better field of vision of the scenario, the area of the scenario was occurring, and to stop action if I observed anything that appeared was going to be or was unsafe.

Q. Okay. Turning back to your

statement, several lines down do you see where the sentence begins At that time?

A. Yes, sir.

Q. Okay. And it says that At that time, the second role player, Shawn Curran of the Virginia Beach Police Department, began moaning in pain and holding his face in his hands.

Do you see -- did I read that correctly?

A. Yes, sir.

Q. The next sentence states that Curran had removed his protective headgear.

Is that accurate?

A. Yes, sir.

Q. Okay. So is it accurate to say that while everyone was a -- a safety officer, you were the safety officer in regard to this specific scenario?

A. It is, sir, yes.

Q. In addition to everyone else who was -- who was also a safety officer and, therefore, able to call stop action at any time?

A. Correct. Yes, sir.

Q. Okay. And so when you state that Curran had removed his protective headgear, were you only able to perceive that subsequent Mr. Pickard discharging his CEW?

A. Yes, sir. Correct.

Q. So prior to Mr. Pickard discharging his CEW, you had not witnessed Mr. Curran removing his protective headgear?

A. I did not, sir.

Q. And was that due to where you were positioned in the training area?

A. Yes.

Q. Okay. And continuing on with your statement, there's what looks like I'd say two primary paragraphs here. The -- the second one beginning with When this occurred, do you see where that is?

A. Yes, sir.

Q. Okay. You state that When this occurred, Master Instructor Nelson immediately stopped action, evaluated the situation and

delegated students to acquire a first aid kit and call for a medic.

Did I read that accurately?

A. Yes, you did. Yes, sir.

Q. Okay. So it was Master Instructor Nelson who called the stop action.

And then do you know who he instructed to obtain a first aid kit?

A. I don't know that he instructed anybody in particular or whether he -- he did designate specific individuals. I believe it was just we need a first aid kit, we need to call a medic, something of that nature.

Q. I see. Okay. Now, since -- is it -- is it accurate to say that your scenario had been the one just prior to this incident involving Mr. Curran?

A. That is correct. Yes, sir.

Q. So you would not have had an opportunity to observe those scenarios preceding Mr. Curran's because you were not within the training area?

A. Correct.
Sir, could you -- could you please restate what I just answered? I want to make sure I provided you a proper response.
MR. BROWN: Court Reporter -- Misty, do you mind rereading my last question?
MS. REPORTER: Of course. Just a moment.
(Thereupon, the record was read back as follows):
"Q. So you would not have had an opportunity to observe those scenarios preceding Mr. Curran's because you were not within the training area?"
Answer, "Correct."
THE WITNESS: I must say I don't understand the way the question is phrased, sir. I apologize.
BY MR. BROWN:
Q. Okay. Let me -- let me try putting

it another way.

You described earlier -- you described earlier that there was a -- let me start over.

Before you conduct a scenario in the training room with the blue mats, where would you be positioned?

A. We were positioned in a hallway off of the gymnasium. We were lined up waiting our turn to enter.

Q. Okay. From that position were you able to see the scenarios being conducted inside?

A. No, sir.

Q. Okay. So you would not have an opportunity from your position in the hallway to see the scenarios that were occurring before yours?

A. That is correct. I did not have that opportunity.

Q. Okay. While you were in the hallway, did you hear anyone call stop action?

A. I did not, no, sir.

Q. And after conducting -- well, let me start over.

During your -- your own scenario, did you call stop action?

A. No, sir.

Q. Did anyone else call stop action?

A. No, sir.

Q. And then after your scenario, the next one was Officer Curran's, correct?

A. Shawn Pickard's.

Q. Excuse me. You're correct.

And in Shawn Pickard's scenario, it was Shawn Curran who was a role player?

A. No, sir. There were two role players that took turns, if you will. One would be on break, if you would, while the other was participating in the exercises.

Q. Okay. And Mr. Curran -- excuse me -- was on break during Mr. Pickard's scenario?

A. Yes, sir.

Q. And when you described Mr. Curran on break, what do you mean by that?

A. They're wearing heavy and hot protective gear, so they -- they take turns. One would -- well, it -- speaking generically from my use of force training experience, one role player goes in to -- to evaluate a few participants and then they will step out. The other will step in. It gives the first role player a chance to cool down a bit and take a break.

Q. Okay. And while taking a break, is it accurate to say that the -- the role players are still within the gymnasium?

MS. PANDAK: Objection, speculation.

BY MR. BROWN:

Q. You may answer, Mr. Sanders.

A. In this instance they were.

Q. Have you participated in -- in scenarios in the past in which the role players would leave the building in which trainings were being conducted?

A. No, sir. They would generally stay in -- in -- at a safe distance, but at a --

reasonably close to the training area.
Q. Okay. And -- and they -- is it accurate to say that they stay close because these scenarios are relatively brief and they need to be prepared to participate in the next one?
A. I would say that's a fair assumption, yes, sir.
Q. Can you -- do you know who the role player who was participating in Mr. Pickard's scenario was?
A. I do not, no, sir.
Q. During your particular scenario, was it your impression that yours was conducted safely?
A. It is, yes, sir.
Q. Do you recall whether your scenario went outside the blue mat area?
A. Yes, sir, it did go outside the blue mat area.
Q. Okay. And you did not call stop action during your scenario?

A. No, sir.
Q. And no one else called stop action during your scenario?
A. No, sir.
Q. Were you told by Master Instructor Nelson that the scenarios must stay within the blue mat area?
A. I do not, sir.
Q. And you described a little bit earlier about the -- the purpose of the mats, the blue mats, in order to contain the scenario; is that accurate?
A. Sir, I don't --
Q. Let me -- let me rephrase. Before you -- before you answer, let me -- let me rephrase.
Your understanding of the -- the blue mats, is it accurate to say that they are to carry out -- let me start over.
The name of the -- the drill that you were participating in was box drill; is that true?

A. Yes, sir.
Q. Okay. And what would you say is the -- the purpose of carrying out a box drill in CEW training?
A. May I mute for a moment and speak with this attorney, my -- my agency's attorney?
Q. Yes.
A. I'll be right back, sir. Thank you.
MR. BROWN: Can we go off the record for a moment, please.
VIDEO OPERATOR: The time is 2:05 p.m. We're going off the record.
MR. BUCKNER: Is there -- hold on. Is there an open question? Is there a pending question?
MR. BROWN: I believe there is, but the --
MR. BUCKNER: You've a pending question to him now, right?
MR. BROWN: If he's concerned about revealing privileged or -- or confidential communications, I think he's entitled to

speak with his attorney first.
MR. BUCKNER: That -- that's fine.
(Thereupon, a discussion was had off the record.)
(Thereupon, a brief recess was taken.)
VIDEO OPERATOR: The time is 2:10 p.m. We're back on the record.
BY MR. BROWN:
Q. Mr. Sanders, before we went off the record there was a -- a question pending.
Is it true that today you have an attorney present with you?
A. It is, yes, sir.
Q. Is it also true that you are not a named defendant in the lawsuit between Mr. Curran and Axon and Master Instructor Nelson?
A. That is true.
Q. And you are here today as a fact witness in this case; is that accurate?
A. Yes, sir.
Q. And before our break you declined to

answer the question that I had posed to you.

A. To clarify, sir, I was not declining to answer. I -- before I answered, I wanted to inquire something from the attorney.

Q. Okay. And you, in fact, did speak -- you -- you, in fact, spoke with your attorney?

A. Yes, sir.

MR. BROWN: Misty, can you read back the question posed prior to going off the record?

MS. REPORTER: Yes. Just a moment and let me find it.

(Thereupon, the record was read back as follows):

"Q. And what would you say is the -- the purpose of carrying out a box drill in CEW training?"

BY MR. BROWN:

Q. Before you answer, Mr. Sanders, let me frame it this way:

What was your understanding of the purpose of the blue mats?

A. Thank you for that rephrasing, sir.
My understanding was each scenario would initiate within that box and that you would respond appropriately with the scenario as it unfolded.
Q. And that is to say the scenarios would unfold in a variety of ways?
A. Yes, sir.
Q. And the trainee participating in a given scenario would not know how theirs was going to unfold?
A. That is correct. Yes, sir.
Q. So to make sure that I understand, you explained earlier that your -- the scenario that you participated in went outside the mats, the blue mat area?
A. It did, yes, sir.
Q. And the scenario that involved the incident with Mr. Curran also went outside the blue mat area?
A. Yes, sir.
Q. And that you and the other observers

of Mr. -- the scenario involving the incident with Mr. Curran were safety officers?

A. Yes, sir.

Q. And you were able to call stop action if you saw something unsafe during the scenario?

A. That is correct.

Q. Was it your understanding that there was a requirement that the scenario stay within the blue mat area?

A. It was not my understanding, sir.

Q. In fact, when your scenario went outside the blue mats, you didn't call stop action; is that true?

MR. BUCKNER: Objection.

THE WITNESS: That is true.

BY MR. BROWN:

Q. Is it accurate to say that you did not see anything unsafe in your own scenario?

A. I did not.

Q. And is it accurate to say that you did not see anything unsafe in the scenario involving the incident with Officer Curran?

A. Unfortunately, I did not, sir.
Q. Now, prior to the incident with Officer Curran but -- but during that particular scenario, had you witnessed any of the role players removing protective headgear?
A. I did not, sir.
Q. Was it your understanding that if they had removed their protective headgear that they would have had to put on safety glasses?
A. I would be presuming. But, yes, sir, they were in the gymnasium and everyone was to have eye protection on in the gymnasium, yes, sir.
Q. Okay. During your time at the training on December 14, 2017, did you have confidence that Master Instructor Nelson was conducting the training in a safe manner?
A. During that time I felt so, yes, sir.
Q. And if you had seen Mr. Curran -- let me start over.
If you had seen Mr. Curran remove his protective helmet and not put on safety glasses,

would you have called stop action?

MS. PANDAK: Just a minute. I -- I do have to interject that that's speculation.

You may answer.

BY MR. BROWN:

Q. Mr. Sanders, you may answer.

A. Yes, sir.

Q. Okay. Those are my questions for now until followup.

A. All right, sir.

EXAMINATION BY COUNSEL FOR PLAINTIFF

BY MR. BUCKNER:

Q. Sergeant Sanders, I've got some questions for you. My name is Elliott Buckner and I represent Shawn Curran in this matter.

A. Good afternoon, sir.

Q. Good afternoon. Let me just start First Sergeant Sanders -- do -- do you -- you understand that you are not a party to this suit, correct?

A. I understand that, yes, sir.

Q. And do you understand that in Virginia there's a two-year statute of limitations to bring a claim against someone for personal injury?

A. I do, yes, sir.

Q. And do you understand that that two-year statute of limitations has run on this case and you have not been sued by anyone?

A. Yes, sir.

Q. So do you understand, then, that Mr. Curran can't bring you in as a party to this suit and can't sue you?

A. I understand that, yes, sir.

Q. Okay. Very good.

First Sergeant Sanders, how long do you think you were in that gym prior to the incident when the probe struck Officer Curran?

A. I would have to guess -- I can only offer you a guess -- 10 to 15 minutes at most.

Q. Okay. Long enough for you to go through your four scenarios and then start the scenarios for Officer -- it starts with a P.

A. Pickard.

Q. Pickard. Thank you.

A. Yes, sir.

Q. All right. So 10 to 15 minutes.

Let me pull something up First Sergeant Sanders. Hold on and bear with me for just a second.

All right. First Sergeant Sanders, can you see that?

A. Yes, sir.

Q. All right. This is a video from the day of the training taken of inside the gym and you can see it's got the VBL -- the initials for the Virginia Beach Law Enforcement Training Academy on the side there. And this is where the training was being conducted that day; is that right?

A. Yes, sir.

(Thereupon, Deposition Exhibit Number 41, previously marked for identification, was referred to.)

BY MR. BUCKNER:

Q. Right. And the timestamp on this is 31:49. Do you see that in the lower left-hand corner?

A. Yes, sir.

Q. All right. And I will share with you First Sergeant Sanders, that the incident involving Mr. Curran took place at approximately 34:10. So we're talking about two and a half minutes after the point in time of this particular freeze frame on the video.

Does that math sound correct to you?

A. I understand what you're telling me, yes, sir.

Q. Okay. So you are in the gym then at this point in time, is that right, about two and a half minutes before the incident involving Officer Curran?

A. Yes, sir. Yes, sir.

Q. Okay. And about two and a half minutes before the incident involving Officer Curran, are you still the player involved

in the scenarios or have you now rotated out, completed your scenarios and you are acting as that higher level safety officer that you described before?

A. I'm not positive, sir. I would say I'm likely in the safety officer capacity, but I cannot say with certainty.

Q. Okay. Let's -- let's watch a little bit of this. And I'm going to hit play. And if you don't see the video play, would you please let me know?

A. Yes, sir.

Q. All right. Let me hit play.

Sir, is the video playing for you?

A. Yes, sir.

Q. Right. I just paused it so I'm going to play it again -- or hit play again.

Unfortunately, it's not playing on mine. It's just frozen.

A. It's froze here as well now.

Q. Well, I just hit pause, so it should be --

A. Okay.
Q. -- it should be frozen there. Let me come back a little bit.
All right. So now it's at 31:45, about four seconds before I previously started it. Let's try it again and see what happens.
Do you see it playing?
A. Yes, sir.
Q. All right. Let me pause it right here for a second.
Where are you in this picture?
A. Sir, I'm trying to figure that out myself.
Q. Okay. Do you know, is -- is this Mr. Nelson with the black shirt and the khaki pants? Do you recall him wearing an outfit like that that day?
A. I would be speculating to say that is him, sir. It -- it -- I cannot say with certainty.
Q. Okay. But you are somewhere in this gym while this is going on and you believe that

you're acting in the capacity as the heightened safety officer, fair?

A. Yes, sir, or just completing my -- my practical portion, one or the other.

Q. Okay. All right. So do you see the role player up here where my cursor is?

A. Yes, sir.

Q. Do you see that the role player has his helmet off, it's in his hand and his bare head is there?

A. Yes, sir.

Q. All right. During that time does he have safety glasses on?

A. I'm not able to tell.

Q. Okay. But there certainly was a time when he was bare-headed without his helmet on.

Do you recall anybody saying anything to him about him not having his helmet on?

A. No, sir.

Q. Is there anything about his positioning in the gym that would prevent Mr. Nelson, you or anybody else from seeing him

at that point? He's not behind any walls or anything, correct?

MS. PANDAK: Objection, speculation.

BY MR. BUCKNER:

Q. To your knowledge, was there anything that would have prevent -- prevented Mr. Nelson, you or anyone else in the gym from seeing him at that time?

A. Where he is standing at this time, had we been looking at him, there's -- there's nothing, no, sir.

Q. Okay. I'll just hit play again. And if you recognize yourself in any of these, please let me know. Okay?

A. Yes, sir.

Q. All right. First Sergeant Sanders, can you tell me what's going on here inside the box?

MS. PANDAK: Can you see well enough?

THE WITNESS: I can barely see.

MS. PANDAK: Yeah, this -- it -- pardon. It's a little hard to see it on the screen.

MR. BUCKNER: Sure, and -- and I'm --

MS. PANDAK: The video itself. I'm not just talking about individual things.

MR. BUCKNER: Yeah.

BY MR. BUCKNER:

Q. And I will -- I will tell you, Mr. Sanders, it's hard on everybody's screen because this is not an HD quality picture. Okay? So I don't --

A. Yes, sir.

Q. I don't want you to think your eyes are getting buggy on you or something. It's hard for everybody to see. But let me back it up just a little bit to help you kind of put it in context and you can see people going in and out of the box and that might help.

Okay. So you saw that one person walked over to this position?

A. Yes, sir.
Q. And we've got someone here. Is this Mr. Nelson?
A. This appears to be Shawn Pickard entering the box from the outside.
Q. Okay. Let me put it on pause. So you believe this person who just came from off screen, onto screen and into the box, you think that's Shawn Pickard?
A. Yes, sir.
Q. And is that -- is that where he, sir, has got his eyes closed and his back turned as you described the participants started the scenario?
A. Yes, sir. That's where the scenario would begin.
Q. All right. And so was this -- who was this giving instruction to him?
A. I believe that may be me, sir.
Q. Okay.
A. This has been three years ago, but I believe -- I don't want to misspeak. I know we

were checked for weapons prior to entering the gym, were issued the training firearm.

Q. Okay.

A. That may be -- well be me in -- in front of him doing a double-check for weapons.

Q. Okay. And for the record, we're looking at 32:10 on the video; is that correct?

A. 32:10, yes, sir.

Q. All right. And this raised -- you -- you kind of leap-frogged a few questions, but let's go there now.

You had testified that you performed your scenario. You went through your scenario and then you rotated to the higher level safety officer role. And that's just a little different than my understanding of how this worked and I just want to make sure we're all on the same page.

As I understood how these worked, you would come in from the hallway and you would be the active scenario participant. You would be the one that would be responding to the role

player who came into the box. That's your first role when you came into the gym; is that right?

A. Yes, sir.

Q. And then when your scenarios were done, you would now rotate to be the instructor, the -- the teacher instructor student -- I mean, you're there learning how to teach the teachers.

So your next role after being the active participant with the CEW would be to rotate into the instructor position; is that right?

A. Sir, I certainly don't recall it being put to me that way.

Q. All right. And I'm not -- I'm not trying to play hide the ball, so what -- the way I understood this entire course to be is to teach all of you or to recertify all of you to teach other people how to use the CEW.

A. Yes, sir.

MR. BROWN: Object to form and foundation.

BY MR. BUCKNER:

Q. And so --

MS. REPORTER: I'm sorry. Who said that?

MR. BROWN: That was Peter Brown.

MS. REPORTER: Okay.

BY MR. BUCKNER:

Q. And so Mr. Sanders, it's my understanding that -- that what would happen is you would come in from the hallway and you would participate in the four different scenarios, which involves reacting to the different role players; is that correct?

A. Yes, sir.

Q. And then the second active role you'd have after you've completed your scenario is now you're going to pretend to be the instructor teaching a student while Mr. Nelson, the actual instructor of the class, supervises you engaging in that instruction to make sure that you're doing it correctly? Is that the second role you performed?

A. Sir, again, this has been three years ago. It would appear to my positioning in the video for that to be correct. My job would have been simply to brief him to ensure he did not have any weapons on him, a double-check there, but yes, sir.

Q. Okay. And then the -- the third role, after you're done instructing the active participant who's going to be responding to the role player, is your third role would be you rotate over to be the heightened level safety officer; is that right?

A. That makes sense, yes, sir.

Q. Okay. So in this particular scenario where Officer Pickard is in here, he's going to be the one responding to the role player -- do you see my cursor pointing to him?

A. Yes, sir.

Q. And I'm still on 32:10 of the video.

And then the person facing him that my cursor is on now, looks like a light-colored shirt and khaki pants, you believe that's you?

A. I do.

Q. Okay. And then the person over here that I pointed out before who's observing, is that the safety officer or is that Officer Nelson?

A. Sir, I can't say with certainty who that is.

Q. Okay. While you were engaged with Officer Pickard during that time, we still see the role player off here to the side holding his helmet with nothing on his head; is that correct?

A. Yes, sir.

Q. Okay. Let's play it a little bit further and maybe help put it in additional context for you.

Okay. I've paused it again, sir, at -- at 32:22. Is this where we see the active role player who's going to be coming in running the scenario with Officer Pickard get up and start to move towards the box?

A. It appears so, yes, sir.

Q. And during that clip that I played,

did you see that the other nonactive role player continues to have his helmet off and his bare head?

A. I see that in the video, yes, sir.

Q. Okay. Do you recall while you were engaged with this with Officer Pickard whether at any time anyone in the gym called a stop action?

A. Before Mr. Nelson called the stop action after Mr. Curran received injury, that was the only stop action I heard.

Q. And -- and that might be helpful and help us speed along. Was that the only stop action that was called the entire day while you were inside the gym?

A. While I was inside the gym, yes.

Q. Okay. All right. Let's play it a little bit further.

Okay. Sir, I've stopped it at 32:35. At any time during that playing of that last little clip have you seen that inactive role player place his helmet back on his head?

A. I was watching the scenario, sir, but

no, I did not.
Q. Okay. And the gentleman that I pointed out a couple times with my clicker that appears he has khaki pants and a dark-colored shirt on has now entered the box at 32:35. That gentleman walked right next to that inactive role player with his helmet off, correct?
A. Yes, sir.
Q. Okay. And I -- I did note that during the course of this, you were engaged in the conduct of the -- of the scenario inside the box, right?
A. That is correct, sir.
Q. When you're engaged in that, is it fair to say that that is supposed to be the focus of your attention and activity, what's occurring inside the box?
A. Yes, sir, to watch the officers' response and also, oddly enough, to prevent physical force from occurring through adrenaline and whatnot.
Q. To -- to prevent them from fighting

one another?

A. We get wrapped up in role play sometimes, sir.

Q. Understood. I -- I get it. I understand.

All right. Let's watch a little bit further.

A. Yes, sir.

Q. All right. So I've stopped it at 33:10 and we just watched a scenario play out and you exited the box during that scenario to let the scenario play out; is that correct?

A. Yes, sir.

Q. All right. And then we see when the scenario is concluded, the role player takes his helmet off and is heading back over to that bench area that was shown to you by Mr. Brown in the pictures; is that right?

A. Yes, sir.

Q. And the person that I've got my cursor on right now, the person I've pointed out a few different times with the dark-colored shirt

and the khaki-colored pants, from his position at this screen capture, 33:10 in the video, is he able to see behind that blue mat where the bench is?

MR. CASEY: Objection to form, calls for speculation.

BY MR. BUCKNER:

Q. Okay.

MR. BROWN: Join.

BY MR. BUCKNER:

Q. All right. So Mr. Sanders, you -- you were present. That's my cursor pointing at you right there, correct?

A. Yes, sir.

Q. And you had an opportunity to observe the layout of the box, the mats, prior to this point in the video, 33:10, right?

A. Yes, sir.

Q. And so from your experience in observing where the mats are, the layout of the gym and having walked around the different places during the pendency of your scenarios and as

you're now the instructor for the other officer scenarios did you have an opportunity to observe where people might be able to see from different positions within the gym and specifically the gentleman with the dark shirt and the khaki-colored pants?

MR. BROWN: Object to foundation.

BY MR. BUCKNER:

Q. You can answer, Mr. -- First Sergeant Sanders.

A. From this view of your video, sir, it would appear that if he was looking up, he would be able to see the role players over near the bench.

Q. Okay. And not -- not only from this video, but, First Sergeant Sanders, from your own experience having been in this gym and walked around and observed things, you know that from his perspective where he's standing there he can see behind that bench, right?

A. Yes, sir.

MR. CASEY: Objection to form and

foundation.

MR. BROWN: Object to foundation.

BY MR. BUCKNER:

Q. Okay. Let's watch --

MR. BROWN: Join.

BY MR. BUCKNER:

Q. Let's watch a little further.

Okay. I've stopped it at 33:20. The active role player has now left his position behind the mat where the bench is located, correct?

A. Yes, sir.

Q. And he circled back behind the -- another one of the mats while Officer Pickard is ready for the scenario to commence, correct?

A. Yes, sir.

Q. And you remain facing Officer Pickard in your -- in your role as the student instructor during this scenario, correct?

A. Yes, sir.

Q. All right. So the scenario is beginning to start. And did you see that the

other role player, the nonactive role player, is standing off to the side, again, not far from the individual with the dark shirt and the khaki pants, holding the helmet in his hand with a bare head?

A. I do.

Q. Okay. Let's watch a little further.

All right. Let's stop it at 33:30. Sir, from the last time I stopped it until this time at 33:30, does the inactive role player continue to hold his helmet in his hand with his bare head exposed?

A. It appears so, yes, sir.

Q. And also now is he talking to, physically -- I -- let me rephrase that.

Is he physically standing next to the individual with the dark top and the khaki pants that I've referenced several times before?

A. Yes, sir.

Q. And from your perspective, you continued to monitor the actual scenario in your role as student instructor?

A. Correct.

Q. Let's go a little further.

I've stopped it at 33:46. Just to ask, First Sergeant Sanders, do you know who these two gentlemen are where my cursor is now, the gentleman in the red-colored shirt and the person standing next to him?

A. I am not positive, sir. I do not recall.

Q. Okay. Fair enough. Let's continue forward.

All right. Sir, I've just stopped it at 33:54. Did you see that the role player that was just engaged as the aggressor left the box area and, prior to moving behind the mat where the bench is located, he removed his helmet?

A. Yes, sir.

Q. And from his position, the gentleman with the dark shirt and the khaki-colored pants is clearly able to observe him doing so, correct?

MR. CASEY: Objection to form and foundation.

MR. BROWN: Object to form and foundation.

BY MR. BUCKNER:

Q. Mr. -- Officer Sanders, you can answer that.

A. The gentleman in the black jacket and khaki pants, if he were looking in that direction, he would be able to see those role players.

Q. Okay. There's nothing between where he's located and where that bench is located that would prevent him from seeing someone -- one of the role players take their helmet off if they were positioned by the bench?

A. No, there is not.

Q. Okay. All right. Let's go a little further.

All right. Let's stop it here at 34:08. First Sergeant Sanders, this is you, where my cursor is pointing, closer to the camera than where the two active participants are standing; is that right?

A. Yes, sir.

Q. And from that perspective, you're continuing to observe the scenario as it plays out, right?

A. Correct. Yes, sir.

Q. And the gentleman that we've talked about several times with the dark top and the khaki pants now is moving closer to that open corner of the box, correct?

A. Yes, sir.

Q. And the portion of the video clip that we just showed while the two participants, Officer Pickard and the role player, exited the box, they did so right in front of the gentleman with the dark top and the khaki pants, correct?

A. Yes, sir.

Q. Okay. And from your perspective where you were standing in this video clip at 34:08, you can't see the other role player who's on the bench area, correct?

A. I cannot.

Q. Okay. The prior clip that we showed

showed the role player -- the prior role player exiting the box coming over to sit down and removing his helmet I believe you've already testified to, correct?

A. Yes, sir.

Q. Right. So we don't know from this video clip, and you don't know from your vantage point here, whether that role player who is behind this mat has his helmet on or off, correct?

A. Correct, sir.

Q. All right. What we do know, though, is where my cursor is now, that's the aggressor role player, correct?

A. Yes, sir.

Q. And where my cursor is now, that's the active participant in the scenario?

A. Yes, sir.

Q. And based on the positioning of those two people, the active participant in the scenario who's got his TASER drawn, the TASER is actually pointed in the direction of the

nonactive role player behind the mat, correct?
A. Yes, sir.
Q. So if that nonactive role player continues to have his helmet off and if this active participant discharges his TASER and misses, the nonactive role player is actually down range from the discharge of that TASER, correct?
A. Yes, sir.
MR. BROWN: Object. Speculation.
BY MR. BUCKNER:
Q. And if that active participant misses, he may strike the nonactive role player who's down range from his TASER, correct?
A. Yes, sir.
Q. Under this situation where the nonactive role player took his helmet off and sat down, did so within clear view of and able to be seen by the gentleman with the black top and the khaki pants, would that role player that I just described behind the mat in the bench area being down range of the person with the TASER, such

that if the TASER misses, it could strike that nonactive role player, isn't this a dangerous situation where stop action should have been called by someone?

MR. CASEY: Objection to form and foundation.

MR. BROWN: Object to foundation.

** Join.

BY MR. BUCKNER:

Q. And if you can answer.

A. Yes, sir.

Q. Okay. All right. Sir, do you recall how you paid for the course? And when I -- and I guess let me be a little bit more specific. I'm not saying that to suggest you pulled cash out of your pocket and paid for it.

Do you recall how your registration for the course was paid for?

A. I believe it was paid for by agency credit card, sir.

Q. Okay. And do you know whether that payment was made to Axon or was it made to

Mr. Nelson?
A. That would have been made to Axon through their website.
Q. And prior to December 14, 2017, which was the one day that you were present for training, had you ever met Mr. Nelson before?
A. Yes, sir.
Q. Okay. When did -- when had you met him -- when did you meet him previously?
A. He was my instructor for two of my previous CEW recertifications.
Q. Did you and Mr. Nelson ever communicate outside of those prior CEW certifications?
A. No, sir.
Q. Did you consider Mr. Nelson to be a friend?
A. A friend? No, sir.
Q. Was Mr. Nelson a nice guy in your previous encounters with him?
A. He was, yes, sir.
Q. And -- and I will be happy to put on

the record he struck me as a nice guy in my encounter with him during his deposition.

Have you had any communications with Mr. Nelson since December 14, 2017?

A. No, sir.

Q. All right. The box drill that we've been looking at in all those video clips that you've described being set up with the mats inside the gym, who set that box drill up?

A. I do not know, sir.

Q. Did you have any role in setting that up?

A. No, sir.

Q. Do you have any knowledge of any statements that were made by Mr. Nelson to Officer Curran that weren't made to the class generally?

A. I would have no knowledge of any statements, no, sir.

Q. Okay. To your knowledge, did Mr. Nelson ever make any statement to Officer Curran regarding how he was supposed to

conduct himself as an inactive role player?

A. I was not privy if such conversation occurred.

Q. Okay. You had testified before when Mr. Brown was asking you questions about everyone in the gym being a safety officer, but that when one person rotated off of their scenarios, they became, for the next scenario, the higher level safety officer.

Is that a fair characterization of your testimony?

A. Yes, sir.

Q. In that role as the higher level safety officer, what specific instructions did Mr. Nelson provide to you or to others that you're aware of as to what you were supposed to look out for, for safety infractions?

A. I don't recall any specifics we discussed one way or the other, sir. (Remote transmission interference.)

Q. And I'm -- I'm sorry. I don't -- something broke up or somebody coughed or

something. Did you -- did you say that you don't recall any specific instructions being provided by Mr. Nelson to you or anyone else that you're aware of regarding how to conduct yourself as the higher level safety officer?

A. Correct. Now, we all bring our experience -- that is correct, sir. I cannot say he did not, but I do not recall that.

Q. All right. And I think you were getting ready to say that you all bring your experiences with you that day. And I'm assuming you're talking about your safety experiences and how you conduct training of other people with dangerous weapons?

A. Yes, sir.

Q. But that day was the first time, if I remember your testimony correctly, that you had ever encountered the box drills; is that correct?

A. That is correct.

Q. All right. So your experience regarding how to safely conduct a ** (remote transmission interference) weapon didn't involve

a box drill previously, it's just general safety -- general things that you need to do to be safe when you're conducting training involving a dangerous weapon; is that fair?

A. Would you say that again, please, sir?

Q. I'm -- I'd be happy to. Is my -- is my audio with you breaking up, First Sergeant Sanders?

A. It is clear now. There was a moment it --

Q. Okay.

A. -- went out a little bit.

Q. Good. Okay.

So the -- you -- you testified before that everyone there that day brought with them their experience and past training regarding safety and how to safely conduct training involving dangerous weapons, right?

A. Correct.

Q. Okay. Your knowledge that you brought with you that day did not include how to

safely conduct a box drill because you had never permitted -- you had never participated in a box drill before?

A. Correct.

Q. And the information you had with how to safely conduct training involving a dangerous weapon was just related to general principles regarding training with a dangerous weapon?

A. Yes, sir.

Q. You had testified that when asked about whether the action inside the box, that starts inside the box, the box being those blue mats, could go outside of the box. And I think you actually testified a couple of times that it was your perception that it could go outside of the box.

Were you ever specifically told by Mr. Nelson that the action could go outside of the box?

A. I cannot -- no, sir, I cannot say that.

Q. All right. Was it your perception

that it could go outside of the box because during your time in the gym and your personal observations it did, in fact, go outside of the box?

A. No, sir.

Q. Then why was it your perception, having not participated in the box drill before, that the action could -- which started inside the box could then leave the box?

A. During the course of me participating in the scenarios, maintaining a -- a distance of officer safety and -- and flowing, if you will, with the scenario, we -- we leave the box in the real world. I left the box. I was not stopped.

Q. Okay. So you -- so your belief that you could leave the box ** row was based solely on not being stopped when you were engaged in your own scenario?

MS. PANDAK: That's not what -- that was not an accurate statement of what his response was.

MR. CASEY: Object to form.

MR. BROWN: ** Join in that.
BY MR. BUCKNER:
Q. Okay. So First Sergeant Sanders, I had asked what was your perception that you could leave the box during a training scenario, what was that based on. And I believe you testified that it was because when you were engaged in the scenarios as the participant, you left the box and no one stopped you.
A. Those were my words, sir. I did not mean that to sound as I dipped my toes in the water to see if I could get away with something. I -- I flowed with the scenario. And for me to properly handle that scenario required me to leave the box, in my opinion.
Q. And -- and First Sergeant Sanders, I wasn't suggesting by that question that you did anything wrong, because I believe your prior testimony to my asking you that question was that you were never instructed one way or the other whether you could leave the box, correct?
A. That is correct.

Q. First Sergeant Sanders, were you ever told what the scope of the training area was for the scenarios that were going to be conducted inside the gym?

A. No, sir.

Q. Do you recall anybody ever telling you the entire gym is the training area?

A. No, sir. Obviously, the training was held within the gymnasium.

Q. Sure. And First Sergeant Sanders, I think you testified also that not only are you a certified TASER instructor or CEW instructor, but that you're also a -- a Virginia certified firearms instructor?

A. Yes, sir.

Q. And a use of force instructor, correct?

A. Yes, sir.

Q. When you do firearms training, when you're conducting the firearms training, I presume that that is at some firing range; is that correct?

A. That is correct.

Q. And at the -- do you do those at both indoor and outdoor ranges?

A. We do.

Q. And wherever you are, whether it's indoor or outdoor, whatever that facility is, that entire facility is the training area, correct?

A. Yes, sir.

Q. But within that training area, you've got specific areas that are the danger areas or the action areas or the hot areas or the at-risk areas. And, for example, at an outdoor gun range, everything from the firing line down range is the hot/active/danger zone; is that correct?

A. That is correct.

MR. BROWN: Object to form and foundation.

BY MR. BUCKNER:

Q. And did the same hold true for the TASER training, that the gym was the training area, but the entire gym might not be the hot,

active or danger area?
MR. BROWN: Same objection.
BY MR. BUCKNER:
Q. You can answer, First Sergeant Sanders.
A. I was -- I do not recall being provided boundaries to keep the training within.
Q. Okay. Fair enough.
First Sergeant Sanders, I'm -- if you would give me just a minute or two, I might be close to wrapping up. Would you like to take a -- a break for a short time -- we've been going for a while -- while I look at my notes or do you want to just keep plugging?
MS. REPORTER: I would like to take a break.
MR. BUCKNER: We can't work without you. So if you'd like to take a break, Misty, that's fine. So why don't -- why don't we take -- is five minutes satisfactory or do we need a little longer than that?

MS. PANDAK: I think five will be fine for us.

MR. BUCKNER: Okay. Very good. Thank you. We'll see everybody back in five.

VIDEO OPERATOR: The time is 2:55 p.m. We're going off the record.

(Thereupon, a brief recess was taken.)

VIDEO OPERATOR: The time is 3:05 p.m. We're back on the record.

BY MR. BUCKNER:

Q. First Sergeant Sanders, I believe that you testified previously when Mr. Brown was asking you questions that on each occasion when you were certified or recertified as a CEW user or trainer by Axon that you were provided warnings of the dangerous nature of the TASER CEWs; is that correct?

MR. CASEY: Objection.

MR. BROWN: Object to form and foundation.

BY MR. BUCKNER:

Q. I'm -- I'm sorry, Mr. Sanders. You'll have to give that answer again.

A. Yes, sir.

Q. And those warnings, did you receive those each time you went through the training and the written materials?

A. Yes, sir.

Q. So over a period of years were you provided similar warnings, if not the same identical warnings, of -- of the risks of a TASER CEW to the extent it hits a sensitive area of the body: head, eyes, neck, heart, things like that?

A. Yes, sir.

Q. So each time you went through these training -- this training, every two years as required by Axon that you testified to earlier, it sounds like Axon was aware that their CEWs were dangerous and they were warning users or participants in their training class of that fact?

A. Yes, sir.

Q. And it sounds like they wanted people to be advised that there was a risk of physical harm unless special precautions were taken during the course of the training; is that right?

A. Yes, sir.

MR. BUCKNER: I have --

MR. BROWN: I'd like to insert a -- a -- a tardy objection on that question to form and foundation.

MR. BUCKNER: Okay.

I -- and I -- I have nothing further. I don't know if you heard that, Peter, or not.

EXAMINATION BY COUNSEL FOR DEFENDANT RICHARD NELSON

BY MR. CASEY:

Q. First Sergeant Sanders, I'm Brian Casey. I represent Richard Nelson.

Can you hear me all right?

A. Yes, sir. Good afternoon.

Q. Good afternoon. I just have a few questions for you.

Do you know whether or not Officer

Curran was a role player during any of the scenarios in which you participated in as a student?

A. I am not aware, sir.

Q. Okay. In other words, you don't know the identity of the person in -- who -- who played the -- the roles in the -- in the black suit when -- when you were the student; is that right?

A. That is correct.

Q. I'm going to ask you a question about Mr. Nelson.

Do you recall Mr. Nelson ever designating a particular area within the gymnasium as a safety area or safety zone where protective eyewear was not required to be worn during the scenarios?

A. There was one wall in the gymnasium where nonparticipants could stand, and that was a safe area out of the way of the scenarios. I do not recall with certainty the requirement of eye protection. I do (remote transmission

interference) in the gymnasium.

MS. REPORTER: I'm sorry, sir?

THE WITNESS: Everyone in the gymnasium was required to wear eye protection, as I recall.

BY MR. CASEY:

Q. And that was an instruction that was given to you by Mr. Nelson?

A. As close as I can recall, yes, sir.

Q. In some of the questioning Mr. Buckner used the phrase higher level safety officer.

Do you recall that?

A. Yes, I do.

Q. Do you recall seeing that phrase, higher level safety officer, used in any of the written Axon training materials?

A. Not at all, sir. I believe I assigned that terminology to that role.

Q. Okay. Do you -- do you recall Mr. Nelson using the phrase higher level safety officer during the instruction on December 14,

2017?

A. No, sir.

Q. Do you agree, Sergeant Sanders, that even if an instructor does what he can to make sure that overall training is safe that a participant or a student can still do something that's not safe?

A. Yes, sir.

Q. And do you agree that an instructor cannot control all of the actions or all of the conduct of a participant or student in training?

A. Yes, sir.

Q. And in this particular case, on December 14, 2017, if someone in the gymnasium removes their eye protection during scenario training, that person is doing something that is not safe, correct?

A. Yes, sir.

Q. And that person is not following the safety rules, correct?

A. Yes, sir.

Q. Thank you. Those are all the

questions I have.

FURTHER EXAMINATION BY COUNSEL FOR
DEFENDANT AXON ENTERPRISE, INC.
BY MR. BROWN:

Q. Mr. Sanders, I have some -- some follow-up questions for you.

A. Yes, sir.

Q. You reviewed a variety of clips, video clips, with Mr. Buckner.

Do you recall doing that?

A. Yes, sir.

Q. And he questioned you about your participation and presence in the -- in the gymnasium during those periods of time that were reviewed with you.

A. Yes, sir.

Q. And I'm going to go through a handful of -- of factors and -- and then ask a -- a broader question.

So the first is would you agree that the scenarios tend to evolve rapidly?

A. Yes, sir.

Q. Would you agree that they are relatively short in duration?

A. Yes, sir.

Q. Would you also agree that the perspective of the video that you reviewed with Mr. Buckner is different from your own perspective on that day, on December 14, 2017?

A. Yes, sir.

Q. Would you agree that it's difficult to keep track of exactly what everyone is doing at all times during a scenario that is evolving rapidly of short duration?

A. Yes, sir.

Q. You also were -- were questioned about your experience in previous CEW certifications and recertifications.

Do you recall those questions?

A. I recall discussing it, yes, sir. I don't remember the specific questions.

Q. Okay. And do you recall a -- a distinction being drawn between your -- let me start over.

Do you recall being asked about this being your first box drill that you had participated in on December 14, 2017?

A. Yes, sir.

Q. And prior to this December 14, 2017 training, while you had not participated in a box drill, you had participated in several previous CEW certifications and recertifications, correct?

A. Yes, sir.

Q. And those certifications and recertifications prior to December 14, 2017 included the types of warnings about wearing safety gear, for example, in the training area; is that correct?

A. Absolutely. Yes, sir.

Q. Including, in particular, eye protection?

A. Safety glasses required, yes, sir.

Q. Okay. And is it also accurate to say that these training scenarios are trying to replicate to the extent possible real -- potential real life interactions that -- that

officers and the trainees may encounter?

A. Absolutely. Yes, sir.

Q. Turning to the method in which different scenarios -- the -- the way in which the instruction transferred between different scenarios, do you recall terms being used to indicate when a particular scenario was going to be begun?

A. To begin, sir?

Q. Yes. Did -- let me -- let me rephrase.

Do you -- do you recall hearing or being instructed about the use of specific terms to begin or end a scenario?

A. I do not recall that, no, sir. No, sir.

Q. Do you recall being -- start or stop scenario being called?

A. Stop scenario, certainly.

Q. Okay. And what was your understanding of the meaning of when stop scenario would be called?

A. Stop scenario is not necessarily called for a safety issue, but scenario was over, stop further action.

Q. Okay. And when you say further action, would that include refraining from discharging a CEW?

A. That would include that, yes, sir.

Q. And stop action, is it accurate to state that the call for stop action is a different command -- excuse me.

Is it accurate to state that a call for end scenario is a different call than stop action?

A. Correct. Yes, sir.

Q. And so when -- when a call for end scenario is made, what does that mean as compared to a call for stop action?

A. An end of scenario, sir, would mean either an officer had bumbled up a scenario so badly it was not going to -- to end well for them or they had taken the proper actions, demonstrated that their role playing offender

would have been subdued and, you know, we stop action before they go in and take physical control, handcuff, things of that nature.

In other words, stop scenario would -- would be simply you're done, good job, bad job, whatever, this role play is -- is over, as opposed to stop action being an emergency sort of command to prevent a bad thing from occurring.

Q. Okay. And when you stated that end scenario may be called if it's not going to end well for the trainee, does that mean that the role player, had this been a real life interaction, would have not been subdued or subdued in a way that was less than safe?

A. Yes, sir, less than safe or poor choices made on the participant -- the officer's part.

Q. I see. So after a call for end scenario is made, was it your understanding that there was anything prohibiting the participants from removing their protective helmets during that time after end scenario was called, but

before the next scenario began?

A. I am not sure how the role players were briefed. But once a scenario was ended, that would certainly be a safe time for that to occur.

Q. And it would be safe at that time because with the call of end scenario, that would mean that no CEWs were to be discharged and that things would be prepared for the next scenario?

MR. BUCKNER: I'm going to object to leading.

But go ahead, First Sergeant Sanders. You can answer that.

THE WITNESS: Yes, sir, or there was no scenario occurring at that time, no CEWs out, the area was safe.

BY MR. BROWN:

Q. Okay. Let me try to phrase it this way:

After end scenario is called, you -- you stated that that was a time that it would be safe; is that accurate?

A. Yes, sir, once the -- the scenario had, in fact, ended.

Q. Okay. And once the scenario had, in fact, ended after a call for end scenario, why would it be safe to remove a helmet as a role player?

A. There would be no active role play occurring. CEWs or any other training weapons would be secure. There was -- be nobody on edge to respond to -- to a scenario. Things are on downtime at that moment, if you will.

Q. Okay. Give me one moment. I'm -- I'm reviewing here.

Once end scenario -- once end scenario has been called, is it your understanding that the expectation -- let me start over.

End scenario has -- has been called. How do the participants know when it's time for the next scenario to begin?

A. On this particular day, they would be taken back to the box and instructed to stand by

until the next scenario presented itself.

Q. Okay. And once the next scenario has presented itself, the expectation is that the role players have put on their protective headgear; is that correct?

MR. BUCKNER: Object to the form of the question. Expectation is my particular objection.

BY MR. BROWN:

Q. You may answer, Mr. Sanders.

A. Yes, sir. Before action started again, certainly.

Q. So to -- to put it slightly differently, was it your understanding that the expectation would be for the role playing participants to put on their protective headgear --

MR. BUCKNER: And same --

BY MR. BROWN:

Q. -- at that time?

MR. BUCKNER: I'm -- I'm sorry, Peter. I thought you were done.

It's the same objection for the same reason.

But go ahead, First Sergeant Sanders.

THE WITNESS: Yes, sir.

BY MR. BROWN:

Q. Okay.

Okay. That -- that concludes my questioning. Thank you.

MR. BUCKNER: All right.

FURTHER EXAMINATION BY COUNSEL FOR PLAINTIFF

BY MR. BUCKNER:

Q. First Sergeant Sanders, that actually prompted some of my end here, but I'll -- I promise I'll be quick.

Mr. Brown, at the beginning of his redirect with you just a little while ago, went through a bunch of questions where he asked you to agree with things, agree that scenarios evolve rapidly, agree that scenarios happen quickly, things like that.

Do you recall that?

A. Yes, sir.

Q. And I -- I think the point of that was to get you to agree that when the scenarios occur, things happen fast during the performance of that scenario.

Is that -- was that your understanding of that line of questioning?

A. My understanding, yes, sir.

MR. BROWN: Object to form and foundation.

BY MR. BUCKNER:

Q. And then recently here towards the end we've been talking about end scenario and -- and at the conclusion of the scenario, not just the calling of end scenario, but when the scenario truly has ended, there's downtime, it's safe, people can take helmets off, presumably they can take eyewear off; is that correct?

A. That is correct. There is no activity occurring. It's -- yes, sir.

Q. Okay. So it's not that all of the training occurs rapidly, quickly, rapidly evolving, it's just the specific point in time

when the scenario is active that is evolving rapidly and happening quickly, correct?

A. Yes, sir.

Q. And so if something unsafe happens during that quick, rapid, evolving scenario and it can't be corrected in real time because it's happening quickly, as soon as the scenario has ended, there's downtime and corrective action can be taken, correct?

A. Yes, sir.

Q. And do you recall at any time when you were in that gym that day Mr. Nelson or anyone else talking to either of the role players and taking any corrective action regarding their removal of their headgear during that downtime following the end of a scenario?

MR. BROWN: Object to form and foundation.

BY MR. BUCKNER:

Q. Go ahead, First Sergeant Sanders.

(Indiscernible remote transmission.)

THE WITNESS: I was not privy to

any of those conversations between Mr. Nelson and the role players, but I -- I certainly did not hear that conversation occur for corrective action.

BY MR. BUCKNER:

Q. But there certainly was an opportunity for that to have occurred during that downtime following the end of each scenario?

A. Yes, sir.

MR. BUCKNER: I've got nothing further.

Brian, prompt anything? You're on mute. Oh, there we go.

MR. CASEY: No further questions.

MS. REPORTER: Signature?

MS. PANDAK: I have no questions and we'll waive signature.

MR. BUCKNER: Very good. Thank you.

First Sergeant Sanders, appreciate it.

THE WITNESS: Thank you.

VIDEO OPERATOR: The time is 3:27 p.m. This concludes the deposition of Jerry Sanders.

We're off the record.

(Thereupon, signature having been waived, at 3:27 p.m. the deposition was concluded.)

CERTIFICATE OF NOTARY

I, MISTY KLAPPER, the officer before whom the foregoing deposition was taken, do hereby certify that the witness whose testimony appears in the foregoing deposition was duly sworn by me; that the testimony of said witness was taken by me in shorthand and thereafter reduced to typewriting by me; that said deposition is a true record of the testimony given by said witness; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken; and, further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

____________________________

Misty Klapper

Notary Public

A

**able** 14:17 20:14 22:4 36:22 37:4 40:12 49:4 57:14 69:3 70:3 70:13 73:20 74:8 77:18
**Absolutely** 8:15 19:22 98:15 99:2
**Academy** 12:10 53:15
**accurate** 17:15 19:19 26:12 27:11,12 28:17 30:14 32:12 35:6 36:13,15 38:15 42:10 43:3 44:12,18 46:20 49:17,20 85:20 98:19 100:8,11 102:22
**accurately** 38:3
**acquire** 38:1
**acronym** 8:6,12
**acting** 55:2 57:1
**action** 20:15,18 22:14,17 31:13 35:19 36:22 37:22 38:6 40:21 41:4,6 43:22 44:2 49:4 49:13 51:1 66:7 66:9,10,13 78:3 84:11,18 85:8 88:12 100:3,5,8 100:9,13,17 101:2,7 104:11 107:8,14 108:4 110:13,19
**actions** 33:9 95:10 100:21
**active** 61:21 62:9 63:15 64:8 65:17 71:9 74:21 76:17,20 77:5,12 89:1 103:7 107:1
**activity** 67:16 106:19
**actual** 21:15 63:18 72:21
**ADC** 10:21 11:1 11:8,19 12:2,6
**add** 32:10
**addition** 36:20
**additional** 13:14 65:14
**addressed** 18:10
**adrenaline** 67:20
**Adult** 9:18 11:2
**advised** 92:2
**afternoon** 6:12 6:13 51:17,18 92:19,20
**agency** 16:19,21 78:19
**agency's** 45:6
**agent** 12:16 13:20
**aggressor** 73:14 76:13
**ago** 6:19 12:5 60:21 64:2 105:16
**agree** 13:20 14:10,20 95:3,9 96:20 97:1,4,9 105:18,18,19 106:2
**ahead** 15:7 23:15 102:12 105:3 107:20
**aid** 38:1,8,12
**Air** 13:6
**al** 1:8 5:6
**aloud** 7:3
**AMY** 3:8
**amynguyen@a...** 3:11
**Andrews** 13:6
**angle** 24:11
**answer** 7:3,5,6 7:11,18 15:8 39:17 42:15 44:15 47:1,3,19 51:5,7 70:9 74:5 78:10 89:4 91:3 102:13 104:10
**answered** 39:3 47:3
**anybody** 38:10 57:17,22 87:6
**apologize** 39:20
**appear** 64:2 70:12
**APPEARANC...** 3:1,2
**appeared** 35:20
**appears** 60:4 65:21 67:4 72:13 110:5
**appreciate** 108:20
**appropriate** 21:21
**appropriately** 25:5 33:2,7,13 48:4
**approximately** 11:9 13:4 54:8
**area** 18:20 22:20 23:2 26:3,6,22 29:17 31:5 35:18 37:12 38:22 39:16 43:1,18,20 44:7 48:16,20 49:9 68:17 73:15 75:20 77:21 87:2,7 88:7,10 88:22 89:1 91:12 93:14,15 93:20 98:13 102:16
**areas** 88:11,11,12 88:12,13
**arising** 8:18
**Arizona** 3:10
**aside** 11:22 26:19
**asked** 84:10 86:4 98:1 105:17
**asking** 81:5 86:19 90:15
**assigned** 94:19
**assume** 7:12
**assuming** 82:11
**assumption** 43:7
**attached** 4:13
**attend** 17:14,16 17:22
**attendance** 17:17
**attended** 15:22 16:10 19:13 23:20 29:13
**attending** 16:5,7
**attention** 67:16
**attorney** 7:8 45:6 45:6 46:1,13 47:4,6 110:16
**attorneys** 7:10
**at-risk** 88:12
**audio** 83:8
**available** 16:17 32:2
**aware** 8:16,20,21 20:13 81:16 82:4 91:18 93:4
**Axon** 1:8 3:9,12 5:6,11 6:10 8:17,21 16:16 18:12 31:18,19 46:17 78:22 79:2 90:17 91:17,18 94:17 96:3
**Axon's** 13:16

B

**B** 4:9
**back** 27:8 28:4,6 34:7 35:22 39:10 45:8 46:8 47:9,13 56:3 59:17 60:12 66:21 68:16 71:13 90:4,11 103:22
**background** 9:12
**bad** 101:6,8
**badly** 100:20
**ball** 62:15
**bare** 57:9 66:2 72:4,12
**barely** 58:22
**bare-headed** 57:16
**Base** 13:7
**based** 33:8 76:19 85:16 86:6
**basic** 10:18
**basically** 23:8
**bcasey@taylor...** 3:16
**Beach** 3:15 8:4 16:19 19:14 24:12 36:6 53:14
**bear** 23:11 53:6
**began** 36:6 102:1
**beginning** 21:7 37:17 71:22 105:15
**begins** 5:3 36:2
**begun** 99:8
**belief** 85:15
**believe** 13:6 15:9 15:21 38:11 45:16 56:22 60:7,19,22 64:22 76:3 78:19 86:6,18 90:13 94:18
**bench** 68:16 69:3 70:14,20 71:10 73:16 74:11,14 75:20 77:21

**best** 16:19 21:8
**better** 10:8 35:17
**beyond** 33:17
**bit** 9:12 30:8,12 42:8 44:9 55:9 56:3 59:18 65:13 66:17 68:6 78:14 83:13
**black** 56:15 74:6 77:19 93:7
**blue** 24:18,21 25:9,9 26:3,22 29:17 31:6 40:6 43:18,19 44:7 44:11,17 47:22 48:16,20 49:9 49:12 69:3 84:12
**body** 91:13
**bounced** 33:16 33:22
**boundaries** 25:2 89:7
**box** 23:6 25:12 25:13,16,19,21 27:10 28:8,15 28:18 29:5,8 44:21 45:3 47:17 48:3 58:19 59:20 60:5,8 62:1 65:20 67:5,12 67:17 68:11 69:16 73:14 75:9,14 76:2 80:6,9 82:18 83:1 84:1,2,11 84:12,12,13,16 84:19 85:1,4,7 85:9,9,13,14,16 86:5,8,15,21 98:2,6 103:22
**break** 7:17,19 41:16,19,22 42:8,9 46:22 89:12,16,18
**breaking** 83:8
**BREIT** 3:3
**Brian** 3:14 92:16 108:12
**brief** 28:1 43:4 46:5 64:4 90:8
**briefed** 102:3
**bring** 33:11 52:3 52:11 82:6,10
**broader** 96:19
**broke** 81:22
**brought** 8:17,20 8:21 83:16,22
**Brown** 3:8 4:3 6:8,11 15:14 24:8 27:17 28:5 32:16 34:21 35:2 39:5,21 42:14 45:9,16 45:20 46:9 47:8 47:18 49:16 51:6 62:20 63:5 63:5 68:17 69:9 70:7 71:2,5 74:1 77:10 78:7 81:5 86:1 88:17 89:2 90:14,21 92:7 96:4 102:17 104:9 104:19 105:5 105:15 106:8 107:17
**Buckner** 3:3,3 4:4 15:6 45:13 45:18 46:2 49:14 51:13,15 54:1 58:5 59:4 59:8,9 63:1,7 69:7,10 70:8 71:3,6 74:3 77:11 78:9 86:2 88:19 89:3,17 90:3,12 91:1 92:6,10 94:11 96:9 97:6 102:10 104:6 104:18,21 105:9,11 106:10 107:19 108:5,10,18
**buggy** 59:16
**building** 42:19
**bumbled** 100:19
**bunch** 105:17

**C**

**C** 4:1 5:1
**call** 20:14 23:7 25:8 31:13 36:22 38:2,12 40:21 41:4,6 43:21 49:4,12 100:9,11,12,15 100:17 101:18 102:7 103:4
**called** 6:5 20:18 38:6 44:2 51:1 66:7,8,13 78:4 99:18,22 100:2 101:10,22 102:20 103:15 103:18
**calling** 22:13,17 106:14
**calls** 69:6
**camera** 5:21 74:20
**CANTOR** 3:3
**capacity** 55:6 57:1
**capture** 69:2
**card** 78:20
**carried** 20:8 30:19
**carries** 19:16
**carry** 44:19
**carrying** 45:3 47:16
**case** 1:7 46:20 52:8 95:13
**Casey** 3:14 4:5 69:5 70:22 73:21 78:5 85:22 90:20 92:15,17 94:6 108:14
**cash** 78:15
**center** 9:18 11:2 23:1,2
**certainly** 57:15 62:12 99:19 102:4 104:12 108:3,6
**certainty** 24:10 32:7 55:7 56:20 65:6 93:21
**CERTIFICATE** 110:1
**certification** 11:21 12:3,17 12:18 13:3 18:4 29:1
**certifications** 11:19 12:12,15 13:14 19:3 79:14 97:16 98:8,10
**certified** 2:17 28:19 87:12,13 90:16
**certify** 110:4
**certifying** 29:7
**CEW** 8:7,12 12:22 13:3,10 13:20 16:3,5,8 17:8,11 18:19 18:20 19:15 20:11,13 26:14 26:14 33:3,10 33:14 37:5,8 45:4 47:17 62:9 62:18 79:11,13 87:12 90:16 91:12 97:15 98:8 100:6
**CEWs** 13:15 19:20 20:2 28:21 90:19 91:18 102:8,16 103:8
**chance** 9:7 42:7
**chapter** 18:14
**characterization** 81:10
**checked** 26:8 61:1
**chemical** 12:16 13:19
**choices** 101:16
**circled** 71:13
**claim** 52:3
**clarify** 47:2
**class** 31:22 63:19 80:16 91:20
**classes** 16:17
**classroom** 19:10 31:22
**clear** 7:5,6 20:16 77:18 83:10
**clearly** 73:20
**clicker** 67:3
**clip** 65:22 66:20 75:11,18,22 76:7
**clips** 80:7 96:8,9
**close** 25:3 34:1 43:1,3 89:11 94:9
**closed** 21:18 60:12
**closer** 35:17 74:20 75:8
**come** 56:3 61:20 63:10
**coming** 65:18 76:2
**command** 100:10 101:8
**commence** 71:15
**Commonwealth** 17:10
**communicate** 79:13

**communicated** 31:3
**communications** 45:22 80:3
**compared** 100:16
**complete** 17:22
**completed** 30:17 34:3 55:2 63:16
**completing** 30:22 57:3
**compliance** 33:11
**concerned** 45:20
**concluded** 68:15 109:7
**concludes** 105:7 109:2
**conclusion** 106:13
**conduct** 14:17 40:5 67:11 81:1 82:4,13,21 83:18 84:1,6 95:11
**conducted** 1:14 8:10,14 18:16 22:5,21 29:2 40:12 42:20 43:14 53:16 87:3
**conducting** 41:1 50:17 83:3 87:20
**confidence** 50:16
**confidential** 45:21
**consider** 79:16
**considered** 31:10 35:5
**consistent** 11:6 24:2
**contain** 44:11
**context** 59:19 65:15
**continue** 16:7 72:11 73:10
**continued** 72:21
**continues** 33:15 66:2 77:4
**continuing** 37:14 75:3
**continuum** 17:12
**control** 33:11 95:10 101:3
**conversation** 81:2 108:3
**conversations** 108:1
**cool** 42:7
**copy** 9:5
**corner** 54:4 75:9
**Corporation** 5:12
**correct** 15:17 17:16 20:3,9,10 22:9 26:13 27:1 28:20 31:14 32:21 35:11 37:1,6 38:18 39:1,17 40:18 41:9,11 48:12 49:6 51:21 54:12 58:2 61:7 63:13 64:3 65:11 67:7,13 68:12 69:13 71:11,15,19 73:1,20 75:5,9 75:15,20 76:4 76:10,11,14 77:1,8,14 82:6 82:7,18,19 83:20 84:4 86:21,22 87:17 87:22 88:1,8,15 88:16 90:19 93:10 95:17,20 98:8,14 100:14 104:5 106:17 106:18 107:2,9
**corrected** 107:6
**corrective** 107:8 107:14 108:4
**correctly** 33:4,18 36:9 63:21 82:17
**coughed** 81:22
**counsel** 3:6,12,17 5:16 6:9 51:12 92:14 96:2 105:10 110:11 110:16
**counting** 32:12
**couple** 6:19 67:3 84:14
**course** 14:15 15:21 21:5 32:20 39:8 62:16 67:10 78:13,18 85:10 92:4
**court** 1:1 5:7,14 5:18 7:5 39:5
**create** 23:9
**credit** 78:20
**Criminal** 12:9
**CRR** 1:20
**Curran** 1:5 5:5 8:17 30:17 34:11 36:5,11 37:3,8 38:17 41:13,18,21 46:16 48:19 49:2,22 50:3,19 50:21 51:16 52:11,17 54:8 54:18,22 66:9 80:16,22 93:1
**Curran's** 38:21 39:14 41:9
**current** 9:19
**cursor** 57:6 64:17,21 68:21 69:12 73:5 74:20 76:13,16

**D**

**D** 5:1
**danger** 88:11 89:1
**dangerous** 78:2 82:14 83:4,19 84:6,8 90:18 91:19
**dark** 70:5 72:3 72:17 73:19 75:7,15
**dark-colored** 67:4 68:22
**dart** 33:21
**darts** 33:15
**date** 16:10
**day** 9:5,9 15:22 17:22 53:12,16 56:17 66:13 79:5 82:11,16 83:16,22 97:7 103:21 107:12
**days** 15:19,20
**decades** 6:19
**December** 8:2,19 15:16 16:11,12 16:14 17:14,18 18:1 19:14 21:5 23:19 27:10 28:14 29:13 30:10 32:18 50:15 79:4 80:4 94:22 95:14 97:7 98:3,5,11
**declined** 46:22
**declining** 47:2
**defendant** 3:12 3:17 6:9 46:16 92:14 96:3
**Defendants** 1:9
**delegated** 38:1
**demonstrated** 100:22
**department** 17:4 36:6
**depending** 14:14
**depicts** 23:12
**deployed** 20:2
**deposed** 6:18
**deposition** 1:13 4:16,17 5:4,10 8:1 24:5 32:13 53:19 80:2 109:2,6 110:3,6 110:9,14
**describe** 23:4
**described** 40:2,3 41:21 44:9 55:4 60:13 77:21 80:8
**describing** 35:3
**DESCRIPTION** 4:10
**designate** 38:11
**designated** 29:12 34:2
**designating** 93:14
**Detention** 9:18 11:2
**different** 61:15 63:11,12 68:22 69:21 70:3 97:6 99:4,5 100:10 100:12
**differently** 104:14
**difficult** 97:9
**difficulties** 28:2,7
**dipped** 86:11
**direction** 74:8 76:22
**discharge** 77:7
**discharged** 102:8
**discharges** 77:5
**discharging** 37:5 37:7 100:6
**discussed** 30:11 81:19
**discussing** 28:8 97:18
**discussion** 27:20 28:10 46:3
**distance** 16:21

34:8 42:22 85:11
**distinction** 35:4 97:21
**District** 1:1,2 5:7 5:8
**division** 1:3 10:16
**document** 30:4
**doing** 17:4 18:3 61:5 63:21 73:20 95:16 96:10 97:10
**door** 21:18
**double-check** 61:5 64:5
**downtime** 103:11 106:15 107:8 107:15 108:8
**drawn** 76:21 97:21
**drill** 27:10 28:15 28:18 29:5,9 44:20,21 45:3 47:17 80:6,9 83:1 84:1,3 85:7 98:2,7
**drills** 28:9 82:18
**Drive** 3:4
**driver's** 12:17 13:19
**DT** 23:7
**due** 8:1 28:2 37:11
**duly** 6:6 110:6
**duration** 97:2,12

**E**

**E** 4:1,9 5:1,1
**earlier** 24:19 27:9 30:12 40:2 40:3 44:10 48:14 91:17
**Eastern** 1:2 5:8
**ebuckner@bre...** 3:6
**edge** 23:9 103:9
**either** 33:15,21 100:19 107:13
**electrical** 8:10,14 18:16
**Elliott** 3:3 51:15
**emerge** 25:8
**emergency** 101:7
**employed** 12:7,8 110:12,16
**employee** 110:15
**encounter** 80:2 99:1
**encountered** 28:7 82:18
**encounters** 79:20
**ended** 102:3 103:2,4 106:15 107:8
**Enforcement** 53:14
**engaged** 14:2,9 65:8 66:6 67:10 67:14 73:14 85:17 86:7
**engaging** 63:19
**ensure** 64:4
**enter** 25:11,13 40:10
**entered** 67:5
**entering** 26:9 60:5 61:1
**Enterprise** 1:8 3:9,12 5:6,12 6:10 96:3
**entire** 7:8 62:16 66:13 87:7 88:7 88:22
**entitled** 45:22
**equipment** 14:10 14:16 15:1,13
**equivalent** 10:14
**ESQUIRE** 3:3,8 3:8,14,20
**established** 15:11 15:12
**et** 1:8 5:6
**evaluate** 42:5
**evaluated** 37:22
**everybody** 34:2 59:17 90:4
**everybody's** 59:11
**evolve** 96:21 105:18
**evolving** 97:11 106:22 107:1,5
**exact** 23:1
**exactly** 97:10
**examination** 4:2 6:5,9 51:12 92:14 96:2 105:10
**examined** 6:6
**example** 88:13 98:13
**excuse** 11:3 12:5 41:11,18 100:10
**exercise** 25:19,20
**exercises** 19:7 32:19 34:9 41:17
**exhibit** 4:16,17 24:2,5,14 32:11 32:11,13 53:19
**Exhibits** 4:13,15
**exited** 68:11 75:13
**exiting** 76:2
**expectation** 15:4 15:10 103:16 104:3,7,15
**expected** 14:21
**experience** 18:2 42:4 69:19 70:17 82:7,20 83:17 97:15
**experiences** 82:11,12
**explain** 33:6
**explained** 48:14
**exposed** 72:12
**extensive** 18:13 18:22
**extent** 91:12 98:21
**eye** 19:4,6,7 21:1 50:12 93:21 94:4 95:15 98:16
**eyeglasses** 21:1
**eyes** 25:3,4 59:15 60:12 91:13
**eyewear** 93:16 106:17
**E-mail** 3:5,11,16

**F**

**face** 36:7
**faced** 25:5,15
**facility** 88:6,7
**facing** 64:20 71:17
**fact** 22:8 46:19 47:5,6 49:11 85:3 91:21 103:2,4
**factors** 96:18
**fair** 7:20 43:7 57:2 67:15 73:10 81:10 83:4 89:8
**familiar** 6:22 8:6 24:17
**familiarity** 24:20
**far** 16:20 72:2
**fast** 106:3
**felt** 50:18
**field** 19:16 35:17
**fighting** 67:22
**figure** 56:12
**final** 24:13
**financially** 110:17
**find** 47:12
**fine** 46:2 89:19 90:2
**finished** 21:12
**fire** 18:20
**firearm** 18:19 26:15,15 61:2
**firearms** 17:10 87:14,19,20
**firing** 33:2,14 87:21 88:14
**first** 7:2,18 9:21 10:11 11:14 13:2 18:3 21:22 27:12 28:14,18 29:1,7 32:17 35:8 38:1,8,12 42:7 46:1 51:19 52:15 53:5,8 54:7 58:17 62:1 70:9,16 73:4 74:19 82:16 83:8 86:3,16 87:1,10 89:4,9 90:13 92:16 96:20 98:2 102:12 105:3 105:12 107:20 108:20
**five** 33:13 89:20 90:1,5
**floor** 23:1,3
**flowed** 86:13
**flowing** 85:12
**focus** 67:15
**follow** 14:3,22 15:11
**following** 35:7 95:19 107:16 108:8
**follows** 6:6 39:11 47:14
**followup** 51:10
**follow-up** 96:6
**force** 13:7 14:21 17:9,12 21:21 33:9 42:4 67:20 87:16
**foregoing** 110:3

110:5
**Forest** 3:4
**form** 15:6 34:18 62:20 69:5 70:22 73:21 74:1 78:5 85:22 88:17 90:21 92:9 104:6 106:8 107:17
**forward** 73:11
**foundation** 62:21 70:7 71:1,2 73:22 74:2 78:6 78:7 88:18 90:22 92:9 106:9 107:18
**four** 33:13 52:21 56:5 63:11
**frame** 47:20 54:11
**freeze** 54:11
**Friday** 5:9
**friend** 79:17,18
**front** 61:5 75:14
**froze** 55:20
**frozen** 55:19 56:2
**fulfilled** 34:7
**function** 24:22
**further** 65:14 66:17 68:7 71:7 72:7 73:2 74:17 92:12 96:2 100:3,4 105:10 108:11,14 110:14

**G**

**G** 5:1
**gear** 21:1 42:2 98:13
**general** 18:15 83:1,2 84:7
**generally** 28:11 42:21 80:17
**generically** 42:3
**gentleman** 67:2,6 70:5 73:6,18 74:6 75:6,14 77:19
**gentlemen** 73:5
**getting** 59:16 82:10
**give** 89:10 91:3 103:12
**given** 35:8 48:10 94:8 110:10
**gives** 42:7
**giving** 60:18
**glasses** 27:3 31:1 31:5,16,20 32:1 32:6 50:9,22 57:13 98:18
**Glen** 3:4
**go** 15:7 23:15 27:16 43:19 45:9 52:20 61:11 73:2 74:16 84:13,15 84:18 85:1,3 96:17 101:2 102:12 105:3 107:20 108:13
**goes** 42:5
**going** 21:16 23:10,22 27:8 27:19 35:20 45:12 47:9 48:11 55:9,16 56:22 58:18 59:19 63:17 64:9,15 65:18 87:3 89:12 90:7 93:11 96:17 99:7 100:20 101:10 102:10
**good** 6:12,13 51:17,18 52:14 83:14 90:3 92:19,20 101:5 108:18
**GRANA** 3:3
**greater** 34:4
**guess** 52:18,19 78:14
**gun** 88:13
**guy** 79:19 80:1
**gym** 26:12,21 52:16 53:12 54:15 56:22 57:21 58:8 61:2 62:2 66:7,14,15 69:21 70:4,17 80:9 81:6 85:2 87:4,7 88:21,22 107:12
**gymnasium** 22:22 23:2,3 24:3,12 26:5,9 27:3,6 30:18 40:9 42:11 50:11,12 87:9 93:15,18 94:1,4 95:14 96:14
**gymnastic-types** 23:8

**H**

**H** 4:9
**half** 54:9,17,20
**hallway** 21:18 40:8,15,20 61:20 63:10
**hand** 6:2 57:9 72:4,11
**handcuff** 101:3
**handful** 96:17
**handle** 86:14
**handled** 19:21
**hands** 36:7
**happen** 34:12 63:9 105:19 106:3
**happening** 107:2 107:7
**happens** 56:6 107:4
**happy** 79:22 83:7
**hard** 59:2,11,16
**harm** 92:3
**HD** 59:12
**head** 7:4,4 57:10 65:11 66:3,21 72:5,12 91:13
**headgear** 36:12 37:3,9 50:5,8 104:5,17 107:15
**heading** 68:16
**hear** 40:21 92:18 108:3
**heard** 66:10 92:12
**hearing** 99:12
**heart** 18:21 91:13
**heavy** 42:1
**heightened** 57:1 64:11
**held** 5:11 10:1 87:9
**helmet** 50:22 57:9,16,18 65:11 66:2,21 67:7 68:16 72:4 72:11 73:16 74:13 76:3,9 77:4,17 103:5
**helmets** 101:21 106:16
**help** 10:13 59:18 59:20 65:14 66:12
**helpful** 66:11
**hereto** 110:17
**hide** 62:15
**higher** 55:3 61:14 81:8,13 82:5 94:11,16 94:21
**hit** 55:9,13,17,21 58:13
**hits** 91:12
**hold** 5:20 45:13 53:6 72:11 88:20
**holding** 36:7 65:10 72:4
**hot** 29:21 42:1 88:12,22
**hot/active/dan...** 88:15
**hours** 32:18
**human** 9:21 11:13

**I**

**ID** 5:21
**identical** 91:11
**identification** 24:7 32:15 53:21
**identified** 25:18
**identity** 93:6
**immediately** 35:7 37:21
**important** 14:3,6 14:10
**impression** 43:14
**inactive** 66:20 67:6 72:10 81:1
**incident** 8:2,19 9:3,9 30:16 34:10 38:16 48:19 49:1,22 50:2 52:17 54:7 54:17,21
**include** 11:16 29:5,8 83:22 100:5,7
**included** 98:12
**including** 26:14 98:16
**indicate** 99:7
**Indiscernible** 107:21
**individual** 59:7 72:3,17
**individuals** 38:11
**indoor** 88:3,6
**information** 84:5

**infractions** 81:17
**initial** 13:3
**initially** 17:7
**initials** 53:13
**initiate** 48:3
**injury** 13:22 14:7 14:19 19:4,6,17 20:8 52:4 66:9
**inquire** 47:4
**insert** 92:7
**inside** 29:21 30:18 31:6 40:12 53:12 58:18 66:14,15 67:11,17 80:9 84:11,12 85:8 87:4
**instance** 42:16
**instructed** 25:3,4 38:8,9 86:20 99:13 103:22
**instructing** 64:8
**instruction** 60:18 63:20 94:7,22 99:5
**instructions** 81:14 82:2
**instructor** 8:18 11:21 12:16,17 12:20 13:7 15:17 16:6,8 17:2,8,9,11 29:2,8,12,15 31:4 32:20 37:21 38:5 44:5 46:17 50:16 62:5,6,10 63:17 63:19 70:1 71:18 72:22 79:10 87:12,12 87:14,16 95:4,9
**instructorships** 16:18
**instructor-type** 11:16
**interaction** 101:13
**interactions** 98:22
**interested** 17:4 110:18
**interference** 81:20 82:22 94:1
**interject** 51:3
**interrupt** 21:10
**involve** 82:22
**involved** 14:8,14 19:6 34:10 48:18 54:22
**involves** 13:21 63:12
**involving** 30:16 38:16 49:1,22 54:8,17,21 83:3 83:19 84:6
**in-service** 10:17
**issue** 100:2
**issued** 61:2

**J**

**jacket** 74:6
**jail** 10:10,17
**Jerry** 1:13 4:3,11 5:4 6:4,16 109:3
**job** 1:21 64:3 101:5,6
**Join** 69:9 71:5 78:8 86:1
**judgment** 21:20
**July** 1:15 2:2 5:9
**Justice** 12:9

**K**

**keep** 14:16 89:7 89:14 97:10
**khaki** 56:15 64:22 67:4 72:3 72:17 74:7 75:8 75:15 77:20
**khaki-colored** 69:1 70:6 73:19
**kind** 30:13 35:4 59:18 61:10
**kit** 38:1,8,12
**Klapper** 1:20 2:16 5:14 110:2 110:21
**know** 7:11,17 18:12 32:5 34:12,19 38:7,9 43:9 48:10 55:11 56:14 58:15 60:22 70:18 73:4 76:6 76:7,12 78:21 80:10 92:12,22 93:5 101:1 103:19
**knowledge** 58:6 80:14,18,20 83:21

**L**

**L** 3:8
**Laskin** 3:15
**Law** 53:14
**lawsuit** 46:16
**layout** 69:16,20
**leading** 102:11
**leap-frogged** 61:10
**learned** 27:13
**learning** 62:7
**leave** 42:19 85:9 85:13,16 86:5 86:15,21
**led** 21:18
**left** 71:9 73:14 85:14 86:8
**left-hand** 54:3
**Legal** 5:15
**let's** 25:8 55:8,8 56:6 61:11 65:13 66:16 68:6 71:4,7 72:7,8 73:2,10 74:16,18
**level** 21:21 34:4 55:3 61:14 64:11 81:8,13 82:5 94:11,16 94:21
**life** 98:22 101:12
**light-colored** 64:21
**limitations** 52:3 52:7
**line** 32:17 88:14 106:6
**lined** 40:9
**lines** 33:13 36:1
**little** 9:11 30:8,12 44:9 55:8 56:3 59:2,18 61:15 65:13 66:17,20 68:6 71:7 72:7 73:2 74:16 78:14 83:13 89:21 105:16
**located** 71:10 73:16 74:11,11
**long** 10:1 52:15 52:20
**longer** 89:21
**look** 81:17 89:13
**looking** 19:1 33:12 58:11 61:7 70:12 74:7 80:7
**looks** 23:16 24:17 37:15 64:21
**lower** 54:3

**M**

**M** 3:3
**Magna** 5:15
**maintain** 18:19
**maintaining** 85:11
**mandate** 14:15
**manner** 50:17
**marked** 4:13 24:6 32:14 53:20
**master** 8:18 10:9 29:2,12,15 31:4 37:21 38:5 44:5 46:17 50:16
**mat** 26:3,22 43:18,20 44:7 48:16,20 49:9 69:3 71:10 73:15 76:9 77:1 77:21
**materials** 91:7 94:17
**math** 54:12
**mats** 23:7,8 24:19,21 25:2 25:10,22 29:18 29:21 31:6 40:6 44:10,11,18 47:22 48:15 49:12 69:16,20 71:14 80:8 84:13
**matter** 5:5 51:16
**ma'am** 5:22
**mean** 21:10 23:18 33:7 41:22 62:6 86:11 100:16 100:18 101:11 102:8
**meaning** 99:21
**means** 10:13 20:7
**meant** 20:5
**media** 5:3
**medic** 38:2,13
**meet** 79:9
**member** 10:20
**mentioned** 12:19 24:18,20 27:9 28:13
**met** 79:6,8
**method** 99:3
**middle** 21:9,14 22:22 30:13

**mind** 39:6
**mine** 55:19
**minimizing** 14:19
**minute** 51:2 89:10
**minutes** 52:19 53:4 54:10,17 54:21 89:20
**missed** 33:15,21
**misses** 77:6,13 78:1
**misspeak** 25:12 60:22
**Misty** 1:20 2:16 5:14 39:6 47:8 89:19 110:2,21
**moaning** 36:6
**mock** 26:15
**moment** 23:11 39:9 45:5,10 47:11 83:10 103:11,12
**monitor** 72:21
**move** 26:2 65:20
**moving** 73:15 75:8
**mute** 45:5 108:13

**N**

**N** 3:14 4:1,1 5:1
**name** 6:14 34:20 34:21 44:20 51:15
**named** 46:16
**nature** 38:13 90:18 101:3
**near** 70:13
**necessarily** 100:1
**necessary** 15:13
**neck** 91:13
**need** 7:16 38:12 38:12 43:5 83:2 89:21
**neither** 110:11
**Nelson** 3:17 8:18 8:22 29:14,16 31:4 37:21 38:6 44:6 46:17 50:16 56:15 57:22 58:7 60:3 63:18 65:5 66:8 79:1,6,12,16,19 80:4,15,21 81:15 82:3 84:18 92:14,17 93:12,13 94:8 94:21 107:12 108:2
**never** 84:1,2 86:20
**new** 10:18
**NGUYEN** 3:8
**nice** 79:19 80:1
**nodding** 7:3
**nonactive** 66:1 72:1 77:1,3,6 77:13,17 78:2
**nonparticipants** 93:19
**NORFOLK** 1:3
**North** 3:9
**Notary** 2:18 110:1,21
**note** 4:13 67:9
**noted** 5:17
**notes** 89:13
**notice** 2:16
**notices** 20:19
**number** 5:3 24:6 32:14 53:20

**O**

**O** 4:1 5:1
**object** 15:6 62:20 70:7 71:2 74:1 77:10 78:7 85:22 88:17 90:21 102:10 104:6 106:8 107:17
**objection** 34:18 42:12 49:14 58:3 69:5 70:22 73:21 78:5 89:2 90:20 92:8 104:8 105:1
**objections** 7:9
**observation** 22:11,12
**observations** 85:3
**observe** 21:15 22:5,8 38:20 39:13 69:15 70:2 73:20 75:3
**observed** 35:19 70:18
**observers** 22:17 31:9 48:22
**observing** 30:18 30:22 32:19 65:3 69:20
**obtain** 17:1 38:8
**obviously** 26:13 87:8
**occasion** 90:15
**occupying** 10:6
**occur** 102:5 106:3 108:4
**occurred** 8:3 34:10 37:17,21 81:3 108:7
**occurring** 35:19 40:16 67:16,20 101:8 102:15 103:8 106:19
**occurs** 106:21
**oddly** 67:19
**offender** 25:6 100:22
**offer** 33:20 52:19
**officer** 5:4,4 10:9 10:10 15:7 34:2 34:5 35:5,9 36:16,17,21 41:9 49:22 50:3 52:17,22 54:18 54:22 55:3,6 57:2 61:15 64:12,15 65:4,5 65:9,19 66:6 70:1 71:14,17 74:4 75:13 80:16,22 81:6,9 81:14 82:5 85:12 92:22 94:12,16,22 100:19 110:2
**officers** 31:10,12 35:4 49:2 67:18 99:1
**officer's** 35:14 101:16
**Oh** 108:13
**okay** 6:21 7:16 7:22 8:11,16 9:1,7,11,19 10:12 11:4,15 12:4,19 13:9,13 13:18 15:15 16:2,9,13,22 17:7,13,17 18:2 19:8,13 20:21 21:10,13 22:3 22:11,19 23:4 23:10,12,22 24:9,18 25:7,16 26:1,17,19 28:13 29:11 30:2,4,11,21 31:19 32:1,4,9 33:1 35:3,22 36:4,15 37:2,14 37:20 38:5,14 39:22 40:11,14 40:20 41:18 42:9 43:2,21 45:2 47:5 50:14 51:9 52:14,20 54:15,20 55:8 56:1,14,21 57:5 57:15 58:13,15 59:12,21 60:6 60:20 61:3,6 63:6 64:7,14 65:2,8,13,16 66:5,16,18 67:2 67:9 69:8 70:15 71:4,8 72:7 73:10 74:10,16 75:17,22 78:12 78:21 79:8 80:20 81:4 83:12,14,21 85:15 86:3 89:8 90:3 92:10 93:5 94:20 97:20 98:19 99:20 100:4 101:9 102:18 103:3 103:12 104:2 105:6,7 106:20
**once** 102:3 103:1 103:3,14,14 104:2
**online** 17:19,21 19:11
**open** 23:6 25:4 45:14 75:8
**OPERATOR** 3:21 5:2 27:18 28:3 45:11 46:7 90:6,10 109:1
**opinion** 86:15
**opportunity** 21:14 38:20 39:13 40:15,19 69:15 70:2 108:7
**opposed** 101:7
**order** 17:22 44:11
**original** 4:13
**outcome** 110:18
**outdoor** 88:3,6 88:13
**outfit** 56:16
**outside** 26:3 29:17 43:18,19

48:15,19 49:12 60:5 79:13 84:13,15,18 85:1,3
**overall** 95:5
**oversight** 11:16

**P**

**P** 5:1 52:22
**pack** 21:9,14 30:13
**page** 4:2,10,15 61:18
**paid** 78:13,16,18 78:19
**pain** 36:7
**pair** 31:18,20
**PANDAK** 3:20 34:18 42:12 51:2 58:3,20 59:1,6 85:19 90:1 108:16
**pants** 56:16 64:22 67:4 69:1 70:6 72:4,17 73:19 74:7 75:8 75:15 77:20
**paragraphs** 37:16
**pardon** 59:2
**part** 10:8 21:20 101:17
**participant** 20:14 20:19 22:2 25:1 25:13,14 33:10 34:1,3,5,8,10 34:13,16 35:9 61:21 62:9 64:9 76:17,20 77:5 77:12 86:8 95:6 95:11 101:16
**participants** 14:17,20 15:10 20:22 22:16 26:20 29:17,21 33:2 34:6 42:5 60:13 74:21 75:12 91:20 101:20 103:19 104:16
**participant's** 35:8
**participate** 28:18 43:5 63:11
**participated** 25:20 28:15 42:17 48:15 84:2 85:7 93:2 98:3,6,7
**participating** 41:17 43:10 44:21 48:9 85:10
**participation** 21:6 22:4 96:13
**particular** 16:14 22:20 38:10 43:13 50:3 54:11 64:14 93:14 95:13 98:16 99:7 103:21 104:8
**particularly** 21:1
**parties** 5:16 110:13,17
**party** 51:20 52:11
**pause** 55:21 56:9 60:6
**paused** 55:16 65:16
**payment** 78:22
**PC** 3:14
**pendency** 69:22
**pending** 45:15,18 46:11
**penetrate** 20:5
**penetration** 20:8
**people** 59:19 62:18 70:3 76:20 82:13 92:1 106:16
**perceive** 37:4
**perception** 26:4 84:15,22 85:6 86:4
**perform** 17:18
**performance** 106:3
**performed** 61:12 63:22
**period** 91:9
**periods** 96:14
**permanent** 10:20
**permitted** 26:2 84:2
**person** 14:13 59:21 60:7 64:20 65:2 68:20,21 73:7 77:22 81:7 93:6 95:16,19
**personal** 52:4 85:2
**persons** 14:8
**perspective** 70:19 72:20 75:2,17 97:5,7
**Peter** 3:8 63:5 92:13 104:22
**peterbrown@a...** 3:11
**phrase** 94:11,15 94:21 102:18
**phrased** 39:20
**physical** 67:20 92:2 101:2
**physically** 72:15 72:16
**pick** 31:20
**Pickard** 35:1 37:5,7 53:1,2 60:4,9 64:15 65:9,19 66:6 71:14,17 75:13
**Pickard's** 41:10 41:12,19 43:10
**picture** 24:2,19 56:11 59:12
**pictures** 24:11 68:18
**place** 15:20 54:8 66:21
**placed** 32:5
**places** 69:21
**Plaintiff** 1:6 3:6 51:12 105:10
**play** 55:9,10,13 55:17,17 58:13 62:15 65:13 66:16 68:2,10 68:12 101:6 103:7
**played** 65:22 93:7
**player** 33:3,9,14 33:17 36:5 41:13 42:4,7 43:10 54:22 57:6,8 62:1 64:10,16 65:10 65:18 66:1,21 67:7 68:15 71:9 72:1,1,10 73:13 75:13,19 76:1,1 76:8,14 77:1,3 77:6,13,17,20 78:2 81:1 93:1 101:12 103:6
**players** 25:8 31:9 41:14 42:10,18 50:5 63:13 70:13 74:9,13 102:2 104:4 107:13 108:2
**player's** 33:16,22
**playing** 14:14 55:14,18 56:7 66:19 100:22 104:15
**plays** 75:3
**please** 5:18 6:14 7:2,7,11,17 23:15 39:2 45:10 55:10 58:14 83:5
**plugging** 89:14
**pocket** 78:16
**point** 7:17 54:10 54:16 58:1 69:17 76:8 106:1,22
**pointed** 65:3 67:3 68:21 76:22
**pointing** 64:17 69:12 74:20
**Police** 36:6
**policy** 13:16
**poor** 101:15
**portion** 17:14 19:10 57:4 75:11
**posed** 47:1,9
**position** 9:20 10:2,3 11:8,11 40:11,15 59:22 62:10 69:1 71:9 73:18
**positioned** 37:12 40:7,8 74:14
**positioning** 57:21 64:2 76:19
**positions** 10:6 11:1,12,16 70:4
**positive** 55:5 73:8
**possibilities** 33:21
**possible** 14:18 98:21
**potential** 98:22
**potentially** 20:20
**PowerPoint** 18:5 18:9 19:9
**practical** 14:2,9 14:21 19:6 22:20 26:2 32:19 57:4
**precautions** 92:3
**preceding** 38:20

39:14
**prepared** 9:2 43:5 102:9
**presence** 96:13
**present** 3:19 5:16 46:13 69:12 79:5
**presentation** 18:13
**presented** 21:22 104:1,3
**presumably** 106:16
**presume** 24:11 87:21
**presuming** 25:21 50:10
**pretend** 63:17
**prevent** 57:21 58:7 67:19,22 74:12 101:8
**prevented** 58:7
**previous** 79:11 79:20 97:15 98:7
**previously** 24:6 53:20 56:5 79:9 83:1 90:14
**primary** 37:16
**Prince** 9:13
**principles** 84:7
**prior** 9:8 10:5 12:4,6,21 17:17 26:8 27:10 30:16 37:7 38:16 47:9 50:2 52:16 61:1 69:16 73:15 75:22 76:1 79:4 79:13 86:18 98:5,11
**privileged** 45:21
**privy** 81:2 107:22
**probe** 18:17 52:17
**probes** 20:2,5,7
**proceed** 6:7
**Professional** 2:17
**prohibited** 26:11 26:20
**prohibiting** 101:20
**promise** 105:14
**prompt** 108:12
**prompted** 105:13
**proper** 39:4 100:21
**properly** 86:14
**protect** 14:13
**protection** 19:7 50:12 93:22 94:5 95:15 98:17
**protective** 21:1 33:16,22 36:12 37:3,9 42:2 50:5,8,22 93:16 101:21 104:4 104:16
**protocols** 14:4,22
**provide** 81:15
**provided** 15:12 30:10 31:15,17 32:5 39:4 82:2 89:7 90:17 91:10
**provides** 10:17 10:18
**providing** 33:9
**Public** 2:18 110:21
**pull** 53:5
**pulled** 78:15
**purpose** 8:1 44:10 45:3 47:16,22
**pursuant** 2:16
**put** 50:9,22 59:18 60:6 62:13 65:14 79:22 104:4,13,16
**putting** 39:22
**p.m** 2:3 5:10 27:19 28:4 45:12 46:8 90:7 90:11 109:2,6

**Q**

**quality** 59:12
**question** 7:9,10 7:12,19 15:7 34:19 39:7,19 45:14,15,19 46:11 47:1,9 86:17,19 92:8 93:11 96:19 104:7
**questioned** 96:12 97:14
**questioning** 7:8 94:10 105:8 106:6
**questions** 51:9,15 61:10 81:5 90:15 92:21 96:1,6 97:17,19 105:17 108:14 108:16
**quick** 105:14 107:5
**quickly** 105:19 106:21 107:2,7
**quite** 6:20

**R**

**R** 5:1
**RADC** 9:14,17 10:6 11:5 16:21
**raise** 6:2
**raised** 61:9
**range** 77:7,14,22 87:21 88:14,14
**ranges** 88:3
**rapid** 107:5
**rapidly** 96:21 97:12 105:19 106:21,21 107:2
**Rappahannock** 12:9
**reacted** 25:14
**reacting** 63:12
**read** 33:4,18 36:8 38:3 39:10 47:8 47:13
**ready** 71:15 82:10
**real** 14:19 26:16 85:14 98:21,22 101:12 107:6
**realistic** 14:17,18
**Realtime** 2:17
**reason** 105:2
**reasonable** 15:3 15:10
**reasonably** 43:1
**recall** 9:1,4 13:2 13:5,7 16:10 18:5,8 19:2,8 21:5,8 22:13,16 22:19 24:3 25:18 28:8,10 29:11,16,19,20 30:1 31:15 43:17 56:16 57:17 62:12 66:5 73:9 78:12 78:17 81:18 82:2,8 87:6 89:6 93:13,21 94:5,9,13,15,20 96:10 97:17,18 97:20 98:1 99:6 99:12,15,17 105:21 107:11
**receive** 12:12,15 91:5
**received** 11:18 11:20 12:3,16 12:21 13:10,14 15:16 66:9
**recertification** 17:2
**recertifications** 13:15 18:4 19:3 79:11 97:16 98:8,11
**recertified** 13:17 90:16
**recertify** 16:17 62:17
**recertifying** 16:1 16:2
**recess** 28:1 46:5 90:8
**recognize** 30:7 58:14
**recollection** 23:5
**record** 5:3,17 6:15 27:16,19 27:21 28:4 39:10 45:10,12 46:4,8,11 47:10 47:13 61:6 80:1 90:7,11 109:4 110:10
**recruits** 10:19
**redirect** 105:16
**reduce** 14:7
**reduced** 110:8
**red-colored** 73:6
**refer** 11:1
**referenced** 72:18
**referred** 4:15 24:7 25:21 53:21
**referring** 8:13 25:17
**refraining** 100:5
**regard** 21:4 36:17
**regarding** 80:22 82:4,21 83:17 84:8 107:14
**Regional** 9:18 12:9
**Registered** 2:17
**registration** 78:17

**related** 84:7 110:12
**relation** 9:2
**relative** 110:15
**relatively** 43:4 97:2
**remain** 22:4 71:17
**remaining** 30:19
**remember** 13:9 82:17 97:19
**remote** 1:14 3:2 81:19 82:21 93:22 107:21
**remotely** 5:11
**removal** 107:15
**remove** 50:21 103:5
**removed** 36:12 37:3 50:8 73:16
**removes** 95:15
**removing** 37:9 50:5 76:3 101:21
**rephrase** 44:14 44:16 72:15 99:11
**rephrasing** 48:1
**replicate** 98:21
**reported** 1:20 31:22
**reporter** 2:17,18 5:14,18,20 6:1 6:7 7:5 27:14 39:5,8 47:11 63:3,6 89:15 94:2 108:15
**represent** 51:16 92:17
**request** 5:11 7:18
**required** 14:16 17:5,21 27:3 86:14 91:17 93:16 94:4 98:18
**requirement** 49:8 93:21
**rereading** 39:6
**resources** 9:22 11:13
**respond** 25:4 48:4 103:10
**responding** 61:22 64:9,16
**response** 39:4 67:19 85:21
**responsibilities** 11:12
**restate** 39:3
**retain** 9:5
**revealing** 45:21
**review** 9:8 19:11
**reviewed** 96:8,15 97:5
**reviewing** 18:5 103:13
**Richard** 3:17 29:14 92:14,17
**Richmond** 3:4
**right** 6:2 45:8,19 51:11 53:4,8,11 53:17 54:2,6,16 55:13,16 56:4,9 56:9 57:5,12 58:17 60:17 61:9 62:2,11,14 64:12 66:16 67:6,12 68:6,9 68:14,18,21 69:11,13,17 70:20 71:21 72:8 73:12 74:16,18,22 75:4,14 76:6,12 78:12 80:6 82:9 82:20 83:19 84:22 92:4,18 93:9 105:9
**risk** 13:21 14:7 18:16,17 19:6 19:17 20:8 92:2
**risks** 91:11
**RMR** 1:20
**Road** 3:15
**role** 14:14 25:8 31:9 33:3,9,14 33:16,17,22 35:14,16 36:5 41:13,14 42:4,7 42:10,18 43:9 50:4 57:6,8 61:15,22 62:2,8 63:12,15,21 64:8,10,10,16 65:10,18 66:1 66:20 67:6 68:2 68:15 70:13 71:9,18 72:1,1 72:10,22 73:13 74:8,13 75:13 75:19 76:1,1,8 76:14 77:1,3,6 77:13,17,20 78:2 80:11 81:1 81:13 93:1 94:19 100:22 101:6,12 102:2 103:5,7 104:4 104:15 107:13 108:2
**roles** 34:7 93:7
**role-playing** 25:6
**room** 21:19 40:6
**rotate** 62:5,10 64:11
**rotated** 55:1 61:14 81:7
**row** 85:16
**rules** 6:22 15:11 95:20
**run** 6:21 52:7
**running** 65:18

**S**

**S** 4:1,9 5:1
**safe** 14:17 29:18 34:7 42:22 50:17 83:3 93:20 95:5,7,17 101:14,15 102:4,6,16,22 103:5 106:16
**safely** 19:21 43:15 82:21 83:18 84:1,6
**safety** 14:4,10,16 14:22,22 15:11 15:13 18:20 27:3 31:1,5,10 31:12,15 34:2,5 35:4,5,9,14 36:16,17,21 49:2 50:9,22 55:3,6 57:2,13 61:14 64:11 65:4 81:6,9,14 81:17 82:5,12 83:2,18 85:12 93:15,15 94:11 94:16,21 95:20 98:13,18 100:2
**Sanders** 1:13 4:3 4:11 5:5 6:4,16 6:17 15:8 23:13 28:6 30:5 42:15 46:10 47:19 51:7,14,19 52:15 53:6,8 54:7 58:17 59:11 63:8 69:11 70:10,16 73:4 74:4,19 83:9 86:3,16 87:1,10 89:5,9 90:13 91:2 92:16 95:3 96:5 102:13 104:10 105:3,12 107:20 108:20 109:3
**sat** 77:17
**satisfactory** 89:21
**saw** 22:1 49:5 59:21
**saying** 21:13 57:17 78:15
**says** 33:1 36:4
**sbucci@breitc...** 3:5
**scenario** 21:15 21:20,22 22:1 22:12 30:13,17 30:22 35:6,7,8 35:10,18,18 36:18 38:15 40:5 41:3,8,12 41:19 43:11,13 43:17,22 44:3 44:11 48:2,4,10 48:14,18 49:1,5 49:8,11,18,21 50:4 60:14,15 61:13,13,21 63:16 64:14 65:19 66:22 67:11 68:10,11 68:12,15 71:15 71:19,21 72:21 75:3 76:17,21 81:8 85:13,18 86:5,13,14 95:15 97:11 99:7,14,18,19 99:22 100:1,2 100:12,16,18 100:19 101:4 101:10,19,22 102:1,3,7,9,15 102:20 103:1,3 103:4,10,14,15 103:18,20 104:1,2 106:4 106:12,13,14 106:15 107:1,5 107:7,16 108:8
**scenarios** 21:6,16 22:6,9,13 30:19 34:4 38:20 39:14 40:12,16

42:18 43:4 44:6 48:6 52:21,22 55:1,2 62:4 63:11 69:22 70:2 81:7 85:11 86:8 87:3 93:2 93:17,20 96:21 98:20 99:4,6 105:18,19 106:2
**schedule** 16:20 16:20
**scope** 87:2
**Scottsdale** 3:10
**screen** 23:10 30:2 59:3,11 60:8,8 69:2
**scroll** 23:22 30:8
**searched** 16:16
**seat** 32:1
**second** 27:14,15 36:5 37:16 53:7 56:10 63:15,21
**seconds** 56:5
**secure** 103:9
**see** 11:4 23:12 34:12 36:1,8 37:17 38:14 40:12,16 49:18 49:21 53:9,13 54:3 55:10 56:6 56:7 57:5,8 58:20,22 59:2 59:17,19 64:17 65:9,17 66:1,4 68:14 69:3 70:3 70:13,20 71:22 73:13 74:8 75:19 86:12 90:4 101:18
**seeing** 57:22 58:8 74:12 94:15
**seen** 50:19,21 66:20 77:19
**sense** 7:14 17:12 64:13
**sensitive** 91:12
**sentence** 33:1 36:2,11
**sergeant** 9:21 10:10,11 11:13 11:14 51:14,19 52:15 53:6,8 54:7 58:17 70:10,16 73:4 74:19 83:8 86:3 86:16 87:1,10 89:4,9 90:13 92:16 95:3 102:12 105:3 105:12 107:20 108:20
**Services** 5:15
**set** 23:5,7 25:22 80:8,9
**setting** 80:11
**setup** 23:17,18
**seven** 11:10 12:8
**shaking** 7:4
**share** 23:10 30:2 54:6
**SHARON** 3:20
**sharp** 20:5,7
**Shawn** 1:5 5:5 8:17 35:1 36:5 41:10,12,13 51:16 60:4,9
**shirt** 56:15 64:22 67:5 68:22 70:5 72:3 73:6,19
**shock** 18:17
**short** 89:12 97:2 97:12
**shorthand** 110:8
**showed** 75:12,22 76:1
**shown** 68:17
**sic** 23:8
**side** 53:15 65:10 72:2
**signature** 108:15 108:17 109:5
**signed** 16:22
**signing** 16:13
**similar** 21:16 23:16 24:4 91:10
**simply** 64:4 101:5
**sir** 5:20 6:1,13,19 7:15,21 8:8,15 9:4,10,15 11:2 11:9,17,20 12:2 12:13 13:1,11 13:16 14:1,5,11 15:2,5,18,22 16:4,12 17:6,20 18:7,11,15,22 19:5,12,18,22 20:6,10,16 21:3 21:8,12,17 22:7 22:10,15,18 23:6,14,14,21 24:4,11,15,17 25:1,11,12 26:4 26:10,13 27:1,4 27:7,14,15 28:12,16 29:3,6 29:10,14,19 30:6,9,15,20 31:2,7,11 32:3 32:8,22 33:5,19 34:14 35:11 36:3,10,14,19 37:1,6,10,19 38:4,18 39:2,20 40:13,22 41:5,7 41:14,20 42:21 43:8,12,16,19 44:1,4,8,13 45:1,8 46:14,21 47:2,7 48:1,8 48:12,17,21 49:3,10 50:1,6 50:10,13,18 51:8,11,17,22 52:5,9,13 53:3 53:10,18 54:5 54:14,19,19 55:5,12,14,15 56:8,12,19 57:3 57:7,11,19 58:12,16 59:14 60:1,10,11,15 60:19 61:8 62:3 62:12,19 63:14 64:1,6,13,18 65:6,12,16,21 66:4,18,22 67:8 67:13,18 68:3,8 68:13,19 69:14 69:18 70:11,21 71:12,16,20 72:9,13,19 73:8 73:12,17 75:1,5 75:10,16 76:5 76:11,15,18 77:2,9,15 78:11 78:12,20 79:7 79:15,18,21 80:5,10,13,19 81:12,19 82:7 82:15 83:6 84:9 84:20 85:5 86:10 87:5,8,15 87:18 88:9 91:4 91:8,14,22 92:5 92:19 93:4 94:2 94:9,18 95:2,8 95:12,18,21 96:7,11,16,22 97:3,8,13,18 98:4,9,15,18 99:2,9,15,16 100:7,14,18 101:15 102:14 103:1 104:11 105:4,22 106:7 106:19 107:3 107:10 108:9
**sit** 76:2
**sitting** 31:21
**situation** 25:5 37:22 77:16 78:3
**skin** 20:5
**slides** 18:5,9 19:10
**slightly** 104:13
**Sol** 3:21 5:13
**solely** 85:16
**somebody** 81:22
**soon** 107:7
**sorry** 63:3 81:21 91:2 94:2 104:21
**sort** 17:18 101:7
**sorts** 19:9
**sound** 54:12 86:11
**sounds** 91:18 92:1
**speak** 32:7 45:5 46:1 47:5
**speaking** 42:3
**special** 11:18 12:12,14 92:3
**specific** 19:1 35:14 36:18 38:11 78:14 81:14 82:2 88:11 97:19 99:13 106:22
**specifically** 21:4 32:9 70:4 84:17
**specifics** 81:18
**speculating** 56:18
**speculation** 42:13 51:4 58:4 69:6 77:10
**speed** 66:12
**spoke** 47:6
**staff** 10:18
**stand** 8:9 93:19 103:22
**standing** 58:10 70:19 72:2,16 73:7 74:22 75:18

**stands** 9:17
**start** 20:11 26:6 40:4 41:2 44:19 50:20 51:18 52:21 65:20 71:22 97:22 99:17 103:17
**started** 7:1 25:1 56:5 60:13 85:8 104:11
**starting** 18:3
**starts** 52:22 84:12
**state** 6:14 32:17 35:6 37:2,20 100:9,11
**stated** 30:12 101:9 102:21
**statement** 4:11 9:2,5,6,8 30:10 32:10 33:14 36:1 37:15 80:21 85:20
**statements** 27:9 80:15,19
**states** 1:1 5:7 36:11
**statute** 52:2,7
**stay** 42:21 43:3 44:6 49:8
**stenographic** 5:17
**step** 42:6,6
**stood** 23:8
**stop** 20:15,18 22:13,17 31:13 35:19 36:22 38:6 40:21 41:4 41:6 43:21 44:2 49:4,12 51:1 66:7,8,10,12 72:8 74:18 78:3 99:17,19,21 100:1,3,8,9,12 100:17 101:1,4 101:7
**stopped** 37:22 66:18 68:9 71:8 72:9 73:3,12 85:14,17 86:9
**Street** 3:9
**strike** 18:18 77:13 78:1
**striking** 18:17
**struck** 52:17 80:1
**student** 62:6 63:18 71:18 72:22 93:3,8 95:6,11
**students** 38:1
**subdued** 101:1 101:13,14
**subsequent** 22:3 22:5,9,13 37:4
**sue** 52:12
**sued** 52:8
**sufficient** 34:22
**suggest** 78:15
**suggesting** 86:17
**suit** 8:17,20,21 33:16,22 51:20 52:12 93:8
**Suite** 3:4,15
**supervises** 63:19
**supervisory** 11:7
**suppose** 34:4
**supposed** 67:15 80:22 81:16
**sure** 9:16 11:5 18:11 39:4 48:13 59:4 61:17 63:20 87:10 95:5 102:2
**swear** 5:18
**sworn** 6:6 110:6

**T**

**T** 4:1,1,9
**table** 31:21
**take** 7:19 15:19 42:2,8 74:13 89:11,15,18,20 101:2 106:16 106:17
**taken** 2:16 28:1 46:6 53:12 90:9 92:3 100:21 103:22 107:9 110:4,7,14
**takes** 68:15
**talked** 75:6
**talking** 54:9 59:7 72:14 82:12 106:12 107:13
**tardy** 92:8
**TASER** 11:20 12:19 13:10 16:3,16 17:2 18:13 32:19 76:21,21 77:5,7 77:14,22 78:1 87:12 88:21 90:18 91:11
**TAYLORWA...** 3:14
**teach** 62:7,16,17
**teacher** 62:6
**teachers** 62:7
**teaching** 63:18
**team** 10:21
**technical** 28:2,7
**tell** 9:17 10:7 34:15 35:12 57:14 58:18 59:10
**telling** 29:16,20 54:13 87:6
**tend** 96:21
**terminology** 11:6 30:1 94:19
**terms** 15:15 16:22 99:6,13
**testified** 6:6 17:13 61:12 76:4 81:4 83:15 84:10,14 86:6 87:11 90:14 91:17
**testimony** 81:11 82:17 86:19 110:5,7,10
**Thank** 6:1 45:8 48:1 53:2 90:4 95:22 105:8 108:18,22
**theirs** 48:10
**thing** 101:8
**things** 18:9 59:7 70:18 83:2 91:13 101:3 102:9 103:10 105:18,20 106:3
**think** 15:3 45:22 52:16 59:15 60:8 82:9 84:13 87:11 90:1 106:1
**third** 64:7,10
**thought** 104:22
**three** 10:4 60:21 64:1
**time** 5:10 13:11 20:1,19 21:19 21:22 25:19 27:13,18 28:3 28:14,18 30:21 31:13 32:12 36:2,4,22 45:11 46:7 50:14,18 54:10,16 57:12 57:15 58:9,10 65:9 66:7,19 72:9,10 82:16 85:2 89:12 90:6 90:10 91:6,15 96:14 101:22 102:4,6,15,21 103:19 104:20 106:22 107:6 107:11 109:1
**times** 21:2 67:3 68:22 72:18 75:7 84:14 97:11
**timestamp** 54:2
**today** 5:9 8:1 9:8 46:12,19
**toes** 86:11
**told** 44:5 84:17 87:2
**top** 72:17 75:7,15 77:19
**track** 97:10
**trainee** 48:9 101:11
**trainees** 22:17 99:1
**trainer** 90:17
**training** 8:3 9:22 10:11,12,15,16 10:17,18,21 11:13,14,19 12:9,12,14,17 12:20,22 13:10 13:19,20,20,21 14:3,9,15,18 15:15,17 16:3 16:10,14,20 17:15,19,21,22 19:14,16 20:11 20:14 22:5,21 23:19 26:2,6,15 29:4,8,13 31:5 33:8 37:12 38:22 39:16 40:6 42:4 43:1 45:4 47:17 50:15,17 53:12 53:14,16 61:2 79:6 82:13 83:3 83:17,18 84:6,8 86:5 87:2,7,8 87:19,20 88:7 88:10,21,21 89:7 91:6,16,16 91:20 92:4 94:17 95:5,11 95:16 98:6,13

98:20 103:8 106:21
**trainings** 13:18 14:21 18:6 20:22 42:19
**Tran** 3:21 5:13
**transferred** 99:5
**transmission** 81:20 82:22 93:22 107:21
**traveled** 33:17
**Treat** 18:18
**true** 24:9 27:2,5 44:22 46:12,15 46:18 49:13,15 88:20 110:10
**truly** 106:15
**try** 39:22 56:6 102:18
**trying** 56:12 62:15 98:20
**turn** 40:10
**turned** 60:12
**Turning** 32:9 35:22 99:3
**turns** 41:15 42:2
**two** 10:4 37:15 41:14 54:9,16 54:20 73:5 74:21 75:12 76:20 79:10 89:10 91:16
**two-day** 15:21
**two-year** 52:2,7
**type** 14:15
**types** 18:8 98:12
**typewriting** 110:9

**U**

**understand** 7:10 7:22 8:13 9:17 10:13 16:9 18:11 39:19 48:13 51:20,22 52:1,6,10,13 54:13 68:5
**understanding** 20:17 24:21 26:1 31:7,8 35:13,16 44:17 47:21 48:2 49:7 49:10 50:7 61:16 63:9 99:21 101:19 103:16 104:14 106:6,7
**understood** 7:12 10:22 19:15,20 20:1,4,21 33:12 61:19 62:16 68:4
**unfold** 48:7,11
**unfolded** 48:5
**Unfortunately** 50:1 55:18
**United** 1:1 5:7
**unsafe** 20:20 35:21 49:5,18 49:21 107:4
**use** 14:10,21,22 17:9 19:15 25:17 33:8,10 42:4 62:18 87:16 99:13
**user** 90:16
**users** 91:19
**utilize** 15:12

**V**

**vantage** 76:7
**variety** 48:7 96:8
**various** 10:22 18:3 19:3
**VBL** 53:13
**version** 13:12
**versus** 5:6
**veteran** 10:18
**video** 3:21 5:2 27:18 28:3 45:11 46:7 53:11 54:11 55:10,14 59:6 61:7 64:3,19 66:4 69:2,17 70:11,16 75:11 75:18 76:7 80:7 90:6,10 96:9 97:5 109:1
**videoconference** 1:14 3:2
**videographer** 5:13
**VIDEOTAPED** 1:13
**view** 24:17 70:11 77:18
**Virginia** 1:2 3:4 3:15,15 5:8 8:3 9:14 16:19 17:10 19:14 24:12 36:6 52:2 53:14 87:13
**virtually** 1:14
**vision** 35:17
**vs** 1:7

**W**

**wait** 7:7
**waiting** 40:9
**waive** 108:17
**waived** 109:6
**walked** 59:22 67:6 69:21 70:17
**wall** 93:18
**walls** 23:9 58:1
**want** 6:21 9:11 17:7 18:18 24:10 25:12 34:19 39:3 59:15 60:22 61:17 89:14
**wanted** 11:5 47:3 92:1
**warning** 19:5 91:19
**warnings** 18:6,9 18:12 19:2,9 90:18 91:5,10 91:11 98:12
**warranted** 33:10
**wasn't** 86:17
**watch** 55:8 67:18 68:6 71:4,7 72:7
**watched** 68:10
**watching** 66:22
**water** 86:12
**way** 39:19 40:1 47:20 62:13,15 81:19 86:20 93:20 99:4 101:14 102:19
**ways** 48:7
**weapon** 8:10,14 18:16 82:22 83:4 84:7,8
**weapons** 19:20 26:8,12,18 61:1 61:5 64:5 82:14 83:19 103:8
**wear** 19:7 20:22 27:3 31:5 94:4
**wearing** 31:1 42:1 56:16 98:12
**website** 16:16 79:3
**Welcome** 28:6
**went** 43:18 46:10 48:15,19 49:11 61:13 83:13 91:6,15 105:16
**weren't** 80:16
**we'll** 90:4 108:17
**we're** 27:19 28:4 45:12 46:8 54:9 61:6,17 90:7,11 109:4
**we've** 60:2 75:6 80:6 89:12 106:12
**whatnot** 67:21
**William** 9:13
**witness** 4:2 5:19 5:22 8:2 9:2 15:9 35:1 39:18 46:20 49:15 58:22 94:3 102:14 105:4 107:22 108:22 110:4,7,11
**witnessed** 37:8 50:4
**word** 25:17
**words** 86:10 93:5 101:4
**wore** 31:16
**work** 9:12 17:19 89:17
**worked** 16:19 61:16,19
**world** 14:19 85:14
**worn** 93:16
**wrapped** 68:2
**wrapping** 89:11
**written** 4:11 30:9 32:10 91:7 94:17
**wrong** 86:18
**wrote** 9:4

**X**

**x** 1:4,10 4:9
**X26** 13:11

**Y**

**Yeah** 59:1,8
**year** 13:17
**years** 10:4,9 11:10 12:5,6,8 60:21 64:1 91:9 91:16

**Z**

**zone** 29:18,22 88:15 93:15

**1**

**1** 5:3
**1:07** 2:3 5:10
**1:36** 27:19
**1:40** 28:4
**10** 1:15 2:2 5:9 52:19 53:4
**100** 3:15
**105** 4:4
**1206** 3:15
**13** 10:9 12:5,6
**13th** 17:14
**1315** 32:18
**14** 8:2,19 16:14 19:14 21:5 27:10 28:14 29:13 32:18 50:15 79:4 80:4 94:22 95:14 97:7 98:3,5,11
**14th** 16:12 17:18 18:1 23:19 30:10
**15** 52:19 53:4
**17800** 3:9

**2**

**2:05** 45:12
**2:10** 46:8
**2:19-cv-617** 1:7
**2:55** 90:7
**2009** 13:4,13 18:3
**2017** 8:3,19 12:21 15:16 16:11,15 19:14 21:5 27:10 28:14 29:13 32:18 50:15 79:4 80:4 95:1,14 97:7 98:3,5,11
**2020** 1:15 2:2 5:9
**22** 4:16 24:2,6,16
**23226** 3:4
**23451** 3:15
**24** 4:16

**3**

**3:05** 90:11
**3:27** 109:2,6
**31:45** 56:4
**31:49** 54:3
**32** 4:11
**32:10** 61:7,8 64:19
**32:22** 65:17
**32:35** 66:18 67:5
**326-6016** 3:10
**33:10** 68:10 69:2 69:17
**33:20** 71:8
**33:30** 72:8,10
**33:46** 73:3
**33:54** 73:13
**34:08** 74:19 75:19
**34:10** 54:9

**4**

**400** 3:4
**41** 4:17 53:20
**45** 4:11 32:11,14

**5**

**51** 4:4
**53** 4:17
**599043** 1:21

**6**

**6** 4:3
**623** 3:10
**625-7300** 3:16

**7**

**7130** 3:4
**757** 3:16

**8**

**804** 3:5
**85th** 3:9
**85255** 3:10
**888-9501** 3:5

**9**

**92** 4:5
**96** 4:3